**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| LEONARD LOGAN, | ) | |
| | ) | Case No. 12 CV 6170 |
| Petitioner, | ) | |
| | ) | Judge Kennelly |
| vs. | ) | |
| | ) | |
| NEDRA CHANDLER, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PETITION FOR WRIT OF HABEAS CORPUS</u>**

Jon Loevy
Tara Thompson
THE EXONERATION PROJECT
at the University of Chicago Law School
6020 S. University Avenue
Chicago, IL 60637
(312) 243-5900

September 28, 2012

NOW COMES Petitioner, Leonard Logan, by and through his attorneys, THE EXONERATION PROJECT at the University of Chicago Law School, and with leave of this Court hereby submits this Memorandum of Law in support of his petition for a writ of habeas corpus.  In support of his Petition, Petitioner states as follows:

### Introduction

Leonard Logan stands convicted of a murder that not a single witness said at trial that he committed.  The State's key witness, Latonya Payton, testified at his trial that although she had signed an earlier statement claiming that she was with Mr. Logan when he committed the crime, in fact her grand jury testimony and written statement to that effect were coerced, and that the police had told her what to say and threatened that if she did not "come up with something" she would be charged with murder.  The other eyewitness to the crime told the jury that Mr. Logan was not the man who had done the shooting.  Mr. Logan was not convicted based on any direct inculpatory evidence - he was convicted based on the earlier uncorroborated statement Ms. Payton gave to the grand jury and police, and on the fact that his fingerprints were found on a CD inside the rental car apparently used in the shooting.  This was all the inculpatory evidence the State had, and all that the jury heard in determining he was guilty.  It was slim evidence, so slim that one of the three state appellate justices who heard his direct appeal dissented from the appellate court's affirmation of the conviction, concluding that because of "the discrepancies in Ms. Payton's testimony which was recanted and lacked corroborative evidence . . . Payton's prior statements, alone, were insufficient to prove defendant guilty beyond a reasonable doubt."  (Ex. A, People v. Logan, 815 N.E.2d 830, 842 (1st Dist. 2004) (Tully, J., dissenting).)

Given this slim evidence, how was Mr. Logan convicted? The answer to this question is that, as in many cases of wrongful conviction, his trial attorneys failed him. His attorney prevented Mr. Logan from testifying in his own defense and presenting evidence that the jury would have used to acquit him, threatening that if Mr. Logan were to testify his attorney - a public defender - would quit the case. His attorney promised the jury that they would hear a story from the defense that included alibi witnesses who placed Leonard Logan out of the state when Timothy Jones was shot dead in Chicago, but then trial counsel, without any reason, failed to keep that promise and was hammered by the prosecution for failing to show any such thing. Counsel failed to argue for a limiting instruction that would have allowed the jury to appropriately consider evidence that Ms. Payton failed a polygraph examination. His trial counsel had a duty to investigate leads to provide Mr. Logan, but did not do so and failed to investigate and admit evidence of a contemporaneous 911 call that described a shooter that could not have been Mr. Logan. Mr. Logan's trial counsel committed cumulative errors in a very close case, and his appellate counsel compounded those errors by failing to raise meritorious claims on direct appeal. These errors were prejudicial and they amounted, separately and cumulatively, to ineffective assistance of counsel under clearly established federal law. Likewise, his right to due process was violated where the court allowed in evidence that Ms. Payton failed a polygraph exam, and where he was convicted despite insufficient evidence to support his conviction.

Leonard Logan is wrongfully imprisoned. He is innocent of the crime of which he was convicted and his conviction resulted from violations of his rights under the Fifth, Sixth and Fourteenth Amendments. Mr. Logan vigorously asserted these rights in prior

state court proceedings to no avail, exhausting his state court remedies. For this reason, as described in this memorandum, he seeks the assistance of this Court in remedying the state court's unreasonable findings of fact and unreasonable applications of clearly established federal law. Leonard Logan was the victim of multiple errors that separately and cumulatively allowed a jury to reach a verdict of guilty in a case with no physical evidence, no witness identification, and no confession tying Mr. Logan to the heinous crime the State of Illinois has imprisoned him for committing. As described below, he seeks relief from this Court in the form of a new, fair trial.

## FACTS

### I.     Timothy Jones is Shot Dead By a Man Whose Physical Appearance Does Not Match Mr. Logan

On the evening of March 18, 1997, a SUV pulled into an Amoco gas station on the south side of Chicago. A passenger got out of the vehicle and fired shots, killing Timothy Jones while he talked on a payphone. Charles Jenkins, also shot by the man who murdered Timothy Jones, testified with certainty that Logan was not the shooter. Jenkins was also the father of Timothy Jones' sister's child, and had no reason to lie for Mr. Logan. (SR.II. at 166, 490, 491-93.)[1] Another eyewitness testified that Timothy Jones was shot by a heavyset African-American man who stood about 5'9" tall. (*Id*. at 145-51, 162-63.) The same eyewitness followed the getaway vehicle and reported the license

---

[1] Citations are to the Record on Appeal from the lower court proceedings, which includes the transcript of Mr. Logan's original trial and the transcript of the evidentiary hearing of his post-conviction petition, as well as all the relevant pleadings in the case. Citations to "A__" are to the appendix to the record on appeal of his direct appeal, which contains a compendium to the key documents about the case. These documents are separately being provided to the Court and counsel for respondent due to their size, along with a table of contents for each so that the Court and the counsel can navigate their contents. Mr. Logan is relying these documents as evidence supporting his constitutional claims.

plate number to police. (*Id.* at 152.) Police tracked the SUV to a rental agency, and from there to Latonya Payton, who had rented the vehicle days before the shooting. (*Id.* at 170-71; A87-88.)

## II.    Latonya Payton Changes Her Version of Events Eight Times

Answers in this case appeared to lead to Ms. Payton, so police spoke to her. She was not cooperative, and ultimately gave eight different accounts of what happened on the evening of March 18 to police interrogators, to the grand jury, and to the court that convicted Leonard Logan of the murder of Timothy Jones. Initially, Ms. Payton told police that the car had never left her parking lot on March 18, and then she said that a friend borrowed the car on the day of the shooting (A88-89, SR.II. 335.) Ms. Payton was taken to the police station, where she claimed that a friend by the name of "Rodman," along with another man, had borrowed the vehicle, and that the two men had returned the SUV about twenty minutes later. (SR.II. 333-40.)

Ms. Payton was subjected to polygraph testing. After the first polygraph test, Ms. Payton said that Rodman and another man by the name of Dino had borrowed the car for three hours on March 18. (SR.II. 350-52.) The next day, Ms. Payton claimed that Leonard Logan had borrowed the car by himself.(*Id.* at 353).

Ms. Payton was then subjected to a second polygraph exam. (*Id.* at 353-54.) After the second polygraph, police report that Ms. Payton told a different story altogether. She claimed that she was in the car with Rodman and Leonard Logan when Logan pulled into the Arco station, got out of the driver's side of the car, took out a gun, and shot the man on the payphone. (SR.II. 370.) Although this version of events contradicted eyewitness accounts of the shooting in many ways, this story was memorialized in a handwritten

statement by Ms. Payton with the assistance of a prosecutor, and this was the story that Ms. Payton told the grand jury.(A192-93.)

### III.    At Trial, Latonya Payton Recants Her Implication of Mr. Logan in the Shooting and Claims that Police Threatened Her

As a state witness at trial, Ms. Payton again changed her story, recanting the grand jury testimony she had given after days of interrogation.  Ms. Payton asserted, on the stand, that she had been threatened by police, held for parts of three days and was unable to eat or sleep at the police station during the questioning.  (A87-A88, A96.)  Ms. Payton said that she testified to the grand jury that Mr. Logan was the shooter because police told her that if she didn't, Ms. Payton herself would be charged with murder.(A98-99.)

The state was allowed to call Ms. Payton as a prosecution witness with the knowledge that she had changed her story since the grand jury, to impeach her statement of the events with polygraph evidence, and to bring the polygraph tests up in the state's closing statement to the jury.  The State told the court it did not "intend on going into what the results" of the exams were. (*Id.*). Logan's trial counsel vigorously objected and said that while he would not object to a limiting instruction, this was not sufficient to avoid the harm. (A101-03.) The sidebar then went off the record, and the State resumed questioning, asking Payton, "After the police confronted you with the results of that polygraph examination, you changed your story again, didn't you?" and "During this statement, they [the police] again now confront you with the results of your second polygraph examination, correct?"  (A107, 114.) This wasn't the only mention of the polygraph results - the State also raised them with the detectives. (SR.II. 343-44, 369.) The court gave no limiting instruction about this evidence until the detectives' testimony,

when it told the jury that "the results of the polygraph are not relevant and not pertinent, and are not going to be revealed to you." (SR.II. 357-58.)  This limiting instruction was not specifically identified to the jury as a limiting instruction. The court also gave the pattern limited purpose instruction during final jury instructions after closings. (SR.II. 639.)  During closings, the state did essentially tell the jury that Ms. Payton failed the exam, telling the jury, "Go down to 11th and State, another polygraph.  Comes back confront with the results.  Boom.  She tells the statement.  Now she's just caught in so many lies to the time she's got to the [*sic*] tell the truth." (A227.)

## IV.    Mr. Logan's Trial Counsel Promises Alibi Witnesses and Fails to Deliver Them to the Jury

At trial, Mr. Logan's counsel told the jury in his opening statement that the evidence would show that Mr. Logan was out of town in Milwaukee on the day of the murder.  (A217.)  This promise was broken, and the prosecution pointed that out and asked the jury why defense counsel would promise to present an alibi and then fail to do so.(A227.)  After defense counsel responded by telling the jury that although alibi witnesses were present to testify, "We did not want a situation where you would get confused about what's at stake here . . . . [W]e did not want you to get concerned about what someone else would say or whether you should believe them," (A228-29), the State still got the final word in rebuttal, asking the pointed rhetorical question of why defense counsel would promise in opening to present an alibi, fail to do so, and then claim trial strategy. (A276-77.)

**V.    Mr. Logan's Trial Counsel Threatens to Quit the Case, and Mr. Logan Is Convicted**

Mr. Logan wished to testify in the case to present evidence in his own defense. As he testified at his post-trial motion, his counsel told him that they would come to the jail, where he was in pre-trial detention, and prepare him to testify. They did not appear. (SR.II. 749.) The next morning, when he asked them why they had not come, they told him that they would prepare him in the room behind the courtroom before he testified. (*Id.*) At some point thereafter, he was taken in the judge's chambers and asked if he was going to testify. (*Id.* at 750-51.) At that point, his counsel told the court that they were against him testifying; as Mr. Logan said, "they was, you adamant in [their] decision then in the judge's chambers sitting on each side of me." (*Id.* at 751.)

The record reflects that the court asked Mr. Logan if he wanted to testify, and his counsel said they told Mr. Logan multiple times not to testify. (SR.II. 532-33.) Both counsel told the court that they told Mr. Logan it was ultimately his decision. (*Id.* at 533.) When asked by the court if he should testify, Mr. Logan had no response. (*Id.* at 535.)

Mr. Logan testified at the post-trial motion that during this exchange, a clerk came in and said that Mr. Logan's family was again him testifying. (*Id.*) Mr. Logan then stood up and asked to speak to his lawyers alone, which he did. He asked the attorneys why they were making a decision that they had not consulted him about. (*Id.* at 752.) They said that "it was their decision that, you know, I shouldn't take the stand because it would hurt [Logan's] case." (*Id.*) During this conversation, Mr. Logan's counsel Anthony Thomas, with whom he had the best relationship with, told him that "if [he] took the stand, that he would have nothing to do with [Logan] in this case," which left

Logan fearing that he would just be left with his lead counsel, Martin Kelly, with whom he had a conflict of interest. (*Id.* at 752.) Because of this statement, because he was "left with no other choice" he told the judge that he did not want to testify. (*Id.* at 752-53.)

The court then reconvened and asked Mr. Logan if he wanted to testify, and he said no. (SR.II. 536.) Although both of Logan's trial counsel, Mr. Thomas and Mr. Kelly, testified at the post-trial proceedings, neither said anything about Mr. Logan's decision not to testify.

Later, immediately before the instructions conference, Mr. Logan attempted to speak to the court but was rebuffed by his counsel, who noted that it was "an issue regarding yesterday." (SR.II. 559.)

Mr. Logan was convicted and sentenced to a term of 45 years. (SC.II 225.)

## VI.    Mr. Logan Files a Post-Trial Motion

Following Logan's conviction, he obtained new counsel and filed a post-trial motion alleging, in part, that his trial counsel was ineffective for failing to call available witnesses including Princess Thomas, Chevelle Thomas, and Earlene Logan, who he argued would testify that he was in Milwaukee at the time of the shooting. (SC.II. 174.) In support of this motion post-trial counsel filed a statement signed by both Princess and Chevelle. (SC.II. 158.) During a sidebar in the trial itself, held right before the defense rested, defense counsel stated to the court that they had advised Logan not to call his alibi witnesses because counsel viewed such witnesses as inherently weak. (SR.II. 151.) Counsel also stated during the sidebar that Logan's mother and grandmother had advised Logan not to call these witnesses. (*Id.*)

The court held an evidentiary hearing on Logan's post-trial motion. Logan testified as described above with respect to his decision not to testify. Earlene Logan testified at the post-trial hearing that she drove Leonard Logan up to Milwaukee the day before the shooting and that he could not have been in Chicago the next day because she dropped him off at their aunty's home in Milwaukee. (SR.II 742-47.) Logan further testified that she never told Leonard Logan's trial counsel this information because when she tried to talk to them they told her to wait. (*Id.* at 746-47.) Neither Princess nor Chevelle Thomas testified at the post-trial hearing; counsel for Logan requested an extension of time to call them because the day of the post-trial hearing they were working in Milwaukee. (*Id.* at 758.) The court denied the motion for a continuance. (*Id.* at 759.) The State presented testimony from John Miraglia, who at the time of Leonard Logan's trial was an intern who worked with Logan's trial counsel. (*Id.* at 721.) He testified that during the trial, Logan's defense counsel asked him to speak with Logan's family and to tell them that Logan's counsel did not think calling alibi witnesses would be beneficial to the case. (*Id.* at 723.) He stated that this conversation took place right before the defense rested. (*Id.* at 726.)

Martin Kelly also testified at the post-trial hearing, and identified a few factors that led to his decision to not pursue and alibi defense. He first stated that he had a conversation with the alibi witnesses during trial and they supposedly said that they did not want to testify because they were afraid that past domestic violence issues with Payton would surface. (SR.II. 732-33.) Kelly also said he did not believe alibi witnesses were good, and that in his experience an alibi defense shifted the burden to the defendant. (*Id.* at 733.) Finally, he testified that he did not want to present a defense because he did

not want to give the State an opportunity to present rebuttal witnesses that would have shored up their case. (*Id.* at 734.)

The court denied this post-trial motion in its entirety, and did not give specific reasons for its findings, simply concluding that "the State's response to the defendant's motion is based on a correct representation of the facts and based on a correct representation of the law, and I find that their position is more persuasive and correct under the facts of this case and the law that guides the rulings in this case. (SR.II.762.)

## VII. Justice Tully Files a Dissent to The Denial of Mr. Logan's Direct Appeal, Declaring That There Was Insufficient Evidence to Convict Mr. Logan

Following his conviction and sentencing to 45 years' imprisonment, Logan appealed his conviction. On appeal, Logan's counsel argued that he was not proven guilty beyond a reasonable doubt; that the State made improper arguments during closings by referencing gangs and by misstating the evidence; that the State failed to prove that he was fit for trial; and that his trial counsel provided ineffective assistance by failing to call his alibi witnesses and by forcing him to waive his right to testify. (Ex. A, People v. Logan, 352 Ill. App.3d 73, 74, 81-83 (1st Dist. 2004).)

The appellate court affirmed Mr. Logan's conviction. It found the evidence sufficient because of Ms. Payton's pretrial statement, her statement to the grand jury, that Mr. Logan's fingerprints were found on a beer bottle in Ms. Payton's apartment, and because Mr. Logan's prints were found on a CD found in the rental car. (*Id.* at 79-80.) It also found that counsel was not ineffective for failing to call the alibi witnesses because of Mr. Kelly's explanations during the evidentiary hearing that the burden would shift if Logan called an alibi witness, that the alibi witnesses would cause domestic violence issues with Mr. Logan to come out, that he did not want rebuttal witnesses from the state,

11

and that Mr. Logan agreed not to call the alibi witnesses.  (*Id.* at 82-83.)  The court ruled

this was an objectively reasonable matter of trial strategy.  (*Id.*)  Finally, the appellate

court concluded that because trial counsel stated on the record that "they recommended to

the defendant that he not testify, but that the decision was ultimately his" the ineffective

assistance of counsel claim on this basis failed.  (*Id.* at 83.)

Although the appellate court affirmed Mr. Logan's conviction, Justice Tully wrote

a dissent.  In his dissent, Justice Tully noted that Latonya Payton's recanted statement,

comprising one of the eight stories she told police and prosecutors, was the only evidence

that Mr. Logan was the perpetrator of the crime of which he was convicted.  Justice Tully

said that this was "so unsatisfactory as to justify reasonable doubt of defendant's guilt."

Id. at 84 (Tully, J., dissenting).  The Illinois Supreme Court denied Logan's PLA. People

v. Logan, 212 Ill.2d 545 (Table) (2004).

## VIII.  Mr. Logan Pursued Post-Conviction Relief and Was Granted a New Trial, But the State Appealed, and The Appellate Court Reversed The Order of a New Trial on Procedural Grounds

After his first PLA was denied, Mr. Logan pursued post-conviction relief.  (A25-

26.)  Mr. Logan subsequently filed a verified supplemental petition for post-conviction

relief.  (A47-57.)  In these two pleadings Mr. Logan raised the following claims:  (1) his

appellate counsel was ineffective for failing to raise meritorious issues; (2) he was not

proven guilty beyond a reasonable doubt and therefore is the victim of cruel and unusual

punishment in serving a sentence for a crime he did not commit; (3) his right to due

process was violated in that Payton's pretrial statements were admitted as substantive

evidence in violation of 725 ILCS 5/115-10.1; (4) he was denied his right to effective

assistance of counsel where his trial attorney failed to present exculpatory evidence from

alibi witnesses; (5) he was denied his right to effective assistance of counsel where his trial counsel forced him to waive his right to testify; (6) his right to due process was violated by the State's closing argument (A25-26); (7) his rights to a fair trial and due process were violated where evidence of Payton's polygraph examinations were repeatedly introduced, the results of the exams were made clear to the jury, and no limiting instruction was given; (8) his right to effective assistance of trial counsel was violated by counsel's failure to ensure a limiting instruction was given to the jury; (9) his right to effective assistance of appellate counsel was violated by counsel's failure to raise argument regarding the improper reference to the polygraphs and failure to render a limiting instruction; (10) his right to effective assistance of counsel was violated by his counsel's opening statement and closing argument where counsel tried to explain his failure to present alibi witnesses; (11) his right to effective assistance of counsel was violated by counsel's failure to present evidence that at the time of the shooting a caller to the 911 emergency service gave a description of the shooter that does not match him; and (12) the cumulative errors committed by defense counsel denied him effective assistance of counsel, including the fact that trial counsel failed to rebut the false assertion by the State that Payton only recanted after a visit to the Cook County Jail when in fact she recanted long before. (A47-57.) Mr. Logan attempted to file a second supplemental post-conviction petition adding to his claims that his counsel was ineffective for failing to move for a mistrial after the State impeached Charles Jenkins by pointing an unsubstantiated revenge motive on his part for testifying on Logan's behalf, but it appears this document was never filed and the courts never considered this claim on its merits. (A. 332-38.)

13

The same judge who presided over Mr. Logan's trial also presided over the post-conviction court proceedings. This judge heard oral argument and granted Mr. Logan a new trial. (SR.I. B3-5.) First, the lower court noted that it remembered the trial "very clearly, vividly, and distinctly." (*Id.* at B3.) It held that Mr. Logan deserved a new trial because of "the circumstances of the polygraph evidence that related to the eyewitnesses, the lack of limiting instruction given to the jury," and "after the fact there may not have been a valid reason for not at least calling the alibi witnesses and having them present for the trial." (*Id.* at B4-5.)

The prosecution objected to the court not holding an evidentiary hearing, contending that there would be a need to determine if the facts as alleged by Logan were true. (*Id.* at B6.) The court considered this but explained, "Well, if I base my ruling on the polygraph alone, that would be on the record and there is really no need for an evidentiary hearing on that." (*Id.* at B7.) Logan's counsel argued that there was no possible reason why appellate counsel would not have raised the polygraph issue on appeal, and the court agreed, stating, "The crux of the matter is the polygraph and the lack of a limiting instruction. That's in the record. I don't see how it could be interpreted any other way, and therefore I'll rely on that in making my decision. The statements about the alibi witnesses could be added." (*Id.* at B7-8.)

The State filed a motion to reconsider, which the court also denied in an oral ruling, clarifying that it was granting a new trial on the polygraph issue because the fact that "a single identification witness in this particular case gave different versions of what occurred, said she was threatened, and the fact that she was given multiple polygraph examinations coupled with the explanation of how her testimony changed after she was

administered the polygraph exams, I find that that did not give the defendant a fair trial."
(A302-03.)

The state appealed the granting of a new trial, and the appellate court reversed and remanded the grant of a new trial. People v. Logan, No. 1-07-1478 (1st Dist. Oct. 9, 2008) (A305). The court made its decision on the procedural error of the trial judge granting a new trial without holding an evidentiary hearing. Id. The case was then remanded for an evidentiary hearing.

## IX. An Evidentiary Hearing Was Held, But Only Two of Mr. Logan's Claims Were Addressed

At the evidentiary hearing, the lower court heard from the defendant; Princess and Chevelle Thomas; Martin Kelly, the defendant's trial counsel; and Tim Leeming, the defendant's appellate counsel. On the issue of appellate counsel's failure to raise the polygraph issue on appeal, Leeming testified that it was his "normal practice to raise all the issues [he] believe[s] are viable." (R. 162B.) Asked why he did not challenge the polygraph evidence, he answered, "I can't tell you exactly what went into the decision making process." (Id. at 171B.) He did offer a post-hoc guess that "it seemed like the trial attorney made some decision about whether the polygraph [ ] would benefit the defense theory of the case or State's theory of the case." (Id. at 172B.)

On the alibi witness issue, Martin Kelly testified that he did not call Princess and Chevelle Thomas to testify because they "did not wish to testify." (Id. at 125B.) The testimony of the Thomas sisters flatly contradicted Kelly on this point: Princess said that she had "no idea" why she did not testify, (Id. at 72B), and Chevelle stated that she "was supposed to testify for him" but "didn't get a chance to." (Id. at 90B-91B.) Kelly also offered an alternate rationale, that "one of them, I forgot which one[,] said that she was

concerned about a domestic violence issue between Latanya [sic] [ ] and Mr. Logan . . . ."
(*Id.* at 121B.)  This bit of information, Kelly said, was related to his law clerk, John
Miraglia, and then to him.  (*Id.* at 125B.)  Kelly's testimony was contradicted both by the
record—Miraglia had testified in the post-trial hearing that his conversation with Logan's
family members consisted only of him telling them that Logan's attorneys thought his
reasonable doubt case was strong and that alibi witnesses would not be beneficial, (SR.II
723-26)—and by the Thomases.  Princess said that she did not "know anything about the
relationship between Latonya Payton and Leonard Logan," and she did not "tell Mr.
Logan's attorneys anything about a relationship between Latonya Payton and Leonard
Logan." (R. 74B).  And Chevelle told the court that she did not know anyone named
Latonya Payton, and she did not "tell anyone anything about a relationship between
Leonard Logan and Latonya Payton."  (*Id.* at 92B-93B.)

Counsel for Logan closed by arguing that the very closeness of the case meant
that "decisions that [in] a lot [of] other cases might [ ] not have made a difference really
made a difference" in his trial.  (*Id.* at 193B.)  Pointing out that "several issues" were
embedded within the so-called polygraph issue, his attorney identified one as the
"admission of [the] polygraph evidence . . . ."  (*Id.* at 194B.)  This issue should not have
been neglected when appellate counsel was raising "every issue he saw in the record,"
and there was no reason to think that raising the polygraph issue "would have somehow
prejudiced his other appellate issues."  (*Id.* at 204B.)  Thus, although appellate counsel's
brief was not ineffective in its entirety, the "good issue" that was "left on the table"
would "have changed the results . . . ."  (*Id.* at 218B.)

Addressing the alibi issue, Logan's attorney noted, "We are not just talking about

16

alibi evidence that wasn't presented. That is one issue. We are [also] talking about alibi evidence that was not presented at trial when Mr. Logan's trial counsel promised the jury they would hear the evidence." (*Id.* at 196B.) This was ineffective, Logan argued, because this decision left "the jury wondering what was that about, why [did] you promise evidence I didn't hear." (*Id.*) Kelly had no good reason not to call the alibi witnesses after promising the jury because "he knew what the evidence at trial was going go to be in advance." (*Id.* at 200B.)

In response, the State reiterated its belief that the ineffective trial assistance claim was barred by *res judicata* and on the merits. (*Id.* at 220B.) It did not address the objective reasonableness of promising but failing to present an alibi defense.

In an oral ruling, the court denied Logan's post-conviction petition. (Ex. B, Transcript of Proceedings in People v. Logan, Case No. 97 CR 19288, Nov. 19, 2009, at 21.) The Court concluded that it was trial strategy not to present alibi evidence, and that "[t]he fact that it was mentioned at one point in the opening statement, and the decision made not to use" was not ineffective because counsel might have come to believe that it would shift the burden to the defense to present evidence. (*Id.* at 10.) The court also found no error in the presentation of the polygraph evidence, and specifically concluded that the trial court "never allowed the results of those polygraph examinations to be presented to the jury. (*Id.* at 14.) The court did allow that "it would have been better practice to have immediately instructed the jury at that point as to how they should consider that limited evidence, and what limited purpose it was being admitted for." (*Id.*)

**X.      Mr. Logan's Post-Conviction Petition Was Denied And the Illinois Supreme Court Denied Mr. Logan's PLA**

Mr. Logan promptly appealed this decision, and the appellate court denied Mr. Logan's appeal on all of these claims.  (Ex. C, <u>People v. Logan</u>,  954 N.E.2d. 743 (1st Dist. 2011).)  The appellate court held that Logan's appellate counsel was not ineffective for failing to raise the polygraph issue because "the polygraph evidence was admissible as a shield against Ms. Payton's claim that her inculpatory statement and grand jury testimony were the product of police coercion."  (*Id.* at 754.)  The appellate court ruled that there was no alternative for the prosecution to elicit this testimony.  (*Id.*)  With respect to the limiting instruction, the appellate court also determined that the limiting instruction given was sufficient, that Logan waived review of this issue by not arguing for one at trial, and that trial counsel's decision not to seek one was trial strategy.  (*Id.* at 757.)  Finally, the court ruled that Logan waived the right to object to closings and that because the defense opened the door the comments were proper.  (*Id.* at 758.)  The appellate court also denied Mr. Logan's alibi defense claims, ruling that Logan waived this issue and that trial counsel exercised trial strategy in not using these witnesses.  (*Id.* at 759.)  Finally, the appellate court determined that the lower court appropriately dismissed Logan's other claims by implication.  (*Id.* at 759-60.)  Mr. Logan again sought leave to appeal all of these claims to the Illinois Supreme Court; that appeal was also denied.  <u>People v. Logan</u>, 962 N.E.2d 486 (Table) (2011).

Each of the claims that Mr. Logan raises before this Court have been denied on the merits by the state courts of Illinois.  In some cases, the claims have been denied without explanation or analysis, but they have all been merit dismissals, treated as such

by subsequent appellate courts that also often failed to provide reasoning for merit dismissals.

## ARGUMENT

Since the Illinois courts have now denied Mr. Logan's attempts to seek relief on these claims, either by denying them on the merits or by refusing to even allow Mr. Logan the opportunity to present his claims, a Petition for Writ of Habeas Corpus is the only opportunity he has left to vindicate his federal constitutional rights. The Supreme Court has held that "[t]he writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 131 S. Ct. 770, 780 (2011) ("Judges must be vigilant and independent in reviewing petitions for the writ."). Mr. Logan now asks this Court to exercise that vigilance and independence and grant him a new trial.

## I.      The Standard for Habeas Relief

To be entitled to habeas relief on his claims, Mr. Logan must show that his incarceration is the result of a state court decision: (1) "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

Under the "unreasonable application" clause, a court may grant a writ of habeas corpus if the state unreasonably applies a clearly established governing principle from Supreme Court decisions to the facts of a petitioner's case. Williams v. Taylor, 529 U.S.

362, 413 (2000). As the Court explained in <u>Yarborough v. Alvarado</u>, 541 U.S. 652

(2004):

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Id.* at 664 (citations omitted).

## II. Mr. Logan has Exhausted the Remedies Available in Illinois State Courts

In order for this Court to review his claims, Mr. Logan must also show that he (1) "has exhausted the remedies available in the courts of the State," or that (2) "there is an absence of available State corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. §2254(b). Mr. Logan's claims meet all of these requirements.

"To preserve a federal claim for habeas review:[i]f the claim comes from the Illinois state courts, the petitioner must have presented each claim in the habeas petition to the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 844-45(1999). "As part of this requirement, a petitioner must have fairly presented both the operative facts and legal principles that control each claim to the state judiciary." <u>Wilson v. Briley</u>, 243 F.3d 325, 327 (7th Cir.2001); <u>Mulero v. Thompson</u>, 668 F.3d 529, 535-36 (7th Cir. 2012).

Mr. Logan's petition raises the following claims:

1.      Leonard Logan was denied effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial counsel used threats to coerce Mr. Logan into foregoing his right to testify at trial.

2.      Mr. Logan was denied effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial counsel promised alibi witnesses in opening remarks and then failed to call them during the course of the trial.

3.      Mr. Logan was denied effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial counsel failed to admit evidence of a contemporaneous 911 call with a description of the shooter that did not match Mr. Logan.

4.      Mr. Logan was denied effective assistance of counsel under the Sixth and Fourteenth Amendments when his trial counsel failed to argue for an effective limiting instruction regarding evidence that the main eyewitness failed a polygraph exam, and failed to object to improper closing arguments.

5.      Mr. Logan was denied effective assistance of counsel under the Sixth and Fourteenth Amendments through cumulative errors made by trial counsel.

6.      Mr. Logan was denied his right to due process under the Fifth and Fourteenth Amendments where the court allowed the introduction of evidence that Latonya Payton had failed a polygraph exam.

7.      Mr. Logan was denied his right to due process under the Fifth and Fourteenth Amendments where he was convicted of a crime without sufficient evidence to support the conviction.

8.     Mr. Logan was denied the effective assistance of appellate counsel under the Sixth and Fourteenth Amendments when his appellate counsel failed to raise meritorious issues in this case.

9.     The above errors, cumulatively, so infected Mr. Logan's trial that they violated his right to due process under the Fifth and Fourteenth Amendments.

On direct appeal, Mr. Logan raised both to the appellate court and to the Illinois Supreme Court the ineffectiveness of his counsel in failing to allow Mr. Logan to testify (Ground 1) and the insufficiency of the evidence (Ground 7).  He also raised ineffectiveness for failing to call alibi witnesses as far as that claim was developed in the post-trial motions (Ground 2.)   The remainder of Mr. Logan's claims other than his cumulative error claims, including the alibi witnesses claim as developed at the post-conviction evidentiary hearing, were raised in the circuit court, the appellate court and the Illinois Supreme Court during post-conviction proceedings.  Mr. Logan has therefore exhausted his available state court remedies, satisfying the requirements of Section 2254(b).

**III.    Mr. Logan's Right to Effective Assistance of Counsel under the Sixth and Fourteenth Amendments Were Violated When Mr. Logan's Trial Counsel Coerced Mr. Logan into Foregoing his Right to Testify in His Own Defense**

The evidence in Mr. Logan's case was close, and Mr. Logan himself wanted to testify to the jury to provide himself an alibi and to explain why his fingerprints were found in Ms. Payton's home and on the CD in the rental car.  Because his counsel prevented him from testifying and prevented him from exercising him a knowing waiver of that right, he received ineffective assistance of counsel.  The trial court and appellate court's cursory review of Mr. Logan's testimony on this claim was an unreasonable

22

application of clearly-established federal law on his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments.  He therefore deserves a new trial on this basis.

Here, after hearing unrebutted testimony from Mr. Logan that he decided not to testify after his counsel told him that he would quit if Mr. Logan exercised his right, the court concluded that Mr. Logan's right was not violated because trial counsel stated on the record that they had advised Mr. Logan that the decision was his.  (Ex. A, <u>Logan</u>, 352 Ill. App.3d at  83.)  When Mr. Logan attempted to raise this issue again on post-conviction review in order to present additional evidence, the court did not allow him to do so, and the appellate court concluded that the claim was properly dismissed by implication.  (Ex. C, <u>People v. Logan</u>,  954 N.E.2d. 743, 759-60 (1st Dist. 2011).)

This claim, as with Mr. Logan's other ineffective assistance of counsel claims, is governed by the familiar two-part test in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984): (1) the representation of counsel must fall below an objective reasonableness standard; and (2) there must be a reasonable probability that the outcome would have been different had counsel met the objective reasonableness standard.  *Id.* at 687.  ("First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.").

**A. Counsel's Refusal to Allow Mr. Logan to Testify Violated His Constitutional Rights**

A criminal defendant has an absolute right to testify on their own behalf, a right that stems from the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Rock v. Arkansas, 483 U.S. 44, 51-53 (1987). This right cannot be waived by counsel. Jones v. Barnes, 463 U.S. 745, 751 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to testify in his or her own behalf."). Counsel coercing a defendant into waiving his right to testify prevents that defendant from exercising his right, and therefore provides unreasonable assistance.

Here, too, Mr. Logan can establish prejudice under Strickland. This was an extremely close case. The jury needed a basis to conclude that Latonya Payton's statement to the police was false, so refusal to allow Mr. Logan to tell the jury that he was not in Chicago and to explain his fingerprints being found in the car was not part of any reasonable trial strategy either.

This case is no different than the Eleventh Circuit's decision in Nichols v. Butler, 953 F.2d 1550 (11th Cir. 1992), an instructive decision on how courts apply the Strickland standard in such circumstances. In that case, the court held that the defendant's right to testify and right to effective assistance of counsel had been violated by counsel telling the defendant that if he chose to testify, counsel would withdraw from his case. Id. at 1553 ("Counsel apparently did not inform Nichols that he had a right to testify and that the ultimate decision on whether he would testify belonged to Nichols. Nor did counsel inform Nichols that even if counsel sought to withdraw from the case after the first day of trial, the trial court could have refused the request. The district court

found that Nichols did not testify because he feared the loss of his counsel in mid-trial, given the extensive work counsel had done in the case. Based on this evidence, the district court found both that Nichols' right to testify had been violated and that he had received ineffective assistance of counsel because counsel's threat to withdraw prevented Nichols from testifying at trial.")

As other courts have recognized, the testimony of a defendant is different and more powerful than the testimony of other witnesses. "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." Green v. United States, 365 U.S. 301, 304 (1961). As the Supreme Court held in Rock, "the most important witness for the defense in many criminal cases is the defendant himself." 483 U.S. at 52.

**B.    Illinois State Courts Have Unreasonably Applied Clearly Established Federal Law in Evaluating Mr. Logan's Claim**

The appellate court's conclusion, on direct appeal, that Mr. Logan's rights were not violated because counsel told him that the right was his is an unreasonable application of clearly established federal law. The Illinois courts completely ignored the issue of coercion, and Mr. Logan's unrebutted testimony, when counsel had every opportunity to refute it, that his counsel told him he would withdraw if Mr. Logan testified. There was no finding of fact by the lower courts that Mr. Logan was incredible, or any recognition at all that coercion is a violation of Mr. Logan's rights. Considering those facts, there is no reasonable conclusion of anything other than that Mr. Logan's counsel was ineffective.

**IV. Mr. Logan's Right to Effective Assistance of Counsel under the Sixth and Fourteenth Amendments Was Violated When Mr. Logan's Trial Counsel Promised Alibi Evidence in His Opening Remarks and Then Failed to Present Alibi Evidence for the Jury's Consideration**

Mr. Logan's trial counsel promised the jury in opening statements that they would hear evidence that at the time of this crime, Mr. Logan was not in Chicago. He then failed to present any such evidence, and paid dearly for that in closings when prosecutors seized on this failure and made much of it. Counsel did testify at an evidentiary hearing at the state court level that he made this decision because the alibi witnesses did not want to testify, and because he did not believe that shifting the burden of proof was in Mr. Logan's interests. He knew both of these facts, though, prior to opening statements. There was no relevant information that he learned during trial that changed his thinking at all. The lower court's conclusions that this decision was trial strategy is an unreasonable application of Strickland, was based on and requires reversal by this Court.

**A. Promising and Failing to Provide Alibi Evidence Was Ineffective Assistance of Counsel and Prejudiced Mr. Logan**

Numerous courts have concluded that failing to produced promised testimony is tantamount to ineffective assistance of counsel. United States v. Leibach, 347 F.3d 219, 259 (7th Cir. 2003) ("Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility."); Harris v. Reed, 894 F.2d 871 (7th Cir. 1990) (counsel's promise to present exculpatory evidence and then failure to present any defense was ineffective, regardless of counsel's belief that there was insufficient evidence to convict); Ouber v. Guarino, 293 F.3d 19, 28 (1st Cir. 2002) ("When a jury is promised

26

that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered. A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made."); <u>Anderson v. Butler</u>, 858 F.2d 16, 19 (1st Cir. 1988) ("[W] e cannot but conclude that to promise even a condensed recital of such powerful evidence, and then not produce it, could not be disregarded as harmless. We find it prejudicial as matter of law."); <u>English v. Romanowski</u>, 602 F.3d 714 (6th Cir. 2010) (holding that defense attorney's promise to the jury to call defendant's ex-girlfriend as a witness, then abandoning that decision based on investigation counsel could have done prior to making the promise, was objectively unreasonable under <u>Strickland</u>).

 Like these cases, in Mr. Logan's case, he promised the jury that they would hear from alibi witnesses, alibi witnesses that counsel had every opportunity to speak with and assess prior to trial. Those witnesses came to trial prepared to testify, but were not called. And then, in an extremely close case, prosecutors were able to point to this failure and argue that the failure to call them demonstrated that they would not have provided Mr. Logan with an alibi. This was particularly prejudicial given the closeness of the case and the absence of any other defense for Mr. Logan. There can be no other reasonable conclusion but that this error destroyed Mr. Logan's chance at winning an acquittal.

27

**B.    Illinois Courts Unreasonably Applied Clearly Established Federal Law and Made Unreasonable Findings of Fact in Determining Counsel's Actions Were Trial Strategy**

No reasonable trial counsel would have promised the jury they would hear an alibi and then fail to present that evidence given the facts in Mr. Logan's case. The Illinois' courts conclusion otherwise was unreasonable.

First, as described above, the only plausible interpretation of Strickland is that these kinds of unfulfilled promises are ineffective, unless counsel learns something in the meantime that could reasonably change their strategy. No reasonable interpretation of the facts here could result in such a conclusion. The lower court's ruling on this issue found first that the issue was waived by appellate counsel's failure to raise the issue on direct appeal, which completely ignored the fact that Mr. Logan had also raised, as he does before this court in Ground Eight, his appellate counsel's ineffectiveness for failing to raise this issue on direct appeal. As such, it is not an independent state law ground on which the decision could rest.[2] Taking the substantive aspect of their ruling, the appellate court concluded:

---

[2] Of course, independent state law grounds for dismissal bar federal review, but only where that independent state law ground is a "firmly established and regularly followed state practice at the time it is applied." Franklin v. Gilmore, 188 F.3d 877, 882 (7th Cir.1999). Illinois state courts do not regularly apply waiver to bar claims not raised on direct appeal because of the ineffective assistance of appellate counsel - in fact, the rule in Illinois is explicitly that waiver *does not* operate to bar such claims. People v. Turner, 187 Ill.2d 406, 413 (1999) (citing cases). The independent state law ground analysis should not apply here. And, to the extent this court concludes that trial counsel was ineffective and that the basis for that ineffectiveness was apparent on the record, appellate counsel was ineffective for failing to raise this claim on direct appeal. Strickland applies to appellate counsel; under Smith v. Robbins, 528 U.S. 259 (2000), Mr. Logan must show that his appellate counsel's failure to raise an issue was objectively unreasonable, and that there is a reasonable probability that had counsel raised the issue, it would have prevailed on appeal. Id. at 285.

>Even if this issue had not been waived, we would find no cause for
>reversal. During the evidentiary hearing on defendant's postconviction
>petition, defense counsel (Mr. Kelly) explained that he changed his mind
>about calling the alibi witnesses once the State completed its case in chief
>without eliciting evidence the defendant had a pending drug case. Mr.
>Kelly state that at the beginning of trial, he had "thought for sure that the
>State would bring in the arrest." Mr. Kelly further testified that after the
>State rested, he learned from his law clerk that the alibi witnesses did not
>wish to testify, and that one of the alibi witnesses expressed concern that
>the State might ask he about "a domestic violence issue" between
>defendant and Ms. Payton. Mr. Kelly also testified that he decided not to
>call the alibi witnesses because they could not specifically state what day
>defendant allegedly was in Milwaukee and because defendant had given
>Mr. Kelly inaccurate information as to the dates he had been in
>Milwaukee. Mr. Kelly testified that at the close of trial he felt he had a
>strong case for acquittal and he was "very, very afraid that by putting alibi
>witnesses on especially ones that [he] believed were rather tenuous, that
>[defendant's] case, its worth would diminish drastically." Mr. Kelly also
>testified to his concern that if he called the alibi witnesses, the jury would
>shift the burden of proof to the defense.

(Ex. C, <u>People v. Logan</u>, 954 N.E.2d at 759.)

These conclusions are unreasonable based on the facts of this case, because each is belied by the evidence. First, when asked whether he "learned something different about [Logan's] arrest or pending [drug] case that changed [his] perception about the alibi witnesses," his trial counsel, Martin Kelly, answered, "No. I heard the State's case in chief." (R.124B.) That could be taken to mean that he did not want to distract the jury's attention from the weakness of the State's case, except that he immediately backtracked. When Logan's post-conviction counsel raised the supposed "domestic issue between Latonya Payton and Leonard Logan," his trial attorney said, "Actually that was the concern." (*Id.* at 125B.) This "concern," however strains belief. At the post-trial hearing Martin Kelly's clerk, John Miraglia, testified that he had spoken to Logan's family, related his conversation with them, but said nothing about a supposed domestic incident. (SR.II. 723-26.) He was supposedly the conduit of this information to Mr.

29

Kelly.  Both potentially alibi witnesses, Princess nor Chevelle Thomas, told the lower

court that they didn't know Latonya Payton and knew nothing about any relationship

between her and Leonard Logan.  (R.74B, 92B-93B).

Second, Mr. Kelly's claim that the alibi witnesses did not wish to testify is

completely refuted by the record.  Both witnesses made the trip from Milwaukee to

Chicago for precisely that purpose.  Princess said she had "no idea" why she did not

testify (R.72B), and Chevelle that she "was supposed to testify for him" but "didn't get a

chance to."  (*Id.* at 90B-91B.)

Finally, counsel claimed that these witnesses did not have a strong recollection of

when Mr. Logan was actually in Milwaukee, and that he felt given how the trial had

proceeded that he was winning and that he did not want to shift the burden to the defense.

Nothing happened in the record between opening arguments and the end of the trial that

could justify Mr. Logan's counsel to change his mind and not call the witnesses he had

promised to the jury in his opening.  Counsel claimed he spoke to these witnesses prior to

trial, so he had every opportunity to assess their testimony and determine if the alibi was

strong enough to be presented.  Second, counsel's claim about the shifting burden of

proof was as true prior to the start of trial as it was in the middle - simply learning

halfway through that the state's case was weak did nothing to change his belief about the

shifting of the burden.  Like the cases described above, this is not an issue of not

presenting a defense or merely failing to call alibi witnesses, it is the failure to call those

witnesses *after promising to call them.* There is no reasonable conclusion, from these facts, that this decisions was reasonable strategy. Instead, it doomed Mr. Logan.[3]

## V. Mr. Logan's Right to Effective Assistance of Counsel under the Sixth and Fourteenth Amendments Was Violated When Mr. Logan's Trial Counsel Failed to Present Evidence of a Contemporaneous 911 Call Describing the Suspect, Which Did Not Match the Description of Mr. Logan

Mr. Logan's third ground for relief is that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments where his trial counsel failed to present evidence that a contemporaneous 911 call gave a description of the shooter that did not match Logan. Mr. Logan raised this claim in his post-conviction pleadings, but it was summarily dismissed without explanation by the Illinois appellate court. (Ex. C, People v. Logan, 954 N.E.2d at 759.) Mr. Logan deserves an evidentiary hearing before this Court to further develop this claim, which the Illinois courts never allowed him to develop.

### A. Mr. Logan's Counsel Abdicated His Duty To Investigate Additional Exculpatory Eyewitnesses

Mr. Logan, without benefit of discovery from the Court and without access to his trial counsel's file of discovery, presented a good-faith allegation to the Illinois courts that 911 calls made about the shooting in this case showed that there were other witnesses besides Charles Jenkins who gave a description of the shooter that did not match Mr. Logan. Obviously, these witnesses could have testified to provide further exculpatory evidence on Mr. Logan's behalf. Mr. Logan had a clearly established constitutional right to present a meaningful defense. *See* U.S. Const. Amends. VI, XIV; Chambers v. Mississippi, 410 U.S. 284, 302 (1973); California v. Trombetta, 467 U.S. 479, 485

---

[3] The Illinois courts never ruled that this was not prejudicial to Mr. Logan - the decisions below hinged only on the trial strategy prong of Strickland.

(1984). In a case that is all about the identity of the shooter, there was no conceivable tactical reason for Mr. Logan's counsel to omit this information from his investigation and trial preparation work. Strickland, 466 U.S. at 691 ("In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). It was clearly established at the time of Mr. Logan's trial that he had a constitutional right for his counsel to conduct a reasonable investigation. Id.

When questioned at Mr. Logan's post-trial motion hearing about his investigation of other witnesses, Mr. Kelly stated that he didn't believe that the 911 tape contained any description of the shooters. (SR.II.739.) As Mr. Logan pled before the courts below, although he does not possess the tape, this is not true, and that the tape does contain a description of the offender. (C.73.) Mr. Logan obviously requires discovery and potentially an evidentiary hearing before this Court in order to prove the truth of this assertion, and he should receive such discovery. Because assuming that Mr. Logan's allegations are correct, Mr. Kelly did not fail to investigate or call such witnesses because of any trial strategy, but because he did not know what was on these tapes. This is a violation of Strickland, both as a matter of trial strategy and as a matter of prejudice. 466 U.S. at 691; see also Moffett v. Kolb, 930 F.2d 1156, 1158 (7th Cir. 1991) (prejudice prong of Strickland met when "there was the absence of any direct testimonial evidence that petitioner actually shot the victim" and exculpatory statements were not produced by counsel); Prou v. United States, 199 F.3d 37, 48 (1st Cir. 1999)("Where, as here, an attorney fails to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission, his performance falls below the standard of proficient

representation that the Constitution demands."); <u>Beltran v. Cockrell</u>, 294 F.3d 730, 734 (5th Cir. 2002) (failure to impeach eyewitness testimony was ineffective assistance because even tentative identifications at issue had exculpatory worth).

Prejudice is clear both as a matter of law and given the facts in Mr. Logan's case. Again, this is a case with the thinnest of evidence supporting his conviction, and there was a potential additional witness who could have testified that Mr. Logan was not the shooter. Evidence contradicting the state's theory was extremely probative. The state did not have eyewitness testimony tying Mr. Logan to the shooting. The state did not have physical evidence tying Mr. Logan to the shooting. The only evidence the state had comprised recanted testimony and CD cases in the rented vehicle used in the shooting that bore Mr. Logan's fingerprints. A contemporaneous 911 call describing a shooter that did not match Mr. Logan's description would undoubtedly have changed the outcome of the trial.

**B.      Illinois State Courts Have Unreasonably Applied Clearly Established Federal Law in Denying Mr. Logan's Claim**

Because the Illinois courts never gave any reason for denying this claim, and because on its face this claim is meritorious, there can be no conclusion here that the Illinois courts reasonably applied clearly established federal law in denying this claim. The Illinois courts really just ignored what Mr. Logan had to say on this score without any basis for doing so. This Court should rectify that error.

**VI.      The Cumulative Errors of Defense Counsel Violated Mr. Logan's Right to Effective Assistance of Counsel.**

Mr. Logan's fifth ground for relief is that even if, when considered separately, the errors of his counsel did not prejudice his rights during his trial, cumulatively they did.

Mr. Logan's federal constitutional claims are cognizable independently and separately, but when read together, they constitute cumulative error that supports a claim for relief under the writ of habeas corpus. The Seventh Circuit has stated that "[t]rial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law." Alvarez v. Boyd, 225 F.3d 820, 824 (7th Cir. 2000), citing Taylor v. Kentucky, 436 U.S. 478, 487 (1978). A cumulative error claim merits relief when: "(1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." Alvarez, 225 F.3d at 824.

Mr. Logan's right to effective assistance of counsel under the Sixth and Fourteenth Amendments was violated at trial through the multiple errors committed by counsel and identified above in this petition, and as such, habeas relief is required independently on the several claims, and taken together under cumulative error.

## VII. Mr. Logan's Due Process Right Under the Fourteenth Amendment Were Violated When He Was Convicted of a Crime Based on Insufficient Evidence

As Mr. Logan argued on direct appeal, the evidence in this case was insufficient to convict him. The jury heard only that in a prior inconsistent--and recanted--statement given before trial, Latonya Payton implicated him in the crime. The jury also heard that Mr. Logan's prints were found in Payton's home and on a CD in the rental car used in the crime. That was all the convicted him, in a trial replete with improper and prejudicial references to Ms. Payton's failing a polygraph exam. This evidence was constitutionally insufficient to convict him, and he should receive a new trial on this basis.

34

If the evidence supporting conviction is insufficient for any rational trier of fact to find guilt beyond a reasonable doubt, federal habeas relief lies. <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). Under <u>Jackson</u>, the Due Process Clause of the Fourteenth Amendment "protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 315 (internal citations omitted). The Court in <u>Jackson</u> held:

> The "critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Id.* at 318-19.

Even after the passage of Section 2254 and the development of a more restrictive view of habeas relief, <u>Jackson</u> still survives, although now, with Section 2254 taken into account, "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury" and may only overturn a state court decision if the state court decision as to the sufficiency of the evidence was "objectively unreasonable." <u>Cavazos v. Smith</u>, 132 S. Ct. 2, 4 (2011) (citing <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1862 (2010).) Mr. Logan's case meets this standard.

**A.     No Rational Trier of Fact Could Have Found Mr. Logan Guilty Beyond a Reasonable Doubt**

The Illinois appellate court unreasonably applied the modified <u>Jackson</u> standard in concluding that the evidence was sufficient to convict Mr. Logan. They concluded that there was sufficient evidence because of Payton's prior statement, the prints in her home, and the prints on the CD.  (Ex. A, <u>People v. Logan</u>, 352 Ill. App.3d at 79-80.)  This was unreasonable.  No rational trier of fact could have found Mr. Logan guilty.

At trial, no one testified that Mr. Logan shot and killed Timothy Jones.  In fact, one of the men who was shot during the crime described a shooter other than Mr. Logan. There was no physical evidence tying Mr. Logan to the shooting itself, and the only physical evidence connecting Mr. Logan to the vehicle used in the murder were fingerprints on a CD case located in the car when the police searched it.  The story that connected the car to Mr. Logan was one of eight stories told by Latonya Payton to the police investigators.  It is a story she later recanted and disavowed on the witness stand. The prosecutors had to rely on polygraph tests from a recanting witness to draw Mr. Logan into the shadow of guilt for the jury.

Justice Tully's dissent in the court below was correct - he said, "I look at the evidence and see an uncorroborated statement that is inconsistent with other eye witness accounts; a statement given after more than 24 hours of interrogation; a statement taken after eight other versions were given. I do not find any other evidence against the defendant."  (Ex. A, <u>People v. Logan</u>, 352 Ill.App.3d at 86.)  He went on:

> Other than Ms. Payton's prior statements, which she recanted at trial, there is no physical evidence indicating that the defendant was the shooter. The majority points to the finger prints of the defendant on a CD case that was recovered from the vehicle used in the shooting. However, the evidence showed that Ms. Payton had the car for five days and there was no

> testimony as to when the CD case was put in the car or that the defendant
> left his fingerprint on the CD case when it was in the car. Even more
> troubling is the majority noting the fingerprint of the defendant on a beer
> bottle taken from Ms. Payton's apartment. This evidence merely puts the
> defendant in Ms. Payton's apartment on March 19, 1997. This evidence
> does not link the defendant to the crime and the fact that the majority
> noted such evidence as "corroborating" raises serious concerns about what
> the majority relies upon to support this conviction.

(*Id.* at 85-86.)

Mr. Logan has maintained his innocence through his direct appeal, his post-conviction petition, his supplemental post-conviction petition, his evidentiary hearing, his appeal, and his petition for leave to appeal to the Illinois Supreme Court. The evidence in this case simply does not support his conviction, and he should receive habeas relief on this ground.

## VIII. Mr. Logan's Claims Concerning the Use of Polygraph Evidence Are Illustrative of the Lack of Evidence in this Case and the Prejudicial Effect of Other Errors

Two of the claims raised in Mr. Logan's habeas petition relate to the critical role that polygraph evidence played in his case. Mr. Logan's sixth ground for relief is that his right to due process was violated when the court allowed in evidence that Latonya Payton had failed a polygraph examination. His fourth ground for relief is that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments where his counsel failed to argue for an effective limiting instruction regarding Payton failing that exam, and where his counsel failed to object to improper closing arguments that revealed that she had failed the exam.

Mr. Logan acknowledges that these claims as litigated below primarily concern Illinois state due process law and Illinois state law conceptions of the impropriety of the use of such evidence, and that the Illinois lower courts ruled on these claims by analyzing

state law on this issue.  Under Illinois law, the results of a polygraph examination are inadmissible, either directly through the results or through witnesses.  See People v. Baynes, 88 Ill.2d 225, 234-45 (1981) (holding that admission of polygraph results is plain error in criminal cases, even if the parties stipulate to their admission); People v. Gard, 158 Ill.2d 191, 201-04 (1994) (holding that such evidence is inadmissible through witnesses).   Most federal and state courts also bar the admission of such evidence.  U.S. v. Scheffer, 523 U.S. 303, 310-11 (1998) (discussing, in an unrelated context, the general view of the unreliability of such evidence and giving an overview of the various court rules on the admissibility of such evidence).

Even if federal law has never held that such evidence is inadmissible, so that Mr. Logan's claims on this issues fall entirely within the Illinois conception of due process, it is important to note that this evidence truly explains why the other errors in his case were so prejudicial - his entire case hung on the jury hearing that Latonya Payton failed a polygraph.  And even if, under federal law, the admission of polygraph results is not clearly established to be a violation of due process, his counsel was still ineffective in dealing with this evidence.

A.    **Trial Counsel Violated Strickland by Failing to Seek a Limiting Instruction on the Consideration of Polygraph Results**

Under any conception of Strickland, Logan's trial counsel should have sought a limiting instruction on the issue of the polygraph results, and should have objected to the prosecution's closing arguments revealing that Payton had failed a polygraph.  Under Illinois law, although the jury might be able to hear that Payton was "confronted" with the results of her polygraph exam, they can consider that evidence only in analyzing Payton's claim of coercion in giving her statement following that confrontation.  People

v. Melock, 149 Ill.2d 423, 466 (1992) ("The evidence is to be considered solely for the purpose of determining the credibility and reliability of the confession. The jury should be admonished not to speculate upon the nonexistence of results on the issue of defendant's guilt or innocence.")  Because this was clearly Illinois law, counsel's failure to seek a limiting instruction and ensure that the prosecutor did not overstep these bounds during closing argument was ineffective.  And, given the paucity of evidence against Mr. Logan and the key role this polygraph evidence played in convincing the jury of the reliability of Payton's statement, this error prejudiced Mr. Logan.

> **B.**    **The Illinois Appellate Court's Conclusion to the Contrary Was An Unreasonable Application of <u>Strickland</u> and Relied on Unreasonable Findings of Fact**

The Illinois appellate court concluded that Mr. Logan's counsel had not violated <u>Strickland</u> in failing to obtain a limiting instruction and in failing to object to closing arguments because, in its view, the limiting instruction given was sufficient, that Logan waived review of this issue by not arguing for one at trial, and that trial counsel's decision not to seek one was trial strategy.  (Ex. C, <u>People v. Logan</u>, 954 N.E.2d at 757.) Finally, the court ruled that Logan waived the right to object to closings and that because the defense opened the door the comments were proper.  (<i>Id.</i> at 758.)[4]

The appellate court concluded that Logan's counsel did not ask for an immediate limiting instruction so as not to focus on the polygraph evidence unduly, but this application of <u>Strickland</u> was clearly unreasonable where the entire record was replete

---

[4] Again, as discussed in Footnote 2 *supra*, the appellate court's invocation of waiver is entitled to no consideration by this Court because Mr. Logan claimed below that his appellate counsel was ineffective for failing to raise these claims on direct appeal.  And to the extent that appellate counsel had a basis in the record to raise these claims on direct appeal, he was ineffective in failing to do so.

with references to the polygraph evidence. Not only was it discussed with Payton, but the State raised this evidence with the police officers who questioned Payton, at which time the court finally gave a limiting instruction. (SR.II. 343-44, 357-58, 369.) And of course, these issues came up again in closing arguments. There can be no reasonable decision to fail to giving a limiting instruction on evidence that was obviously going to come up repeatedly in the trial. No reasonable trial attorney could have concluded that by failing to seek a limiting instruction, the jury would somehow not hear this evidence or forget about it, when it was destined to be brought up again and again. Similarly, the state's closing arguments, in which they specifically discussed Payton's failure to pass a polygraph exam, were clearly improper, including under Illinois Supreme Court precedent, People v. Gard, 158 Ill.2d 191 (1994) (reversing and remanding where, in closing argument, the prosecution told the jury that the defendant told the truth after getting caught in a lie). Given that impropriety, counsel had no reasonable basis for failing to object.

## IX.    The Cumulative Errors in Mr. Logan's Case Denied Him Due Process

Mr. Logan's ninth ground for relief is that these errors cumulatively denied him the right to a fair trial. Again, to the extent this Court concludes that these errors, standing alone, were not sufficiently prejudicial, Mr. Logan contends that collectively they clearly were prejudicial, and that on this basis the Court should grant him habeas relief.

## CONCLUSION

Leonard Logan has spent the past 12 years in prison for a crime he did not commit, and more importantly, for a crime that he was convicted of only after a trial that

40

violated his basic constitutional rights. His trial counsel failed to investigate and present evidence that would have acquitted him, preferring instead to roll the dice in a way that no trial strategy can explain. He was convicted on evidence that was constitutionally insufficient. And, he was not given the opportunity to make a knowing waiver of his right to testify by an overbearing trial counsel that coerced him into not taking the stand. These errors and the remaining errors described in his petition and in this memorandum, led to his wrongful conviction.

Mr. Logan zealously pursued his state court remedies, and sought to give the Illinois courts an opportunity to correct these errors. The Illinois courts did not. He therefore respectfully requests, given the evidence and law applicable to this petition, that this Court grant him relief in the form of:

1. Overturning his conviction and granting him a new trial;

2. An evidentiary hearing if necessary to fully present his claims; and

3. Discovery if necessary to present further evidence in support of his claims.

Respectfully submitted,

/s/ Tara Thompson

Jon Loevy
Tara Thompson
THE EXONERATION PROJECT
  at the University of Chicago Law School
6020 S. University Avenue
Chicago, IL 60637
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

I, Tara Thompson, an attorney, certify that on September 28, 2012, I sent by electronic means a copy of the attached Memorandum to all counsel of record.

<u>/s/Tara Thompson</u>