**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **LEONARD LOGAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **No. 12 C 6170** |
| | ) | |
| **NEDRA CHANDLER, Warden,** | ) | |
| **Dixon Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**CORRECTED
MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

On November 17, 2000, an Illinois jury convicted Leonard Logan of the first-degree murder of Timothy Jones. The trial judge sentenced Logan to a prison term of forty-five years.

Logan has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argues, in nine separate claims, that he received ineffective assistance of trial and appellate counsel; he was denied his right to due process; and insufficient evidence existed to support his conviction. For the following reasons, the Court denies all of Logan's claims except claim 2, one of his claims of ineffective assistance of counsel, and orders an evidentiary hearing on that claim.

**Background**

**A.     Trial court proceedings**

The Court begins by describing the proceedings at Logan's trial in state court.

1.      **Opening statements**

In opening statement, the prosecutor stated that the evidence would show that on March 18, 1997, in a gas station parking lot on the south side of Chicago, Logan shot Jones in the head, killing him.  The prosecutor further stated that the evidence would show that a witness to the shooting followed the shooter's vehicle in his car and was able to get the shooter's license number and call the police.  The police then traced the car to Latonya Payton.  The prosecutor said that Payton had given several versions of the events.  Though he did not know how she would testify in court, the prosecutor said, Payton had ultimately implicated Logan.  The prosecutor also said that fingerprints matching Logan's were found in Payton's apartment and in the vehicle used in the shooting and that when arrested, Logan tried to flee.

The opening statement of defense counsel Anthony Thomas focused, at the outset, on the importance of the jury listening to all the evidence and holding the prosecution to its burden of proof.  He stated that the description given of the shooter did not match Logan.  Thomas also promised that the jury would hear evidence of an alibi.  He stated: "The evidence will show that on the date that the murder took place, Leonard Logan was not in Chicago.  He was in Milwaukee, Wisconsin."  Resp't Ex. 3 at 136.  Thomas also stated that a defense witness would testify that he was present at the shooting and was himself shot by the person who shot Jones, and that Logan was not the shooter.

2.      **The prosecution's case**

a.      **L.C. Robinson and Detective Phil Graziano**

L.C. Robinson testified that on March 18, 1997, between approximately 11:00

and 11:30 p.m., he was driving north on Yates Boulevard in Chicago. As he passed

through the intersection of Yates Boulevard and 75th Street, he saw his friend, Charles

Jenkins, talking on a pay phone at an Amoco station located on the corner of that

intersection. He also saw the victim, Timothy Jones, talking on another pay phone.

Robinson watched as a "short, about 5'9", 5'7", kind of heavy-set" African-American

man got out of a sport utility vehicle (SUV) that was parked approximately twenty feet

from the pay phones. Resp't Ex. 3 at 147. Robinson testified that when the man was

two or three feet away from the victim, he pulled a gun from his waistband and aimed it

at the victim's head. Robinson watched as the man shot the victim. He saw the victim

fall to the ground and then saw the shooter fire two or three more shots at other people

in the vicinity.

Robinson saw the shooter return to the SUV, get in the front passenger side, and

drive away down 75th Street. Robinson made a U-turn and then followed the SUV

westbound on 75th Street. He wrote down the vehicle's license plate number, called

911, and gave the 911 operator this information. Robinson followed the SUV until it

turned into an alley. He then returned to the Amoco station and told police who had

arrived there what he had seen.

Chicago police detective Phil Graziano testified that he traced the license plate

number provided by Robinson to a Budget Rent-A-Car rental agency and determined

that it was registered to a Nissan Pathfinder that had been had been rented to an L.

Payton on North Winthrop in Chicago.

### b. Latonya Payton

Latonya Payton was called by the prosecution to testify immediately after

detective Graziano.  She said that she had been Logan's friend for five or six years.
She stated that on March 15, 1997, at Logan's request, she rented a Nissan Pathfinder
and paid for it with her credit card.  Logan was with her when she rented the vehicle.
Logan then dropped her off and left with the vehicle.  Payton said that she next saw him
a few days later, when she went to his home near 36th and Federal Streets in Chicago.
Logan came to her apartment a couple days later, along with another man, to help put
together an entertainment center.  The police came to her apartment while Logan and
the other man were still there.  The two men left after the police rang Payton's doorbell
and announced that they were there.  The police asked her whether she had rented the
Pathfinder, telling her it had been involved in a hit and run accident, and she said yes.
They asked her to come to the police station to answer questions, and she agreed.

Payton testified that she was "interrogated" at the police station and was asked
about a homicide and who had the vehicle and when it was used.  She stated that at
first, she lied about who she had rented the Pathfinder for, saying this was because she
had not put Logan's name on the rental.  She falsely told the police that the car hadn't
left her home.  Payton said that after being interrogated for three hours, she admitted
she had rented the vehicle for Logan, whom she called "Dash."

The prosecutor then asked Payton about March 18, 1997.  She said that she
worked until 5:30 p.m. and then went home.  She did not see Logan until 1:30 the next
morning.  She denied that she was with Logan around 11:30 p.m. near 75th and Yates
and stated that she did not see Logan that evening.  When asked whether she knew
someone called "Rodman," Payton said that she was badgered by the police and was
told by them that Rodman was the other man who helped put up the entertainment

center at her home.  Payton also claimed that the police told her what had happened at the crime scene and that Logan was the shooter.  She said that she told the police she wasn't there.

According to Payton, the police told her that if she didn't come up with anything other than the name of who she had rented the vehicle for, she would be charged with murder.  She stated that she was held for three days without food or sleep.

Payton was confronted by the prosecutor with her grand jury testimony that she had seen Logan shoot a man at the Amoco station.  She replied, "That was a coerced statement . . .," Resp't Ex. 3 at 198, and she stated that two police officers had told her than unless she identified Logan as the shooter, she would be charged with murder.

At a sidebar, the prosecutor advised the trial judge that he intended to go through the process the police used to obtain Payton's statement inculpating Logan, "including use of two polygraph examinations and being confronted with the results." *Id.* at 200.[1] The prosecutor said he would not go into the results of the polygraph tests but wanted to bring out that after being confronted with the test results, Payton changed her story. The defense objected, arguing that the jury would erroneously believe that the test results were accurate.  The judge overruled the objection and said that he would give a limiting instruction "at the time I instruct the jury on the case," i.e. at the end of the trial. *Id.* at 203.

The prosecutor then elicited testimony from Payton regarding her interaction with the police on March 19.  She said the police first asked her about the two men they had

---

[1] This had been the subject of a defense motion *in limine* prior to trial.  The trial judge ruled that if Payton claimed she had been coerced, the prosecution would be permitted to introduce the fact that she gave a statement inculpating Logan after being administered a polygraph examination.  Resp't Ex. 3 at 119.

seen in the hallway outside her door, and she admitted that she initially falsely denied knowing them. She also said she initially lied to the police in saying that the SUV had not left her home on the night of March 18. The police then took her to the police station and interviewed her again, on the night of March 19. Payton denied telling the police that Rodman had borrowed the SUV on the night of March 18 and brought it back within twenty minutes.

Payton admitted that she was then asked to take a polygraph examination and that after the examination, she was brought back to the police station in the early morning hours of March 20. She testified that after the polygraph results were given to her, she told the police that "Dino" (evidently a nickname for Logan) and another man had been in her apartment when the police came. Payton stated that the police told her that if she didn't identify the person for whom she had rented the car, she would be charged with murder. Payton said that she told the police that she had loaned the car to Rodman on March 19. She said that she was questioned constantly throughout the night and was not able to get any sleep. She ultimately told the police, due to being threatened with a murder charge, that she had rented the vehicle for "Dash," who she said was Logan. At some point, Payton said, the police brought her a photograph of Logan, and she identified him as the person who had the car between 11:00 p.m. on March 18 and 2:00 a.m. the next morning. She said, however, that the police were not satisfied with her story because she had said she wasn't on the scene of the shooting, so they continued to badger her and interrogate her.

Payton admitted that she agreed to take a second polygraph test on the afternoon of March 20. She denied that her story changed after she was confronted

6

with the test results. She denied telling the police that she was with Dino (Logan) and Rodman when they drove the vehicle to 75th and Yates, instead saying that the police told her that was what had happened. Payton also said that the police told her that Logan had made a comment about a "pussy motherfucker," walked up to people at a pay phone at a gas station, and started shooting. Payton further stated that the police had given her other details of the crime.

Payton also claimed that when interviewed by a female detective named Van Witzenburg and an assistant state's attorney, people in the room (she was not sure who) told her what her story should be. Payton identified her signature and initials on a written statement, and she admitted that the statement contained a different story from what she had testified. Payton said that the prosecutor had gone through the statement with her and elicited its contents, including identifying Logan as "Dino." Payton acknowledged that her signed statement reported that on March 18, Logan drove with her and Rodman to 75th and Yates, said, "There goes that pussy motherfucker," got out of the car and shot with a handgun at a man talking on a pay phone. Her statement further reported that they then drove away in the vehicle, Logan noticed someone was following them, and he stopped the vehicle hoping to lose the car that was following. Her statement also reported that Logan then went to a building at the Stateway Gardens housing project and returned to the vehicle without the gun. Payton said, however, that these statements had come from the detectives and that they were untrue.

Payton admitted that on March 21, after the statement was completed, she was taken before a grand jury to testify under oath. She identified a transcript of her grand jury testimony, and it was read into the record. Before the grand jury, Payton had

testified that on March 15, 1997, she rented a Nissan Pathfinder from Budget Rent-A-Car so that she could bring home an entertainment center she had purchased. On March 16, she met with a man named PeeWee at the Stateway Gardens Chicago Housing Authority complex. When there, she also saw Logan, whose nickname was Dino. On March 17, Logan made arrangements with her over the phone to borrow the car she had rented. Logan picked up the car and returned it approximately ninety minutes later. On March 18, 1997, Logan called Payton at work because he wanted to borrow the car again. Payton agreed, and Logan picked her up from work at 5:15 or 5:30 p.m. They ran some errands and then went to Stateway Gardens, where they met with Rodman. A few hours later, Logan drove the three of them down 75th Street. As they approached the intersection of 75th Street and Yates Boulevard, Logan noticed the victim. Logan then pulled the car into the gas station and got out of the car. Payton heard a gunshot approximately three minutes later, and she looked and saw a young man near the pay phones fall to the ground. Payton saw Logan firing the gun. Logan then got back in the car, put the gun on the seat between his legs, and drove away. As they drove away, Logan noticed a car following them, so he pulled into an alley. After five minutes, Logan drove to Stateway Gardens, where he went into a building. He returned approximately ten minutes later without the gun.

The transcript of Payton's grand jury testimony further reflected that she told the grand jury that on March 19, 1997, she saw Logan when he again borrowed the car. She stated that he was supposed to pick her up at work, but instead he called and asked whether Budget Rent-A-Car had called her about the car. Payton told him that the car was not due back until March 20. Later that night, Logan and another man

came to Payton's apartment to set up her entertainment center.  As they ate pizza, the police arrived, and Logan and his friend left Payton's apartment through the backdoor.

At Logan's trial, Payton testified that her signed statement and grand jury testimony had been fabricated and coerced by police detectives, who threatened to charge her with murder if she did not implicate Logan.  On cross examination, she testified that she had been interviewed repeatedly by several detectives, through the night on March 19-20, with no sleep and nothing to eat.  She said that she was constantly interrogated over a thirty-six hour period.  She said that some of the statements in the signed statement and grand jury testimony were true, but others were untrue.  She stated that in fact she was not in the vehicle at 75th and Yates on March 18 and did not know how Jones had been shot.  Defense counsel also elicited that Payton was being held in custody on contempt charges and was facing a possible perjury charge but was willing to risk that to tell the truth.

### c.    Detective Alejandro Almazon; polygraph evidence

After testimony by a forensic pathologist regarding the cause of Timothy Jones' death, Chicago police detective Alejandro Almazon testified that he and detectives William Higgins and Edward O'Boyle went to the apartment of Latonya Payton at approximately 6:30 p.m. on March 19, 1997.  The detectives first asked Payton about two African-American men they had seen in the hallway as they had approached her apartment.  Payton denied knowing the men.  The detectives then asked Payton about the SUV.  Payton told them that she had rented it and that it had been parked in front of her building from the evening of March 18 through the time of the interview.  When the detectives told Payton that the vehicle was involved in a shooting, she again told them

that it had been parked in front of her building and that she had no knowledge of what they were talking about.

The detectives then asked Payton about beer bottles and two large pizzas that they observed in her apartment. At this point, Payton admitted that the two men whom the police had seen walking down the hallway were friends of hers and had been in her apartment. Payton told the detectives that another friend of hers borrowed the vehicle she rented on March 18, but this person was not either of the two men who had just left her apartment. Payton did not identify either of those two men by name. The detectives told Payton that the shooting was a homicide, and she agreed to go to the police station to speak with them about the shooting. The detectives also brought the SUV to the police station for evidence processing.

Almazon testified that at the police station, the detectives asked Payton about the events of March 18. Payton stated that at approximately 11:00 p.m. that night, her friend Rodman came over to her apartment with a man named either Keith or Kevin. Payton said that the men came over to assemble an entertainment center, but they did not put it together because they arrived too late. Payton said that Rodman then asked to borrow the car, and she gave him the keys. Rodman returned the car approximately twenty minutes later.

Because Payton had given the detectives different stories, they asked her to take a polygraph examination, and she agreed. Around 10:00 p.m. on March 19, the detectives took Payton to another location for the exam. After speaking with the polygraph examiner after the exam was completed, they returned with Payton to the police station about 12:30 a.m. Around 1:00 a.m. on March 20, 1997, Almazon testified,

10

the detectives told Payton the results of the examination. Payton then said she wanted to "clear her name." She told the detectives that Rodman had borrowed the car and that the two men who were leaving her apartment when the detectives first arrived were Dino and a friend of his whom she did not know. Police then sought and obtained from Payton a consent to search her apartment and left her in an interview room at the police station.

Almazon testified that the detectives next spoke with Payton around 8:00 a.m. on March 20. Payton told the detectives a different story. Specifically, she said that Rodman had come to her apartment with Dino around 11:00 p.m. on March 18. The two men borrowed the car and returned at approximately 2;00 a.m. Dino came back the next morning at approximately 7:00 a.m. and borrowed the car again. According to detective Almazon, Payton said that she believed that Dino's first name was either Leonard or Anthony and that his last name was Logan. Payton then identified a picture of Logan as the man she called Dino who had come to her apartment.

Around 2:00 p.m. on March 20, Payton told the detectives still another version of her story, namely that Rodman was at her apartment that night but that he did not borrow the SUV. She said that Dino was the only person who took her vehicle that night. Due to Payton's changing story, around 4:00 p.m., the detectives asked her if she would be willing to submit to a second polygraph exam. She agreed, and Almazon then turned Payton over to detective Van Witzenburg.

On cross examination, defense counsel made reference to Almazon's testimony about polygraph tests, and the following exchange occurred:

Q:      Now, you know that polygraph tests are not admissible in a court of law, correct?

11

A:    Yes.

Q:    That's because they're proven to be inaccurate?

Resp't Ex. 5 at 357.  At this point, the prosecutor objected.  The judge sustained the

objection and gave the following instruction *sua sponte*:

> These questions, Ladies and Gentlemen, the testimony concerning the
> polygraph is to be utilized by you only as to how it explains how the police
> conducted their investigation and why they asked certain questions of the
> witness.  And the results of the polygraph are not relevant and not
> pertinent, and are not going to be revealed to you.  And you are not to
> speculate or guess what the polygraph results are, and the polygraph
> results themselves are not relevant in this case.  It only explains how the
> detectives conducted their investigation and their interviews and what they
> did with that examination and how it was utilized in interviewing Miss
> Payton.

*Id.* at 357-58.

### d.    Detective Sylvia Van Witzenburg; more polygraph evidence

Detective Sylvia Van Witzenburg testified that on March 20 she took Payton to

the second polygraph examination, which took about two hours, and then returned her

to the police station around 6:30 p.m. that evening.  She testified that around 7:00 p.m.,

with another detective, she read Payton her rights and confronted her with the results of

the polygraph test.

Van Witzenburg testified that Payton then gave a statement, which she

summarized as follows.  Payton said that on March 18, Logan was driving Payton's

rented vehicle down 75th Street while she sat in the front seat and Rodman sat in the

backseat.  They were approaching Yates Boulevard when Logan said, "Look at that

pussy motherfucker."  Resp't Ex. 5 at 370.  Logan pulled into a gas station at 75th and

Yates and exited the car.  He pulled a gun out of his waistband and started shooting a

man who was on a pay phone. Logan then turned, shot down the alley at another person, got back into the vehicle, and sped away. When he noticed another car following them, he pulled into an alley to elude the vehicle. They then drove to 36th and Federal, where the Stateway Gardens Chicago Housing Authority complex is located. Payton stated that Logan went into one of the apartment buildings there and returned after approximately ten minutes. Logan had changed his clothes, and he no longer had the gun with him.

Van Witzenburg testified that she then contacted the State's Attorney's office, and Assistant State's Attorney Kent Stinson came to the police station around 7:00 a.m. He interviewed Payton in Van Witzenburg's presence, and her statements were consistent with her earlier statement to the detective. Payton's statement was reduced to writing, and she signed it. Van Witzenburg then took Payton to the grand jury to testify.

Detectives Almazon and Van Witzenburg both testified that that no one provided Payton any facts or any details surrounding the shooting of the victim. Both also testified that Payton was not coerced or pressured. Almazon testified specifically that Payton was not threatened with a murder charge.

### e. The prosecution's remaining witnesses

Assistant State's Attorney Kent Sinson testified that he interviewed Payton on the morning of March 21 after being briefed by detectives on "some basic facts about the case." Resp't Ex. 5 at 402. Sinson testified at trial that he first advised Payton of her rights and then asked if she had information about the murder of Timothy Jones. Sinson stated that the detectives were not in the room for most of the interview. During

13

the interview, and outside the presence of detectives, Sinson asked Payton how she had been treated by the police. She replied that she had been treated well and that the police had provided her with something to eat and drink. Following the interview, Stinson prepared in Payton's presence a written statement memorializing what she had said. Once the statement was written, Sinson read it out loud to Payton. He also asked her to review it for accuracy and to make any changes if necessary. Payton then signed each page of the thirteen-page statement.

Assistant State's Attorney Lawrence O'Reilly testified that he questioned Payton before the grand jury. He said that when speaking with Payton before she testified, he asked whether she had been threatened or coerced, and she said no. She did not complain about being tired or having been mistreated.

Chicago police officer Hasan Al-Amin testified that on June 20, 1997, he responded to a call regarding a man wanted for homicide. When Al-Amin arrived at the scene, he saw a man who fit the given description trying to hide underneath a landing behind boxes. Al-Amin scaled a fence, and the man started running. The man ran to the roof of the building and started to jump off but then stopped. Al-Amin's partner ordered the man to stop and lie down, and the two officers then arrested the man. The man was Logan.

The prosecution also presented evidence that police removed two compact discs and three compact disc cases from the Nissan Pathfinder SUV. A fingerprint on one of the compact discs matched Logan's. Logan's fingerprint was also on one of the beer bottles found in Payton's apartment on March 19th.

### 3.     The defense case

#### a.     Charles Jenkins

Logan's defense counsel called a witness to impeach Robinson regarding his description of the shooter and also called Charles Jenkins to testify.  Jenkins testified that he was talking on a pay phone next to the victim at the Amoco station at 75th and Yates on Mach 18, 1997 at approximately 11:30 p.m.  While he and the victim were on the phones, a truck pulled into the Amoco station and stopped five or six feet away from them.  A young man exited the truck and walked toward them as though he was going to use a pay phone.  Jenkins kept turning to look at the man as he approached, and he saw the man pull out a gun.  He watched as the man put the gun to the victim's head and shot him.  Jenkins then dropped the phone and started to run through an alley, where he was shot in the back by the same man who had shot the other victim.

At trial, Jenkins described the shooter as 5'6" or 5'7" tall and 160 to 170 pounds. He further testified that the shooter's complexion was darker than his own.  He stated that he was "positive" that Logan was not the man who shot him.  Resp't Ex. 7 at 512. Jenkins also testified, however, that there was only a "slim chance" that he could recognize the shooter if he saw him again because the scene was "pretty chaotic."  *Id.* at 492, 506.  On cross-examination, the prosecution elicited that Jenkins was being prosecuted for parole violations, suggesting this gave him a bias against the prosecution.  Jenkins denied that he was upset with the prosecution.

#### b.     Colloquy regarding testimony by Logan and alibi witnesses

After the conclusion of Jenkins' testimony, outside the jury's presence, Logan's lead defense attorney Martin Kelly said the defense had another witness (an

impeachment witness) and that Logan would testify after that. *Id.* at 514. The trial judge stated, "you did mention in the opening statement some sort of alibi to the jury, are you calling those witnesses, yes or no?" Kelly replied, "Judge, we do not anticipate calling the alibi witness [sic]." The judge asked whether Logan understood, and Logan said "I need to speak with the attorney, your Honor." *Id.* The judge stated that Logan had an opportunity to speak with counsel just earlier; Logan replied that they were "speaking on another issue, your Honor." *Id.* at 515. The judge asked Kelly if he had talked to Logan about the alibi witnesses. Kelly replied that he had done so that morning and that "[a]t the time he made a decision that we didn't need the alibi witnesses." Asked about this by the trial judge, Logan said that Kelly "discussed that with me, I did not make an accurate decision on that, I told him I would think about it and he was suppose [sic] to get back with me, he never came back to the back." *Id.* The judge pressed Logan: "Do you want to call those witnesses, yes or no?," and Logan replied, "Yes." *Id.* at 516.

The jury was then brought back into the courtroom, where it heard testimony from a defense investigator who said he had shown a photograph of Logan to Jenkins. On redirect examination, defense counsel elicited that Jenkins reported that Logan was not the shooter.

Following the investigator's testimony, defense counsel Kelly requested a sidebar. The record reflects that the sidebar was held in the trial judge's chambers. *See id.* at 529. Kelly stated that the defense intended to rest its case at that point and asked whether the trial judge wanted to admonish Logan—presumably concerning his right to testify, calling witnesses, or both. The trial judge said that Logan had stated

earlier that he wanted to testify[2] and asked if he changed his mind. Logan said, "No, I wanted to talk to the attorneys about that, your Honor, that's why I was asking you if I could speak with the attorneys." *Id.* at 530. Logan said he had spoken to the attorneys about whether to call witnesses and whether to testify, but "wanted to talk to them some more in detail with the attorneys about that, your Honor." *Id.* The judge said that "we're getting to a point where I find that this is being dilatory on the defense part, that you're stalling." *Id.* After putting some of the background on the record, the judge gave Logan "a few moments with your attorney in this room in private next to my chambers" to discuss the matter and decide what to do. *Id.* at 531. The judge said, "I'll give you a few minutes. The jury is waiting for us in the courtroom." *Id.*

After Logan and his attorneys had an opportunity to speak, the judge asked defense counsel whether, prior to that day, defense counsel had spoken to Logan about whether he should testify. *Id.* at 532. Both attorneys said yes. Thomas said, "I personally have spoken to Mr. Logan regarding his testimony, I have advised him double digit times not to testify. . . . I told him at least five times today that it is my opinion that he should not testify." *Id.* at 532-33. Kelly said, "I've talked to him not only today but on other occasions saying that, explaining that his past convictions could come in and that if the case is going well enough he probably shouldn't testify, that is my feeling that the case is going well enough." *Id.* at 533. Both attorneys said, however, that they had told Logan it was ultimately his decision. *Id.*

The trial judge then turned to the question of calling alibi witnesses and asked whether counsel had discussed that with Logan. Thomas stated:

---

[2] This was not exactly correct. It was defense counsel, not Logan, who had earlier reported that Logan intended to testify. *See id.* at 514.

I have explained to Mr. Logan that in my view as a lawyer and I've practiced law now more than fifteen years that with my experience again I have handled hundreds of cases, I have tried probably nearly one hundred jury trials, it is my opinion that he should not call these alibi witnesses.

*Id.* at 533. Kelly stated, "Judge, I have explained to him that alibi witnesses are weak

and that we rarely win an alibi case because they are inherently weak the first time." *Id.*

at 534.

At this point, the following exchange occurred:

MR. THOMAS: Excuse me, Judge, I have something else that I would like to tell Mr. Logan. Judge, we have just received information that some of his family members have advised us to tell him that he should not call his alibi witnesses. I have just told him that in the Court's presence now on the record.

THE COURT: So what family members?

MR. THOMAS: His mother and his grandmother have advised that he not call his alibi witnesses to testify.[3]

THE COURT: Well, we will -- Do you want to testify in your trial, yes or no? Mr. Logan, do you want to testify in your trial, yes or no?

THE DEFENDANT: Your Honor, during the testimony –

THE COURT: It is your trial.

THE DEFENDANT: I understand. During the testimony, your Honor, they were going to be testifying that I was in other places other than the scene of the crime.

THE COURT: I'm talking about your testimony, do you want to testify in your trial? I am not talking about your alibi witnesses now, you, do you want to take the stand and testify in your trial that is a decision that you have to make. Your attorneys advised you as to what they think but you can reject their advice if you want. What do you want to do.

MR. THOMAS: Once again, Mr. Logan, I advise you not to testify but

_____

[3]  The Court notes that Logan's mother and grandmother were not his alibi witnesses. Thus, attorney Thomas's contemporaneous account of what he had just been told does not reflect that Logan's alibi witnesses had said they should not be called to testify.

that's your call.

THE COURT:  Twenty seconds have gone by since I've asked that question.  I'm going to ask you again, do you want to testify, yes or no?

THE DEFENDANT:  (No response.)

THE COURT:  All right, we'll call the jury out and then I'll ask the defense who their witnesses are and if you don't have any more witnesses you'll rest.  If you have more witnesses we'll hear from the witnesses.

MR, KELLY:  Are you testifying or not?

THE COURT:  The records should reflect that the defendant won't answer my question.  We'll go back out and have the jury back out in the courtroom.  Call the jury in.

(The following proceedings were had in the courtroom out of the presence of the jury.)

THE COURT:  We're back in court, the jury is out of our presence.  Mr. Logan, do you want to testify in your trial, yes or no?

THE DEFENDANT:  No, our Honor.

THE COURT:  Are you sure now?

THE DEFENDANT:  Yes.

THE COURT:  Positive?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Does the defense intend to call any other witnesses?

MR, KELLY:  Judge, at this point we're resting.  I spoken [sic] to Mr. Logan and he indicates to me that he does not wish to call the witnesses.  Is that correct, Mr. Logan?

THE DEFENDANT:  Yes.

THE COURT:  Positive now?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

*Id.* at 534-37.

After a further brief exchange about a prosecution rebuttal witness, the Court directed the courtroom officer to bring the jury in.  The defense then rested its case.  *Id.* at 538.  The Court notes that the record does not reflect that any break was taken between the point at which attorney Thomas stated that counsel had "just received information" that certain members of Logan's family purportedly said to tell him not to call the alibi witnesses and the final exchange where Kelly reported that Logan agreed not to call defense witnesses.

### 4.     The prosecution's rebuttal; closing arguments

In rebuttal, the prosecution called Joseph Adamczyk, a law clerk with the State's Attorney's office.  Adamczyk testified that he was present for an interview with Jenkins during which Jenkins stated that he did not see the face of the man who shot him.

During closing arguments, the prosecution, after discussing the evidence and the elements of the crimes, concluded its argument by highlighting the failure of the defense to follow through on defense counsel's promise of alibi evidence.  The prosecutor stated:

> The Defense in its opening statement told you you would hear evidence
> that the defendant wasn't even in Chicago, he was in Milwaukee when it
> happened.  You didn't hear any evidence of that, so you can't consider
> that.

*Id.* at 586.

Defense counsel Thomas began his closing argument by attempting to explain the non-calling of the alibi witnesses.  He stated:

> Ladies and gentlemen of the jury, before I get into the crux of my closing

20

> arguments, I'd like to refer back to my opening statement Counsel just
> touched on a little bit. I did tell you in our opening statement that we were
> going to present witnesses for an alibi defense. And those witnesses
> were present in court. They were prepared to testify.

*Id.* at 587. At this point the prosecutor objected, and the judge told the jury that "[w]hat

the attorneys say is not evidence." *Id.* Thomas continued as follows, starting off by

essentially attributing the non-calling of the alibi witnesses to Logan himself:

> *Conferring with our client*, we made the decision not to call those
> witnesses. And again to point something that I have told you in our
> opening statement, the Court told you earlier, and I will tell you again. The
> defendant is not required to prove his innocence. We did not want a
> situation where you would get confused about what's at stake here, what's
> at issue here. The issue is has the State been able to prove its case to
> you beyond a reasonable doubt, and we did not want you to get
> concerned about what someone else would say or whether you should
> believe them. And, so, based on the evidence that you've heard so far, in
> our view, the State has failed to sustain its burden.

*Id.* at 587-88 (emphasis added).

In rebuttal, the prosecution returned to the alibi issue, ridiculing Thomas's

comment about the alibi witnesses as "unbelievable" and virtually asking the jury to

draw an adverse inference from the defense's failure to introduce the promised alibi

evidence:

> There's a few things that I want to talk about that Mr. Thomas brought out
> as far as proof, some questions that he had for us through this case. He
> says, first of all, and it's unbelievable, that he had witnesses here that
> were going to be the alibi, because they told you and promised you this in
> opening statement that they were going to give you an alibi. There was no
> evidence in this trial, and you cannot, cannot consider whether he did or
> didn't have witnesses whether he is telling you the truth or not in his
> closing argument, that is not evidence in this case. *But he tells you "Oh, it
> was my strategy. I chose not to call them." I wonder why? Let's see,
> Latonya Payton puts him at the house, even with her testimony here, like
> an hour or so after the murder happens, I wonder why?*

*Id.* at 635-36 (emphasis added). Defense counsel objected, but the court overruled the

objection, and the prosecutor concluded with one last shot: "You do your own math on that one." *Id.* at 636.

The prosecution made no mention of Payton's polygraph examinations in its closing argument. In his closing argument, defense counsel Thomas made two brief references to the polygraph examinations, suggesting at one point that the police had used the polygraph to pressure Payton and that they had not done another polygraph test after her final, inculpatory statement because that statement fit their preconceived view of what had happened. *Id.* at 597, 606. Thomas did argue, however, that Payton had been the subject of pressure and coercion by the police.

In rebuttal, the prosecution, in response to Thomas's coercion argument, said the following about the polygraph tests:

> So what do they do? She lies to them out on the scene. They confront her about the uneaten pizza. She admits she knows the guys leaving the place. She lies to them. She agrees to go to the police station. She tells you she voluntarily goes to the police station. They get her to the police station, she lies again. Gives a little bit more, but lies again. They say, "Hey, would you take a polygraph?" "Sure." She goes, takes a polygraph. All there [sic] stuff takes time. Takes the polygraph, that takes a couple hours. She comes back. She feeds them a little more, but she's still lying. It's not matching what's going on in the case. This time they know that she's lying because of the cell phone records. So now they confront her with the cell phone records. "Okay. You're right, I'm lying about that," and she gives them a little bit more "Okay. I will give you a little bit more." But obviously she is not telling the whole truth here. "Will you take another polygraph?" "Sure." Time again. Go down to 11th and State, another polygraph. Comes back and confront with the results. Boom. She tells the statement. Now she's just caught in so many lies to the time she's got to the [sic] tell the truth.

*Id.* at 628. The prosecutor made no direct reference to the results of the polygraph examinations.

Defense counsel did not object to these statements, and the judge did not repeat

his limiting instruction about the polygraph during closing arguments. During the judge's final instructions to the jury, he did not repeat his earlier limiting instruction regarding the polygraph evidence, but he did instruct the jury that "[a]ny evidence that was received for a limited purpose, should not be considered by you for any other purpose." *Id.* at 639.

The jury found Logan guilty of first-degree murder, and the trial judge sentenced him to a prison term of forty-five years.

**B.    Logan's post-trial ineffective assistance of counsel motion**

Logan, through new private counsel, filed a post-trial motion in which he alleged, among other things, that his trial counsel had rendered ineffective assistance. Among other things, he alleged that trial counsel had failed to present the testimony of several alibi witnesses who were available. Specifically, Logan identified Princess Thomas, Chevelle Thomas, and Earlene Logan, who he said would have testified that he was in Milwaukee at the time of the shooting. In support of this motion, counsel filed a sworn statement signed by both Princess Thomas and Chevelle Thomas. *See* Resp't Ex. 9 at 687.

### 1.    Testimony by attorney Thomas

After hearing argument on the post-trial motion, the trial judge determined that he wanted to hear testimony from Logan's trial counsel. *See id.* at 693. They were called as "court's witnesses" and were questioned first by the prosecution. *Id.*

Defense attorney Thomas testified first. The prosecutor asked Thomas whether the issue of alibi witnesses had come up "in preparation for trial," and he stated, "We spoke to Mr. Logan and both Mr. Kelly and I advised Mr. Logan that we thought that it

23

would be a wiser trial strategy not to proceed with the alibi defense because --." The prosecutor asked whether the attorneys had come to that conclusion after interviewing the alibi witnesses, and Thomas said yes. *Id.* at 695**.** But then the following exchange occurred, in which Thomas conceded he had not interviewed the witnesses:

> Q:    And then, so after you interviewed these witnesses –
>
> A:    I personally did not interview the witnesses.
>
> Q:    You caused the witnesses to be interviewed?
>
> A;    I was present in court in chambers with Mr. Kelly when my then law clerk, Mr. John Moralia [sic], came into chambers and informed me that he had spoken to the witnesses.  And the witnesses had informed him, Mr. Moralia, to inform me that they thought it would be wiser for us not to call them to testify for Mr. Logan.
>
> Q:    So the witnesses themselves told your law clerk that it wouldn't be a good idea to call them as alibi witnesses?
>
> A:    That is correct.
>
> Q:    And it was based on that that you related that to Mr. Logan?
>
> A:    Yes, I did.

*Id.* at 696-97.  Thomas testified that he and Kelly then discussed with Logan whether to call the alibi witnesses and gave him their opinion that "based on what had been presented before, . . . calling witnesses that could be shaky would only help make the prosecution's case better and we didn't want to make it any better because we thought we had a good chance to win at that point."  *Id.* at 697.  Thomas stated that "after prolonged discussion," Logan ultimately agreed not to call the witnesses.  *Id.* at 698.

On cross examination by Logan's attorney, Thomas repeated that it was the defense attorneys' law clerk, John Miraglia, who had talked to the alibi witnesses:

> Q:    You spoke to Mr. Logan about the alibi witnesses?

A:     Yes, sir.

Q:     And you told him what you had learned from the law clerk?

A:     Yes.  From Mr. Moralia [sic].

Q:     And the law clerk had told you that the alibi witnesses had told him that they did not wish to testify?

A:     No, they didn't say that they didn't wish to testify.  Mr. Moralia told me that they told him that they thought it would be in his best interest that they not testify.

*Id.* at 702-03.

Thomas verified that Kelly likewise had not talked to the defense witnesses

during trial; he also suggested that he and Kelly had *never* wanted to call the witnesses:

Q:     Do you know if Mr. Kelly spoke to the alibi witnesses?

A:     He did not speak to them in my presence.

Q:     Do you know if the alibi witnesses were present outside the courtroom at any time during the trial?

A:     Yes, they were.  Mr. Moralia spoke to them in the hallway while I was in chambers with Judge Simmons[,] Mr. Kelly and counsel for the state.

Q:     I see.  So they were actually present at the trial when Mr. Moralia had the conversation with –

A:     Yes.  We had subpoenaed them to come to court.  And even though we didn't think that those witnesses were in Mr. Logan's best interest, we did subpoena those witnesses pursuant to his request. . . .

*Id.* at 703-04.  *See also id.* at 706 ("Sir, I never talked to the alibi witnesses.  It was Mr.

Moralia that spoke to them.").

In response to a question by the trial judge, Thomas described his concern about

the alibi witnesses' testimony and again repeated that it was his law clerk who had

spoken to the witnesses:

> THE WITNESS: The content of their testimony based on my understanding was that he was in Milwaukee at the time of the shooting, but it really wasn't clear to me that the witnesses were really clear about the times. And that's what was concerning me. Because if under cross examination the witnesses for the alibi were to crumble under cross examination, I was concerned that the jury would not believe Mr. Logan's innocence if they didn't believe his witnesses. It was my position that it didn't matter whether they believed his witnesses or not, that the state had not proven its case.

> THE COURT: So your decision was in part based on what their testimony would have been?

> THE WITNESS: Yes, sir.

> THE COURT: All right. And that's [what] was related to you by Mr. –

> THE WITNESS: Mr. John Moralia, yes, sir.

*Id.* at 704-05.

### 2.    Testimony by John Miraglia

John Miraglia testified that at the time of Logan's trial, he was a law student extern with the public defender's office. He assisted Kelly and Thomas during Logan's trial. He stated that "Mr. Thomas had asked me to talk with Mr. Logan's family members who were in court that day." Resp't Ex. 10 at 722. He spoke with Logan's mother and several other people. Miraglia testified that he told these persons that Kelly and Thomas were of the view that alibi witnesses would not be beneficial to the case and should not be called to testify:

> A:    I had related to the people that I was talking to that Mr. Kelly and Mr. Thomas were both of the opinion that Mr. Logan had a good reasonable doubt case, and they did not think that any alibi witnesses would be beneficial to Mr. Logan's case, and that we shouldn't call any as such.

*Id.* at 723. Significantly, Miraglia did not testify that the witnesses expressed any

concern about testifying; rather, they simply echoed the opinions of counsel that

Miraglia had relayed:

> Q:    And when you related this to these people, what was the response?
>
> A:    They did not question what I said.  I believe that one of the people who I was talking to, I can't remember which one, but I remember specifically hearing that please tell Leonard to listen to his attorneys.
>
> Q:    *And was that the extent of your conversation with these people?*
>
> A:    *Yes.*
>
> Q:    After that conversation did you relate that information to Mr. Kelly and Mr. Thomas?
>
> A:    Yes.

*Id.* at 723 (emphasis added).

On cross examination by defense counsel, Miraglia made it clear that his

directions from Thomas were to communicate the attorneys' opinions, not to interview

the witnesses or obtain information from them:

> Q:    Did they – who exactly asked you to talk to witnesses for anybody?
>
> A:    I believe it was Mr. Thomas.
>
> Q:    Okay, did he ask you to interview them, ask questions about what their testimony would be?
>
> A:    No, it was simply talk with the family and tell them what our position is.
>
> Q:    Okay, so you were just basically relaying the message that the attorneys on the case thought that the case did not require the alibi testimony?
>
> A:    Yes, correct.
>
> Q:    And they concurred or were – indicated that they [assented] to that in some way?

A:      The family –

Q:      Yes.

A:      -- members, yes.

Q:      How long did your conversation take?

A:      A couple of minutes, two minutes maybe.

*Id.* at 724-25.

### 3.      Testimony by attorney Kelly

Kelly also testified at the hearing on the post-trial motion and, like the other

witnesses, was questioned first by the prosecutor.  Kelly stated that in preparation for

trial, "I had an alibi prepared I believe.  I talked to two witnesses, his aunt Chapell [sic]

Thomas and Princess Thomas."  *Id.* at 730.  He conducted the interview by telephone

and was prepared to go ahead with an alibi defense and made arrangements for the

witnesses to appear at trial.  *Id.* at 730-31.

On the date the alibi witnesses were to come to court, Kelly testified, he analyzed

the case as follows after Charles Jenkins testified in the defense case:

> Mr. Jenkins came across as a very, very good witness.  And at that point I
> reviewed a lot of things in my mind; for example, Latonya Payton, the
> witness that I recanted – she was recanted.  So she was neutralized, I
> believe.  I thought that Mr. Jenkins was a very strong witness in that our
> case could not get any better.

*Id.* at 732.

Kelly was asked whether he had personally spoken to the alibi witnesses, and he

said yes.  *Id.*  He gave the following testimony:

Q:      And what was the sum and substance of your conversation with
them?

A:      Well, John, my clerk at the time came back and said I should talk to

28

the witnesses. They don't want to testify. I did talk to the witnesses, and
they said they did not want to testify. And I said, well, why not. And they
said, well, we don't want to testify; we're afraid that other things would
come out. And I went, "What do you mean, other things?" One of them
said, well, some past domestic violence issue with Tonya Payton.

*Id.* at 732-33. On this point, Kelly's testimony directly contradicted that of Miraglia, who

had testified that his communications with the witnesses only involved him telling the

witnesses that counsel believed they should not testify, and one of the witnesses saying

to tell Logan to listen to his attorneys. Kelly's testimony also contradicted that of

Thomas, who indicated that it was only Miraglia, not attorneys Thomas or Kelly, who

had talked to the witnesses and that Miraglia had not reported that the witnesses did not

want to testify

In his testimony, Kelly went on to explain his reasons for advising Logan not to

pursue an alibi defense. He said that what the witnesses had supposedly told him

about a "past domestic violence" issue was one factor. Another was a general problem

with alibi defenses:

. . . I had some hesitancy about the alibi, particularly in this one case and
in all alibi cases. Alibi defenses are not good, particularly when they're
family members. There's always the issue of bias and coerced testimony
and untruthful testimony. And generally speaking it's been my experience
every time I use an alibi, that they're not good.

*Id.* at 733. Kelly also testified that alibi witnesses are generally problematic for another

reason:

Secondly, if the defense puts on an alibi, even though it is not suppose[d]
to happen legally, realistically the burden shifts. All of a sudden, the jury is
not focused on the reasonable doubt issue of making the State prove their
case, but did the defense prove him innocent, if they proved their alibi.
And I wanted the jury to remain focused on the State's case, and what I
perceived to be its weakness.

Kelly also identified a third factor:

> I didn't want the State to have the chance to go into rebuttal witnesses. It
> was my believe that in the State's case-in-chief they forgot to put a value
> piece of evidence in, namely that being when Leonard Logan was
> arrested, he was arrested with a substantial amount of cash on him and
> drugs. Had the State got that in, that would corroborate what Tonya
> Payton's original testimony, that she rented the car for Leonard on her
> credit card, and that Leonard was suppose[d] to pay her in cash. It was
> my belief that the State was going to do that, that they should have done
> that, that they didn't do that, and I didn't want to give them a chance to do
> it on rebuttal.

*Id.* at 734. Kelly testified that after discussion, Logan ultimately agreed that it was not in

his best interest to call the alibi witnesses. *Id.* at 735.

On cross examination by defense counsel, Kelly was asked again about his

communications with the alibi witnesses. He conceded that it was John Miraglia who

explained to the witnesses the attorneys' reasons for not wanting to call them. *Id.* at

737 ("I believe that John Martin [sic] explained it to them."). He described his own

conversations with the witnesses as taking place prior to trial, saying that "when I spoke

to them *originally,*" they did not appear to be all that firm about the dates in question. *Id.*

at 737 (emphasis added).

Kelly also identified an additional reason, which he had prior to trial, for his

hesitancy about using an alibi defense:

> And there was another reason I was having hesitancy with the alibi. When
> I had spoken to Mr. Leonard [sic], he told me that he was in Wisconsin
> from early March to early April, okay. And then actually a few days before
> the trial, I was really worried about the alibi.
>
> I checked out a companion file he had with us, and in fact he had made a
> court appearance on March 17th, the day before this event which really
> kind of shook me. And then I thought the State probably knew about that
> being good competent attorneys, and they would have checked the file to
> see that he was actually in town the day before.

*Id.* at 737-38.

### 4.     Testimony by Earlene Logan

Logan's sister, Earlene Logan, also testified at the hearing.  She stated that on the day before the murder, she drove Logan to Milwaukee and dropped him off at her aunt's house.  Earlene Logan further testified that she was present at the trial but that she had not given Logan's lawyers her information, because no one asked her any questions.  *Id.* at 744.  She said she tried to talk to Logan's attorney, but he just told her to wait.  *Id.* at 746-47.

### 5.     Testimony by defendant Logan

Logan was the final witness called to testify at the hearing.  He stated that before trial, he told his attorneys that he intended to testify.  *Id.* at 748.  The attorneys promised to come over to the jail to prepare him the night before he was to testify, but they did not show up.  At court the next day, he asked them why, and they said that they would prepare him to testify while at court.  *Id.* at 749-50.  When the defense rested, Logan stated, he decided not to testify "because I hadn't been prepared and counsel and 'nem [sic] was adamantly against me testifying without even conferring with me . . . .  They had just decided not to, you know, allow me to testify."  *Id.* at 750.

Logan also testified about the sidebar conference in chambers at which the trial judge asked whether he was going to testify and whether his witnesses would be called.  Logan testified about intern Miraglia coming into the room:

> [T]hat's when the short guy came in that just testified, the clerk of the
> Public Defender's office and said that, well, the defendant's family –
> Leonard Logan [sic] family saying that they are against him testifying as
> well and that he shouldn't testify, and he should listen to the attorneys.

*Id.* at 751.  Logan said that he then asked to talk separately with counsel.  Counsel told him that he "shouldn't take the stand because it would hurt my case."  *Id.* at 752.  He

31

didn't understand this and said he thought the jury needed to hear his testimony. Logan stated that Thomas "advised me that if I took the stand or presented my witness, that he would have nothing to do with me in this case and that made me feel that I would be left with Martin Kelly who I had a conflict of interest with." *Id.* Logan said he felt he was left with no other choice. *Id.* at 753.

On cross examination, Logan said that counsel's only explanation for why they felt it was not in his best interest to call his alibi witnesses was that counsel "spoke to the witnesses that morning, and that they was contradicting themselves, and he felt they wouldn't be credible, and he said this in front of said judge in chambers as well." *Id.* at 754. *See also id.* at 755 ("he said the witnesses was contradicting themselves, and that he had spoken with them that morning."). Logan said that he decided not to call the witnesses based on counsels' statements "that they had spoken with the witnesses and that they were contradicting themselves, and they wouldn't be credible witnesses." *Id.* Logan said, however, that "I found out later on that they hadn't never spoken to the witnesses that morning regarding what they could have testified during trial." *Id.* at 756.

### 6. Arguments and the trial judge's ruling

Neither Princess Thomas nor Chevelle Thomas was called to testify at the hearing. Defense counsel sought a continuance to bring them to court to testify, but the trial judge denied the request. *Id.* at 759.

Counsel presented brief arguments. The prosecutor argued that Kelly and Thomas "knew how the trial was going," "had the facts of the alibi," and "talked to the people involved with it," and made a tactical decision, with Logan's agreement, not to call the alibi witnesses.

The trial judge denied Logan's post-trial motion. The judge made no specific findings, did not express judgments regarding the witnesses' credibility, and did not resolve conflicts in the testimony. Rather, the judge stated only that

> the State's response to the defendant's motion is based on a correct representation of the facts and based on a correct representation of the law, and I find that their position is more persuasive and correct under the facts of this case and the law that guides the rulings in this case.

*Id*. at 762.

## C.    Direct appeal

On direct appeal, Logan argued that: (1) the prosecution failed to prove him guilty beyond a reasonable doubt; (2) the prosecution made improper remarks during closing argument; (3) the prosecution failed to prove he was fit for trial; and (4) his trial counsel provided ineffective assistance by failing to call the alibi witnesses who would have testified he was in Milwaukee at the time of the murder and by forcing him to waive his right to testify. The appellate court affirmed Logan's conviction by a two-to-one vote. On the alibi witness issue, the majority stated that counsel had made a strategic decision not to call the witnesses, stating, among other things, that Kelly "testified that the alibi witnesses told him that they did not want to testify because they were afraid 'other things would come out,' specifically 'some past domestic violence issue with [Ms. Payton].'" *People v. Logan*, 352 Ill. App. 3d 73, 83, 815 N.E.2d 830, 839 (2004) ("*Logan I*"). The majority concluded, based on this and the other considerations Kelly had described in his testimony, that the decision not to call the alibi witnesses was objectively reasonable as a matter of trial strategy. *Id*.

The dissenting justice, Justice Tully, opined that the evidence against Logan was insufficient to prove his guilt. Justice Tully was of the view that when the only evidence

against a defendant is a disavowed out-of-court witness statement – as he found was the case here – the evidence is insufficient to convict. *See id.*at 84-86, 815 N.E.2d at 840-42.

The Illinois Supreme Court denied Logan's petition for leave to appeal (PLA). *See People v. Logan*, 212 Ill. 2d 545, 824 N.E.2d 288 (2004).

**D.     Logan's post-conviction petition**

**1.     The petition and preliminary proceedings**

In March 2005, Logan filed a petition for post-conviction relief.  He later filed a supplemental petition.  Logan raised the following claims:  (1) appellate counsel rendered ineffective assistance by failing to raise meritorious issues; (2) the prosecution failed to prove him guilty beyond a reasonable doubt; (3) the trial court improperly admitted Payton's statements into evidence; (4) trial counsel rendered ineffective assistance by failing to present the testimony of the alibi witnesses and by forcing him to waive his right to testify; (5) he was deprived of due process and a fair trial when the prosecution implied during closing arguments that Payton had failed her polygraph examination; (6) he was denied his rights to a fair trial and due process when evidence of Payton's polygraph examinations was introduced, the results of the exams were made clear to the jury, and no written limiting instruction was given; (7) trial counsel rendered ineffective assistance by failing to tender a written limiting instruction; (8) appellate counsel rendered ineffective assistance by failing to make arguments regarding the improper admission of the polygraph examination and trial counsel's failure to tender a limiting instruction; (9) trial counsel rendered ineffective assistance by his opening statement and closing arguments in connection with his failure to present

34

alibi witnesses; (10) trial counsel rendered ineffective assistance by failing to present evidence that at the time of the shooting, a 911 caller gave a description of the shooter that did not match Logan; and (11) defense counsel's cumulative errors constituted ineffective assistance of counsel.

The prosecution filed a motion to dismiss. The trial judge (the same judge who had presided over Logan's trial and the post-trial motions) denied the prosecution's motion and ordered a new trial based on the admission of the polygraph evidence without any written limiting instruction. The court also stated that trial counsel's failure to call the alibi witnesses factored into the decision to grant a new trial. The prosecution appealed. The appellate court reversed and remanded, holding that the circuit court had erred by granting Logan a new trial without first conducting an evidentiary hearing.

### 2. The evidentiary hearing

On remand, the case was heard by a different judge. Logan filed a motion to clarify the scope of the evidentiary hearing, arguing that he should be allowed to pursue all of his post-conviction claims. The court limited the hearing to a consideration of Logan's claims of ineffective assistance of trial and appellate counsel with respect to the admission of the polygraph evidence and the failure to submit written limiting instructions, and his claim of ineffective assistance of trial counsel for failure to call the alibi witnesses. The court determined that these were the only post-conviction claims that had survived the prosecution's motion to dismiss.

### a. Testimony by defendant Logan

At the evidentiary hearing, Logan testified that he had a poor relationship with Kelly, who he said refused to come see him at the jail and would not communicate with

35

him.  Logan said that after he complained to supervisors in the public defender's office, attorney Thomas was added as co-counsel.  On the topic of alibi witnesses, Logan testified that he told counsel that he had been with Princess and Chevelle Thomas in Milwaukee on March 18, 1997, and he expected them to testify at his trial.  He stated that during trial, counsel told him they didn't believe the witnesses should be called. Logan recounted his recollection of the sidebar held in the trial judge's chambers, including a "clerk" (intern Miraglia) coming in to say the witnesses had indicated they did not want to testify.  Logan said he then met with counsel, and Thomas told him "if I present my witnesses, he would be done with the case and leave."  Resp't Ex. 16 at 38. He said that the attorneys were adamant that the witnesses should not be called, and Thomas "walked off."  *Id.* at 39.  Kelly then interjected, "the witnesses don't want to testify" – even though Kelly had not talked to the witnesses to find out if this was their position.  *Id.* at 39-40.  Logan testified that based on Thomas's threat to resign, he told the judge he did not want to call the alibi witnesses.  *Id.* at 41.  Logan also said that he had not told either Princess of Chevelle Thomas that he had a domestic violence issue with Latonya Payton.  *Id.*

### b.    Testimony by alibi witnesses Princess and Chevelle Thomas

Logan's step-aunts, Princess and Chevelle Thomas, testified that Logan came to Milwaukee in March 1997 to celebrate their late mother's birthday.  The birthday is on March 15, but they did not celebrate it that year until a day or two after.  Princess testified that Logan came to Milwaukee either on or after the date of the birthday.  She acknowledged that she had previously signed an affidavit stating that Logan had come to Milwaukee on March 17.  Princess testified that after coming to Milwaukee, Logan

stayed with the Thomases for a few days, though she did not recall the exact date he left.  She was unaware of whether Logan had a court appearance in Chicago on March 17.  Princess testified that she talked to Logan's attorneys while they were preparing for trial.  She stated that she had no information about Logan's relationship with Latonya Payton and said nothing to Logan's attorneys about that.  She did not know why she was not called to testify at trial.

Chevelle Thomas testified that the birthday celebration was held that year sometime between March 15 and March 18.  She said that Logan was there for the celebration and stayed somewhere between three days and one week.  She acknowledged signing an affidavit at an earlier time stating that Logan had come to Milwaukee on the night of March 17 and stayed for at least two days.  On cross examination, however, Chevelle stated that they typically celebrate her mother's birthday on March 15, 16, or 17, and she also stated that Logan had said something about having to go back to Chicago to go to court.  Chevelle stated that she came to Logan's trial to testify.  She was not told why she was not called as a witness.  She stated that she knew nothing about Logan's relationship with Latonya Payton and had never told anyone anything about that.

### c.    Testimony by attorney Kelly

Lead trial counsel Kelly also testified at the hearing.  He stated that Logan had given him the names of Princess and Chevelle Thomas as alibi witnesses.  When asked whether he met with either witness, Kelly testified, "I spoke with them on the phone."  *Id.* at 116.  When asked whether anyone on the defense team had spoken with these witnesses prior to trial, Kelly stated, "I think my investigator Whitney Harris might have

spoken to her [sic]." *Id.* at 117.

Defense counsel asked Kelly whether, at the time Logan's trial start, he intended to call the alibi witnesses. Kelly replied, "That was rather in flux. If I thought it was absolute necessity, I would have." *Id.* at 118. Kelly stated, however, that he "did not have a lot of confidence in those alibi witnesses," and that this was so even before second chair defense counsel Thomas, in his opening statement, promised to call alibi witnesses to testify. *Id.* at 121.

Kelly testified that he ultimately decided against calling the alibi witnesses for several reasons. One is that he thinks that alibi witnesses in general are not good witnesses. *Id.* at 120. Another was that he was concerned that calling alibi witnesses would enable the prosecution to present rebuttal evidence. *Id.* at 121. He said that the witnesses' testimony that Logan was in Milwaukee would have amounted to a violation of his bail bond on his pending drug case and that he was "afraid [it] would have been brought out that [Logan] had a pending case for drugs." *Id.* at 123. (Kelly had made no mention of this as a rationale in his post-trial hearing testimony. ) Going one step further, Kelly suggested the alibi evidence might have enabled the prosecution to call the officer who had arrested Logan to testify that he had drugs and cash on him, and that this would lend credence to Payton's testimony that Logan was going to pay for the rented vehicle with cash. *Id.* at 123. Kelly did not explain, however, how either the pendency of a drug charge against Logan or his possession of cash at the time of arrest might have been proper rebuttal testimony in response to alibi evidence.

Kelly further stated that although "[a]t the time the trial began I thought I was going to call [the alibi witnesses]," albeit with "a lot of trepidation," he then "heard the

State's case in chief," which contributed to changing his mind. *Id.* at 124. He explained that after hearing the prosecution's case and the testimony of defense witness Jenkins, "I thought that our case had reached a zenith, could not get any better. I was . . . very afraid that by putting alibi witnesses on[.] especially ones that I believed were rather tenuous, that our case, its worth would diminish dramatically." *Id.* at 146. Kelly also said he was concerned that putting on alibi testimony would effectively shift the burden of proof to the defense, in other words, to prove the alibi. *Id.* at 146-47.

Defense counsel asked Kelly about his concern regarding the Thomases having information about a domestic issue between Logan and Payton. Kelly said that he learned this after the prosecution rested and his law clerk talked to the Princess and Chevelle. *Id.* at 125. Miraglia, according to Kelly, "relate[d] to us that [the] alibi witnesses did not wish to testify. And that one of them, I forgot which one[,] said that she was concerned about a domestic violence issue between Latonya, Latonya and Mr. Logan would arise." *Id.* When asked whether the witness told him this directly, Kelly said, "I believe she related it directly to me. Because I went out and talked to them after [Miraglia] talked to them." *Id.* Kelly said that the witness specifically mentioned an issue with Payton. On cross examination, Kelly repeated that Miraglia told him and Thomas during the in-chambers sidebar that the alibi witnesses "said they did not wish to testify. And that Leonard should listen to his attorneys." *Id.* at 149. Kelly also said that "I went, I believe that at that point I went and talked to them. They again said they didn't want to testify. That is when . . . one of them said she was afraid the domestic violent [sic] issue would come up." *Id.* On redirect, defense counsel asked Kelly whether he was aware that Miraglia had testified at the post-trial hearing that he did not

speak with the witnesses, but the judge sustained the prosecution's objection to this question. *Id.* at 159.

On cross examination by the prosecution, Kelly stated that Logan had told him in pretrial interviews that he had been in Milwaukee all of March 1997 and part of April. At some point, Kelly looked at the file in Logan's drug case and learned that Logan had been in court on that case on March 17 – one day before the murder. Kelly said that this "presented me with an ethical dilemma." *Id.* at 143. He said that in speaking with the alibi witnesses before trial, he was unable to pin them down on the exact dates Logan had been in Milwaukee. *Id.* at 144. Kelly said that the lack of specificity and the "ethical dilemma" were among the reasons he was reluctant to call the witnesses. *Id.* Elaborating further on the latter point, Kelly said that he "had huge problems when I determined that I received inaccurate information about when he was in Chicago." *Id.* at 145. The Court notes that Kelly had made no mention of this point during his extensive testimony on the alibi issue at the post-trial hearing on the motion for new trial.

On redirect, defense counsel asked Kelly to explain, given his reluctance about the alibi witnesses' testimony even before trial, "why did you promise the jury they were going to hear that testimony." *Id.* at 156-57. Kelly replied as follows:

> We wanted, when we make the opening statement we have to be prepared for all eventualities. When we decided not to use them, we strategized we could explain it away. If we didn't put them on.
>
> In other words, saying you know we were going to do this, but you heard the State's case, isn't worth our time putting these alibis on. The state doesn't have enough. He is not guilty.

*Id.* at 157.

With respect to the polygraph evidence, Kelly testified at the hearing that he had

filed a motion *in limine* to prevent its admission and that the only evidence admitted was that Payton took two polygraph examinations; the test results were not introduced. Kelly also testified that the court had given an oral limiting instruction. He stated that he did not request a written limiting instruction because the references at trial to the polygraph evidence "were so scant" that sending a written limiting instruction to the jury would unduly focus the jury's attention on it and "blow it way out of proportion for what it is worth." *Id.* at 133.

### d.  Testimony by appellate attorney Tim Leeming

Logan's appellate counsel, assistant public defender Tim Leeming, testified at the hearing that his normal practice was to raise all viable issues on appeal. Leeming did not have any notes about how he had analyzed Logan's case when he prepared his appeal, but he explained that in preparing appeals, he typically reads the post-trial motion, closing arguments, opening statements, and the transcript of the trial from start to finish. A supervisor or third party also reads the record and consults with him regarding the issues that should be raised on appeal.

Leeming testified that he did not remember why he did not raise the admission of the polygraph evidence and the lack of a written limiting instruction as issues on appeal. Leeming noted, though, that defense counsel arguably waived any error regarding the admission of the polygraph evidence by "adopt[ing] the polygraph and [making] the best of it to stress their theory of the defense." *Id.* at 177.

### e.  Admission of transcripts from prior proceedings

At the conclusion of the hearing, the transcripts of all prior proceedings were introduced. *See id.* at 191-92. Thus the transcript of the post-trial evidentiary hearing

on Logan's motion for new trial was before the court in considering the post-conviction petition.

### 3. The circuit judge's ruling

The circuit court judge denied Logan's post-conviction petition. In addressing the alibi issue, the court characterized the defense as "an illusion of an alibi" or "the appearance of a possible alibi." Resp't Ex. 17 at 5. The court concluded that trial counsel's decision not to present the alibi witnesses was not an error but was a matter of trial strategy. *Id.* at 5-6. Strategy, the court stated, "changes sometimes during the course of the trial." *Id.* at 6. The court stated that trial counsel might have originally believed they needed to present an alibi defense but later concluded, after hearing Payton's testimony, that presenting the alibi would have "diminished their efforts and would have swayed or perhaps [misled] the jury into confusing where the real burden was." *Id.; see also id. at* 9-10 ("trial lawyers understand . . . that sometimes juries become perhaps confused or don't necessarily abide by the fundamental principles of law when an alibi defense is presented. It now becomes sort of a balancing test rather than keeping the burden of proof beyond reasonable doubt squarely where it belongs, which is on the State.").

The court also stated that trial counsel "had learned of the deceit of his own client" on the question of having been in Milwaukee the entire month of March when in fact he had appeared in court in Cook County the day before the murder. *Id.* at 6-7. The court also referenced the "lack of certainty" from the alibi witnesses, saying that "[b]ased on that alone, I can understand that trial strategy could very easily be not to call them." *Id.* at 8. In this regard, the court also noted that the fact that Logan had been

42

out of state would have been a violation of the conditions of his bail bond on his pending narcotics case. *Id.* at 9. The court also referenced a possibility that Kelly had not identified during his testimony as a basis for his decision, specifically that "the presentation of the alibi . . . would have been somewhat inconsistent" with the fact that Logan's fingerprints were found in Payton's apartment and on "a CD case [sic]" inside the van identified as having been used in the murder. *Id.* at 8.

The court concluded its discussion of the alibi witnesses by stating that "I don't think there was an alibi in this particular case that would have been worth pursuing" and that "[t]he fact it was mentioned at one point in the opening statement, and the decision not to use, it is not ineffective assistance of counsel." *Id.* at 10.

This Court notes the following with regard to the circuit court's ruling. The circuit judge made no reference at all to attorney Kelly's testimony about the possibility of rebuttal evidence regarding domestic violence, Logan's possession of cash and drugs at arrest, or the fact that Logan had a pending drug charge at the time of the shooting. This suggests that the circuit judge either did not credit Kelly's testimony on these points or, at least, did not consider the points significant. One way or another, however, the circuit judge made no findings on these points. The circuit judge also did not resolve the previously-discussed conflicts between the testimony and that of attorney Thomas, intern Miraglia, or Princess and Chevelle Thomas; indeed, the judge did not reference those conflicts at all. Likewise, the circuit judge did not reference or resolve the conflicts in the evidence regarding whether Kelly had actually talked to Logan's alibi witnesses shortly before resting the defense case.

With regard to the polygraph evidence, the court noted that Payton's claim of

43

coercion warranted the prosecution's introduction of the fact that she had taken polygraph examinations.  The examination results, however, were not admitted.  *Id.* at 13-14.  The court stated that "it would have been better practice to have immediately instructed the jury at that point as to how they should consider that limited evidence, and what limited purpose it was admitted for."  *Id.* at 14.  The court noted, however, that the trial judge had given a limiting instruction when the subject came up with a later witness.  *Id.* at 14-15.  And though neither party submitted a written limiting instruction, the trial judge instructed the jury that it was to consider evidence admitted for a limited purpose only for that purpose.  *Id.* at 15.

The court concluded that defense counsel's failure to submit a limiting instruction "was a legitimate exercise of trial strategy," given trial counsel's testimony that they had adequately neutralized any detrimental effect of the evidence and wanted to avoid highlighting the evidence further.  *Id.* at 15-16, 20.  Finally, because there was no error by trial counsel, the court concluded, appellate counsel did not err in failing to raise the issue.  *Id.* at 20-21.

**E.      Appeal on post-conviction petition**

Logan appealed the lower court's dismissal of his petition to the Illinois Appellate Court, which affirmed the circuit court's ruling.  *See People v. Logan*, 2011 IL App (1st) 093582, 954 N.E.2d 743 (2011) ("*Logan II*").  On the polygraph-related issues, the court held that:  (1) the testimony about polygraph testing was admissible, and thus appellate counsel did not render ineffective assistance by failing to challenge it; (2) the trial court's oral limiting instruction regarding the polygraph evidence was adequate, and thus appellate counsel was not ineffective for failing to raise that issue; (3) trial counsel was

not ineffective for failing to seek additional instructions because it was reasonable trial strategy to avoid drawing jurors' attention to the polygraph evidence; and (4) because the defense made the circumstances of Payton's sworn statement and grand jury testimony an issue in the case, the prosecution was allowed to comment on her having failed her polygraph examinations during closing arguments, and appellate counsel was not ineffective for declining to challenge that. *Id.*, 954 N.E.2d at 753-58.

On the issue of the alibi witnesses, Logan's appellate briefs noted, among other things, the conflicts between the testimony of attorney Kelly and that of other witnesses on various key points. In particular, Logan noted the conflict between Kelly's testimony and the testimony of Princess and Chevelle Thomas on Kelly's claim that they had said they did not want to testify. *See* Resp't Ex. E at 15-16, 44-45. Logan also noted the conflict between Kelly's testimony and that of Miraglia and the Thomases on what their discussions concerned and on what the Thomases had told Kelly – in particular, on the claimed domestic violence issue. *See id.* at 16, 45.

The appellate court ruled that trial counsel was not ineffective for failing to call alibi witnesses after promising in opening statement that he would do so, because he had a number of strategic reasons for changing his mind. The court relied on several factors that the circuit court had not referenced and on which the circuit court had neither made credibility determinations nor resolved testimonial conflicts, as well as on some factors the circuit court had addressed. Specifically, the appellate court cited the following factors from Kelly's testimony:

- Kelly's testimony that "he changed his mind about calling the alibi witnesses once the State completed its case in chief without eliciting evidence

45

that defendant had a pending drug case." The court noted that Kelly "decided not to call the alibi witnesses so as to prevent the State from eliciting evidence of the arrest in rebuttal." The circuit judge had not addressed this point in his decision. The appellate court did not address how it was that this testimony might have come in on rebuttal.

- Kelly's testimony that after the prosecution rested its case, he learned from his law clerk "that the alibi witnesses did not wish to testify" and that one of the witnesses expressed concerned that she might be asked about a domestic violence issue between her and Payton. The circuit court likewise had not addressed these points in its decision that was under review. In particular, as pointed out earlier, the circuit court did not resolve the conflicts between Kelly's testimony and that of Thomas, Miraglia, and the alibi witnesses on these points and made no determinations regarding Kelly's credibility, which Logan had challenged.

- The appellate court also cited Kelly's testimony that the witnesses could not specifically state on what day Logan had been in Milwaukee and that Logan had given him inaccurate information on when he had been in Milwaukee. This factor had been cited by the circuit court in its ruling.

- The appellate court also cited Kelly's testimony that he felt there was a strong case for acquittal and that putting on alibi witnesses might diminish the worth of the case and lead the jury to effectively shift the burden of proof. The circuit court had likewise cited this factor in its ruling.

*Id.* at 759.

The appellate court's decision referred only to Kelly's testimony, and to no other evidence, in addressing the alibi / ineffective assistance issue. As indicated earlier, the appellate court had before it the testimony of Logan, attorney Thomas, and witnesses Princess and Chevelle Thomas from the post-conviction hearing, as well as the testimony of intern Miraglia, attorney Thomas, Logan, and other witnesses at the post-trial hearing. A good deal of this testimony conflicted with what Kelly had said. The court made no mention of any of the other witnesses' testimony and did not attempt to resolve any conflicts in the evidence.

In rejecting Logan's ineffective assistance claim, the appellate court contrasted other cases in which an attorney's failure to deliver on a promise to call witnesses was ruled ineffective. The court stated that Kelly had "testified in detail as to his many strategic reasons for changing his mind about calling the alibi witnesses," and that as a result "[t]here was no ineffective assistance here." *Id.* As indicated, however, though the court cited Kelly's testimony, it did not address or attempt to resolve conflicts between that testimony and other evidence.

The Illinois Supreme Court denied Logan's petition for leave to appeal. *People v. Logan*, 962 N.E.2d 486 (Ill. 2011).

## F. Logan's habeas corpus petition

On August 6, 2012, Logan filed the present habeas corpus petition. He asserts the following claims in his petition: (1) he was denied constitutionally effective assistance of counsel because his trial counsel used threats to coerce him into not testifying; (2) trial counsel was ineffective by promising alibi witnesses in his opening statement and then failing to call them during the course of trial; (3) trial counsel was

ineffective for failing to obtain and offer a 911 tape that Logan alleges contains a description of the shooter that does not match him; (4) trial counsel was ineffective for failing to seek an effective limiting instruction regarding the polygraph evidence and for failing to object to the prosecutor's closing remarks about the evidence; (5) he was denied effective assistance of counsel due to the cumulative effect of all errors made by trial counsel, including those already cited, as well as trial counsel's failure to elicit Payton's testimony that she recanted before speaking with Logan while he was in jail and counsel's failure to seek a mistrial when the prosecution asked Jenkins whether he was upset with the prosecution for its treatment of him in other criminal cases; (6) he was denied a fair trial by the trial court's admission of evidence that Payton failed a polygraph exam; (7) his conviction was not supported by sufficient evidence; (8) appellate counsel rendered ineffective assistance in failing to raise meritorious issues, including the impropriety of polygraph evidence, the prosecution's improper closing remarks, and trial counsel's decision not to seek additional limiting instructions; and (9) the combined effect of these alleged errors violated his right to due process. *See* Pet'r Opening Mem. at 21-22.

## Discussion

A petitioner is entitled to a writ of habeas corpus if he is being held under a state court judgment obtained in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Id.* § 2254(d)(1)–(2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).

A decision meets the "contrary to" requirement of section 2254(d)(1) if "the state court applies a rule that contradicts the governing law set forth" by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A decision meets the "unreasonable application" requirement if the "state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case," *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), or "unreasonably refuses to extend a principle to a context in which it should apply." *Griffin*, 622 F.3d at 841 (internal quotation marks omitted). Finally, a state court's findings of fact are presumed correct and will not be deemed "unreasonable" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007).

The Court will address Logan's claims in a somewhat different sequence from how he presents them in his petition.

## 1.      Claim 7:  The evidence was insufficient to convict Logan

Logan contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt. A reviewing court considers "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This Court, however, is not reviewing Logan's sufficiency claim in the first instance. Rather, the

Court assesses whether the Illinois appellate court's denial of Logan's sufficiency claim was "contrary to" or an "unreasonable application of" federal law. *Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011) (per curiam).

The state court set forth the proper standard for reviewing Logan's sufficiency of the evidence claim. *See Logan I*, 352 Ill. App. 3d at 79, 815 N.E.2d at 835-36. It then discussed cases in which later-recanted statements alone were sufficient to prove a defendant's guilt beyond a reasonable doubt. Specifically, the state appellate court cited the following excerpt from *People v. Morrow*, 303 Ill. App. 3d 671, 674-75, 708 N.E.2d 430, 436 (1999), for the proposition that even when there is no corroborative evidence, a prior inconsistent statement can support a conviction:

> The previous inconsistent statements alone were sufficient to prove defendant's guilt beyond a reasonable doubt. . . . It is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony. Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was substantially corroborated or clear and convincing, but it may *not* engage in any such analysis.

*Logan I*, 352 Ill. App. 3d at 80, 815 N.E.2d at 836-37 (internal citations and quotation marks omitted). Applying this law to the facts, the appellate court concluded that Payton's pretrial statement and grand jury testimony implicating Logan, combined with the physical evidence of Logan's fingerprints on various items linking him to Payton and to the vehicle she had rented that was used in the murder, were sufficient to sustain Logan's conviction. The court noted that although Jenkins testified that he was positive that Logan was not the shooter, "[i]t is for the trier of fact to resolve any inconsistencies in the testimony." *Id.* at 80-81, 815 N.E.2d at 837.

Though the dissenting appellate justice disagreed with the majority's conclusion, the Court cannot say that the decision was contrary to or an unreasonable application of federal law. As the Supreme Court has explained, "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos*, 132 S. Ct. at 3. Payton's earlier statements that she had witnessed Logan shooting Timothy Jones were admitted as substantive evidence under Illinois law. The jury was entitled to believe those earlier, inculpatory statements. It was not required to believe Payton's initial statements to the police or her testimony at trial that she had lied while giving the inculpatory written statement and grand jury testimony because she was coerced by the police to inculpate Logan. The inculpatory statements were not inherently unbelievable, and they were corroborated to some extent by the fingerprint evidence connecting Logan to the vehicle used in the murder.

In sum, viewing the evidence in the light most favorable to the prosecution, the appellate court reasonably could conclude that a reasonable jury properly could find Logan guilty of first-degree murder. Although there was not an abundance of evidence, reasonable jurists could conclude it was constitutionally sufficient. *See Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009) ("[I]t is black letter law that testimony of a single eyewitness suffices for a conviction even if 20 bishops testify that the eyewitness is a liar."). The Court thus concludes that the appellate court did not unreasonably apply *Jackson* in holding that a rational trier of fact could have found Logan guilty of murder beyond a reasonable doubt.

**2.     Claim 6:  Logan was denied due process by the trial court's admission of evidence regarding Payton's polygraph examinations**

In claim 6, Logan contends that he was denied his right to due process when the

state court admitted evidence regarding Payton's polygraph examinations. In his reply

brief, however, Logan withdrew this claim. *See* Pet'r Reply at 9 n.2 (conceding that his

claim that the use of polygraph evidence at his trial violated his right to due process

"cannot survive the review of this Court" because it is not a federal constitutional claim).

The Court therefore finds in respondent's favor on this claim.

**3.      Claim 4:  Trial counsel was ineffective for failing to argue for an effective limiting instruction and failing to object to improper closing arguments**

Logan contends in claim 4 that his trial counsel was ineffective for failing to argue

for an "effective" limiting instruction regarding the proper use of the polygraph evidence

and for failing to object when the prosecutor suggested in closing argument that Payton

had failed the polygraph exam.  Under *Strickland v. Washington*, 466 U.S. 668 (1984),

to prevail on a claim of ineffective assistance of counsel, a petitioner must show that his

counsel's performance fell below an objective standard of reasonableness and that this

prejudiced the petitioner.  *Id.* at 687-88.  To prove prejudice, the petitioner must

establish a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  *Id.* at 694.  A "reasonable

probability" consists of a probability sufficient to undermine confidence in the outcome of

the proceeding.  *Id.*  If a defendant is unable to make a sufficient showing on one

component of the *Strickland* standard, a court need not consider the other component.

*Id.* at 697; *see also Pearson v. Callahan*, 555 U.S. 223, 241 (2009).

With respect to the first point asserted by Logan in this claim, the record shows

that the trial judge stated that he would give the jury a written limiting instruction

regarding the use of the polygraph evidence at the close of trial but that he did not

actually do so.  *See* Resp't Ex. 3 at 203.  The trial judge did, however, give an oral

limiting instruction during the trial in which he stated that no evidence was being presented about the results of polygraph tests; the jury was not to speculate about the results; and "the testimony concerning the polygraph is to be utilized . . . only as to how it explains how the police conducted their investigation and why they asked certain questions of the witness."  Resp't Ex. 5 at 357-58.  The court also instructed the jury at the close of trial that evidence received for a limited purpose should not be considered for any other purpose.

Logan contends that his trial attorney should have requested additional limiting instructions at the close of trial as well as each time there was any reference to polygraph testing.  On Logan's post-conviction appeal, the state appellate court noted that "trial counsel explained at the evidentiary hearing that he made the strategic decision not to tender the limiting instruction so as not to focus the jury's attention on the polygraph evidence."  *Logan II*, 954 N.E.2d at 757.  The appellate court ruled that counsel's failure to request additional limiting instructions was not constitutionally ineffective, stating that decisions about trial strategy "typically" do not support a claim of ineffective representation.  *Id.*

The state court's reasoning is debatable, but that does not satisfy Logan's burden under section 2254(d).  *See Morgan v. Krenke*, 232 F.3d 562, 567 (7th Cir. 2000) ("No federal court can second-guess a state court's adjudication of an issue simply because [it] disagree[s] with it.").  Rather, section 2254(d)(1) requires a showing that the state court applied federal law unreasonably.  *See Williams*, 529 U.S. at 412 ("[A]n unreasonable application of federal law is different from an *incorrect* or *erroneous* application of federal law.") (emphasis in original).

Applying *Strickland*, the Seventh Circuit has made clear that the decision to seek a limiting instruction is generally a question of trial strategy. *Anderson v. Sternes*, 243 F.3d 1049, 1057-58 (7th Cir. 2001); *United States v. Lindsay*, 157 F.3d 532, 536 (7th Cir. 1998). Calling a decision a matter of strategy or tactics does not insulate it from scrutiny, but in this case fair-minded jurists reasonably could conclude that counsel's strategic decision was reasonable. When a limiting instruction has the potential to highlight damaging evidence to the jury, a trial attorney's decision not to request the instruction is typically considered reasonable. *Anderson*, 243 F.3d at 1057-58 (attorney's decision not to ask for a limiting instruction was reasonable trial strategy where any limiting instruction would likely have underscored troublesome material).

Even were the Court to conclude that the state court acted unreasonably in concluding that counsel's failure to request a limiting instruction during closing arguments was a reasonable strategic judgment, the Court would conclude that Logan was not prejudiced. The trial judge gave a pointed and accurate instruction during trial regarding the purposes for which the polygraph evidence could and could not be considered, and his final instructions cross-referenced limiting instructions given during the course of trial. Given those facts, there is no reasonable probability that the trial would have come out differently had additional limiting instructions been given, written or otherwise.

Logan also contends in claim 4 that trial counsel rendered ineffective assistance by failing to object to the prosecution's reference to the polygraph examinations during closing arguments. Logan waived this claim in his reply brief, however, stating that the claim "cannot survive the review of this Court because of the absence of federal law . . .

and the state law-driven determinations made below."  Reply at 9 n.2.

Even assuming Logan had not given up this part of claim 4, it would fail on its merits.  The state appellate court in this case concluded that the prosecutor's remarks regarding Payton's polygraph exam were proper as a matter of Illinois law.  *Logan II*, 954 N.E.2d at 758.  Counsel's failure to object to an argument that was not improper cannot be considered constitutionally deficient performance.  *See United States v. Stark*, 507 F.3d 512, 521 (7th Cir. 2007) (failure to object not a basis for ineffective assistance of counsel claim, because prosecutor's statement was not improper); *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001) ("[F]ailing to object to admissible evidence cannot be a professionally 'unreasonable' action, nor can it prejudice the defendant against whom the evidence was admitted.").

**4.     Claim 8:  Appellate counsel was ineffective for failing to raise issues regarding the polygraph evidence.**

In claim 8, Logan contends that counsel on his direct appeal rendered ineffective assistance by failing to challenge:  (1) the admissibility of polygraph evidence, (2) the prosecutor's allegedly improper remarks during closing argument regarding Payton's polygraph tests, and (3) trial counsel's failure to seek additional limiting instructions regarding the polygraph evidence.  *See* Pet. at 10.  In his petition, Logan says he asserts this claim only "[t]o the extent that this court finds that [he] failed to exhaust" his claims of ineffective assistance of trial counsel regarding the polygraph evidence.  The Court has made no such finding and therefore denies the claim ineffective assistance of appellate counsel as moot.

5.    **Claim 3:  Trial counsel was ineffective for failing to offer evidence of a 911 call with a description of the shooter that did not match Logan**

Logan contends that his trial counsel was ineffective for failing to introduce evidence that there was a 911 call that, he claims, included a description of the shooter that did not match him.  Logan further states that he has never had access to recordings of 911 calls following the shooting, and he asks the Court to grant him an evidentiary hearing or an expansion of the record to further develop the factual basis for this claim.

Section 2254(e)(2) precludes an evidentiary hearing or expansion of the evidentiary record in support of a habeas corpus petition if the petitioner failed to develop the factual basis for his claim in state court.  28 U.S.C. § 2254(e)(2).  Under this provision, a petitioner's failure to develop the factual basis of his habeas claim in state court bars a hearing or expansion of the record if this failure was due to "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420. 432 (2000); *see also, e.g., Ward v. Jenkins*, 613 F.3d 692, 699 (7th Cir. 2010) (bar to evidentiary hearing applies "when the failure to develop the factual basis for a claim is attributable to the petitioner.").

In determining whether the petitioner's failure was due to lack of diligence, "[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts. . . .  Diligence for purposes of the opening clause [of section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Williams*, 529 U.S. at 435.  When evaluating a petitioner's alleged failure to fully develop the factual basis for a claim in state court, "[d]iligence will require in the usual case that

56

the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

Logan has not explained any efforts he took during the state court proceedings to obtain the 911 tapes. He has not stated, for instance, whether he ever tried to get the 911 tape from his trial counsel, nor has he explained how exactly he "sought a copy from the courts only to be rejected." Pet'r Reply at 8. Logan states that he "consistently presented to the state courts that he could not present the 911 tapes themselves because he did not possess them" and that "he futilely requested the opportunity to obtain them in discovery," *id.*, yet he cites to nothing in the record to support this contention. Because Logan has offered no support for his assertion that he diligently sought to develop the factual basis for this claim in state court, expansion of the record is not permitted by section 2254(e)(2).

The Court next assesses whether the state court's ruling on this claim was contrary to, or an unreasonable application of, federal law. *See Griffin*, 622 F.3d at 841. The appellate court, on post-conviction review, gave no express substantive reason for overruling this claim. Rather, in affirming the circuit court, it relied on the fact that "the circuit court implicitly dismissed all of defendant's other claims" – which included this one – on the ground that the circuit court did not state that such claims factored into its decision to grant a new trial. *Logan II*, 954 N.E.2d at 759.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). The presumption is

overcome if there is reason to think some other explanation for the state court's decision is more likely. *Id.* at 785. Whether there is some other explanation for the state court's disposal of the claim, such as an independent and adequate state law ground, is determined by looking at the nature of the disposition and the surrounding circumstances. *See Woods v. Schwartz*, 589 F.3d 368, 375 (7th Cir. 2009).

Respondent implicitly acknowledges the absence of explanation by the state appellate court and contends the court ruled either on the merits or based on an application of 725 ILCS 5/122-2. *See* Resp. at 21. Section 122-2 provides that a post-conviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2. Respondent argued in its motion to dismiss Logan's post-conviction petition that the claim was insufficient because Logan merely alleged that there was exculpatory material on the 911 tapes without providing any evidence from the record or attaching any supporting material substantiating his claim. *See* Resp't Ex. 14 at 105. But "the affidavit requirement of section 122-2 does not apply beyond the first stage of [post-conviction] proceedings," *People v. Clark*, 2011 IL App (2d) 100188 at ¶ 33, 957 N.E.2d 162, 169 (2011), when the trial court reviews the petition to ascertain whether it sets forth the gist of a meritorious constitutional claim. *See People v. Pendleton*, 223 Ill. 2d 458, 472, 861 N.E.2d 999, 1007 (2006). In Logan's case, by the time the circuit judge dismissed this claim, Logan's post-conviction petition had progressed past this initial, threshold review stage and was in the second stage of the review process. *See id.* at 472-73, 861 N.E.2d at 1007-08 (explaining that at the second stage, the trial court appoints counsel if necessary, the prosecution may file an answer or motion to dismiss,

and the court may consider that motion). Given the procedural status of Logan's case, it is unlikely that the circuit court relied on section 122-2 to dismiss the claim.

The Court therefore infers that the courts dismissed this claim on its merits, and proceeds to determine whether the rejection of the claim was an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d).

Logan's ineffective assistance claim regarding the 911 recordings is premised on the duty of defense counsel to conduct a reasonable investigation. Pet'r Opening Mem. at 32; *see Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Specifically, Logan contends that trial counsel Kelly provided constitutionally ineffective assistance because he failed to investigate the 911 tapes, thereby failing to discover whether they included any descriptions of the shooter that did not match Logan. *See* Pet'r Opening Mem. at 32 ("Mr. Kelly did not fail to investigate . . . because of any trial strategy, but because he did not know what was on these tapes."). The evidence is otherwise. During the evidentiary hearing on Logan's post-trial motion, Kelly testified unequivocally that he had "listened into the 911 office" and that he "[didn't] believe that there were descriptions" of the shooter. Resp't Ex. 10 at 739. Rather, Kelly said, the calls "just [said] a shooting had occurred." *Id.* Logan offered (and still offers) nothing to contradict either of these points. Based on this testimony, the state courts' rejection of Logan's claim was not an unreasonable application of *Strickland*.

**6. Claim 1: Trial counsel was ineffective for using threats to coerce Logan into foregoing his right to testify**

In claim 1, Logan contends that his trial counsel rendered ineffective assistance by coercing him to forego his right to testify. Respondent argues that this claim is

procedurally defaulted because Logan failed to raise it in his PLA filed in the Illinois Supreme Court on direct appeal. Resp't Ans. at 17.

Before presenting a claim in a federal habeas corpus petition, the petitioner must first give the state courts an opportunity to act on the claim. *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). This requires the petitioner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. In Illinois, that means asserting the claims not just before the state appellate court but also in a petition for leave to appeal in the Illinois Supreme Court. *Id.* When a habeas corpus petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted, and a federal court is, as a general rule, barred from reviewing the claim's merits. *Id.* at 853-54; *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010).

Logan did not include this particular ineffective assistance of counsel claim in his PLA to the Illinois Supreme Court after raising it before the appellate court on direct appeal. For that reason, the claim is procedurally defaulted. *See Boerckel*, 526 U.S. at 848.

In his reply, Logan argues that his claim is not defaulted because he raised it in his post-conviction petition. This does not cure the default. As respondent notes, during the proceedings on Logan's post-conviction petition, the state trial court ruled that this claim was barred by the doctrine of *res judicata*, because Logan had already obtained a merits determination on the claim on his direct appeal. The appellate court affirmed the trial court's decision. Although the appellate court's ruling does not explain

why it affirmed the trial court, the Court infers that the appellate court based its decision

on the doctrine of *res judicata*, given the parties' briefing. *See Williams v. Washington*,

59 F.3d 673, 678 n.3 (7th Cir. 1995) (looking to state court briefs to determine the basis

of the appellate court's holding).

The post-conviction court's *res judicata* ruling does not count as a second,

separate adjudication on the merits of Logan's ineffective assistance claim that

overcomes his earlier procedural default. Rather, the merits ruling came on Logan's

direct appeal, and that is the relevant ruling. *See Sutherland v. Gaetz*, 581 F.3d 614,

616 (7th Cir. 2009). Thus the fact that Logan included this already-litigated claim in his

post-conviction petition does not save it from the procedural default that occurred when

he failed to include the claim in his direct appeal PLA.

A habeas corpus petitioner can overcome a procedural default on a claim if (1)

he shows cause for the default and actual prejudice as a result of the alleged violation

of federal law; or (2) default "would lead to a 'fundamental miscarriage of justice.'"

*House v. Bell*, 547 U.S. 518, 536 (2006); *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th

Cir. 2004). Ineffective assistance of counsel can constitute cause to excuse the default

of another claim. *Smith*, 598 F.3d at 383 (citing *Murray v. Carrier*, 477 U.S. 478, 488-89

(1986)). This includes constitutionally ineffective assistance of appellate counsel. *See*

*Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Logan, however, has not argued ineffective

assistance of counsel as an excuse for the procedural default on his direct appeal PLA.

Nor could he do so successfully. Because a defendant's constitutional right to counsel

does not extend to discretionary appeals but rather is limited to the first appeal of right,

ineffective assistance of appellate counsel in connection with a PLA does not constitute

cause to excuse a procedural default.  *See Anderson v. Cowan*, 227 F.3d 893, 901 (7th Cir. 2000).

"The fundamental miscarriage of justice exception requires a claim that the defendant be actually innocent of the crime for which he or she was imprisoned." *Steward v. Gilmore*, 80 F.3d 1205, 1211-12 (7th Cir. 1996).  This would require Logan to show that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'"  *House*, 547 U.S. at 536–37 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  He would have to support such a claim "with new reliable evidence . . . that was not presented at trial."  *Schlup*, 513 U.S. at 324; *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010).  The Court would then "consider all of the evidence, old and new, and based on this total record, make a probabilistic determination about what reasonable, properly instructed jurors would do." *Coleman*, 628 F.3d at 319 (internal quotation marks omitted).

Logan has disavowed any argument that failure of the Court to examine this or any defaulted claim in his habeas corpus petition would result in a miscarriage of justice.  *See* Pet'r Reply at 9 n.2 ("[B]ecause he has not procedurally defaulted the claims relied on [in] his Petition, he has no need of the actual innocence gateway to excuse procedural default").  Thus the Court does not address that point.

Because Logan's first claim of ineffective assistance of trial counsel is subject to an unexcused procedural default, the Court denies the claim without considering its merits.

## 7.    Claim 2:  Trial counsel was ineffective for promising alibi evidence but failing to offer it

In claim 2, Logan contends that his trial counsel was constitutionally ineffective

for promising to call alibi witnesses in his opening statement but then failing to call those witnesses. The Seventh Circuit has held that under *Strickland*, an unfulfilled promise to present testimony from critical witnesses is objectively unreasonable unless "unexpected developments . . . warrant . . . changes in previously announced trial strategies." *Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003) (internal quotation marks omitted). Thus trial counsel may not renege on a promise to present a crucial witness without being deemed constitutionally ineffective if the disadvantages of presenting the witness's testimony would have been obvious from the outset of the case. *Id.* at 258.

In considering a habeas corpus petitioner's challenge to his conviction, a federal court reviews the last reasoned state court decision addressing the particular claim. *See, e.g., McElvaney v. Pollard*, ___ F.3d ___, 2013 WL 4423669, at *3 (7th Cir. Aug. 20, 2013); *Taylor v. Grounds*, 721 F.3d 809, 817 (7th Cir. 2013); *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012). In this case, that is the Illinois Appellate Court's decision on Logan's appeal from the denial of his post-conviction petition. In finding, on post-conviction review, that Logan's ineffective assistance of counsel claim lacked merit, the Illinois appellate court acknowledged that defense counsel had promised an alibi defense in opening statement. The court found, however, that the defense had "many strategic reasons" for changing its mind about calling alibi witnesses once the prosecution had rested its case. In this regard, the appellate court relied entirely on the testimony of lead attorney Kelly. The court cited the following seven points from Kelly's testimony:

1) "Mr. Kelly stated that at the beginning of trial, he had 'thought for sure

that the State would bring in the arrest.'  Mr. Kelly decided not to call the alibi witnesses so as to prevent the State from eliciting evidence of the arrest in rebuttal."

2 & 3)  "Mr. Kelly further testified that after the State rested, he learned from his law clerk that the alibi witnesses did not wish to testify, and that one of the alibi witnesses expressed concern that the State might ask her about 'a domestic violence issue' between defendant and Payton."

4 & 5)  "Mr. Kelly also testified that he decided not to call the alibi witnesses because they could not specifically state what day defendant allegedly was in Milwaukee and because defendant had given Mr. Kelly inaccurate information as to the dates he had been in Milwaukee."

6)  "Mr. Kelly testified that at the close of trial he felt he had a strong case for acquittal and he was 'very, very afraid that by putting alibi witnesses on especially ones that [he] believed were rather tenuous, that [defendant's] case, its worth would diminish drastically.'"

7)  "Mr. Kelly also testified to his concern that if he called the alibi witnesses, the jury would shift the burden of proof to the defense."

*Logan II*, 954 N.E.2d at 759.

This Court acknowledges, of course, that consideration of a claim of ineffective assistance of counsel is, and must be, based on the entire state of affairs that confronted counsel at the relevant time.  That said, however, of the seven points from Kelly's testimony cited by the appellate court, three – points 4, 5, and 7 – involve matters that Kelly knew *before* trial (and thus before opening statement) and thus could

not, without more, have been reason to change his mind. Specifically, Kelly concededly was aware before trial that the alibi witnesses were vague on their dates; that Logan had supposedly misstated when he had been in Milwaukee; and that calling alibi witnesses tends to shift the burden to the defense.

Kelly's statement that he believed the case had gone well for the defense and that putting on an alibi defense would have diminished the strength of the case arguably was something Kelly did not know fully until he heard the evidence at trial. It is worth noting, however, that to the extent that it was unknowable in advance how the prosecution's evidence would come in at trial, it becomes somewhat more difficult to explain why the defense would have promised an alibi defense in opening statement, before hearing any evidence at all. The only explanation that Kelly gave about this – words to the effect that the defense wanted to keep it options open – is less than satisfactory, seeing as how remaining silent about the alibi *would have* kept the defense's options open without verbally committing Logan to a particular line of defense. The appellate court made no evaluation of Kelly's explanation on this point.

This leaves points 1, 2, and 3 (as listed above) cited by the appellate court: concern about Logan's arrest coming out in rebuttal; concern about a purported domestic violence issue coming out in rebuttal; and the contention that the alibi witnesses did not want to testify. These are all factors that, if supported, would represent arguable support for the defense changing its mind after opening statement about putting on an alibi defense. For these points, however, the appellate court relied entirely on Kelly's testimony. The court did so without addressing, or even acknowledging, significant evidence that contradicted that testimony.

65

For example, the court relied on Kelly's testimony that "he learned from his law clerk that the alibi witnesses did not wish to testify." *Logan* II, 954 N.E.2d at 759.  But attorney Thomas – the lawyer who actually talked to Miraglia, the law clerk – expressly denied that Miraglia had told him the alibi witnesses said they did not want to testify. *See* Resp't Ex. 9 at 703.  Indeed, contemporaneously with the events at issue, Thomas said that it was Logan's mother and grandmother – who were not the alibi witness – who said that they did not believe the witnesses should be called.  *See* Resp't Ex. 7 at 534. Miraglia, the law clerk / intern who had actually talked to Logan's family members outside the courtroom, also directly contradicted Kelly's version upon which the appellate court relied.  Miraglia said that his task was not to get information from the family members and witnesses, but rather to *tell them* that the attorneys believed the alibi witnesses should not testify.  *See* Resp't Ex. 10 at 724-25.  The appellate court did not attempt to resolve these significant conflicts in the testimony; indeed, it did not even mention them.  Rather, it simply adopted Kelly's version.

Similarly, the appellate court adopted Kelly's testimony that the alibi witnesses had expressed concern that a "domestic violence issue" involving Logan and Payton might come out if they testified, without acknowledging or attempting to deal with the fact that the witnesses (Princess and Chevelle Thomas) and Logan himself not only said this did not come up, but that there was no such issue at all.  Again, the appellate court simply adopted Kelly's testimony on this point, without resolving the direct conflicts between Kelly and the other witnesses.  There was also evidence to the effect that Kelly, contrary to his testimony, did not actually talk to the alibi witnesses at that point in the trial but instead knew only what Miraglia had communicated, which was a far

different version of the events from Kelly's version that the appellate court adopted without examination.

If the circuit court, which actually heard testimony from these witnesses, had made findings on these points, or even assessed the contradictory evidence, it might be appropriate to say that the appellate court had implicitly adopted the circuit court's findings or assessment. But on these points, the circuit court was silent. As this Court noted earlier, in ruling on Logan's post-conviction petition, the circuit judge did not rely upon, and in fact made no mention of, Kelly's testimony about the domestic violence issue, the arrest issue, or the purported desire of the alibi witnesses not to testify. In addition, neither of the state courts that addressed the ineffective assistance claim assessed, in any way, the viability of Kelly's claimed concern that putting on an alibi defense would somehow have enabled the prosecution to introduce in rebuttal the fact that Kelly had been arrested with money and narcotics on him. That proposition is far from obvious, but it was not scrutinized or addressed by the state courts.

The Court is cognizant of the presumption of correctness that applies to state court factual findings when they are subjected to habeas corpus review. *See* 28 U.S.C. § 2254(e)(1). When a habeas corpus petitioner challenges the factual basis for a state court decision rejecting a claim, a federal court may overturn the state court's decision "only if it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 2013 WL 5904117, at *4 (U.S. Nov. 5, 2013) (quoting 28 U.S.C. § 2254(d)(2)). In addition, Logan, as the petitioner, "bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(d)(1)). Given the circumstances,

however, Logan has met that burden on this particular claim. The state appellate court – typically not a fact-finding court – adopted Kelly's testimony on the critical points without acknowledging that there was contradictory evidence on these very points, and without attempting to reconcile the testimony or resolve the conflicts. And on these points, the circuit court, which did act as a fact-finder after seeing and hearing the witnesses, made no findings at all. Thus there is no apparent basis in either court's decision for the appellate court's wholesale adoption of Kelly's version of the events.

Upon careful review of the record, the Court finds that the appellate court determined that Kelly learned new evidence during trial that warranted abandoning the promised alibi defense in a way that was contrary to the clear and convincing weight of the evidence that was presented. *See* 28 U.S.C. § 2254(d)(2). Because the appellate court's determination in this regard was critical to its conclusion that the abandonment of the alibi defense did not constitute ineffective assistance, that conclusion was based on an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2); *see Wiggins*, 539 U.S. at 528 (recognizing that a clear factual error "reflects an unreasonable determination of facts" under § 2254(d)(2)) (internal quotation marks omitted).

The Court's analysis, however, does not end there. A court may issue a writ of habeas corpus only if a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003); *see also Mosley v. Atchison*, 689 F.3d 838, 842 (7th Cir. 2012) ("A state court's mistake in summarily rejecting a petition, *i.e.*, without fully evaluating conflicting evidence on disputed factual issues, does not necessarily mean the petitioner is ultimately entitled to

relief.").  Because the Illinois appellate court's decision rested its analysis upon an unreasonable factual determination, the question of whether Logan's right to effective assistance of counsel was violated remains unresolved.  The Court therefore orders an evidentiary hearing on this claim.  *See Schriro*, 550 U.S. at 474 (instructing habeas courts to consider whether granting an evidentiary hearing "could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief").

8.      **Claim 5:  Trial counsel was ineffective for his cumulative errors.**

        In claim 5, Logan argues that his trial counsel was ineffective because he (1) failed to elicit testimony that Payton recanted before she met with Logan in the Cook County Jail, and (2) failed to request a mistrial after Jenkins was asked on cross-examination whether he was angry with the State for its conduct in other criminal cases involving him.  Logan also contends that these and trial counsel's other alleged errors, when considered together, cumulatively violated his right to effective assistance in a way that prejudiced him within the meaning of *Strickland*.

        Logan's first argument – that his counsel did not elicit testimony that Payton recanted before meeting with Logan – is refuted by the record.  At trial, Payton testified that she had recanted to an Assistant Public Defender and a private attorney who was representing Logan prior to her August 1998 visit to the jail.  *See* Resp't Ex. 4 at 311-13. This claim thus fails as a factual matter.

        Logan's second argument regarding trial counsel's failure to request a mistrial is procedurally defaulted.  As discussed earlier, a habeas corpus petitioner must have presented his claim to the Illinois Appellate Court and to the Illinois Supreme Court

before a federal court can consider the claim.  *See Smith*, 598 F.3d at 382.  "As part of this requirement, a petitioner must have fairly presented both the operative facts and legal principles that control each claim to the state judiciary."  *Id.*  In this case, Logan apparently sought leave to assert this claim in a second supplemental petition to the state court in post-conviction, but the record does not reflect that he ever filed the second supplemental petition.  Logan then raised this claim in the Illinois appellate court, but in his PLA to the Illinois Supreme Court, he said only that the "claim in his second supplemental petition about the State's improper impeachment of Charles Jenkins is also meritorious, and he should be given a chance to present it."  Resp't Ex. H at 20.  A state court is not required to read beyond a petition or brief to determine whether a claim exists.  *See Baldwin v. Reese*, 541 U.S. 27 32 (2004) ("[A] state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document).").  Because Logan did not actually file the second supplemental petition and did not explain to the Illinois Supreme Court the federal constitutional rule that the impeachment violated, he did not fairly present his federal claim to the state courts.  Accordingly, the claim is procedurally defaulted. Logan has offered no basis to excuse the default

Logan finally contends in his fifth claim that the combined effect of his trial counsel's errors resulted in ineffective assistance of counsel.  In assessing a claim of ineffective assistance, a court does not examine a lawyer's alleged errors in isolation. *Strickland*, 466 U.S. at 690-96.  The whole can, in some circumstances, be greater than the sum of the parts.  *See, e.g., Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006); *Hough*, 272 F.3d at 891 n.3.

With one exception, however, the Court has concluded that Logan's claims regarding trial counsel's alleged ineffectiveness were defaulted, deficient on the merits, or were denied by the state courts based on a reasonable application of federal law. Although claim 2 survives pending an evidentiary hearing, the viability of that claim does not in any way strengthen Logan's other non-meritorious ineffective assistance claims. As such, there is no basis for a claim of cumulative error.

9.      **Claim 9: Logan was denied due process due to cumulative errors.**

Finally, Logan contends that all of the errors cited in his other claims, including his claims of ineffective assistance of counsel, cumulatively resulted in a denial of his right to a fair trial. "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000) (internal quotation marks omitted). Logan concedes, however, that he did not make this argument in either his direct appeal or the post-conviction proceedings. *See* Pet. at 10. The claim is therefore procedurally defaulted. *See Boerckel*, 526 U.S. at 845 (requiring petitioner to assert his federal claim through one complete round of state court review before seeking relief in habeas corpus). Logan has offered no excuse for the procedural default.

## Conclusion

For the foregoing reasons, the Court orders an evidentiary hearing on Logan's ineffective assistance of trial counsel claim concerning the alibi defense (claim 2). The Court overrules all of Logan's other claims. The case is set for a status hearing on

November 26, 2013 at 9:30 a.m. for the purpose of setting a date for the evidentiary

hearing.

_____

MATTHEW F. KENNELLY
United States District Judge

Date:  November 21, 2013