1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3
LEONARD LOGAN,                    )    No. 2012 C 6170
4
               Plaintiff,         )    February 18, 2014
5
          v.                      )    10:30 a.m.
6
NEDRA CHANDLER,                   )
7
               Defendant.         )
8

9           TRANSCRIPT OF PROCEEDINGS - MOTION
          BEFORE THE HON. MATTHEW F. KENNELLY
10

11   APPEARANCES:

12   For Plaintiff:      MS. TARA E. THOMPSON
                         MR. WILL EVANS
13                       MR. ERIC ALSTON
                         LOEVY & LOEVY
14                       312 North May Street, Suite 100
                         Chicago, Illinois 60607
15                       (312) 243-5900

16   For Defendant:      MR. NEAL B. GOODFRIEND
                         MR. VINCENZO CHIMERA
17                       ASSISTANT ATTORNEY GENERAL
                         100 West Randolf street, 13th floor
18                       Chicago, Illinois 60601

19

20

21

22

23              MICHAEL P. SNYDER, FCRR
                Official Court Reporter
24           United States District Court
        219 South Dearborn Street, Room 2244A
25              Chicago, Illinois 60604
                   (312) 435-5563

       MICHAEL P. SNYDER, Official Court reporter

1    THE CLERK:  12 C 6170, Logan versus Chandler;
2    evidentiary hearing.
3    THE COURT:  Good morning.
4    MR. EVANS:  Good morning.
5    MR. ALSTON:  Good morning.
6    MR. EVANS:  Your Honor, Tara Thompson is the main
7    attorney on this case.  She just left the courtroom.  She'll be
8    back shortly.
9    MR. ALSTON:  And I'm Eric Alston, student counsel
10   licensed to practice under Illinois Rule 711.
11   MR. EVANS:  And my name is Will Evans.  I am also a
12   students licensed to practice under 711.
13   MS. THOMPSON:  Good morning, Your Honor.  Tara
14   Thompson, also on behalf of Mr. Logan.
15   MR. GOODFRIEND:  Neal Goodfriend, Assistant Attorney
16   General, on behalf of the respondent.
17   MR. CHIMERA:  Good morning, Your Honor.  Vincenzo
18   Chimera from the Attorney General's office.
19   MR. BECKER:  Good morning.  Matthew Becker also from
20   the Attorney General's office for the respondent warden.
21   THE COURT:  So the marshal, how did we find that out,
22   Pam?  It is by email?  So the marshal said that Mr. Logan isn't
23   here yet, and they are trying to figure out how far away he is.
24   I assume there were issues on weather and whatnot.
25   So do we have another witnesses here that --

MICHAEL P. SNYDER, Official Court reporter

1     MS. THOMPSON:  Well, I am hesitant to proceed with
2  live witnesses without my client.
3     THE COURT:  It's really not up to you, Miss Thompson.
4     MS. THOMPSON:  Understood, Your Honor.
10:27:34  5     THE COURT:  We are going to proceed with other
6  witnesses because I have a finite amount of time for this
7  hearing, and we are going to go ahead.
8     MS. THOMPSON:  I understand.
9     THE COURT:  If he was going to be your first witness,
10:27:42  10  you'll just have to make an adjustment.
11     MS. THOMPSON:  I understand.
12     THE COURT:  He's obviously, you know, would be present
13  if he were here, so there's not going to be -- I'm going to
14  make an order excluding witnesses, but there's not going to be
10:27:52  15  any prohibition on you telling him what other people have said
16  because he would have heard it if he was here.  But I don't
17  know if he's going to be here in five minutes or five hours or
18  even today, so in terms of other witnesses, do we have any
19  other missing in action?
10:28:07  20     I know there was one person coming from out of town.
21     MR. GOODFRIEND:  He's in town.
22     THE COURT:  This is the guy from Connecticut or
23  whatever?
24     MR. GOODFRIEND:  Massachusetts.
10:28:14  25     MR. CHIMERA:  We flew him in.

MICHAEL P. SNYDER, Official Court reporter

1          THE COURT:  I just wondered whether he got in.

2          MR. GOODFRIEND:  He had a little trouble, but he made

3     it.

4          THE COURT:  All right.  Okay then.  So I'm going to

10:28:21   5     give you about ten minutes to get set up.

6          Is there anything we should talk about before we take

7     a short break?

8          MS. THOMPSON:  There is one evidentiary issue to

9     resolve.

10:28:29  10          THE COURT:  Okay.

11          MS. THOMPSON:  The Public -- well, since it's your

12     subpoena, maybe you can address this issue.

13          MR. BECKER:  Sure.  So both Tara and I subpoenaed the

14     Public Defender's file in this case, and the Public Defender

10:28:45  15     wasn't able to produce the file until this past Friday, and

16     there are some materials over which the Public Defender would

17     like to assert work product privilege.

18          And then there were also some materials I believe you

19     identified which you might be asserting attorney-client

10:29:04  20     privilege, is that correct?

21          MS. THOMPSON:  There are a limited number of documents

22     in the file, Your Honor.  Some are letters from prior

23     post-conviction counsel seeking copies of the file from the

24     Public Defender, and there are some letters that Mr. Logan

10:29:14  25     wrote to a prior private attorney that don't have anything to

MICHAEL P. SNYDER, Official Court reporter

1  do with the issues in this hearing, but are communications

2  between him and his prior counsel that in my view are not

3  covered by any waiver of privilege that would occur by virtue

4  of him making an ineffective assistance of counsel --

10:29:30  5  THE COURT:  Be a little more specific.  You have two

6  categories.

7  MS. THOMPSON:  Yes, Your Honor.

8  THE COURT:  You have letters by post-conviction

9  counsel to the Public Defender's office?

10:29:38  10  MS. THOMPSON:  Yes, Your Honor.

11  THE COURT:  Okay.  And you have a -- what's the

12  problem with disclosing those?

13  MS. THOMPSON:  Well, I don't think there's a problem

14  except to the extent that I'm waiving other privilege.

10:29:49  15  THE COURT:  All right.  So the problem isn't those

16  letters; it's whatever other doors those might open?

17  MS. THOMPSON:  That's right.

18  MR. GOODFRIEND:  Judge, the attorney from the Public

19  Defender's office is here.  She should probably be --

10:29:59  20  THE COURT:  Well, if somebody who is going to assert a

21  privilege is here, they ought to be here, so why don't you grab

22  that person.

23  Hi.

24  MS. DIMOND:  Good morning, Your Honor.  Karen Dimond,

10:31:06  25  deputy Public Defender.

MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  Hi.  So I guess we were talking about you

2    in your absence.

3        MS. DIMOND:  Okay.

4        THE COURT:  It was described to me that there had

5    been, both sides had subpoenaed the Public Defender's file on

6    Mr. Logan's case.  I didn't get into any detail on this, but I

7    think Mr. Goodfriend or somebody said, I guess it was Mr.

8    Becker said that the Public Defender's office may be asserting

9    work product over some portions of the file, and then Miss

10   Thompson was in the process of describing that she may be

11   asserting attorney-client privilege over something.  So I just

12   want to pick up where we left off.

13       There are two categories, as I understood.  Number one

14   would be communication between post-conviction attorneys and

15   the Public Defender's office, and your concern wasn't

16   necessarily the content of those communications in and of

17   themselves, but, rather, that that might wedge open some other

18   door somewhere.  Did I have it right?

19       MS. THOMPSON:  That's right.

20       THE COURT:  And then the second were letters that Mr.

21   Logan wrote to the, I assume to the Public Defenders because

22   they are in their file.

23       MS. THOMPSON:  But that's not correct, Your Honor.

24   They are letters to a private attorney who represented him

25   before his --

MICHAEL P. SNYDER, Official Court reporter

1        THE COURT:  Got it, probably turned his file or her

2  file over to the Public Defender when they, when the Public

3  Defender took over the case.

4        MS. THOMPSON:  That's my assumption.

10:32:19   5        THE COURT:  Okay.  And how much are we talking about?

6        MS. THOMPSON:  There's three letters, Your Honor.

7        THE COURT:  Three letters?  And so you're saying that

8  those don't relate to any of the issues in the hearing, and so

9  you don't think that there's any waiver of that.

10:32:31  10        MS. THOMPSON:  That's right, Your Honor.

11        THE COURT:  What's your position on that, Mr. Becker?

12        MR. BECKER:  My position is that to the extent that

13  the Public Defender would have looked at those letters and they

14  would have informed his sense of I guess his client's

10:32:46  15  credibility and his ability to get information about the alibi

16  from the client, they might be relevant.  That said, we are

17  probably not at the end of the day as interested in those

18  letters as we are in some of the work product items to the

19  extent that those include requests for investigation.

10:33:02  20        THE COURT:  Let's table this for a second.

21        What's your issue?  You said Miss Dougherty, right?

22        MS. DIMOND:  Dimond.

23        THE COURT:  Dimond.  I'm sorry.  My mistake.

24        MS. DIMOND:  Yes, Your Honor.  We did produce all

10:33:13  25  nonprivileged parts of our file to both sides.  They have made

1   copies at this point.  We did withhold three categories of

2   documents.

3         One was grand jury testimony, which we believe we are

4   not supposed to turn over under state law.

10:33:24    5         Two is --

6         THE COURT:  This was something that the Public

7   Defender's office got in discovery in the criminal case?

8         MS. DIMOND:  It's a portion of a transcript.  I am not

9   sure how it came into our possession, but I found it in the

10:33:34    10  file.  So it's just a portion of a transcript.

11        THE COURT:  But whether it's, whether it's transcript

12  of the grand jury testimony that relates to the indictment in

13  Mr. Logan's case, presumably the Public Defender's office can't

14  just go out and say to the court reporters that deal with the

10:33:51    15  grand jury, "Hey, give me the transcript for such and such a

16  date;" you would have had to have gotten it from someone,

17  wouldn't you have?

18        MS. DIMOND:  Presumably, but my --

19        THE COURT:  So where is there a work product

10:34:00    20  protection for that?

21        MS. DIMOND:  No, no.  That's not a work product

22  assertion for that.  That's a state law prohibition.

23        THE COURT:  I'm directing you to turn it over.

24        What's the next category?

10:34:08    25        MS. DIMOND:  The next category is attorney-client

                    MICHAEL P. SNYDER, Official Court reporter

1    materials.  Now, these are letters that we have going back and
2    forth.
3          THE COURT:  Do you think these are the same letters
4    that Miss Thompson was talking about?
5          MS. DIMOND:  Yes.
6          MS. THOMPSON:  With Mr. Gaston.
7          MS. DIMOND:  With Mr. Gaston.
8          THE COURT:  Let's table that for a second.  Let's talk
9    about category three.
10          MS. DIMOND:  And the third is work product.
11          THE COURT:  And be more specific about what you're
12    talking about.
13          MS. DIMOND:  In the work product category we have
14    photocopies of case law with notes written on them.  There are
15    handwritten notes by various attorneys.  There are also
16    directives to investigators to take certain actions with notes
17    on them regarding, that relate to theories of the case.
18          THE COURT:  Okay.  And understanding that in Illinois,
19    at least in some circumstances, under state law, the work
20    product privileges can be asserted by the attorney.  I just
21    want, I want to ask you this question because I want to make
22    sure I understand.
23          So you are telling me that the Public Defender of Cook
24    County is asserting the work product doctrine against a former
25    client?  That's what you're telling me, right?

MICHAEL P. SNYDER, Official Court reporter

1       MS. DIMOND:  Well, Your Honor, we believe that --

2       THE COURT:  It's a yes or no question.  So pretend

3  you're on cross-examination because, in fact, you are.

4       MS. DIMOND:  Yes.

10:35:26  5       THE COURT:  Seriously.  Do I need to get Mr.

6  Cunningham in here to explain that to me?  That's shocking.

7       MS. DIMOND:  Your Honor, we think that the --

8       THE COURT:  It's shocking.  You'd assert it against a

9  former client?

10:35:36  10       MS. DIMOND:  We think that attorneys themselves have

11  an interest in their own work product.

12       THE COURT:  Yeah?  I understand that you have an

13  interest.  That was sort of the premise of the whole thing.

14  But you're asserting it against a former client?

10:35:50  15       MS. DIMOND:  Your Honor, if you wish to review them in

16  camera to determine if there is something --

17       THE COURT:  I want to have somebody explain to me on

18  what planet this makes sense for a person, for an office that

19  defends people accused of crimes, that you assert privileges

10:36:03  20  against your clients.

21       MS. DIMOND:  Your Honor, my review of the case law

22  indicates that attorneys have an interest --

23       THE COURT:  I am not asking you if you can.  I'm

24  asking you why you are.  I mean, it just, it's stunning.  It's

10:36:15  25  just absolutely stunning.  You know, I defended people accused

MICHAEL P. SNYDER, Official Court reporter

1  of crimes for a significant part of my career, and in the one

2  or two cases where somebody had a question about something,

3  they got the whole file, my notes, my work product, my thought

4  product, everything, because what you're doing just isn't done.

10:36:37  5  It just isn't done by honorable defense lawyers, and that is

6  why I say, do I have to get former judge, Mr. Cunningham in

7  here to explain this to me, why his office is doing this?

8  MS. DIMOND:  Your Honor, I have brought the

9  information with me.  If Your Honor certainly directs us to

10:36:54  10  disclose it, we will do so.

11  THE COURT:  So you're just not going to answer my

12  question?

13  MS. DIMOND:  I'm sorry, what question?

14  THE COURT:  Why you're doing it.  Not that you can do

10:37:05  15  it, but why?  What's, what's the rationale?

16  MS. DIMOND:  Your Honor, I think that attorneys in

17  general have some right to --

18  THE COURT:  You're just repeating yourself.

19  Seriously.  It's pretty stunning.  It's pretty stunning.

10:37:21  20  You haven't seen it, obviously, Miss Thompson, so you

21  don't know what the relevance of it is?

22  MS. THOMPSON:  I haven't.

23  THE COURT:  Okay.  Well, you're directed to provide it

24  to me now.

10:37:33  25  MS. DIMOND:  Okay.

MICHAEL P. SNYDER, Official Court reporter

1        THE COURT:  Come hand it to me.  I will look at it.
2   We'll take a break while you guys are getting set up, and we'll
3   look at it and figure out what I'm going to do next.
4        MS. DIMOND:  Your Honor, there are some tapes in here.
10:37:53   5   We don't have a way of playing them.
6        THE COURT:  Oh, because they are cassettes and nobody
7   has a cassette player anymore.
8        MS. DIMOND:  One cassette is broken, in any event, and
9   the smaller one I don't have any equipment to play it.  And
10:38:07  10   I'll just give you everything in here.
11        THE COURT:  Okay.  So I've been given a cassette tape,
12   it says Latonya Payton on it.  I've been given a little mini
13   cassette that says Leonard Logan on it.  For all I know, that's
14   an interview of Mr. Logan.  Then there's a file of papers, I am
10:38:29  15   going to say probably just a guess about 60, 70 pages.  And I
16   will look through these.
17        So get set up.  Maybe we'll figure out where Mr. Logan
18   is in the meantime.  I'll come back out in about 10 or 15
19   minutes or so.
10:38:47  20        MS. THOMPSON:  Thank you, Your Honor.
21        MR. CHIMERA:  Thank you, Your Honor.
22        (Recess.)
23        THE COURT:  Okay.  Recalling Logan versus Chandler.
24        So I've gone through this material.  I've broken it
10:55:52  25   down into some categories.

MICHAEL P. SNYDER, Official Court reporter

1       There are four sheets of paper that bear, they are a
2  form, they are called "Disposed File Request Form," and they
3  are basically requests for the file.

4       It escapes me why anybody could even think that there
10:56:09    5  is some sort of a work product protection to these.  It's mind
6  boggling, frankly.

7       Two of them are duplicate.  I am going to order those
8  turned over.  They really don't tell you much other than Mr.
9  Thomas asked for the file before he was going to testify in
10:56:29   10  2002, and Mr. Kelly asked for it before he was going to testify
11  in 2005, and then Miss Dimond asked for it recently.

12       Second, there are three copies of a motion to suppress
13  identification testimony.  I don't know.  Maybe it never got
14  filed.  Was there a motion --

10:56:47   15       MS. DIMOND:  If I can just address that.  I have no
16  reason to think that was ever filed.  I didn't see any file
17  stamped copies in the file, and because I believe those were
18  simply drafts, that's why I considered them --

19       THE COURT:  It has nothing to do with any of the
10:56:58   20  issues here.  It involves some witness who I don't even
21  remember the name.  I'm not sure they even testified at the
22  trial.  So it's not relevant.

23       There are four printouts or five printouts of cases
24  that, judging from the highlighting, had to do with when the
10:57:14   25  Sixth Amendment right to counsel attaches, that's two of them;

MICHAEL P. SNYDER, Official Court reporter

1   when testimony of a single witness is enough to convict, so

2   sufficiency of the evidence issue; something about a motion to

3   suppress an identification and the standards for that; and then

4   the other one, it had to do -- I guess that was also about the

5   Sixth Amendment right to counsel.  Those aren't relevant

6   either.

7        There is the grand jury, there's a copy of Miss

8   Payton's grand jury testimony, but judging from -- there were

9   some markings on it, and judging from those, or at least one or

10  two of the references that I saw, it appears to me that there

11  is some handwriting from Mr. Logan on it.  Just you'll see on

12  page 8, for example.

13       So I think counsel needs to review that for privilege.

14  I mean, it looks to me like Mr. Logan's review of Ms. Payton's

15  grand jury testimony.  Again, I don't think it has anything to

16  do with any of the issues here, but you ought to review that

17  for privilege.  So I'm going to put that in a different pile.

18       There are, there is a handwritten draft of an order to

19  allow an assistant Public Defender to look at photographs.

20  Nobody cares about that.

21       There are some notes that, judging from their content,

22  are notes from somebody when, during the hearing on the

23  post-conviction petition.  In other words, notes by an observer

24  regarding Mr. Kelly's testimony.  Again, nobody cares about

25  that.

           MICHAEL P. SNYDER, Official Court reporter

1    There are notes of an interview with I believe an

2  attorney on a prior charge, I believe.  The attorney discloses

3  communications he had with Mr. Logan, mostly having to do with

4  making arrangements for the attorney's representation.  Again,

10:59:25    5  I am going to put this in the category of things that I think

6  Miss Thompson needs to look at.

7    There are three forms, they are forms that have the

8  heading "Cook County Office of the Public Defender

9  Investigation Request."  They all, or two of them -- I think, I

10:59:47    10  don't know the subject matter is privileged.  Two of them are

11  requests to interview Miss Payton, they are largely

12  duplicative, and one was about some other witness.

13    The one about the other witness is not relevant.  It's

14  not any of the witnesses we are talking about.  It's a

11:00:03    15  purported eyewitness to the crime, and it's the same person who

16  is named in the unfiled motion to suppress.  So it doesn't have

17  anything to do with the issues that we are having a hearing on

18  here, so I don't think that's relevant.

19    The interviews of Miss Payton.  I mean, the request to

11:00:17    20  interview Miss Payton, again, it doesn't really have anything

21  to do with.  The only difference between the two is that the

22  handwritten notes by -- I think it was, was there originally a

23  Public Defender by the name of Tountas?

24    MS. THOMPSON:  George Tountas.

11:00:30    25    THE COURT:  It looks like, at least from the surface

MICHAEL P. SNYDER, Official Court reporter

1    of it, it looks like they are Mr. Tountas' notes, basically

2    just saying interview this person because Mr. Logan says she's

3    lying because she was threatened by the police.  There's

4    nothing particularly secret about that, and it's simply a

5    request to interview somebody.  Again, not relevant to the

6    issues we have here.

7         There's a letter dated May of 2005 from a private

8    attorney who I assume was going to be representing him or was

9    thinking about representing Mr. Logan in some sort of

10   post-conviction proceeding.  I don't know if this falls into

11   the same category as the stuff that you're talking about here.

12   The lawyer asks for certain things.

13        So I want you, Miss Thompson, to take a look at that.

14   It may be one of the letters you're talking about.

15        There's a cassette tape which says on the outside

16   "Latonya Payton, first 10 minutes."  I assume that means the

17   first ten minutes of the thing.  It's broken.  I actually have

18   a cassette player, strangely enough, but I couldn't play it.

19        I think it's reasonable to believe that it's an

20   interview of Ms. Payton.  I don't know whether that's relevant

21   or not to the issues we have here.  I tend to think it's not

22   because the hearing is about the alibi and the discussions that

23   were about that.  If somebody can come up with a, can tell me

24   how to fix something like this, I mean, you'd basically have to

25   fish in there and get the one end and pull it out and then

MICHAEL P. SNYDER, Official Court reporter

1    splice them together.  You know, you can think about that.

2         Then there's the little mini cassette, the kind that

3    people used to have those little mini cassette players.  I used

4    to have one, but I don't have a player anymore.

11:02:06  5         It says "Leonard Logan" on it.  I think it's logical

6    to think that maybe this was, this was an interview of Mr.

7    Logan maybe at the jail or something like that.

8         So I guess what I, if you can all sort of dredge

9    through the backs of the drawers of your desk and see if

11:02:24  10   somebody could find a mini cassette player, and I'll listen to

11   it to see if that's what it is.  If it is, then I'm going to

12   have Miss Thompson review it.

13        Then the last is a sheet of paper that has a note to

14   Marty -- I assume Mr. Kelly -- from the same person who filled

11:02:41  15   out the -- it's the same handwriting as the person who filled

16   out the investigation requests that were requested by Mr.

17   Tountas.  And I think that this is absolutely 100 percent

18   relevant, not for anything directly pertinent.  Yeah, there's a

19   work product, there's a theoretical work product claim, but

11:03:06  20   because the conduct of the attorneys in their dealings with Mr.

21   Logan are at issue, I think that the privilege is, well, and

22   because they've also testified about their dealings with Mr.

23   Logan extensively in two hearings, any privilege I think has

24   been foregone at this point, and so that is to be turned over

11:03:29  25   as well.  There are a couple little Post-it notes on it, but I

MICHAEL P. SNYDER, Official Court reporter

1 don't know what to make of those.

2   So I'm going to, I think quite honestly that to make a

3 record of this, I'm going to, I'm going to have copies made of

4 the stuff that I concluded was not relevant so that I can keep

11:03:50 5 those.  I'm going to have copies made of the, I'll have a copy

6 made of these four, five sheets of paper that I'm going to

7 order turned over, but I'm going to let you look at them first.

8 Then there's this little handful of stuff.  I am going to give

9 Miss Thompson a chance to look at it, but I need you to give it

11:04:14 10 back to me so I can make copies, and then we'll figure out how

11 to deal with the recordings later.

12   So the things in the paperclip that I'm handing Ms.

13 Thompson are the things that I'm ordering to be turned over,

14 and the other things in another paperclip are the things that

11:04:33 15 Miss Thompson needs to review.

16   Okay.  So Ms. Dimond, I'll leave it up to you whether

17 you want to stay or go.  I'll get all this stuff back to you,

18 but not right at the moment because we have a hearing going on.

19   I guess there's no further word at the moment on Mr.

11:04:50 20 Logan's whereabouts.  I assume that this is an issue about

21 weather and road conditions.  Where was he coming from?

22   MS. THOMPSON:  Dixon Correctional Center.

23   THE COURT:  So it's a little longer hike.  I'm

24 guessing that's what it had to do with.

11:05:08 25   MR. BECKER:  May I remind for a moment, Your Honor, I

MICHAEL P. SNYDER, Official Court reporter

1    don't think you've looked at the letters yet to the former

2    attorney.

3         THE COURT:  I have not.

4         MR. BECKER:  Do you want to wait until after she

5    reviews these other materials?

6         THE COURT:  I think so, because my guess is one of the

7    letters is going to turn out to be one of the ones that I have

8    here because it was within same generic description.

9         Okay.  So, let's go.

10        MS. THOMPSON:  Your Honor, we are prepared to offer

11   opening statements or proceed directly with witnesses.

12        THE COURT:  Let's just start with witnesses.  I'll let

13   you give closings when we are done, but I reread the briefs, I

14   reread my opinion.  I think I have enough of a handle on the

15   issues to forgo openings.

16        MR. BECKER:  May we have post hearing briefing, Your

17   Honor?

18        THE COURT:  Maybe.  It kind of ends up depending upon

19   how the testimony comes out and how complicated it ends up

20   being.  We'll talk about that.  But assume you're going to give

21   closing arguments and not brief it, but I might change my mind

22   as I have in other situations that Mr. Chimera and Mr.

23   Goodfriend are familiar with.

24        MR. CHIMERA:  That's fine, Judge.  As another

25   preliminary matter, I think counsel had asked us as far as how

MICHAEL P. SNYDER, Official Court reporter

1    to question the attorneys and so forth.  She had thought that

2    maybe she would ask Your Honor to have them declared hostile

3    witnesses.

4            We are making the record clear we are not going to

11:06:18    5    object.

6            THE COURT:  We don't have rules about that in federal

7    court.

8            MS. THOMPSON:  Judge, we don't care.

9            THE COURT:  Okay.  Their conduct isn't called into

11:06:24    10    question.

11            MR. CHIMERA:  We are not going to object if she wants

12    to ask leading questions.

13            MS. THOMPSON:  Thank you, Your Honor.

14            THE COURT:  Call the first witness.

11:06:56    15            I just heard noise over there.  That may mean Mr.

16    Logan is here.  Let's just wait a second.  I think he's here.

17            Is that Mr. Logan?

18            THE MARSHAL:  Yes.  Sorry about the delay.

19            THE COURT:  That's okay.  The record should reflect

11:07:27    20    that Mr. Logan just got here.

21            You are still going to go ahead and start the witness.

22            MS. THOMPSON:  Your Honor, our first witness is going

23    to be John Miraglia.

24            THE COURT:  I'm going to order all witnesses other

11:07:42    25    than Mr. Logan to be excluded, in other words, all nonparty

MICHAEL P. SNYDER, Official Court reporter

1    witnesses.  So if anybody is in the courtroom who might be

2    called to testify, you can't sit here and listen to other

3    people's testimony, just to be clear.  Just to be clear to the

4    lawyers, the exclusion order also precludes anybody from

11:07:58   5    telling a witness what another witness has testified.  We will

6    be absolutely 100 percent clear about that.

7            Okay.  Do we have the witness in the room?  Right up

8    here, sir.

9            Raise your right hand, please.

11:09:15  10             JOHN MIRAGLIA, PLAINTIFF'S WITNESS, SWORN

11            THE COURT:  Have a seat, please.

12            Tell me your name again.

13            MR. EVANS:  My name is Will Evans.

14            THE COURT:  Thanks.

11:09:27  15                        DIRECT EXAMINATION

16    BY MR. EVANS:

17    Q.  Would you please state your name for the Court.

18    A.  John Miralgia, M-i-r-a-g-l-i-a.

19    Q.  Mr. Miralgia, what do you do for a living?

11:09:46  20    A.  I'm an attorney.

21    Q.  And how long have you been licensed to practice?

22    A.  November 2001, 13 years almost.

23    Q.  What type of law do you practice?

24    A.  Primarily criminal defense.

11:09:56  25    Q.  Mr. Miralgia, turning your attention back to the fall of

MICHAEL P. SNYDER, Official Court reporter

1    2000, what was going on in your life at that time?

2    A.  I was in law school, I was also a 711 or Illinois Supreme

3    Court Rule 711 clerk with the Public Defender's office, and I

4    believe I was also clerking with a private law office as well.

11:10:16    5    Q.  Were you a third-year law student at that time?

6    A.  I was.

7    Q.  At that time that you performed an internship, were you

8    working for the Public Defender's office?  Interning at the

9    Public Defender's office?

11:10:29    10    A.  When I was interning, yes, specifically I was working with

11    the Public Defender's office.

12    Q.  Was there any particular attorney for whom you were

13    working?

14    A.  Anthony Thomas.

11:10:38    15    Q.  Mr. Thomas was an assistant Public Defender at that time?

16    A.  Yes.

17    Q.  Now, Mr. Miralgia, as an extern or intern, what sort of

18    work did you do for Mr. Thomas?

19    A.  I did lower level felony drug cases.  I would actually

11:10:54    20    litigate under his supervision.  That's primarily why I took

21    the job, to get trial experience.  And from time to time I

22    would do some research for he or the two other -- there were

23    two other attorneys assigned to the courtroom I was in.  I

24    would do some research from time to time as well I would sit in

11:11:12    25    on trials.  This one, for example, is one that I sat in

MICHAEL P. SNYDER, Official Court reporter

1   primarily to observe.

2   Q.  So you said there were other attorneys that you, that

3   worked in the particular courtroom that you were assigned to?

4   A.  Martin Kelly and David Dunn were the two other Public

11:11:29   5   Defenders in that courtroom.

6   Q.  Did you also sort of shadow the attorneys that were present

7   in this courtroom, working this courtroom for the Public

8   Defender's office?

9   A.  I did.

11:11:40   10   Q.  Mr. Miraglia, in total how long were you an extern for the

11   Public Defender?

12   A.  I believe for the two semesters of that year, so real time

13   six, seven months I think I was there.

14   Q.  And you said you remember this particular trial that we are

11:12:00   15   here about today?

16   A.  Yes.

17   Q.  Is there any particular reason why you remember that trial?

18   A.  Well, I testified at a post-trial hearing already in

19   regards to I think some of these issues at least that you're

11:12:12   20   addressing today.  And it was a murder case, and I don't think

21   that I sat in with Mr. Thomas or Mr. Kelly during my time

22   interning on any other murder cases.  And I remember his name,

23   I remember certain things about the case.

24   Q.  So this case, we are talking about Mr. Leonard Logan's

11:12:36   25   case, correct?

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

24

| | |
|---|---|
| 1 | A.  Right. |
| 2 | Q.  Anthony Thomas was working that case? |
| 3 | A.  Yes, he and Marty Kelly. |
| 4 | Q.  Now, Mr. Miraglia, drawing your attention to the course of |
| 5 | the Logan trial, you say you recall sitting in on that trial? |
| 6 | A.  Yes. |
| 7 | Q.  Do you recall where the trial was held? |
| 8 | A.  Courtroom 700.  Henry Simmons was the presiding judge. |
| 9 | Q.  And this courtroom is located where, exactly? |
| 10 | A.  2650 South California, Chicago. |
| 11 | Q.  Is this the Cook County courthouse? |
| 12 | A.  Yes. |
| 13 | Q.  Now, what does that courtroom look like, room 700? |
| 14 | A.  It's bigger than this room, but basically there's two doors |
| 15 | that would lead into the room as this room, aisles on both |
| 16 | side.  The aisles and the gallery do go further.  The defense |
| 17 | table is situated as the defense, the table that Mr. Logan is |
| 18 | sitting, situated like that, similarly to that, and the state's |
| 19 | attorney's table is actually, the state's attorneys would be |
| 20 | facing the Judge's bench.  That's how it's set up in that room. |
| 21 | The jury box would be similarly situated, and the Judge would |
| 22 | be in similar position as to how he's sitting here. |
| 23 | Q.  Do you recall -- you said you observed this trial, right? |
| 24 | A.  Yes. |
| 25 | Q.  Do you recall where you observed the trial from? |

MICHAEL P. SNYDER, Official Court reporter

11:12:45

11:12:57

11:13:14

11:13:35

11:13:51

Miraglia - direct by Evans

25

1   A.  Defense table.

2   Q.  Do you recall where at the defense table you were seated?

3   A.  No.  I would think that Mr. Logan sat between Mr. Thomas

4   and Mr. Kelly, and I was probably at the end.  I wouldn't have

11:14:14   5   been sitting closest to Mr. Logan.

6   Q.  And you said Mr. Thomas and Mr. Kelly and Mr. Logan.  Were

7   these the three other people located, seated at that table with

8   you?

9   A.  Yes.

11:14:23   10   Q.  Mr. Thomas, from your vantage point observing the trial,

11   you could see what Mr. Thomas and Mr. Kelly were doing?

12   A.  Yes.

13   Q.  You could see -- what else could you see from your vantage

14   point in the courtroom?  Could you see the gallery, for

11:14:39   15   example?

16   A.  Sure.  I could see the whole, I could see the whole room.

17   As if I was sitting at this table today, I could see the full

18   scope of the room including the jury, the Judge, the gallery.

19   Q.  Mr. Miraglia, you said you were working under Anthony

11:14:54   20   Thomas?

21   A.  Right.

22   Q.  Does he have a physical disability?

23   A.  Yeah.  He's blind, legally blind.

24   Q.  Did he have an assistant in court to help him with that

11:15:03   25   disability?

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

26

1    A.  No.  I, I think I was filling that role when I was there.

2    Q.  Okay.

3    A.  I think he did have a reader, I believe that would have

4    been the person's title, that was there at other times, but

11:15:15    5    when I was working, I was the only person who was assisting

6    him.

7    Q.  During the course of this trial, did you see people

8    observing the proceedings from the gallery?

9    A.  Yeah, yes.

11:15:27    10    Q.  Were some of these people Mr. Logan's family members?

11    A.  Yes.

12    Q.  Do you recall where in the gallery they were sitting?

13    A.  In relation to this room, it would have been the side

14    closest to the defense table or from where I'm seated to the

11:15:41    15    left.

16    Q.  Did you know who these individuals were?

17    A.  I did not.

18    Q.  Did you know their names?

19    A.  I did not.

11:15:48    20    Q.  Mr. Miraglia, had you seen any of these people before

21    trial?

22    A.  If I had, I don't remember.  I don't believe I did.

23    Q.  Had you spoken with any of them previously to trial?

24    A.  No.

11:16:06    25    Q.  Mr. Miraglia, from your subsequent experience as an

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

27

1   attorney, were these individuals who were in the courtroom

2   gallery likely to be witnesses?

3   A.  Well, there were a number, I remember a number of women

4   that were there, anywhere from three to five or six women.  I

11:16:28   5   don't know if any of those people were witnesses or the alibi

6   witnesses.  I never met them or talked to them.  Based on my

7   experience subsequent to that, I know that motions are made to

8   exclude witnesses, so there should not have been witnesses

9   sitting in the courtroom.

11:16:48   10   Q.  Do you recall if the motion to exclude witnesses was made

11   in this case?

12   A.  I believe, you know, standard operating procedure, yes,

13   especially in a case like that, and I, I've never seen a case

14   in 13, 14 years where the State, at least the State has not

11:17:04   15   made such a motion.  I'm supposing that it was, but I don't

16   remember the words being uttered.

17   Q.  Mr. Miraglia, were you aware of any family members of Mr.

18   Logan who were potential witnesses and who were waiting outside

19   of the courtroom?

11:17:19   20   A.  I don't know who they were.  I -- there was a conversation

21   that they were there, that there was a possibility of an alibi

22   defense being put forth.  I was -- I believed that they were

23   present.  Who they were, I don't know.  I don't know who they

24   were.  I didn't talk to them.

11:17:34   25   Q.  You never talked to them?

MICHAEL P. SNYDER, Official Court reporter

1  A.  No.

2  Q.  Mr. Miraglia, do you know where these people, if they were

3  waiting outside the courtroom, where they were waiting?

4  A.  No.  I don't know who they were, I didn't know their names.

11:17:50  5  I believe, to the best of my knowledge they would have been in

6  the hallway if a motion to exclude had been made to the Court.

7  But I do remember that there was a small group of

8  women on the side of the gallery closest to the defense table.

9  Q.  Is it possible that they were waiting, that these witnesses

11:18:11  10  outside the courtroom were waiting somewhere other than the

11  hallway outside the courtroom?

12  A.  Possible, sure.

13  Q.  Is it possible that they were waiting inside the Public

14  Defender's office?

11:18:20  15  A.  It's possible.

16  Q.  Mr. Miraglia, do you currently work at the location where

17  this trial was held?

18  A.  Yeah, I'm there almost every day.

19  Q.  Mr. Miraglia, do you have knowledge of the layout of the

11:18:35  20  courthouse itself?

21  A.  Yes.

22  Q.  Do you have knowledge of the layout of the auxiliary office

23  building next to the courthouse?

24  A.  I do.

11:18:41  25  Q.  Do you have knowledge about how to access that building

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

29

1    from the courthouse?

2    A.  Yes.

3    Q.  How do you access that building from the courthouse?

4    A.  Well, from the courthouse side you'd have to descend to the

11:18:53    5    first floor and walk across the lobby area and then into

6    another elevator area which would lead up into the

7    administrative building.

8    Q.  So to be clear, the courthouse is one building?

9    A.  Correct.

11:19:05    10    Q.  And the auxiliary office building is a separately building?

11    A.  Correct.

12    Q.  And there is a first floor breezeway or something like that

13    that attaches the two?

14    A.  Right.

11:19:14    15    Q.  Now, Mr. Miraglia, where is the Public Defender's office

16    located?

17    A.  The seventh and eighth floor of the administrative

18    building.

19    Q.  And the courtroom was the seventh floor of the opposite

11:19:29    20    building?

21    A.  Correct.

22    Q.  In your estimation, from your knowledge of the layout of

23    these two buildings, how long would it take a person to walk

24    from the seventh floor of the courthouse building to the

11:19:39    25    seventh floor of the auxiliary office building?

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

1  A.  Well, it would vary depending on how many stops the

2  elevator made.  But if it was just one uninterrupted elevator

3  ride down to the first floor, five minutes.

4  Q.  And then if it was a round trip, that would presumably take

5  twice that?

11:19:58

6  A.  Right.

7  Q.  Mr. Miraglia, during the course of the Logan trial, did Mr.

8  Thomas ever appear to you to leave the courtroom to talk to

9  witnesses outside the courtroom?

10  A.  Yes.  Yes.  I mean, he left -- I wasn't by his side

11:20:10

11  continually.  I'm trying to remember because actually I was his

12  guide, but there were moments when other people would, he would

13  hold onto other individuals who would guide him to where he was

14  going.  So the majority of the time, if he was to go anywhere

15  within the courtroom or outside the courtroom, I would have

11:20:36

16  been with him.  But I believe there were instances when he did

17  leave with another person.

18  Q.  Did he ever leave for a period of time sufficient to go

19  down to the first floor, cross over to the auxiliary building,

20  go up to the seventh floor of that building, and then have a

11:20:53

21  conversation of sorts at that location and then return back?

22  A.  Do you mean during the trial?

23  Q.  During the course of the trial.

24  A.  No, I don't believe that happened.

25  Q.  And why don't you believe that?

11:21:03

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

31

1   A.  Because more likely than not, that would have been me

2   taking him, and I don't remember doing that.

3   Q.  Mr. Miraglia, did you ever see Mr. Kelly leave the

4   courtroom for a time sufficient to do this, to travel to the

11:21:17   5   opposite building and to speak to witnesses?

6   A.  It's hard to say.  I did see Mr. Kelly leave the courtroom

7   a number of times, and I really wasn't paying as much attention

8   to his whereabouts, so it's entirely possible that he did go

9   back over to his office.  What he did there, I mean, what he

11:21:38   10  was doing when he left, when he was out of my presence, I don't

11  remember a discussion about that.  So it is possible.  Did he?

12  I couldn't tell you.

13  Q.  Was Mr. Kelly present in the courtroom most of the time

14  during the course of the trial?

11:21:50   15  A.  Mr. Kelly was present during the course of the trial most

16  of the time, yes.

17  Q.  Mr. Miraglia, at any time after the trial began and the

18  Court concluded, did you ever see Anthony Thomas or Martin

19  Kelly speak with these alibi witnesses, so to speak, outside of

11:22:10   20  the courtroom, or anywhere for that matter?

21  A.  I don't remember whether they did or not.  I'm remembering

22  more specifically my conversation that I had with them, and I,

23  you know, I don't want my review of transcripts to refresh my

24  recollection.  Just sitting here independently, I don't

11:22:36   25  remember seeing those conversations occur.  It's possible that

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

32

1   they did, but I don't remember them.

2   Q.  Okay.

3   A.  I remember my conversation specifically.

4   Q.  Okay.  Now, Mr. Miraglia, getting to your conversation, in

5   addition to being an observer at this trial, were you asked to

6   do anything else during the course of the trial other than

7   observing?

8   A.  Yeah.  Well, the instance where I was asked to go speak

9   with the family when there was some, there was some

10  disagreement about how to proceed after the State had rested,

11  whether to present the affirmative defense evidence or to have,

12  and/or to have Mr. Logan testify, I was asked to go speak with

13  the family members because I believe that that was something

14  that Mr. Logan wanted.  He wanted input from the family when he

15  was making that decision.  So there was that.  I believe I,

16  because of Mr. Thomas' disability, I think I actually held some

17  exhibits for him as he was making argument, and I did some

18  research on the admissibility of some substantive evidence,

19  prior inconsistent statements as substantive evidence, and

20  whether it was admissible, I remember doing something along the

21  lines of that.

22  Q.  So getting to your first point about what you were asked to

23  talk to the family members, who asked you to do this?

24  A.  I believe it was Mr. Thomas.

25  Q.  Do you recall any details about how this request was made,

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

33

1   where it occurred, when it occurred?

2   A.  You know, I remember -- it's kind of blurred because there

3   were a lot of conversations going on with Mr. Logan and the

4   lawyers.  There was a lot of contention about how to proceed,

11:24:17   5   and Mr. Logan didn't have a very good relationship with Mr.

6   Kelly communicationwise.  So where it happened, I sort of

7   remember it happening where the lawyers and I were with Mr.

8   Logan somewhere in the back behind the courtroom.  Mr. Logan

9   was in and out of the Judge's chambers a number of times.

11:24:41   10   There's a side room next to chambers, or an anteroom, and then

11   there's the lockup area.  So conversation had occurred in any

12   number of those places with Mr. Logan.

13           Who was present?  My best recollection was that there

14   was a discussion going on.  Mr. Logan wasn't in agreement.

11:25:02   15   There was some room in the discussion where Mr. Miraglia wanted

16   to hear from his family.  Mr. Thomas told me to go talk to the

17   family to see what they thought about what we were trying to

18   convince Mr. -- what they were trying to convince Mr. Logan to

19   do as far as a defense case.

11:25:18   20   Q.  So you recall that you were asked to speak with the family?

21   A.  Yes.

22   Q.  Do you recall that you were asked to speak with anybody in

23   particular amongst that family?

24   A.  I think I knew who his mom was.  I can't tell you what she

11:25:32   25   looks like today, but at that time I did know who his mom was,

MICHAEL P. SNYDER, Official Court reporter

1  and she was there amongst several other females that were

2  there.  So I went to where I knew she was and had the

3  discussion with her.

4  Q.  Now, you said you were asked to speak with them.  Were you

5  asked to obtain information for them or to do anything in

6  particular or just to --

7  A.  No, I -- no.  I was not asked to get anything other than

8  their opinion on what we were trying, what we were discussing

9  with Mr. Logan about whether or not he should testify and

10  present affirmative, present an affirmative defense, which

11  would have clearly been part of what his testimony would have

12  entailed.

13  Q.  Your testimony today is that you were obtaining information

14  from the family?

15  A.  No, just their opinion.  I was going to tell them where we

16  were with Mr. Logan in our discussion.  The lawyers, Mr. Thomas

17  and Mr. Kelly, did not want Mr. Logan to testify.  They didn't

18  think he would come across well to the jury.  And there was

19  some doubt in their minds as to the reliability of the

20  affirmative defense, and they, the lawyers also felt that at

21  that point there was a good reasonable doubt argument to be

22  made; the State's case wasn't that strong.

23       I went and relayed that to the family, and their

24  response was to the effect of tell Leonard to listen to his

25  lawyers.  There was no, nothing, there was no equivocating.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

35

1    They were, they assented to go tell Leonard to listen to the

2    lawyers, and that's what I did.  So I think the conversation

3    lasted a minute, two minutes tops.  I told them what the

4    lawyers were doing and saying, asked them what they thought,

11:27:20    5    they told me, and I went back and told the lawyers.

6    Q.  So you said that the family told you to tell Leonard to

7    listen to his attorneys?

8    A.  Yes.

9    Q.  And your testimony about what you said to them when you

11:27:43    10    approached them is what?

11            THE COURT:  Them being the family members?

12            MR. EVANS:  Them being the family.

13            THE COURT:  Okay.

14    BY THE WITNESS:

11:27:50    15    A.  Verbatim, I can't tell you, but I know the substance of

16    what I told them was, and that was specifically as to whether

17    or not Leonard would testify and whether he would present an

18    affirmative defense.  If he was going to testify, he was going

19    to say that he was in Milwaukee.  So I told them that, to the

11:28:12    20    best of my memory, the lawyers do not want Leonard to testify,

21    it's a good reasonable doubt case, one of the victims I believe

22    could not identify Mr. Logan, and one of the witnesses had

23    recanted.  So it was a good affirmative defense case.  The

24    lawyers did not want to put Leonard on and have the focus shift

11:28:33    25    to him as to whether or not he was being honest and then,

MICHAEL P. SNYDER, Official Court reporter

1  thereby, putting on his alibi witnesses trying to convince the

2  jury that they were being honest when the lawyers felt they had

3  a good reasonable doubt case based on what the State put forth.

4  BY MR. EVANS:

11:28:48  5  Q.  So your testimony today is that you approached the family?

6  A.  Yes.

7  Q.  And you told them that the attorneys did not want to call

8  the alibi witnesses?

9  A.  We didn't want Leonard to testify and present an

11:28:58  10  affirmative defense.

11       Did I use the words "We don't want to call any alibi

12  witnesses"?  I don't know if I used those words.  But

13  essentially what I just told you.  The wording of it exactly I

14  can't tell you, but that was the substance of what I was

11:29:13  15  telling them.

16  Q.  You told them two things is your testimony.  You told them,

17  one, that Leonard would not be called to testify; and, two,

18  that the alibi witnesses would not be called to testify; is

19  that your testimony today?

11:29:23  20  A.  No.

21       THE COURT:  That was the lawyer's view.

22  BY THE WITNESS:

23  A.  Yeah, right.  Those weren't my words, but that was what I

24  was conveying.  Yes, that was the lawyers' view.

11:29:34  25  BY MR. EVANS:


          MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

37

1   Q.  And your testimony is that their response was tell Leonard
2   to trust his attorneys?
3   A.  Listen to the lawyers.  I'm pretty sure those were the
4   words that -- I remember certain things better than others.  I
11:29:45   5   think those were the words.
6   Q.  Mr. Miraglia, backing up a bit about this conversation.
7       Where did this conversation physically take place?
8   A.  I believe, I believe it could have been two places.  It
9   could have been in the gallery, because the courtroom was down,
11:30:02   10  the Judge wasn't on the bench, and they were -- the ladies were
11  sitting in one particular area I believe most of the trial.  I
12  thought it, it could have been there or it could have been in
13  the hallway outside of the courtroom, just on the other side of
14  the courtroom doors as in this room.
11:30:17   15  Q.  The people you spoke with, were they the same people that
16  you had observed watching the proceedings?
17  A.  Yes, I believe so.  I mean, exactly the same people?  I
18  don't remember, but I know his mom was there.
19  Q.  Your recollection is that it probably was the same people?
11:30:30   20  A.  Yes, that would be fair to say.
21  Q.  Did you ever speak -- the people you spoke to, they were
22  not in the Public Defender's office?
23  A.  No.
24  Q.  Mr. Miraglia, when --
11:30:43   25      MR. EVANS:  Excuse me.  Strike that, Your Honor.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

38

BY MR. EVANS:

Q.  Mr. Miraglia, when you spoke to these people, you said that you were located either in the gallery of the courtroom or in, beyond the courtroom in the hallway?

11:30:59  A.  Yes.

Q.  Was this located some distance from where Kelly and Mr. Thomas were at that time?

A.  They weren't with me when I went and had this conversation. They were I believe still with Leonard in the, in the back of

11:31:12  the courtroom, somewhere behind the courtroom.

Q.  So they were out of earshot?

A.  Yes, absolutely.

Q.  Mr. Miraglia, you've already told us about the substance of your conversation with these people.  Was anything else

11:31:27  exchanged beyond what you have testified to today?

A.  No.  It was pretty simple and quick conversation.

Q.  You said it took a minute or two?

A.  Yes.

Q.  During the course of the trial, was this your only

11:31:46  interaction with these people?

A.  I believe so, yes.

Q.  Mr. Miraglia, getting back to what you did, after you spoke to these people, wherever it was that you spoke to them, what did you do?

11:31:58  A.  I went back to where Mr. Thomas -- you know, I know Mr.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

39

1   Thomas was there.  Whether Mr. Kelly was there, my memory is

2   that they were both there, and Leonard was there as well.  I

3   don't know which room it was.  I initially thought it was in

4   the lockup area, but it may have been in another room.  I don't

11:32:23   5   remember.  But I remember that Leonard was -- I said it so

6   Leonard could hear it, so he would have heard what I said

7   because there was -- it was an argument that was going on that

8   I was bringing information to that I thought would help resolve

9   it.  And I know Leonard was there, and I know Mr. Thomas was

11:32:41   10   there.  Whether Mr. Kelly was, I don't remember.

11   Q.  Could it have been in chambers where this took place?

12   A.  Could have been, could have been.

13   Q.  Did you happen to see a court reporter present?

14   A.  No, I don't remember a court reporter.  Certainly there was

11:32:56   15   no court reporter transcribing anything that we were discussing

16   when I relayed that information.

17   Q.  Could it have been that a recording device was recording at

18   that time?

19   A.  I don't believe -- no, I don't think so.

11:33:06   20   Q.  Mr. Miraglia, when you returned, you said you relayed a

21   message?

22   A.  Yes.

23   Q.  What was the substance of the message that you relayed?

24   A.  Family does not want you to testify.  They said to listen

11:33:22   25   to the lawyers.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

40

1      I believe it was as simple as that.

2      I just talked to your mother.  I just talked to your

3  mother.  She said to listen to the lawyers.  They don't want

4  you to testify.  She doesn't want you to testify.

5      And that's it.

6  Q.  So you specified who it was that you thought you were

7  speaking with?

8  A.  Yes, I believe I did.

9  Q.  And, Mr. Miraglia, did you do anything else in between when

10  you spoke with the people that you spoke with and when you

11  returned to Mr. Thomas and everyone else and gave the message?

12  A.  No, I did not.

13  Q.  Mr. Miraglia, did you tell Anthony Thomas or Martin Kelly

14  or anyone else in this subsequent discussion that the family

15  had said anything that they actually hadn't said?

16  A.  No.

17  Q.  Did you ever tell Mr. Thomas or Mr. Kelly about a domestic

18  issue involving Latonya Payton?

19  A.  I don't know anything about a domestic issue.  I did see

20  that in prior records.  I had no knowledge of that being an

21  issue or why it would have been, so, no.

22  Q.  Did you ever tell Mr. Thomas or Mr. Kelly that the

23  witnesses, that anybody was afraid of testifying or unwilling

24  to testify?

25  A.  I did not.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

41

1 Q. Because nobody told you that?

2 A. Correct.

3 Q. Mr. Thomas, is it consistent with your recollection that

4 all you did here was relay a message from the family to the

11:34:57  5 attorneys?

6 A. Yes.

7 Q. Just as you had relayed a message from the attorneys to the

8 family?

9 A. Yes.

11:35:05  10 Q. Mr. Miraglia, how long did this talk with Mr. Thomas last,

11 or Mr. Thomas or anybody else who was there?

12 A. Which talk?  When I went back?

13 Q. The second one.

14 A. After I talked with the family?

11:35:16  15 Q. Yes.

16 A. It went on for a while because they were back there with

17 Mr. Logan.  So I relayed the information, and the conversation

18 went on, the discussion that the lawyers were having with

19 Leonard Logan went on for some time.  He was having a hard time

11:35:32  20 coming to a decision, Leonard Logan.  He wanted to testify.  He

21 was being advised not to.  He wasn't in agreement with the

22 lawyers at that point.  He wanted input from the family.  I

23 think the discussion went on for a little while.

24 Q. But you weren't involved in this discussion?

11:35:49  25 A. I was -- at that point, no.  I was observing.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

1   Q.  The part of the discussion that you were involved with, how

2   long did it take, would you say?

3          THE COURT:  In other words, for you to relay.

4   BY THE WITNESS:

11:35:58   5   A.  Oh, seconds.  Seconds.  It wasn't very long at all.

6   BY MR. EVANS:

7   Q.  And after this episode in chambers and the discussion

8   between Logan and his attorneys, what happened next in the

9   course of the trial?

11:36:10   10   A.  Well, Leonard was admonished as to whether or not he wanted

11   to testify, and he decided --

12          THE COURT:  You mean by the Judge?

13          THE WITNESS:  By the Judge, by Judge Simmons himself.

14   BY THE WITNESS:

11:36:27   15   A.  And he declined.  He said that he did not wish to testify.

16          I don't know the timing, like how long, much longer

17   after that discussion that I was involved in.  I don't remember

18   how long it was before he was brought out, Leonard Logan was

19   brought out for the admonishments, but that's what I remember

11:36:45   20   next happening.  That would have been the next step

21   procedurally.

22   Q.  Mr. Miraglia, you said you were an observer of this trial?

23   A.  Yes.

24   Q.  You observed the entirety from the beginning to the end?

11:36:53   25   A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - direct by Evans

43

1   Q.  During the course of the trial, did you ever hear from

2   Anthony Thomas or Martin Kelly that they had been conferring

3   with alibi witnesses outside the courtroom?

4   A.  Outside of the courtroom?  There was -- I remember hearing

11:37:16   5   that they had conferred with alibi witnesses.  When and where,

6   I don't know.

7   Q.  You have no knowledge about when or where these

8   conversations took place?

9   A.  The circumstances of the conversations, I do not, no.  I do

11:37:30   10   not remember.

11   Q.  And your testimony is that you never spoke to or even maybe

12   even saw the alibi witnesses themselves?

13   A.  Unless they were with the group that I talked to, no, I did

14   not.

11:37:41   15   Q.  Mr. Miraglia, the interaction you described in this

16   testimony with Leonard Logan's family members, is that the only

17   time you spoke to anyone from Leonard Logan's family during the

18   course of the trial?

19   A.  I believe so.

11:37:58   20   Q.  Mr. Miraglia, the interaction you described in this

21   testimony with the family members, was that the only time you

22   spoke to any potential witnesses during the course of the

23   trial, to your knowledge?

24   A.  If they -- I don't know if there were potential witnesses

11:38:16   25   in this group, so I can't answer.

MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  That's a very good, lawyerly, precise

2  answer.  Your were listening well.

3    So aside from this conversation, did you have any

4  conversations with anybody that you thought might be a witness?

11:38:25    5    THE WITNESS:  No, I did not.

6    THE COURT:  Okay.

7    MR. EVANS:  One moment, Your Honor.

8      (Pause.)

9  BY MR. EVANS:

11:38:54   10  Q.  Okay, Mr. Miraglia, I have a few further questions.

11    You testified that there was a disagreement when you

12  returned to the attorneys about what to do, and prior to that,

13  that there had been contentious discussions between the

14  attorneys and Mr. Logan?

11:39:12   15  A.  Yes.

16    MR. EVANS:  One moment, Your Honor.

17    THE COURT:  Yes.

18      (Pause.)

19  BY MR. EVANS:

11:39:32   20  Q.  Mr. Miraglia, the conversation with Thomas, the first

21  conversation when he told you to speak to the family members,

22  did that occur after the State had rested?

23  A.  Yes.

24  Q.  It occurred after several defense witnesses had been

11:39:46   25  presented?

MICHAEL P. SNYDER, Official Court reporter

1  A.  It may have.  I don't remember what defense witnesses were

2  presented, so that's possible.  I can't answer that right now.

3  Q.  It's your recollection, though, that that's possible?

4  A.  Yes.

11:40:03  5  Q.  Mr. Miraglia, when you relayed the message from the family

6  members back to Mr. Thomas, to your recollection was Martin

7  Kelly present at that time?

8  A.  Like I testified earlier, I member Mr. Thomas being there,

9  I remember Leonard being there, and which room I don't

11:40:24  10  remember.  I believe that Mr. Kelly was there, but I'm not a

11  hundred percent sure.

12  Q.  Finally, Mr. Miraglia, you testified that you remembered

13  hearing about some sort of conference with the alibi witnesses

14  from the attorneys, but you said that you don't know precisely

11:40:42  15  when that took place?

16  A.  Correct.

17  Q.  Do you recall when you heard this, when you were, when

18  during the course of the trial that you heard about this thing

19  you don't know the time of?

11:40:52  20  A.  Well, I knew about it during the course of the trial, so I

21  would imagine earlier on.  And I was sitting there when Mr.

22  Thomas made his opening statement, so I was aware of the

23  existence of possible alibi witnesses throughout the whole

24  trial.  So it would have been, you know, was it months before,

11:41:11  25  you know, when I was, in a conversation I had with Mr. Thomas

MICHAEL P. SNYDER, Official Court reporter

Miraglia - cross by Goodfriend

46

1    as he was preparing the case?  Was it the day of the trial's

2    beginning?  It was earlier on.  I knew about it throughout.  I

3    knew that they existed, that potential witnesses from Milwaukee

4    existed.

11:41:28    5    Q.  Would you say it's possible that the conference that you

6    heard about second-hand was a conference which took place prior

7    to the beginning of the trial?

8    A.  It's possible.

9              MR. EVANS:  Thank you.

11:41:41    10              THE COURT:  Is that it?

11              MR. EVANS:  Yes.

12              THE COURT:  Cross.

13              MR. GOODFRIEND:  One moment, Judge?

14              THE COURT:  Sure.

11:41:47    15         (Pause.)

16              MR. GOODFRIEND:  Thank you, Judge.

17                        CROSS-EXAMINATION

18    BY MR. GOODFRIEND:

19    Q.  Mr. Miraglia, I believed you briefly touched on the point

11:43:08    20    that Mr. Logan was a difficult client?

21    A.  Yes.  His relationship with Mr. Kelly was strained.

22    Q.  And how did it exhibit itself as being strained?

23    A.  Well, Mr. Thomas was sort of the intermediary between Mr.

24    Kelly and Leonard.  Leonard Logan didn't seem interested in

11:43:29    25    what Mr. Kelly had to say.  I don't think he trusted him, his

                    MICHAEL P. SNYDER, Official Court reporter

Miraglia - cross by Goodfriend

47

1    opinion, his abilities.  He more so listened to Mr. Thomas for

2    whatever reason.

3    Q.  Was Leonard Logan argumentative with Mr. Kelly?

4    A.  Yes.

11:43:45  5    Q.  And how did he exhibit this, his being argumentative?

6    A.  Well, he would, the arguments occurred frequently.  I mean,

7    it was just, the communication between Martin Kelly and Leonard

8    Logan throughout my observations was always contentious.  Were

9    there screaming matches?  I don't remember that.  I don't

11:44:09  10   remember Leonard ever screaming at Mr. Kelly.  But he, he got

11   angry with him a few times.

12   Q.  Mr. Logan got angry with Mr. Kelly?

13   A.  Sure.  Refused to listen to him, didn't -- he didn't -- he

14   clearly didn't agree or trust Mr. Kelly's direction with the

11:44:29  15   case, with his defense.

16   Q.  Would it be correct to say that at times Mr. Logan didn't

17   want to hear what Mr. Kelly had to say?

18   A.  Yes.

19   Q.  And Mr. Logan got along better with Mr. Thomas?

11:44:44  20   A.  Yes.

21   Q.  Now, you indicated on direct examination that you went to

22   talk to the family of Leonard Logan?

23   A.  Correct.

24   Q.  And you were directed to do that by Mr. Thomas?

11:45:05  25   A.  Yes.


               MICHAEL P. SNYDER, Official Court reporter

Miraglia - cross by Goodfriend

48

1  Q.  Now, this conversation you had was either in the courtroom

2  during a recess or out in the hallway?

3  A.  Yes, during a recess.  Either place that it occurred, it

4  was during a recess, yes.

11:45:22  5  Q.  Now, when you approached this group, were they already,

6  were they all together?

7  A.  Yes.

8  Q.  How many individuals were in that group?

9  A.  His mom for sure and several other I think women.  So I'd

11:45:39  10  say three to six people.

11  Q.  Three to six?

12  A.  Somewhere, yeah, somewhere in there.  There were several

13  people including his mother.

14  Q.  Okay.  Now, do you know the name of his mother?

11:45:52  15  A.  I do not.

16  Q.  Of these three or five other people, do you know the names

17  of those people?

18  A.  I do not.

19  Q.  Do you know what their relationship was to Leonard Logan?

11:46:06  20  A.  Other than his mom, obviously, no, I don't.  I didn't know

21  who those people were that were with his mom.

22  Q.  Is it possible that one or two of them may have been one of

23  the alibi witnesses?

24  A.  It's possible.

11:46:17  25  Q.  Now, in terms of Mr. Logan not testifying, you indicated

MICHAEL P. SNYDER, Official Court reporter

Miraglia - cross by Goodfriend

49

1    that he finally agreed not to testify?

2    A.  Yes.

3    Q.  And that was put on the record?

4    A.  Yes.

11:46:43  5    Q.  Okay.  When that was put on the record, did Mr. Logan look

6    back in the gallery at some point in time?

7    A.  I remember that instance where he was being admonished by

8    Judge Simmons as to whether he wanted to testify, and before he

9    said the word "No," he turned and looked at, in the direction

11:47:03  10    of where the family was sitting.

11    Q.  And did anybody have any reaction?

12    A.  I remember individuals in the gallery shaking their head,

13    indicating no.

14    Q.  Not to testify?

11:47:16  15    A.  Correct.

16    Q.  Now, when you talked to the women, they told you to please

17    tell Leonard to listen to his lawyers, is that correct?

18    A.  Yes.

19    Q.  Did any of the women say that they wanted him to testify at

11:47:44  20    that point in time?

21    A.  No.

22    Q.  Did any of the women voice any concern about testifying?

23    A.  No.

24          MR. GOODFRIEND:  Judge, could I have a minute, please?

11:47:58  25          THE COURT:  Sure.

MICHAEL P. SNYDER, Official Court reporter

Miraglia - redirect by Evans

50

1      (Pause.)

2           THE COURT:  I'm waiting on you.

3           MR. GOODFRIEND:  I'm sorry, Judge.  Thank you.

4  BY MR. GOODFRIEND:

11:48:59  5  Q.  Mr. Miraglia, once again going back to that conversation

6  you had with either the family members or potential alibi

7  witnesses, one of them said listen to his lawyer, is that

8  correct?

9  A.  Tell Leonard to listen to his lawyers.

11:49:19  10  Q.  Which one said that?

11  A.  You know, I want to say his mom, but -- she would have been

12  the one I was focusing on because I didn't know the other

13  individuals; I just recognized his mom.  But I'm not going to

14  say that because I don't know who said it.  One of the group

11:49:40  15  said it.

16  Q.  And you're not sure if the alibi witnesses were included in

17  that group?

18  A.  Not sure.

19           MR. GOODFRIEND:  Judge, I have no further questions.

11:49:49  20           THE COURT:  Mr. Evans?

21           MR. EVANS:  Just briefly, Your Honor.

22                     REDIRECT EXAMINATION

23  BY MR. EVANS:

24  Q.  Mr. Miraglia, you've testified that when you spoke with the

11:49:59  25  family, the response they gave you was essentially to tell

MICHAEL P. SNYDER, Official Court reporter

Miraglia - examination by the Court

51

1   Leonard to listen to his lawyers?

2   A.  Yes.

3   Q.  And you just said in response to one of opposing counsel's

4   questions that at some point towards the conclusion of the

11:50:14   5   trial, you saw members in the gallery shaking their heads at

6   Leonard at some point?

7   A.  Yes.

8   Q.  You don't know why the family told you what they told you,

9   do you?

11:50:24   10   A.  I don't know why, no.

11   Q.  And you don't know why they were shaking their heads?

12   A.  I could only assume that it was because they didn't want

13   him to testify.

14   Q.  It's possible that they were saying what they said and

11:50:38   15   shaking their heads because you had told them that the

16   attorneys didn't want him to testify?

17   A.  Right.

18   Q.  That's possible?

19   A.  Possible.

11:50:47   20        MR. EVANS:  Thank you.  No more questions.

21        THE COURT:  Mr. Goodfriend, do you have anything else?

22        MR. GOODFRIEND:  No, Judge.

23                          EXAMINATION

24   BY THE COURT:

11:50:53   25   Q.  So, Mr. Miraglia, the people that you talked to outside of

MICHAEL P. SNYDER, Official Court reporter

1     the courtroom, and I know you've said a lot about this, more

2     like three people, more like five people, or do you have a good

3     recollection on that?

4     A.  No.  I would, my best guess would be that it was, it was

11:51:16     5     more than three.

6     Q.  Okay.

7     A.  But it could have been just a few people.

8     Q.  Okay.  And all women, though, that much is clear?

9     A.  Yes.  I don't remember any men in the group.

11:51:27     10     Q.  And I know that you said that you recognized Mr. Logan's

11     mother because she had been in the courtroom, and that was

12     definitely one of the people you talked to?

13     A.  Yes.

14     Q.  Do you have any sense of who the others were, relatives,

11:51:39     15     friends?  Did you get any sense of that either before talking

16     to them or when talking to them?

17     A.  You know, Judge, if I did, I don't remember now.

18     Q.  Do you have any memory as to whether any of the other

19     people other than Mr. Logan's mother that you spoke to outside

11:51:53     20     the courtroom or in the courtroom had been in court listening

21     during the trial?

22     A.  I believe so, yes.

23     Q.  Okay.

24     A.  I believe there was a small group.

11:52:04     25     Q.  It was the same small group?

MICHAEL P. SNYDER, Official Court reporter

1  A.  I believe so, yes.

2  Q.  So you used the phrase "in the back," and I had cases at

3  26th Street in the old days, and I know that's sort of a phrase

4  out there.

11:52:13  5       The layout of the back, if you will, the Judge

6  typically has -- I don't know if I was ever in 700, but I spent

7  a lot of time in 706, which I think is the one right across the

8  hall?

9  A.  Right.

11:52:26  10  Q.  So the Judge has a chambers and then sort of an anteroom to

11  the Judge's chambers, right?  And that's usually, there's a

12  door kind of right off the side off the bench that goes back in

13  there?

14  A.       Likening it to this room, the Judge's chambers would be

11:52:35  15  through the far door on that side of the room.  Directly on the

16  opposite side of this wall would be the anteroom -- or actually

17  there would be a little office where the deputies congregate,

18  and there's security behind that in the anteroom.  And then to

19  get to the lockup would be through this door down the hallway.

11:52:52  20  Q.  Right.  So the door that you'd go out to go to the lockup

21  would generally speaking be the same door that the jury would

22  go out to go to the jury room, right?

23  A.  Yes.  And I'm forgetting the jury room, of course.  The

24  jury room would be the room directly through this door.  A door

11:53:05  25  to the left of the jury room door would be the hallway to the

MICHAEL P. SNYDER, Official Court reporter

Miraglia - examination by the Court

54

1  lockup.

2  Q.  To the lockup, okay.

3         And there was a jury during this case, so you

4  definitely wouldn't have had this conversation in the jury

11:53:16  5  room?

6  A.  Correct.

7  Q.  Okay.  So did you go back and, just before today, and

8  there's no right or wrong answer to this.  I just want to know.

9  Did you go back and look at any part of the transcript of the

11:53:26  10  trial before you came in today?

11  A.  The trial?  No.  I just looked at my transcript from the

12  post-trial motion.

13  Q.  Okay.  So you had said that there had been, that there had

14  been some discussions ongoing involving Mr. Thomas and Mr.

11:53:39  15  Kelly on the one hand and Mr. Logan on the other, and you were

16  there during those conversations except when you were sent?

17  A.  Yes.

18  Q.  Okay.  Am I correct that at least some of those

19  conversations were happening in the Judge's chambers with the

11:53:50  20  court reporter there because there was a discussion about

21  testimony and not and so on?

22  A.  Yes.

23  Q.  And I can show it to you here.  I've got it.  It sort of

24  starts at page 5 -- well, these things are numbered

11:54:02  25  differently, so it's E146 at the bottom and has sort of a Bates

MICHAEL P. SNYDER, Official Court reporter

Miraglia - examination by the Court

55

1    stamp number starting at 529.

2         It looks like there's a discussion, I'm just asking,

3    throwing this out there to see if it refreshes your memory.  It

4    looks like there was a discussion that started out in the

5    Judge's chambers after Mr. Kelly asked for a sidebar after a

6    defense witness had testified, and there was a discussion

7    about, involving the Judge about whether Mr. Logan was going to

8    testify, and there also was some reference to calling other

9    witnesses.  Do you remember that generally speaking?

10   A.  Generally.

11   Q.  Do you think you were there during that conversation?

12   A.  Yes, I would have been there at all phases with Mr. Thomas,

13   yes.

14   Q.  I guess my take on that is the Judge was at some point I

15   guess expressing concern that Mr. Logan wasn't able to make up

16   his mind or was kind of going back and forth.  Is that a fair

17   statement?

18   A.  Yes.

19   Q.  I don't want to overstate it, but I would say, if it were

20   me, I would probably say I was perturbed.  But one way or

21   another, the Judge was not --

22   A.  I can tell you that Judge Simmons was as pleasant --

23   Q.  He's a pleasant guy.

24   A.  -- as I've ever seen.  I was surprised Mr. Logan was in and

25   out of that, of his chambers unfettered.  I mean, not

MICHAEL P. SNYDER, Official Court reporter

1   concerned, but it was surprising.

2   Q.  In other words, he didn't have shackles on?

3   A.  Right.

4   Q.  Now, when you left, when Mr. Thomas asked you to go talk to

11:55:21   5   the family members, do you remember if immediately before that

6   you were in the Judge's chambers or somewhere other than the

7   Judge's chambers?

8          Actually let me put this a different way.  Do you

9   remember if you were in the Judge's presence immediately before

11:55:36   10  that or somewhere else?

11  A.  I don't remember Judge Simmons being there when Mr. Thomas

12  told me to go speak with the family.

13  Q.  Okay.  So I'm going to show you, I'm going to just, you can

14  read as much of it to yourself as you want.  The colloquy or

11:56:01   15  the colloquy outside the presence of the jury starts at the

16  bottom of page E146, depending on the numbering system, or 529.

17  The part I want you to focus on is over on page 534.  So get up

18  to there, but read as much of it before that as you need to.

19  So I'm just going to hand it to you.  Starting with 529, just

11:56:22   20  read it to yourself obviously, 529 where he asks for the

21  sidebar, and I'll get another copy here.

22         Okay.  You got past 534.  So before you go on too much

23  further, if you turn to the bottom of page 533, you see there

24  there's a discussion involving alibi witnesses, and at the very

11:58:41   25  bottom of that page Mr. Thomas says, "It is my opinion that he

MICHAEL P. SNYDER, Official Court reporter

Miraglia - examination by the Court

57

1    should not call these alibi witnesses."  I just read part of
2    the sentence.
3    A.  Yes.
4    Q.  Then the Judge seems to turn to Mr. Kelly.  Mr. Kelly says,
11:58:51  5    "Judge, I've explained to him that alibi witnesses are weak,
6    that we rarely win an alibi case because they are inherently
7    weak the first time."
8            Then the Judge says, "Alibis are such" --
9            And it looks like that Mr. Thomas almost in the middle
11:59:03  10   of the Judge's sentence cuts him off.  In fact, he says,
11   "Excuse me, Judge."  He says, "I have something else that I
12   would like to tell Mr. Logan.
13           "Judge, we have just received additional information
14   that some of his family members have advised us to tell him
11:59:16  15   that he should not call his alibi witnesses.  I have just told
16   him that in the Court's presence now on the record."
17           The Court says, "So what family members?"
18           Mr. Thomas says, "His mother and his grandmother
19   advise that he not call his alibi witnesses to testify."
11:59:30  20           So here's my question on that.  Understanding what you
21   said before, is it possible that you actually came back into
22   the room and communicated your information to Mr. Thomas while
23   he was still there with the Judge and with Mr. Logan?
24   A.  Yes.
11:59:44  25   Q.  I mean, that's kind of how this reads.

          MICHAEL P. SNYDER, Official Court reporter

Miraglia - examination by the Court

58

1    A.  Right, yes, it is.

2    Q.  Okay.  So putting that aside for a second, and

3    understanding that you don't know the identities of anybody

4    that you were talking to other than the mother, did you have

12:00:00    5    any understanding at the time you talked to them that any of

6    them were the alibi witnesses?

7    A.  I did not.

8    Q.  Okay.  So Mr. Thomas or Mr. Kelly didn't say "Go talk to

9    the alibi witnesses;" they said "Go talk to the family"?

12:00:12    10    A.  Correct.

11    Q.  Okay.  All right, give me just a second here.  I just have

12    one or two other things I want to ask you.

13         Oh, and by the way, just for your own interest, if you

14    were to read on there, so it's over on page 536, so just two

12:00:38    15    pages later where Mr. Logan, the Judge asks Mr. Logan if he

16    wants to testify, and he says no.  And then after that the jury

17    comes back out -- or after that they act in the presence of the

18    jury.  It's not clear when they came back out.

19         Let's see.  I think I had one other question.  Oh,

12:01:01    20    yes.  It had to do with you said that you recalled hearing that

21    the attorneys had conferred with the alibi witnesses, but you

22    didn't really remember when.  So whenever they conferred with

23    them, you weren't there when it happened?

24    A.  Yes, correct.

12:01:20    25    Q.  And was it your sense that there was any, at least from

MICHAEL P. SNYDER, Official Court reporter

1  your understanding, during this sort of moment in time if you

2  will where there was this discussion with Mr. Logan back in

3  chambers about whether he should testify and discussion with

4  the lawyers and you then go out and talk with the family

12:01:38  5  members, did you have any notion or sense that there was any

6  discussion that the lawyers, Mr. Kelly or Mr. Thomas, were

7  having with alibi witnesses right then?

8  A.  No.

9  Q.  Okay.  As far as you knew, they were still back with Mr.

12:01:47  10  Logan?

11  A.  Yes.

12       THE COURT:  Do you have follow-up questions based on

13  my questions?

14       MR. EVANS:  No, Your Honor.

12:01:57  15       THE COURT:  Mr. Goodfriend?

16       MR. GOODFRIEND:  Just briefly.

17       THE COURT:  Yes.

18                  RECROSS-EXAMINATION

19  BY MR. GOODFRIEND:

12:02:01  20  Q.  Mr. Miraglia, do you know the exact number of people who

21  were sitting in the courtroom for Leonard Logan during the

22  trial?

23  A.  A small group.  No.  Again, I'd say the same number.  I

24  remember three, five, somewhere in that number.

12:02:18  25  Q.  Do you know the exact number of people who were

               MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

60

1   participating in the conversation outside the courtroom?

2   A.  Same, same number.  There were several people.

3   Q.  You're not sure how many?

4   A.  No.

12:02:33   5            THE COURT:  Anything else, Mr. Goodfriend?

6            MR. GOODFRIEND:  No, Judge.

7            THE COURT:  Anything else?

8            MR. EVANS:  No, Your Honor.

9            THE COURT:  Thanks, Mr. Miraglia.  You're excused.

12:02:39   10            THE WITNESS:  Thank you, Your Honor.

11            THE COURT:  Thanks.  I appreciate it.

12      (Witness excused.)

13            THE COURT:  We are going to go to 12:30, so call the

14   next witness.

12:02:49   15            MR. EVANS:  Your Honor, we'll call Anthony Thomas.

16            THE COURT:  Mr. Thomas, why don't you come up here and

17   have a seat, and I'll swear you in after you're seated.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Raise your right hand, please.

12:04:47   20             ANTHONY THOMAS, PLAINTIFF'S WITNESS, SWORN

21            THE COURT:  Thanks.

22      You can proceed.

23            MR. EVANS:  Thank you, Your Honor.

24                        DIRECT EXAMINATION

12:04:55   25   BY MR. EVANS:


             MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

61

1    Q.  Will you please state your name for the Court.

2    A.  My name is Anthony Thomas.

3    Q.  Hi, Mr. Thomas.  My name is Will Evans.  I'm a law student

4    working on behalf of Leonard Logan.

12:05:10    5    A.  Good morning to you, sir.

6    Q.  Mr. Thomas, you were one of Mr. Logan's trial attorneys,

7    correct?

8    A.  I was.

9    Q.  You were what's called a second chair at Mr. Logan's trial?

12:05:22    10    A.  I was.

11    Q.  The lead attorney was Martin Kelly?  The primary attorney

12    was Marty Kelly?

13    A.  That's correct.

14    Q.  Mr. Thomas, at Mr. Logan's trial you gave the opening

12:05:37    15    statement?

16    A.  I did.

17    Q.  During the opening, you told the jury that at the time of

18    the murder Mr. Logan was not in Chicago?

19    A.  Speak up, please, counsel.

12:05:46    20    Q.  Sorry, Mr. Thomas.

21         During the opening statement that you gave --

22         THE COURT:  Mr. Evans, why don't you pull the

23    microphone so it's a little bit closer to you.  There you go.

24    You don't have to lean into it.  Just so it's pointing at your

12:05:59    25    face, it will work.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

62

BY MR. EVANS:

Q.  Mr. Thomas, during the opening you gave, you told the jury
that at the time of the murder in this case Leonard Logan was
not in Chicago?

A.  That's correct.

Q.  You told the jury that Leonard Logan was in Milwaukee,
Wisconsin?

A.  That's correct.

Q.  Mr. Thomas, you told the jury this because you intended to
present evidence that Leonard Logan was not in Chicago?

A.  I told the jury that because we might call the witnesses to
testify to that.

Q.  Not only did you tell them because you might; you told the
jury that because you intended to present evidence that Leonard
Logan was not in Chicago?

A.  We might have called them, depending how the evidence came
out.

Q.  You're testimony is that you weren't sure whether you would
call them or not?

A.  That's correct.  We weren't sure.

Q.  It was certainly a possibility?

A.  There was a possibility that we would call them.  There was
a possibility we would not call them.

Q.  Now, Mr. Thomas, this idea that Mr. Logan was not in
Chicago, this was Mr. Logan's alibi, right?

MICHAEL P. SNYDER, Official Court reporter

1    A.  That was the information that was passed on to me.  It was

2    an alibi defense, yes, sir.

3    Q.  But, in fact, during the course of Mr. Logan's trial no

4    evidence in support of this alibi was presented to the jury?

12:07:20    5    A.  That is correct.

6    Q.  Now, Mr. Thomas, in addition to giving the opening

7    statement, you also gave the closing argument?

8    A.  That is correct.

9    Q.  And your closing argument followed the State's closing

12:07:33    10    argument?

11    A.  That's correct, at least their opening closing argument,

12    because they have the right to rebuttal.

13    Q.  Right.  Now, Mr. Thomas, the State's opening closing

14    argument, as you refer to it, it mentioned the lack of any

12:07:46    15    alibi evidence, didn't it?

16    A.  I haven't read the transcript, counsel.  I couldn't tell

17    you what their opening closing argument stated.

18    Q.  Is it consistent with your recollection that this opening

19    closing argument mentioned the lack of any alibi evidence?

12:08:02    20    A.  I couldn't tell you.  I have no independent recollection of

21    what the content of their argument was.

22    Q.  Well, Mr. Thomas, in your closing argument you mentioned

23    the lack of any alibi evidence?

24    A.  That's correct.

12:08:14    25    Q.  And you wouldn't have mentioned the lack of alibi evidence

MICHAEL P. SNYDER, Official Court reporter

1    if the State hadn't referred to it first?

2    A.  I don't know about that.  I believe it was our strategy to

3    explain to the jury why we did not put on the alibi witnesses.

4    We mentioned it in opening.  I believe that it was appropriate

12:08:33    5    to explain why I didn't call them or we didn't call them in my

6    closing.

7    Q.  Mr. Thomas, your testimony is that you don't remember

8    whether or not the State referred to the lack of any alibi

9    evidence during its opening closing?

12:08:57    10   A.  That is correct, I do not have any independent recollection

11   of the content of the State's opening closing argument.

12   Q.  Would anything, would the trial transcript refresh your

13   memory?

14   A.  Certainly.

12:09:11    15        THE COURT:  How big of a point is this?  I mean, we

16   have the trial transcript.  Can we just -- I can tell him they

17   did mention it, okay?  Just take it on faith.

18   BY MR. EVANS:

19   Q.  Now, Mr. Thomas, taking it on faith that the State did in

12:09:28    20   fact mention the lack of any alibi evidence during its opening

21   closing, isn't it true that the State couldn't have mentioned

22   this if you hadn't promised the jury an alibi in the opening

23   statement?

24   A.  I am not going to tell you what another attorney would have

12:09:48    25   or might not have or would not have done.  That would be up to

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

65

1    that attorney.

2    Q.  But legally speaking, it would be improper for a prosecutor

3    to mention the lack of any alibi evidence in a trial in which

4    no alibi was even referred to at all, correct?

12:10:07    5    MR. GOODFRIEND:  Objection, Judge.

6    THE COURT:  Overruled.  You can answer.

7    BY THE WITNESS:

8    A.  I believe that that would be improper, that's correct.

9    BY MR. EVANS:

12:10:18    10   Q.  Mr. Thomas, you said that in your closing argument you also

11   addressed the lack of any alibi evidence?

12   A.  That is correct.

13   Q.  In fact, that was the first thing you did in your closing

14   argument?

12:10:28    15   A.  Absolutely.

16   Q.  You referred back to the promise in your opening statement?

17   A.  That is correct.

18   Q.  You told the jury that the alibi witnesses were "present

19   and in court"?

12:10:41    20   A.  Yes.

21   Q.  You told the jury that the alibi witnesses were "prepared

22   to testify"?

23   A.  That's correct.

24   Q.  You told the jury that you and Mr. Kelly had "made the

12:10:52    25   decision to not call those witnesses"?

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

66

1    A.  That is absolutely correct.

2    Q.  You told the jury that you didn't want them to be

3    "confused" by the alibi witness testimony?

4    A.  That is also correct, yes, sir.

12:11:06    5    Q.  You told the jury that you did not want them to be

6    "concerned" with what the alibi witnesses might say?

7    A.  That's right.

8    Q.  In fact, you actually told the jury that you didn't want

9    them to question whether they "should believe" the alibi

12:11:22    10    witnesses?

11    A.  That's right.

12    Q.  These are the same alibi witnesses who were never called to

13    testify, right?

14    A.  That's correct.

12:11:30    15    Q.  The same witnesses who the jury never saw?

16    A.  That's correct.

17    Q.  The same witnesses who the jury never heard from at all?

18          THE COURT:  I'm going to suggest that you save your

19    closing for closing, and let's just get about the business of

12:11:40    20    questioning the witness.

21    BY MR. EVANS:

22    Q.  Now, Mr. Thomas, about these alibi witnesses that we are

23    referring to, one of their names was Chevelle Thomas?

24    A.  Yes.

12:12:01    25    Q.  And the other one's name was Princess Thomas?

          MICHAEL P. SNYDER, Official Court reporter

                 1   A.  That's right.

                 2   Q.  They were aunts of Mr. Logan?

                 3   A.  I didn't understand your question, counsel.

                 4        THE COURT:  Were they his aunts?

12:12:13         5   BY THE WITNESS:

                 6   A.  It's my understanding that they are his aunts, yes.

                 7   BY MR. EVANS:

                 8   Q.  And they lived in the Milwaukee area?

                 9   A.  That's my understanding, yes.

12:12:23        10   Q.  They had been subpoenaed to appear in court?

                11   A.  Yes.

                12   Q.  And they were in fact present at the courthouse?

                13   A.  Yes.

                14   Q.  They waited there for the duration of the trial?

12:12:32        15   A.  I can't answer that.  I assume as much, but I can't answer

                16   that.

                17   Q.  To your knowledge, they were waiting --

                18   A.  To my knowledge, they were there on the day when they could

                19   have testified.

12:12:45        20   Q.  And they waited outside the courtroom?

                21   A.  That's right.

                22   Q.  Because they were potential witnesses?

                23   A.  That's right.  There was a motion to exclude.

                24   Q.  Yes, as there usually is.

12:12:59        25        Now, Mr. Thomas, you don't know where these witnesses

                     MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

68

1  were waiting, do you?

2  A.  No.

3  Q.  They could have been waiting outside the courtroom?

4  A.  When I say "No," that means no.

12:13:14  5  Q.  They could have been waiting in the Public Defender's

6  office?

7  A.  I don't think so.

8  Q.  You don't think so?

9  A.  No.  If they were waiting in our office, we would have

12:13:28  10  arranged for that, and Mr. Kelly and I did not make any

11  arrangements for that.

12  Q.  Do you recall that you made -- that you specifically did

13  not make arrangements for the witnesses to wait?

14  A.  That's correct.  I, I can tell you I never specifically

12:13:43  15  spoke to either one of those witnesses.  It was Mr. Kelly's

16  responsibility to interview the witnesses.  I never spoke to

17  them at any time.

18  Q.  You never spoke to them before trial?

19  A.  At any time, sir, before, during, or after, not even today.

12:13:57  20  I've never spoken to the witnesses.

21  Q.  So you never directly assessed these witnesses'

22  credibility?

23  A.  That's correct.

24  Q.  You trusted what Martin Kelly told you?

12:14:09  25  A.  Absolutely.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

69

1    Q.  Now, back you up a bit, Mr. Thomas.

2         You were appointed to represent Mr. Logan in the late

3    spring of 2000, right?

4    A.  I don't remember when it was.  Marty was appointed to

12:14:28    5    represent Mr. Logan, and he asked me to try the case with him

6    as his second chair.  I was not the lead counsel.  Mr. Kelly

7    was lead counsel.

8    Q.  And Mr. Kelly had been on the case for some time by that

9    point?

12:14:39   10    A.  Marty was on the case before he asked me to join, that's

11    correct.

12    Q.  Mr. Logan's trial occurred in November of 2000?

13    A.  That's right.

14    Q.  You had several months to prepare for trial, didn't you?

12:14:52   15    A.  Yes.

16    Q.  And Mr. Kelly had more time than you did because he was on

17    the case first?

18    A.  That's right.

19    Q.  Mr. Thomas, I have to ask you a personal question to

12:15:05   20    establish the basis for knowledge.

21         Just for the record, you are visually impaired?

22    A.  I'm totally blind.

23    Q.  You have aids who help you with work-related tasks?

24    A.  Do I have a reader?  I have a law clerk, yes.  When you

12:15:19   25    said "aids," you threw me off.  I thought you were asking me

MICHAEL P. SNYDER, Official Court reporter

1   about Acquired Immune --

2           THE COURT:  You know what?  I thought the exact same

3   thing.

4           You had people helping you?

12:15:28   5       THE WITNESS:  Yes, I did.

6   BY MR. EVANS:

7   Q.  For the record, at the time you represented Mr. Logan, you

8   used such help?

9   A.  John Miraglia was my law clerk.

12:15:38   10  Q.  Now, Mr. Thomas, in this case you reviewed discovery

11  documents?

12  A.  There were reports that were read to me.

13  Q.  And these reports were part of discovery?

14  A.  That's right.

12:15:56   15  Q.  Part of the reports that were read to you were police

16  reports?

17  A.  Yes.

18  Q.  You reviewed these discovery documents well in advance of

19  trial, right?

12:16:09   20  A.  Yes.  I can tell you now I have no independent recollection

21  of documents I reviewed 14 years ago.

22  Q.  Now, Mr. Thomas, in the fall of 2000 when this trial took

23  place, you had a student extern by the name of John Miraglia?

24  A.  That's correct.

12:16:28   25  Q.  He was a law student, and he was working for you?

        MICHAEL P. SNYDER, Official Court reporter

A.  He was working with me as my law clerk, that is correct.

Q.  During the proceedings in the Logan trial, he sat at the defense table with you?

A.  He did.

Q.  And also present was Martin Kelly and Leonard Logan at that table?

A.  That is correct.

Q.  Now, Mr. Miraglia was kind of shadowing you, so to speak, as a law clerk?

A.  Well, actually, sir, when Mr. Miraglia would travel with me, I would take him by the arm above the elbow, and we would walk together.  He would sort of guide me around physical obstacles in the courtroom.

Q.  So Mr. Miraglia was with you most of the time during the proceedings?

A.  Unless I asked him to do something separately.

Q.  Now, Mr. Thomas, at one point during the defense case a man by the name of Charles Jenkins testified?

A.  That is correct.

Q.  He testified that Mr. Logan was not the person who shot him?

A.  That is correct.

Q.  Shortly after his testimony concluded, and out of the jury's presence, the Judge inquired in open court whether the alibi witnesses were to be called?

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

72

A.  That is correct.

Q.  Mr. Kelly responded, "We do not anticipate calling the alibi witnesses"?

A.  That's correct.

12:17:48  Q.  The Judge asked Mr. Logan whether he understood this?

A.  That's correct.

Q.  Mr. Logan said that he needed to confer with his attorneys?

A.  That is also correct.

Q.  This whole exchange occurred before Investigator Whitney Harris was called to testify?

12:18:02  A.  I assume as much.  I haven't read the entire transcript, sir.

Q.  Shortly after this exchange and after Mr. Harris testified, the defense requested a sidebar?

12:18:22  A.  I don't remember, but I'm not going to refute that.  I don't remember.

Q.  Mr. Thomas, do you remember during the sidebar the Judge ushered yourself, Mr. Kelly, Mr. Logan into chambers?  Do you remember that?

12:18:45  A.  Sir, he would have invited us into chambers, but he didn't usher us in, no.

Q.  But do you remember being invited into chambers?

A.  I know we went into chambers, yes, sir, but we were not ushered in by the Judge, no.

12:18:58  Q.  Okay.  Excuse my language then, Mr. Thomas, okay?

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

73

1        Now, Mr. Thomas, a court reporter was present in
2   chambers?
3   A.  Yes, sir.
4   Q.  The court reporter was recording what happened there?
5   A.  Yes.
6   Q.  In chambers at this time, Mr. Logan once again expressed
7   uncertainty about whether to call alibi witnesses?
8   A.  That's correct.
9   Q.  The Judge gave Mr. Logan time to discuss the matter
10  privately with his attorneys?
11  A.  That is correct.
12  Q.  Now, Mr. Thomas, around this time you told Mr. Miraglia to
13  do something, didn't you?
14  A.  I'm sorry, I didn't hear you, counsel.  Say it again,
15  please.
16  Q.  At around this time you told Mr. Miraglia to do something
17  for you?
18  A.  I asked Mr. Miraglia to do something outside of the
19  situation in chambers.
20  Q.  Outside meaning physically outside?
21  A.  Yes.
22  Q.  You told Mr. Miraglia to go talk to Mr. Logan's family?
23  A.  That's correct.
24  Q.  After you told him, after you told him this, Mr. Miraglia
25  left the chambers?

          MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

74

1  A.  No.  See, what I told John did not happen in chambers.

2  There was a break, and during the break I told John to go and

3  talk to the family.  And John came back and told me what the

4  family said, and I went out and talked to the family.  Then I

5  came back, and both Mr. Miraglia and I told Mr. Logan that the

6  family agreed with our strategy of not calling the witnesses.

7       Now, what's not clear in the transcript is there was a

8  break before that colloquy in the back with the Judge.  But

9  the -- when I'm saying on the record to the Judge, I'm

10  answering his questions.  The Judge asked me questions.  I'm

11  answering his questions.  And I said, "Judge, additionally I

12  want to tell you on the record," and I told the Judge that we

13  found out from the family that they agreed with us, but this

14  actually happened outside of the chambers.  But I did not get a

15  chance to talk right away because the protocol is if the Judge

16  asks you a question, you have to answer the Judge's question;

17  you can not go with your agenda.

18  Q.  So, Mr. Thomas, it's your testimony that at the time you

19  told Mr. Miraglia to speak with Mr. Logan's family, that did

20  not occur in chambers?

21  A.  No, that did not happen in chambers.

22  Q.  It happened during the break?

23  A.  That's correct.

24  Q.  But at the time Mr. Miraglia had spoken with Mr. Logan's

25  family, you were in fact in chambers at that time?

12:20:31

12:21:00

12:21:21

12:21:39

12:21:47

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

1   A.  No.  He came to the back and spoke to me and told me what

2   the family said.  Then I left, and I went and talked to the

3   family.  The conversation might have lasted 20 or 30 seconds

4   just to confirm what they told John, because John was a clerk,

12:22:08   5   I was one of the lawyers.  I did not want John to be

6   responsible for what the family said.  I just wanted him to

7   report to me what they said.

8   Q.  Mr. Thomas, the reason why Mr. Miraglia reported to you

9   what the family said was because you were not present when Mr.

12:22:26   10   Miraglia had this conversation?

11   A.  That's absolutely correct.

12   Q.  You were in the back somewhere at that time?

13   A.  I was in the back.

14   Q.  Mr. Miraglia was not in the back at that time?

12:22:36   15   A.  He was not in the back at that time.

16   Q.  So, Mr. Thomas, you couldn't hear what the conversation,

17   what took place within the context of this conversation between

18   Mr. Miraglia --

19   A.  With Mr. Miraglia and the family, that is absolutely

12:22:52   20   correct.

21   Q.  Mr. Thomas, you don't know who precisely Mr. Miraglia spoke

22   to, do you?

23   A.  I wasn't present for the conversation, counsel.

24   Q.  You don't know where this conversation occurred?

12:23:11   25   A.  I was not present for the conversation, counsel.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

1  Q.  You don't know what precisely Mr. Miraglia said?

2  A.  I was not present for the conversation, counsel.

3  Q.  You don't know what precisely was told to Mr. Miraglia by

4  the people?

12:23:26  5  A.  I was not present for the conversation, counsel.

6        THE COURT:  I think you made your point, Mr. Evans.

7  Why don't we go on to something else.

8  BY MR. EVANS:

9  Q.  When Mr. Miraglia came back to relay the message, at that

12:23:37  10  time you were in chambers?

11  A.  No.  When he relayed it, I was outside of the presence of

12  the Judge.  As I told you, it appeared as though it was in

13  chambers, but I actually got a chance to speak for the first

14  time to the Judge about what happened during the break because

12:23:56  15  the Judge was asking me questions first, and I had to answer

16  the Judge's questions.  That was my first time to speak after

17  the Judge had me answer his questions.

18        John Miraglia actually told me that information before

19  we came to the chambers.

12:24:16  20  Q.  Now, Mr. Thomas, your testimony was that you had a separate

21  conversation with the family?

22  A.  That's absolutely correct.

23  Q.  This occurred after this conversation with the Judge?

24  A.  No.  Again, it was during the break when the judge told us

12:24:32  25  to talk to Mr. Logan.  And when he took the break, we separated

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

77

1   from the Judge, and we talked to Mr. Logan in the back, we

2   meaning John Miraglia, Martin Kelly, and myself.  And I asked

3   John Miraglia to go speak with the family and to convey to them

4   what our strategy was.

12:24:56  5   He came back and told me the family said to tell

6   Leonard to go along with his lawyers.  And once he told me

7   that, I said "I'm going to go out and confirm what they just

8   told you."

9   And I went out, I said, "Ma'am, John Miraglia just

12:25:17  10  spoke to you," and they identified themselves as the mother and

11  grandmother.  "I've been given to understand that you told Mr.

12  Miraglia that you agree with our strategy not to call these

13  witnesses."

14  And they said "Yes."  Both said "Yes," each one of

12:25:34  15  these two women said "Yes."

16  Now, when they said mother and grandmother, they did

17  not give any specific names.  They told me, one said "I'm his

18  mother," the other said "I'm his grandmother," and they both

19  said "Yes, we agree not to call the witnesses."

12:25:49  20  Not in sentences I asked, "Did you tell John Miraglia

21  that you agree with us not to call the witnesses?"

22  And they both said "Yes."  They did not speak full

23  sentences.  The conversation might have lasted 20 to 25 seconds

24  and then I was gone.

12:26:07  25  I went back in the back with Mr. Leonard Logan where

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

78

1   Marty Kelly was.  Then Marty left, and John Miraglia and I

2   remained behind with Mr. Logan.

3   Q.  Mr. Thomas, backing up a bit.

4   A.  Yes, sir.

12:26:22    5   Q.  Your testimony is today that you spoke with -- before this

6   meeting in chambers with the Judge, you spoke with two women,

7   mother and grandmother of Mr. Logan?

8   A.  That's correct.

9   Q.  Mr. Thomas, there's no question in your mind that that's

12:26:41   10   your testimony today?

11   A.  That's right.

12   Q.  Mr. Thomas, you gave prior testimony in the state court in

13   this matter?

14   A.  I did.

12:26:49   15   Q.  It was back on December 17, 2001.

16   A.  I testified in a prior matter.  I couldn't tell you the

17   date, sir.

18   Q.  Is it consistent with your memory that this occurred back

19   in 2001?

12:27:06   20         THE COURT:  I think it's just better to ask him about

21   the event.  Was it the post-conviction hearing?

22         MR. EVANS:  The post-conviction hearing, yes.

23         THE COURT:  Or was it the post-trial hearing?  There

24   were two.

12:27:14   25         MR. EVANS:  It was the post-trial hearing, excuse me.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

79

1     THE COURT:  Do you remember the post-trial hearing?

2     THE WITNESS:  I did testify at a post-trial hearing.

3  BY MR. EVANS:

4  Q.  It was approximately a year after the trial itself?

12:27:23    5  A.  I believe that was a post-conviction hearing.

6     THE COURT:  The date is not that important.  The event

7  is what is important.  So he says he remembers testifying at

8  the post-trial hearing.  Let's just go from there.

9  BY MR. EVANS:

12:27:36   10  Q.  Mr. Thomas, you were under oath during that hearing?

11  A.  At both hearings, yes.

12  Q.  You were questioned by an attorney representing Mr. Logan?

13  A.  Yes.  Who was the attorney?

14  Q.  I believe it was a Mr. Frankel.  Do you remember that?

12:27:53   15  A.  Dan Frankel?

16     THE COURT:  Scott.

17     THE WITNESS:  Scott Frankel?  Okay.

18     All right, ask your next question, counsel.

19  BY MR. EVANS:

12:28:02   20  Q.  And you answered Mr. Frankel's questions honestly?

21     MR. CHIMERA:  Objection, Judge.  Could we just ask

22  him, "Were you asked this question, and did you give this

23  answer?"

24     THE COURT:  What's your objection?

12:28:13   25     MR. CHIMERA:  My objection is he can stop badgering

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

1    the witness on this, Judge.

2        THE COURT:  Seriously, you're saying he's badgering

3    the witness?  The objection is overruled, Mr. Chimera.  Please.

4    BY MR. EVANS:

12:28:25   5    Q.  You answered his questions honestly?

6    A.  I did.

7    Q.  And a court reporter transcribed these answers?

8    A.  Yes.

9    Q.  Now, Mr. Thomas, you were asked during this proceeding to

12:28:40   10   explain your role as an attorney at Mr. Logan's trial, right?

11   A.  I don't remember the questioning, counsel.  You'll have to

12   read it to me.

13   Q.  Well, you were asked several questions during this hearing

14   relating to your role as an attorney for Mr. Logan?

12:28:55   15   A.  You'll have to read it to me.  What was the question?

16   Q.  It's a yes or no question, Mr. Thomas.

17        You were asked several questions --

18   A.  I've already said that I answered questions.  I'm telling

19   you I don't remember what they were.  Read the question to me.

12:29:09   20   Q.  Yes or no, Mr. Thomas.  You were asked questions during

21   this prior proceeding with regard to your role as Mr. Logan's

22   attorney?

23   A.  I've answered that question.

24        THE COURT:  Okay.  We are going to take a break at

12:29:19   25   this point, and we'll have a little conversation with

         MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

81

1    everybody.

2         Hi, Mr. Thomas.  I'm the Judge.

3         THE WITNESS:  Yes, sir.

4         THE COURT:  Don't make your own objections.

12:29:27  5         THE WITNESS:  All right.

6         THE COURT:  Don't say you're not going to answer

7    questions because, frankly, sir, that is not up to you.

8         Mr. Evans, stop messing around with all of these

9    little preliminaries, okay?  You don't have to jump through all

12:29:41  10    of those hoops.  There is no jury in the box, okay?  So let's,

11    you know, you will get to where you're going much more

12    efficiently if you get past all of that.  You've established

13    that he's testified at the post-trial hearing.  Just ask the

14    question you want to ask, okay?  Let's just get to that.

12:30:02  15         And then we are going to take a break after I think

16    you've gotten to it.

17    BY MR. EVANS:

18    Q.  Okay, Mr. Thomas, during the course of this prior

19    proceeding, nowhere in that testimony do you ever discuss

12:30:13  20    having this conversation with these two women?

21         THE COURT:  Mr. Thomas, let me ask that in a different

22    way.

23         Would you agree with me that if anybody had read your

24    testimony from the two hearings, the post-trial hearing and the

12:30:24  25    hearing on the post-conviction petition, as well as what you

MICHAEL P. SNYDER, Official Court reporter

1    said during the trial, they would not have gotten from that

2    that you yourself had a conversation with these people?

3              THE WITNESS:  That's absolutely correct.

4              THE COURT:  Good.  Is that what you were trying to

5    establish?

6              MR. EVANS:  Yes.

7              THE COURT:  Then we are there.  We are going to break

8    for lunch, and we are going to start again at 1:30.

9              The witness is instructed not to discuss his testimony

10   with anyone.

11             (Recess from 12:30 p.m. to 1:30 p.m..)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL P. SNYDER, Official Court reporter

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3
     LEONARD LOGAN,                   )      No. 2012 C 6170
 4
                      Plaintiff,      )      February 18, 2014
 5
                 v.                   )      1:30 p.m.
 6
     NEDRA CHANDLER,                  )
 7
                      Defendant.      )
 8
 9                   TRANSCRIPT OF PROCEEDINGS - MOTION
                    BEFORE THE HON. MATTHEW F. KENNELLY
10
11   APPEARANCES:

12   For Plaintiff:        MS. TARA E. THOMPSON
                           MR. WILL EVANS
13                         MR. ERIC ALSTON
                           LOEVY & LOEVY
14                         312 North May Street, Suite 100
                           Chicago, Illinois 60607
15                         (312) 243-5900

16   For Defendant:        MR. MATTHEW P. BECKER
                           MR. VINCENZO CHIMERA
17                         ASSISTANT ATTORNEY GENERAL
                           100 West Randolph street, 13th floor
18                         Chicago, Illinois 60601

19                         MR. NEAL B. GOODFRIEND
                           100 West Randolph Street, 13th floor
20                         Chicago, Illinois 60601

21

22

23                     MICHAEL P. SNYDER, FCRR
                        Official Court Reporter
24                  United States District Court
                219 South Dearborn Street, Room 2244A
25                     Chicago, Illinois 60604
                          (312) 435-5563

             MICHAEL P. SNYDER, Official Court reporter
```

1    THE CLERK:  12 C 6170, Logan versus Chandler.

2    THE COURT:  I need to call them and get Mr. Logan down

3  here.  I am not sure why they didn't bring him back down.

4    All right.  We've just got to wait for them to get him

5  back down here, so just sit tight.

6    MS. THOMPSON:  Your Honor, I know that Mr. --

7    THE COURT:  There was something I needed to bring up.

8    I handed somebody the wrong things this morning when

9  we were talking about those documents from the Public

10  Defender's office.  I meant to hand you the three things that I

11  thought you needed to review, which were the grand jury

12  testimony which appeared to have Mr. Logan's notes on it, the

13  letter from the lawyer from 2005, and the notes of the

14  interview with the prior lawyer, and I think I handed you

15  something else, and Mr. Chimera got it.  It's the cases I

16  think.  Yes, this is the stuff that really wasn't relevant.

17    MS. THOMPSON:  Thank you, Your Honor.

18    THE COURT:  What was your question now?

19    MS. THOMPSON:  I was going to say that Mr. Miraglia is

20  waiting in the hall because he -- we are certainly finished

21  with him if the State is.

22    THE COURT:  Let's wait till we finish this witness.

23    MS. THOMPSON:  Understood, Your Honor.

24    THE COURT:  And we've just got to wait for Mr. Logan

25  to get back down here.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

85

1      (Pause.)

2           THE COURT:  Okay.  Mr. Logan is present.

3           Mr. Evans, you can proceed.

4      ANTHONY THOMAS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

01:45:52   5              DIRECT EXAMINATION (resumed)

6  BY MR. EVANS:

7  Q.  Mr. Thomas, before the recess, you remember we were talking

8  about the errand that you sent Mr. Miraglia on during the

9  course of Mr. Logan's trial.  Do you remember that?

01:46:23   10 A.  Yes.

11 Q.  You testified today that you sent Mr. Miraglia on this

12 errand during a break in the trial?

13 A.  Yes.

14 Q.  When during the course of the trial was this break?

01:46:41   15 A.  It was during the time when the Judge said he was going to

16 give us time to talk to Mr. Logan again.  He said to Mr. Logan

17 that we had already had an hour to speak to him, there was

18 additional time.  The Judge felt like Mr. Logan had had a good

19 time to make a decision as to whether he was going to testify.

01:47:11   20      He said, "But I will give you another opportunity to

21 talk to your lawyers in the anteroom outside of chambers here,"

22 and it was during that time when I sent Mr. Miraglia on that

23 errand during that break.

24 Q.  Mr. Thomas, you just testified that there had been another

01:47:33   25 time when the Judge gave Mr. Logan an opportunity to confer

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

86

1  with his attorneys about this previously?

2  A.  Well, actually what I said was the Judge said to Mr. Logan

3  that "I've given you adequate time."

4  Q.  Mr. Thomas, that previous occasion that you were referring

01:47:59  5  to just now, that occurred right after, that occurred after the

6  testimony of -- excuse me -- that occurred before the testimony

7  of Investigator Whitney Harris, correct?

8  A.  Yes.

9  Q.  And then there was a later occurrence which you are now

01:48:23  10  talking about which is when you sent Mr. Miraglia on this

11  errand?

12  A.  I don't think it was a later occurrence.  It was -- I

13  remember the Judge saying that "I will give you additional time

14  to talk to your lawyers."

01:48:43  15          And when the Judge gave us that time, I couldn't tell

16  you what time of day it was, I couldn't, I couldn't give you

17  that, but at that point he said "You may speak to your lawyers

18  in the anteroom outside of chambers right now."

19          So Marty, John, and I went into that area, and we

01:49:07  20  spoke --

21          THE COURT:  The area being the anteroom?

22          THE WITNESS:  The anteroom, yes, Judge.

23          THE COURT:  Okay.

24  BY THE WITNESS:

01:49:13  25  A.  And we spoke to Mr. Logan.

MICHAEL P. SNYDER, Official Court reporter

BY MR. EVANS:

Q.  And --

A.  I'm sorry, counsel.  Ask your question.  I'm sorry for
volunteering.  Ask your question.

01:49:22  Q.  The anteroom was where you had this first conversation with
Mr. Miraglia, telling him to go?

A.  Yes.

Q.  Mr. Thomas, how long did Mr. Miraglia take in terms of time
to run this errand?

01:49:44  A.  It was a very short period of time.  I would say he was
back in less than five minutes.

Q.  And when Mr. Miraglia came back, Marty Kelly was with you?

A.  Yes.

Q.  Mr. Thomas, before the recess you also testified about a
01:50:04  conversation that you say you personally had with Mr. Logan's
family?

A.  Yes.

Q.  And you testified that you had this conversation
immediately after Mr. Miraglia returned?

01:50:16  A.  Yes.

Q.  And your intention, the reason why that conversation
happened was because you wanted to talk to the same people that
Mr. Miraglia had just spoken to?

A.  Yes.

01:50:27  Q.  And you testified that the people you spoke with were Mr.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

88

1    Logan's mother and grandmother?

2    A.  Yes.

3    Q.  And the location where this conversation occurred was in

4    the courtroom?

01:50:55    5    A.  No.  It was in the hallway.

6    Q.  In the hallway outside the courtroom?

7    A.  That's correct.

8    Q.  Now, Mr. Thomas, before we recessed, you also said that

9    Marty Kelly left at some point?

01:51:13    10    A.  Yes.

11    Q.  How long did Marty Kelly leave for?

12    A.  It was just a few minutes.

13    Q.  In terms of a few minutes, maybe five minutes?

14    A.  Maybe five, six minutes, not long.  It certainly wasn't as

01:51:31    15    long as ten minutes, I can tell you that.

16    Q.  And this, when Kelly left, it was after you had spoken to

17    the mother and the grandmother?

18    A.  Yes.

19    Q.  And did you have a conversation of some sort with Mr. Kelly

01:51:42    20    prior to him leaving?

21    A.  Yes.

22    Q.  Mr. Thomas, you have no reason to suspect that the court

23    reporter's record in this case is inaccurate, do you?

24    A.  I don't understand the question, counsel.

01:52:03    25    Q.  I withdraw the question.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

89

1   A.  I assume the record is what it is.

2   Q.  Mr. Thomas, shortly after all of this, there was a recorded

3   conversation in chambers, correct?

4         THE COURT:  You mean a conversation where the court

01:52:26   5   reporter was present?

6         MR. EVANS:  A conversation where the court reporter

7   was present.

8   BY THE WITNESS:

9   A.  Yes.

01:52:33   10   BY MR. EVANS:

11   Q.  Mr. Kelly was present for that?

12   A.  Yes.

13   Q.  For the duration of that situation, Mr. Kelly was present?

14   A.  Yes.

01:52:39   15   Q.  And you yourself were present?

16   A.  That's right.

17   Q.  And shortly after that conversation, you rested your case,

18   or Mr. Logan rested his case?

19   A.  The defense rested.

01:52:53   20   Q.  The defense rested their case, correct?

21   A.  The defense rested.

22   Q.  Now, Mr. Thomas, the alibi witnesses were never called

23   prior to the defense resting, yes?

24   A.  That is correct.

01:53:14   25   Q.  And there were reasons why the alibi witnesses were not

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

90

1  called to testify?

2  A.  That's correct.

3  Q.  Ultimately, however, it was Marty Kelly's decision to not

4  call the witnesses?

01:53:30  5  A.  That's correct.

6  Q.  Mr. Kelly and yourself had discussed these reasons?

7  A.  That's correct.

8  Q.  Mr. Logan was consulted on this at some level about these

9  decisions?

01:53:41  10  A.  That's correct.

11  Q.  I want to briefly go through some of these reasons, okay?

12  A.  Proceed, counsel.

13  Q.  Mr. Thomas, you've said in previous testimony that you were

14  worried about the jury judging the alibi rather than the

01:53:59  15  evidence of guilt, and that was a reason for not calling the

16  alibi witnesses?

17  A.  That's correct.

18  Q.  Mr. Thomas, you've said in previous testimony that you were

19  worried about the accuracy of the alibi witnesses'

01:54:14  20  recollection, and that was the reason for not calling them?

21  A.  That's correct.

22  Q.  Mr. Thomas, you said in previous testimony that you were

23  worried about information coming in through rebuttal testimony

24  about what Mr. Logan may have had on him when he was arrested

01:54:29  25  in this case, and that was a reason?

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

91

1   A.  Actually I don't remember that, but I'll take your word for
2   it.
3   Q.  It was a reason; it was not the main reason because you
4   don't remember it?
01:54:40   5   A.  I don't remember.
6   Q.  Mr. Thomas, finally you said in previous testimony that the
7   reason why the alibi witnesses were not called is because you
8   believed that Mr. Logan deserved an acquittal on the evidence
9   presented?
01:54:56   10   A.  At trial, yes.
11   Q.  Yes.  And that was in fact a reason for not calling the
12   alibi witnesses, correct?
13   A.  That is correct.
14   Q.  You had discussed these four considerations with Marty
01:55:07   15   Kelly?
16   A.  Yes, I had a conversation with Marty, but I don't believe I
17   outlined it the way you just did, no.
18   Q.  Well, in this conversation you discussed these
19   considerations?
01:55:22   20   A.  We discussed our reasons, yes, sir.
21   Q.  Mr. Thomas, you don't today recall any other explanations
22   for why the alibi witnesses were not called to testify?
23         THE COURT:  You mean other than the ones that have
24   been listed?
01:55:38   25         MR. EVANS:  Other than the ones that have been listed.

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

92

1  BY THE WITNESS:

2  A.  Yes, there's another reason.

3  BY MR. EVANS:

4  Q.  Mr. Thomas, you never gave any other reasons during your

01:55:51    5  prior testimony in this matter, did you?

6  A.  I did not.

7  Q.  Mr. Thomas, the alibi witnesses never told you that they

8  didn't want to testify, did they?

9  A.  I did not speak to the alibi witnesses, sir.

01:56:03    10  Q.  John Miraglia had never told you that the alibi witnesses

11  didn't want to testify?

12  A.  He did not.

13  Q.  You didn't receive any information that the alibi witnesses

14  didn't want to testify?

01:56:17    15  A.  That is incorrect.

16  Q.  Marty Kelly told you that the alibi witnesses --

17  A.  That is correct.

18  Q.  You don't have personal knowledge that Marty Kelly ever

19  spoke to the alibi witnesses, do you?

01:56:31    20  A.  I know what Marty told me.

21  Q.  You know what Marty told you?

22  A.  I did not speak to the witnesses myself.

23  Q.  So your impression, your recollection that the alibi

24  witnesses had given information that they didn't want to

01:56:46    25  testify is solely through Marty Kelly?

MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

93

1    A.  That's correct.

2    Q.  And that was the other reason why, according to you, the

3    alibi witnesses were not called to testify?

4    A.  There was another reason that you haven't stated or asked

01:57:01    5    me about.

6    Q.  Mr. Thomas, you never said whatever that other reason was

7    in prior testimony, have you?

8    A.  I did not.

9    Q.  Mr. Thomas --

01:57:25    10         MR. EVANS:  One moment, Your Honor.

11         (Pause.)

12   BY MR. EVANS:

13   Q.  Mr. Thomas, this other reason that you just referred to,

14   your knowledge of that reason also came through Marty Kelly?

01:58:04    15   A.  That's incorrect.

16   Q.  Well, speaking about this reason you said that did come

17   from Marty Kelly, the --

18         THE COURT:  Reluctance of the alibi witnesses.

19   BY MR. EVANS:

01:58:22    20   Q.  -- reluctance of the alibi witnesses, when precisely did

21   that information come to your attention?

22   A.  During the day when Judge Simmons was asking Mr. Logan did

23   he want the witnesses to testify.  It was that day.

24   Q.  But when precisely during that day?

01:58:45    25   A.  I couldn't tell you precisely.

                MICHAEL P. SNYDER, Official Court reporter

Thomas - direct by Evans

94

1   Q.  Was it after the first time given by the Judge for Mr.

2   Logan to confer with his attorneys?  It was after that, wasn't

3   it?

4   A.  I couldn't tell you, sir.  I don't remember when, but I

01:59:02   5   know it happened that day.

6        THE COURT:  Do you know if it was before or after you

7   went out in the hallway to talk to the family members?

8        THE WITNESS:  It was before, Judge.

9        THE COURT:  Before that?

01:59:11   10        THE WITNESS:  Yes, sir.

11   BY MR. EVANS:

12   Q.  And when you say before, you're referring to a conversation

13   that you had with Marty Kelly about this information?

14   A.  I'm sorry.  I really don't understand your question.

01:59:24   15   Q.  When you say before, you're referring to a conversation

16   that you had with Marty Kelly?

17        THE COURT:  When you learned that -- I think what he's

18   trying to ask you is that when you learned that the alibi

19   witnesses didn't want to testify, you learned that in a

01:59:40   20   conversation you had with Mr. Kelly?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  Is that what you wanted to ask?

23        MR. EVANS:  Yes, Your Honor.

24        No further questions.

01:59:55   25        THE COURT:  Mr. Goodfriend?

MICHAEL P. SNYDER, Official Court reporter

CROSS-EXAMINATION

BY MR. GOODFRIEND:

Q.  Mr. Thomas, counsel asked you what other reason there was

that the alibi witnesses didn't testify, is that correct?

A.  Yes, sir.

Q.  What was that other reason?

A.  At trial, Latonya Payton recanted her original statement,

but part of the statement she did not recant.

One of the things she said at trial was that Leonard

Logan was at her apartment at 11 -- I'm sorry -- 1:30 in the

morning on the morning of March 19th.  Our alibi defense was

for a murder that took place at 11:30 p.m. March 18th.  The

alibi was that Leonard Logan was in Milwaukee, Wisconsin, at

11:30 p.m. on March 18th.

When Miss Latonya Payton testified at trial that

Leonard Logan came to her apartment at 1:30 in the morning, two

hours after the murder, it was very difficult to try to

reconcile an alibi defense where he's supposed to be in

Wisconsin at 11:30 and he shows up at 1:30 in the morning, two

hours after the murder, on the south side of Chicago.

It's an hour and a half drive from Milwaukee to

Chicago.  That's the north side.  It would take another hour to

get to 75th and Yates from that distance.

And from our point of view, we thought it would be

very difficult from a strategic point to ask the jury to

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

96

1    believe Latonya Payton when she recanted her testimony and said

2    Leonard Logan did not commit the murder, and yet please do not

3    believe her when she says he was there at 1:30 in the

4    afternoon -- or I'm sorry, not the afternoon -- 1:30 in the

02:02:29    5    morning.

6         And so we did not call the alibi witnesses because we

7    thought that there was sufficient reasonable doubt, we could

8    not reconcile those two facts, that Latonya Payton even in her

9    recantation she still said that Leonard Logan was at two hours

02:02:50    10    after the murder.

11         That is why, that was the additional reason. And that

12    I did not get from Marty Kelly because that was at the trial.

13    Q.  But in terms of the information you got from Marty Kelly.

14    Marty Kelly did tell you that the alibi witnesses were

02:03:10    15    reluctant to testify?

16    A.  That is correct.

17    Q.  And did he also inform Mr. Logan that the alibi witnesses

18    were reluctant to testify?

19    A.  He certainly did, and in my presence, yes, sir.

02:03:20    20    Q.  Where was that?

21    A.  In the lockup area.

22    Q.  Now, Mr. Thomas, where did you go to undergraduate school?

23    A.  DePaul University.  I had a double major, psychology

24    philosophy.

02:03:40    25    Q.  When did you graduate from DePaul?

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

97

1  A.  1980.

2  Q.  Did you go to John Marshall Law School?

3  A.  I did.

4  Q.  Wait for my question, okay?

02:03:48    5      When did you graduate from John Marshall?

6  A.  1984.

7  Q.  And you are licensed to practice in the State of Illinois?

8  A.  Yes, sir.

9  Q.  In 1986 did you become a member of the Cook County Public

02:03:59   10  Defender's office?

11  A.  On September 2nd, 1986, yes, sir.

12  Q.  Could you please tell Judge Kennelly which divisions you

13  were in in the Public Defender's office.

14  A.  My first assignment was at juvenile court.  I was assigned

02:04:13   15  there September 2nd, 1986.  I was in the child custody unit

16  where I represented parents who were charged with abuse and

17  neglect and dependency of children.

18      In October of 1987 I was transferred to the

19  delinquency unit where I represented minor respondents who were

02:04:35   20  charged with crimes.

21      I was transferred from juvenile court.  My last day

22  there was December 7th, 1989, and my first day at 26th Street

23  was December 8th, 1989, and I've been at that assignment since

24  that time.

02:04:51   25  Q.  That's the felony trial division, is that correct?

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

98

1    A.  Yes, sir.

2    Q.  And you're still currently in the felony trial division?

3    A.  Yes, sir, I am.

4    Q.  Now, in 2000 you were assigned to the courtroom of Judge

02:05:03    5    Henry Simmons, is that right?

6    A.  Yes, sir.

7    Q.  That's a felony trial courtroom?

8    A.  Yes, sir.

9    Q.  That's at 26th and California?

02:05:09    10    A.  Yes, sir.

11    Q.  And your partner during that time period that you were in

12    Judge Simmons' courtroom was Martin Kelly?

13    A.  Yes.

14    Q.  Now, before Mr. Logan's trial, approximately how many

02:05:21    15    felony jury trials had you conducted?

16    A.  In the neighborhood of 100.

17    Q.  Before the, before Mr. Logan's trial, approximately how

18    many felony bench trials had you tried?

19    A.  Probably in the neighborhood of 300.

02:05:38    20    Q.  Before Mr. Miralgia's trial, had you tried any murder

21    cases?

22    A.  Yes, sir.

23    Q.  Approximately how many?

24    A.  About five.

02:05:44    25    Q.  Now, Mr. Kelly asked you to be partners with him on the

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

1   Leonard Logan case?

2   A.  Yes, sir, he did.

3   Q.  And were you present for meetings or discussions with Mr.

4   Logan while you were assigned to his case?

02:05:59   5   A.  Yes, sir, I was.

6   Q.  Now, could you please tell Judge Kennelly what

7   accommodations the courtroom personnel made for interviews with

8   criminal defendants before the court call?

9   A.  We would ask the deputy in our courtroom could he allow us

02:06:15   10   to interview our client in the jury room, and he said he could

11   do that for us before court started.  So he would bring the

12   client over at around 8:30, 9 o'clock, and we'd have to be

13   there to interview him before the call began at 9:30.

14   Q.  Did you conduct interviews with Leonard Logan in the jury

02:06:36   15   room before the court call?

16   A.  Yes, on some occasions we did.  On other occasions we

17   talked to him in the back in the lockup.  But we talked to him

18   multiple times.

19   Q.  Now, could you describe your relationship with Leonard

02:06:53   20   Logan as a client?

21   A.  I can try.

22   Q.  Well, I guess maybe the question, was he a difficult

23   client?

24   A.  He certainly was, yes, sir.

02:07:04   25   Q.  Why was Mr. Logan a difficult client?

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

1    A.  He was difficult in that his demeanor was hostile, he would

2    be evasive when we asked him questions, he was discourteous.

3    He, for example, he never called me Mr. Thomas.  He always

4    called me Thomas.  "Yo, Thomas, Thomas," that's how he

02:07:28    5    addressed me.  He never called me Mr. Thomas, not once since I

6    knew him.

7    Q.  Did he ever complain to you that you were not interviewing

8    the witnesses for trial?

9    A.  Never.

02:07:41    10   Q.  What was Mr. Logan's relationship with Martin Kelly?

11   A.  It was very hostile.  As a matter of fact, I kind of acted

12   as a buffer between the two of them.

13   Q.  Now, in terms of hostile towards Mr. Kelly, how was Mr.

14   Logan hostile towards Mr. Kelly?

02:08:00    15   A.  In his tone, in his words.  It was a very strained

16   relationship.

17   Q.  Now, in spite of the difficulties that Mr. Kelly had with

18   Mr. Logan, was Mr. Kelly diligent in preparing for trial?

19   A.  Absolutely.

02:08:19    20   Q.  Now, in your conversations with Leonard Logan, did you talk

21   to Mr. Logan about his alibi defense?

22   A.  Yes, sir.

23   Q.  And what was his alibi defense that he gave to you?

24   A.  The alibi defense was that he was in Milwaukee around the

02:08:40    25   time of the murder.  And the witnesses, according to Marty,

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

1  were saying that he was around, he was in Milwaukee around the

2  time of the murder.  They did not give a specific time or date.

3  Mr. Logan said he was in Milwaukee from March to April.  That's

4  what he told us.

02:09:06   5  Q.  Now, during your conversations with Mr. Logan regarding the

6  alibi defense, did he give you the names of Princess Thomas and

7  Chevelle Thomas?

8  A.  I was aware of the names, yes, but I didn't ever speak to

9  the witnesses myself.

02:09:24  10  Q.  Right, but you were aware of --

11  A.  I was aware of the names, yes, sir.

12  Q.  -- the names of the two alibi witnesses?

13  A.  Yes.

14  Q.  Now, during your conversations with Mr. Logan, did he ever

02:09:34  15  tell you he was in Milwaukee to celebrate the birthday of the

16  mother of Princess Thomas and Chevelle Thomas?

17  A.  No, sir.

18  Q.  During your conversations with Mr. Logan regarding the

19  alibi defense, did he ever tell you that Earline Logan gave him

02:09:52  20  a ride to Milwaukee on March 17th, 1997?

21  A.  No, sir.

22  Q.  During your conversations with Mr. Logan, did he ever

23  mention Earline Logan as an alibi witness?

24  A.  Not to me, sir.

02:10:04  25  Q.  To your knowledge, did he say the name Earline Logan to

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 102 of 217 PageID #:3468
Thomas - cross by Goodfriend
102

1    anyone?

2    A.  I don't recall his saying that name either to me, to Martin

3    Kelly, or to John Miraglia.

4    Q.  Now, in terms of preparing for trial, did you and Mr. Kelly

02:10:24    5    discuss the alibi defense?

6    A.  Yes, sir, we did.

7    Q.  And where would you discuss that?

8    A.  We discussed it in an area behind the courtroom.  There is

9    an area -- sometimes we talked about it in the lockup area, but

02:10:43    10    not actually near where the cages are.  We were -- there's a

11    hallway that leads to the lockup.  Sometimes we would talk in

12    that area.

13    Q.  Did Mr. Kelly and you share the same office?

14    A.  Yes.

02:10:58    15    Q.  Did you and Mr. Kelly talk about your cases in the office?

16    A.  Yes, sir, we talked in the office also.

17    Q.  So did you talk about the alibi defense with Mr. Kelly in

18    your office?

19    A.  Yes.

02:11:07    20    Q.  Now, you did the opening statement in this case?

21    A.  Yes, sir.

22    Q.  Did you talk with Mr. Kelly about how to handle the alibi

23    defense in opening statement?

24    A.  Yes, sir, I did.

02:11:21    25    Q.  What was the content of your conversation regarding alibi

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

103

1   defense in opening statement?

2   A.  In the conversation we talked about how we did not think

3   this alibi was a strong alibi at all, and Mr. Logan wanted us

4   to put this alibi in.  We did not really believe in it because

02:11:46   5   we thought it was very tenuous.  His being there around that

6   time was not strong, in our position.  But Mr. Logan was such a

7   difficult client that what we said we would do, we said that we

8   would go and talk to Mr. Logan and explain to him that we would

9   say in opening statement about the alibi, but we did not want

02:12:16   10   to be too specific about it because we didn't really have

11   specific information and because we were thinking there's a

12   possibility we may not call those witnesses, depending on how

13   the evidence comes out.

14          We said -- actually it was Marty that spoke to him in

02:12:39   15   my presence, but Marty said to Mr. Logan, we may not call these

16   witnesses.  We'll let the jury know that there's a possible

17   alibi, but depending on how the evidence comes out, we may not

18   need to call these witnesses, and it would be better for you

19   that we don't if we -- if it comes out the evidence that really

02:12:59   20   hurts us and we have to call the witnesses, then we will.  But

21   if we don't have to, we are not going to.  And he said okay.

22   Q.  Now, why would you mention the alibi at all in opening

23   statement if you weren't so sure about it?

24   A.  Because if we needed to put on an alibi, we thought it

02:13:18   25   would be easier to explain witnesses that the jury had heard

MICHAEL P. SNYDER, Official Court reporter

1    about rather than not telling them anything about it and then

2    saying at the last minute "Well, here are our alibi witnesses."

3    We didn't think that would have any credibility with the jury,

4    whereas if we did not call the witnesses, I thought that we

02:13:39    5    could explain that and have the jury understand the reasons why

6    we didn't call them.  And I did explain that in the opening

7    part of my closing argument.

8    Q.  Now, you talked at the beginning of my questioning about

9    Latonya Payton, is that correct?

02:14:02    10    A.  Yes, sir.

11    Q.  Now, in terms of Latonya Payton, she had given different

12    statements at different times?

13    A.  Yes, sir.

14    Q.  She had a handwritten statement that was taken by the

02:14:16    15    state's attorney?

16    A.  Yes, that's correct.

17    Q.  And that handwritten statement implicated Mr. Logan?

18    A.  That's correct.

19    Q.  She had given grand jury testimony?

02:14:24    20    A.  That's correct.

21    Q.  And that grand jury had implicated Mr. Logan in the murder?

22    A.  Yes, sir.

23    Q.  She had also recanted from that testimony, is that correct?

24    A.  She recanted to the extent of saying that Mr. Logan didn't

02:14:44    25    do it; the police made her say that because they said if she

MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

1  didn't put it on Mr. Logan, they would put the murder on her.

2  She recanted to that extent, but she did not recant the

3  statement that Leonard Logan was at her apartment at 1:30 in

4  the morning on March 19th.

02:15:05  5  Q.  Now, did you and Mr. Kelly talk about Leonard Logan

6  testifying in his own behalf?

7  A.  Yes.

8  Q.  And did you also -- and how many times did you and Mr.

9  Kelly talk about Leonard Logan testifying in his own behalf?

02:15:24  10  A.  With just one another, is that what you're asking?

11  Q.  Yes, just between the two of you.

12  A.  Many times.  Many, many times.  I would say over double

13  digit times we had conversations with one another.

14  Q.  Now, in terms of Leonard Logan as a witness, did you have

02:15:45  15  certain perceptions about him testifying in his own behalf?

16  A.  Yes, sir, I did.

17  Q.  What were those perceptions?

18  A.  Sir, Mr. Logan was such a disagreeable human being when Mr.

19  Kelly and I interacted with him.  Since Mr. Kelly and I were on

02:16:05  20  his side, it was our belief that the jury would have hated him,

21  and I did not want Mr. Logan to be found guilty of murder

22  because they didn't like him.  I thought it should be about the

23  evidence; it should not be about whether or not he was a

24  winning personality.  And that's why I wanted for Mr. Logan not

02:16:28  25  to testify.

MICHAEL P. SNYDER, Official Court reporter

1  Q.  Now, did you talk to Mr. Logan about testifying?

2  A.  Yes, sir.  I advised him multiple times that I did not

3  think it was in his best interest to testify.

4  Q.  Did he express a desire to you that he wanted to testify at

5  some point?

6  A.  He did.  He disagreed with me, but eventually he did come

7  to the point where he said that he would not testify, that he

8  finally agreed with Mr. Kelly and with me that he should not

9  testify because of the reasons that we explained to him.

10  Q.  And what reasons did you give to Mr. Logan for not, for

11  recommending that he not testify?

12  A.  We explained to him that the way the case had gone so far,

13  Latonya had retracted her initial statement implicating him.

14  She actually said he didn't do it.  Additionally to her saying

15  at trial that he didn't do it, Charles Jenkins said that he

16  didn't do it.  We thought that that was enough and that if he

17  testified, his conviction would come in -- he had a felony

18  conviction, that that would come in, the jury would hear about

19  that, and we thought that because of those reasons, it would

20  not be in his best interests to testify.

21  Q.  You mentioned a witness by the name of Charles Jenkins.

22  What was his part in this?

23  A.  Charles Jenkins had been injured in the same shooting with

24  Tim Jones, who was murdered.  Charles Jenkins testified for the

25  defense.  He testified that Leonard Logan did not commit the

02:16:46

02:17:15

02:17:39

02:18:05

02:18:24

MICHAEL P. SNYDER, Official Court reporter

1  murder, he was not the shooter.  And because we thought he was

2  such a strong witness, we believed that it was a stronger case

3  for reasonable doubt for Mr. Logan, and we did not want the

4  case to be about whether the jury believed the alibi witnesses,

02:18:47   5  because if they took it to that point, in our position, from

6  our position, it would be shifting the burden, and we did not

7  want the jury to think oh, well, we don't believe the defense

8  witnesses, so we are going to find Mr. Miraglia guilty.  We

9  didn't want it to be about that.  We wanted it to be about the

02:19:05  10  State's case, and in our opinion the State did not prove its

11  case beyond a reasonable doubt.  We tried to win that case for

12  Mr. Logan.

13  Q.  Now, what was your impression of Charles Jenkins as a

14  witness?

02:19:18  15  A.  I thought he was a good witness.  I believed him.  I

16  thought the jurors believed him.

17          MR. GOODFRIEND:  Could I have a minute, Judge?

18          THE COURT:  Sure.

19      (Pause.)

02:19:37  20          MR. GOODFRIEND:  Thank you, Judge.

21          THE COURT:  Nothing else?

22          MR. GOODFRIEND:  No.  I've got a few more.

23          THE COURT:  Okay.

24  BY MR. GOODFRIEND:

02:21:09  25  Q.  Mr. Thomas, did Mr. Logan ever mention a Derrick Meita,

MICHAEL P. SNYDER, Official Court reporter

1   M-e-i-t-a, as an alibi witness?

2   A.  No, sir.

3   Q.  On that third day of trial, November 16, 2000, the day that

4   you had the colloquies with the Judge in chambers, did you have

02:21:39   5   multiple conversations with Leonard Logan about him testifying?

6   A.  Yes, sir.

7   Q.  Did you also have multiple occasions on that date about

8   presenting the alibi witnesses?

9   A.  Yes, sir, we had multiple conversations with Mr. Logan

02:21:52   10   about that issue as well.

11   Q.  And those occurred in the lockup in the anteroom, and the

12   anteroom?

13   A.  In the lockup and the anteroom and at counsel table for the

14   defense.

02:22:06   15   Q.  You indicated you spoke with Mr. Logan's mother and

16   grandmother, is that correct?

17   A.  Yes, sir.

18   Q.  Do you know if anybody else was present during those

19   conversations?

02:22:22   20   A.  Sir, I had the sense that there were other people around

21   me, but those people did not speak to me.

22          MR. GOODFRIEND:  I'm sorry, Judge.  One moment?

23          THE COURT:  Sure.

24       (Pause.)

02:22:38   25   BY MR. GOODFRIEND:


            MICHAEL P. SNYDER, Official Court reporter

Thomas - cross by Goodfriend

109

1  Q.  Mr. Thomas, you testified in a post-trial motion in this

2  case, is that right?

3  A.  I did.

4  Q.  And you were asked certain questions and you gave certain

02:23:14  5  answers?

6  A.  I did.

7  Q.  I'm going to go to that transcript.

8         THE COURT:  What's the page?

9         MR. GOODFRIEND:  I'm sorry, Judge.  Page 696.

02:23:24  10         THE COURT:  I've got it.

11  BY MR. GOODFRIEND:

12  Q.  You were asked this question and you gave this answer.

13  A.  This is at the post-trial motion or the post-conviction?

14  Q.  It's a post-trial motion.

02:23:34  15  A.  All right.

16  Q.  (Reading:)

17         "Question:  You caused the witnesses to be

18  interviewed?

19         "Answer:  I was present in court in chambers with Mr.

02:23:41  20  Kelly when my law clerk Mr. Miraglia came into the chambers and

21  informed me he had spoken with the witnesses and the witnesses

22  had informed him, Mr. Miraglia, to inform me that they thought

23  it would be wiser for us not to call them to testify for Mr.

24  Logan."

02:23:56  25         When you referred to witnesses, were you referring to

MICHAEL P. SNYDER, Official Court reporter

1   the family members?

2   A.  Yes, sir, I was.  I misspoke when I testified.  This was at

3   a hearing 13 months later, and I had actually tried a case

4   earlier that day.  I had not had a chance to review the file at

02:24:13   5   all before I testified, so I misspoke when I said "witnesses."

6   John Miraglia was never sent to speak to witnesses.  His job

7   was to get the information to the family that we were not going

8   to call the witnesses.

9           MR. GOODFRIEND:  Judge, I have no further questions.

02:24:30   10          THE COURT:  Mr. Evans?

11                    REDIRECT EXAMINATION

12  BY MR. EVANS:

13  Q.  Hi, Mr. Thomas.

14  A.  Mr. Evans.

02:25:04   15  Q.  That portion of the transcript that opposing counsel just

16  read to you, I'd like to refer to that same portion, okay?

17  A.  Proceed.

18  Q.  Part of that portion of your prior testimony, Mr. Thomas,

19  again the question states "You caused witnesses to be

02:25:22   20  interviewed," and the answer is "I was present in court in

21  chambers with Mr. Kelly when my then law clerk, Mr. John

22  Miraglia, came into chambers and informed me," and then it

23  continues on.  Did you hear that?

24  A.  I did.

02:25:36   25  Q.  You testified from your previous statement that your

            MICHAEL P. SNYDER, Official Court reporter

Thomas - redirect by Evans

111

1    conversation with Mr. Miraglia occurred in chambers, didn't

2    you?

3    A.  Actually, what I testified to was that I spoke to John

4    Miraglia during a break at the anteroom.  That's what I

02:25:55   5    testified earlier today.

6    Q.  I'm talking about this prior testimony before today, Mr.

7    Thomas.  Do you understand?

8    A.  The question you're asking me about, the transcript?

9    Q.  Yes.

02:26:04  10    A.  Yes.

11         THE COURT:  Yes what?  I'm not sure -- I've lost what

12    the question is at this point.  Why don't you ask the question

13    again, Mr. Evans.

14    BY MR. EVANS:

02:26:16  15    Q.  Mr. Thomas, isn't it true that in your prior testimony

16    given back in 2001, you testified that, "I was present in court

17    in chambers with Mr. Kelly when my then law clerk, Mr. John

18    Miraglia, came into chambers and informed me that he had spoken

19    to the witnesses."

02:26:38  20    A.  Yes, I did say that.

21    Q.  Mr. Thomas, you testified a bit earlier about Latonya

22    Payton, correct?

23    A.  Yes.

24    Q.  Prior to trial in this case, you didn't know what Ms.

02:26:57  25    Payton would testify to, did you?

               MICHAEL P. SNYDER, Official Court reporter

1    A.  I was not sure what she would testify to, that's correct.

2    Q.  She had given several different stories?

3    A.  That's correct.

4    Q.  Mr. Thomas, regarding the opening statement, you gave the

02:27:13   5    opening statement?

6    A.  I did.

7    Q.  But your testimony is that yourself and Marty Kelly

8    consulted together about what to include in that statement?

9    A.  That's correct.

02:27:23   10         MR. EVANS:  No further questions, Your Honor.

11         THE COURT:  Mr. Goodfriend, anything else?

12              RECROSS-EXAMINATION

13   BY MR. GOODFRIEND:

14   Q.  Just one more area, Mr. Thomas, regarding the question that

02:27:40   15   was asked of you and the answer you gave back at the post-trial

16   motion.

17         You referred to the conversation being in chambers in

18   the transcript, is that correct?

19   A.  Yes.

02:27:54   20   Q.  Actually, you're saying now that the conversation was in

21   the anteroom?

22   A.  That's correct.

23   Q.  You were mistaken?

24   A.  I was mistaken.  I misspoke.  This happened 14, 13 years

02:28:06   25   ago.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 113 of 217 PageID #:3479
Thomas - examination by the Court
113

1  Q.  Okay.  Thank you.

2         THE COURT:  Anything else, Mr. Evans?

3         MR. EVANS:  No, Your Honor.

4         THE COURT:  Okay.  Give me just a second here, Mr.

02:28:15  5  Thomas.

6         THE WITNESS:  Yes, sir.

7      (Pause.)

8                    EXAMINATION

9  BY THE COURT:

02:28:23  10  Q.  You've testified a couple of times that you yourself had

11  not spoken to the alibi witnesses, and I take it that at least

12  the people you understood that you were talking to outside the

13  courtroom during the middle of the trial there, you didn't

14  understand the mother and the grandmother to be alibi

02:28:45  15  witnesses.  Is that a fair statement?

16  A.  That's correct, Judge, yes.

17  Q.  So the alibi witnesses, I guess when I refer to that, I'm

18  referring primarily to Chevelle Thomas and Princess.  And

19  you've made it clear that you yourself did not talk to them,

02:28:57  20  but your understanding is Mr. Kelly did, right?

21  A.  Yes, sir.

22  Q.  And do you -- what was your understanding as to when Mr.

23  Kelly had talked to them?  I mean, to your understanding had he

24  talked to them before trial?

02:29:11  25  A.  Yes, sir.

           MICHAEL P. SNYDER, Official Court reporter

Thomas - examination by the Court

114

1  Q.  Okay.  Do you have any sense of how often or how many

2  times?

3  A.  I have the --

4  Q.  Before trial.

02:29:18  5  A.  I have the impression that Mr. Kelly had spoken to them on

6  at least two occasions prior to the trial.

7  Q.  And, obviously, as his trial partner, he had made you aware

8  of what he was doing and you made him aware of what you were

9  doing?

02:29:31  10  A.  Yes, sir.

11  Q.  Did Mr. Kelly ever tell you before the trial, in other

12  words before the trial started, that the witnesses, alibi

13  witnesses, Chevelle and Princess Thomas, had expressed any

14  reluctance to testify?

02:29:43  15  A.  No, sir, he didn't say that then.

16  Q.  So that came up at a later point, in other words?

17  A.  That came up during the trial.

18  Q.  We are going to get back to that in a second.  I just

19  wanted to make sure I had that right.

02:29:52  20       Let's see.  Okay.  So I want to ask you about the

21  sequence of events when you first asked Mr. Miraglia to go talk

22  to the family members, and then you talked to them, and then

23  Mr. Kelly talked to them.

24       So if I'm understanding you correctly, first of all,

02:30:11  25  before this there was a conference in chambers that involved

MICHAEL P. SNYDER, Official Court reporter

1    the Judge, the court reporter, the prosecutors, you and your

2    co-counsel, and Mr. Logan at which there was this discussion

3    about Mr. Logan, whether he was going to make up his mind to

4    testify or call the witnesses?

02:30:26   5    A.  Yes, sir.

6    Q.  And at some point during that, the Judge made a comment

7    well, you've already had an hour or whatever it was, but he was

8    going to give you a little more time?

9    A.  Yes, sir.

02:30:34   10   Q.  When you were having that conversation with the Judge, I

11   assume that was in the chambers, not in the --

12   A.  Yes, sir.

13   Q.  So where did you and Mr. Logan and Mr. Kelly go from there?

14   A.  There's a room right outside the Judge's chambers where he

02:30:48   15   wanted us to sit.

16   Q.  And that's what you're calling the anteroom?

17   A.  Yes, sir.

18   Q.  Was there anybody, was Mr. Miraglia there at that point or

19   not?

02:30:55   20   A.  It was John Miraglia, Marty Kelly, Leonard Logan, and

21   myself, sir.

22   Q.  Was there a sheriff in there or anything like that?

23   A.  No, they weren't permitted to be there while we were

24   talking.

02:31:06   25   Q.  Understood, but, I mean, Mr. Logan was in custody.  Judge

MICHAEL P. SNYDER, Official Court reporter

Thomas - examination by the Court

1    Simmons was okay with that, obviously?

2    A.  Yes, sir.

3    Q.  And about how long were you in there with Mr. Logan and the

4    other people before you asked Mr. Miraglia to leave and go talk

02:31:19    5    to the family members, ballpark?

6    A.  I would say probably about two minutes before I asked him

7    to go speak to the family.

8    Q.  And to the best of your memory, what exactly was it you

9    asked Mr. Miraglia to do?

02:31:30    10    A.  Well, what I asked him to do was would you please go tell

11    the family that it is our position that these witnesses should

12    not testify; because of the way the evidence has come in, we

13    think that we have a strong case for not guilty based on

14    reasonable doubt.

02:31:49    15    Q.  Right.

16    A.  And we want them to understand what we are doing, and we

17    also wanted the family to know that Mr. Logan was resistant to

18    our strategy.  And so Mr. Miraglia went --

19    Q.  Okay.  Don't get forward.  I want to ask you a couple

02:32:08    20    questions about that.

21    A.  Yes, sir.

22    Q.  You basically told Mr. Miraglia to say to them, "Look, our

23    view as lawyers is that he should not testify, he should not

24    call the witnesses for the following reasons"?

02:32:18    25    A.  Yes, sir.

MICHAEL P. SNYDER, Official Court reporter

1   Q.  You told Mr. Miraglia all that?

2   A.  Yes, sir.

3   Q.  When you said that to Mr. Miraglia, was Mr. Logan sitting

4   there, could he hear you say that?

02:32:24   5   A.  Yes, sir.

6   Q.  So he heard you say to Mr. Miraglia that, to talk to his

7   family members and to say it was the lawyers' view that he

8   shouldn't testify, et cetera?

9   A.  Yes, sir.

02:32:33   10   Q.  Okay.  Why did you want Mr. Miraglia to talk to the family

11   members?

12   A.  Because in my practice, Judge, it has been my experience

13   that many of the clients who are unsure, they tend to listen to

14   what their family members say.  And if the family members

02:32:55   15   disagree with us, they feel stronger in their position; if the

16   family member agrees with us, then they are likely to go along

17   with what we are suggesting would be the better strategy

18   regarding the client's case.

19   Q.  Okay, understood.

02:33:12   20        And about how long was Mr. Miraglia out there before

21   he came back?

22   A.  I would say no more than five minutes.  It might even have

23   been less.  He might have been gone three and a half or four

24   minutes.

02:33:24   25   Q.  So when he was out, you and Mr. Logan and Mr. Kelly were

MICHAEL P. SNYDER, Official Court reporter

1    all still in the anteroom waiting?

2    A.  Yes, sir.

3    Q.  And did Mr. Miraglia come back into the waiting room?

4    A.  Yes, sir.

02:33:31
5    Q.  Do you have to -- and I've honestly, I've been in a number

6    of those courtrooms.  I don't recall ever having been in 700.

7    To go to the anteroom in 700, do you have to walk through the

8    Judge's chambers?

9    A.  No, you can access it from the hallway.

02:33:44
10   Q.  All right, so you can go right in there.  Okay.

11        So when Mr. Miraglia came back in the room, whatever

12   it was he said, did he say it to everybody or did he pull you

13   aside, did he pull anybody aside, or did he say whatever he

14   said to everybody who was present at the same time?

02:33:59
15   A.  He said it to me down low, and then I repeated it.

16   Q.  You repeated it so Mr. Logan could hear it?

17   A.  So Mr. Logan could hear it.

18   Q.  And then I believe that your testimony was that after that,

19   you went out to talk to the same people?

02:34:12
20   A.  Yes, sir.

21   Q.  Who went out there with you?

22   A.  Mr. Miraglia.

23   Q.  So he went out, he helped you go out there?

24   A.  Yes, sir.

02:34:18
25   Q.  Guided you out there?

                MICHAEL P. SNYDER, Official Court reporter

Thomas - examination by the Court

1  A.  Yes, sir.

2  Q.  And presumably he took you to the same people he talked to?

3  A.  Yes, sir.  And during my conversation, I pointed to him and

4  made the reference to the previous conversation.

02:34:28  5  Q.  To make sure?

6  A.  That they understood to whom I referred.

7  Q.  And what's your best memory of what the -- and you, I think

8  what you said was that you, you know you talked or at least you

9  believe you talked to the mother and the grandmother; you had a

02:34:43  10  sense other people were there, but they didn't talk to you?

11  A.  Yes, sir.  I got the sense that there were other people

12  standing near me, but they did not speak to me.

13  Q.  And to the best of your memory, was it just Mr. Logan's

14  mother who talked or was it also his grandmother, was it both

02:34:56  15  of them?

16  A.  Both of them spoke to me, but both of them, their words

17  were short.

18  Q.  Okay.  And did you give them sort of, for want of a better

19  word, an executive summary of what your position was?

02:35:08  20  A.  Yes, sir.

21  Q.  And then they repeated essentially what they told Mr.

22  Miraglia?

23  A.  Yes.

24  Q.  And you were out there I think you said no more than a

02:35:15  25  couple three minutes, and then you went back into the anteroom?

MICHAEL P. SNYDER, Official Court reporter

Thomas - examination by the Court

120

1   A.  That's correct, judge.

2   Q.  And then I believe that you testified that at that point

3   then Mr. Kelly left the room?

4   A.  Yes, sir.

02:35:22  5   Q.  And did he say why he was leaving the room?

6   A.  Yes, sir.  He said he was going to go speak to the

7   witnesses.

8   Q.  Okay.

9   A.  I have the sense -- I can't tell you what he did.  I'm just

02:35:32  10   telling you what he told me.  He told me he was going to go

11   speak to the witnesses and let them know that we were not going

12   to call them.

13   Q.  Okay.  And so the witnesses would have been somebody

14   different from the two people that you knew that you were

02:35:42  15   talking to?

16   A.  Yes, sir.

17   Q.  And what was your understanding as to where the alibi

18   witnesses, in other words, Chevelle Thomas and Princess Thomas,

19   where they were at that point in time?

02:35:54  20   A.  It was my understanding that they were in the hallway.

21   Q.  Outside the courtroom?

22   A.  Outside, the hallway, outside in the hallway in the

23   corridor.  Judge, I don't know.  It might have been the

24   witnesses who were standing near me when I spoke to the mother

02:36:09  25   and grandmother.  I don't know who they were.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 121 of 217 PageID #:3487
Thomas - examination by the Court
121

1  Q.  Right.  And about how long was Mr. Kelly gone then?

2  A.  I would say Mr. Kelly might have been gone like five or six

3  minutes.  He might have been gone longer, Judge, but this is 14

4  years ago.

02:36:23  5  Q.  And then while he's gone, it's you and Mr. Miraglia along

6  with Mr. Logan waiting in the anteroom?

7  A.  Yes, sir.

8  Q.  Then Mr. Kelly comes back.  What does he say when he comes

9  back in the room?

02:36:33  10  A.  I don't remember, but I do remember shortly thereafter

11  Judge Simmons called us.

12  Q.  So he whistled you back in?

13  A.  Yes.

14  Q.  So you went back into chambers?

02:36:46  15  A.  Yes, sir.

16  Q.  So you don't remember one way or another whether Mr. Kelly

17  said anything about whatever conversation he had had before you

18  went in to see the Judge?

19  A.  No, sir, I do not.

02:36:55  20  Q.  All right.  Okay, give me just a second.  Oh, so I said

21  earlier we were going to come back to this.

22      So at some point, I think you said it was during the

23  trial, Mr. Kelly told you that the alibi witnesses didn't want

24  to testify?

02:37:22  25  A.  Yes, sir.

MICHAEL P. SNYDER, Official Court reporter

Thomas - examination by the Court

122

1  Q.  Was it before the sequence of events that we were just now

2  talking about?

3  A.  Yes, sir.

4  Q.  So it was earlier during the trial?

02:37:28  5  A.  Yes, sir.

6  Q.  Do you remember how much earlier?

7  A.  I would say it was that afternoon.

8  Q.  So earlier that day, in other words?

9  A.  Yes, sir.

02:37:35  10  Q.  So after opening statements, probably after Ms. Jordan --

11  A.  It was after the State rested its case.

12  Q.  After the State rested, okay.

13      And when Mr. Kelly told you that, do you remember

14  where you were?  Were you in the courtroom, were you in the

02:37:49  15  back, were you -- do you remember?

16  A.  I believe I might have been sitting at counsel table for

17  the defense.  He might have come from the hallway and told me.

18  Q.  And do you know whether Mr. Logan was there at that time

19  when Mr. Kelly came in and said to you the witnesses don't want

02:38:06  20  to testify?

21  A.  I don't think they had brought him out yet.

22  Q.  So this may have been during a break before they brought

23  him back out or even before trial started?

24  A.  Yes, sir.

02:38:14  25  Q.  Okay.  Let me just make a note of that.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 123 of 217 PageID #:3489
Thomas - examination by the Court
123

1        So some portions of your testimony at the post-trial

2   hearing were read to you.  I want to read to you a little more

3   of it.

4   A.  Yes, sir.

5   Q.  I'm going to start, the testimony that was read was from

6   page 696 which was really, it has two different numbering

7   systems.  It was 41G in the court reporter's numbering system,

8   but there's another numbering system that has it as 696.  So

9   you actually were called, your testimony started on 694, there

10  was some basic background stuff, so I'm going to read you a

11  series of questions and answers here:

12       "Question:  Now, in preparation for trial, did the

13  issue of alibi witnesses come up?

14       "Answer:  Yes.

15       "Question:  And how did you and Mr. Kelly handle the

16  issue of alibi witnesses?

17       "Answer:  We spoke to Mr. Logan, and both Mr. Kelly

18  and I advised Mr. Logan that we thought it would be a wiser

19  trial strategy not to proceed with the alibi defense

20  because" --

21       Then it cuts off.  Then there's a question:

22       "Question:  And you and Mr. Kelly came to that

23  conclusion after interviewing the alibi witnesses?

24       "Answer:  That's correct.

25       "Question:  Did those alibi witnesses include a woman

MICHAEL P. SNYDER, Official Court reporter

1    named Princess Thomas?

2           "Answer:  Actually, sir, it was 13 months ago.  I

3    don't remember the names of the witnesses.

4           "Question:  In any event, the sum and substance of the

02:39:45   5    supposed alibi was that these witnesses would have said that

6    the defendant was in Milwaukee at the time of the shooting?

7           "Answer:  This is what our understanding was, that

8    they were going to say that Mr. Logan was in Milwaukee at the

9    time.

02:39:56   10          "Question:  And then so after you interviewed these

11   witnesses, you cut him off and said --

12          "Answer:  I personally did not interview the

13   witnesses."

14          So everything correct so far, right?

02:40:06   15   A.  Yes, sir.

16   Q.  So the next question is the one that was read to you:

17          "Question:  You caused the witnesses to be

18   interviewed?"

19          And you answered:

02:40:12   20          "I was present in court in chambers with Mr. Kelly

21   when my then law clerk, Mr. John Miraglia, came into chambers

22   and informed me that he had spoken to the witnesses, and the

23   witnesses had informed him, Mr. Miraglia, to inform me that

24   they thought it would be wiser for us not to call them to

02:40:27   25   testify for Mr. Logan.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 125 of 217 PageID #:3491
Thomas - examination by the Court
125

1    "Question:  So the witnesses themselves told your law

2  clerk that it wouldn't be a good idea to call them as alibi

3  witnesses?

4    "Answer:  That is correct.

02:40:37  5    "Question:  And it was based on that that you relayed

6  that to Mr. Logan?

7    "Answer:  Yes, I did."

8    So what you're telling me is that in those three

9  questions and answers where there were repeated references to

02:40:49  10  the witnesses after the series of questions about the alibi

11  witnesses that you misspoke, and that what you were referring

12  to, whatever the questioner was referring to, what you were

13  referring to was the conversation that Mr. Miraglia had had

14  with the family members?

02:40:59  15  A.  Yes, sir.

16  Q.  All right.  One more second.

17    When was the first time that you recall of somebody

18  asking you whether you had gone out and talked to the family

19  members yourself?

02:41:27  20  A.  Judge, I don't remember.

21  Q.  Okay.  Was it -- were you asked that in preparation for the

22  hearing today?

23  A.  Yes, I was.

24  Q.  Okay.  And who do you remember asking it to you, both

02:41:47  25  sides, one side, the other?

MICHAEL P. SNYDER, Official Court reporter

Thomas - examination by the Court

126

1    A.  I spoke to Neal Goodfriend about that.

2    Q.  Okay.  Were you interviewed by defense counsel?  By defense

3    counsel, I mean Mr. Logan's attorney, current attorney.

4    A.  No, sir.

02:41:58    5    Q.  At what point did you -- I asked you this question right

6    before lunch.  Would it be fair to say that if somebody looked

7    at your transcripts, this was, your testimony that you had gone

8    out to do that was the first time that anyone would see it.

9         When did it, when did you first realize that you

02:42:21    10    hadn't previously testified to doing that yourself?

11    A.  When I talked to Mr. Goodfriend.

12    Q.  Okay.

13    A.  He read me the transcript I testified previously, and that

14    John had spoke to the family, and that he read me the

02:42:37    15    transcript 13 months later where I said he spoke to the

16    witnesses.

17    Q.  Witnesses, yeah.  Okay.  And that jogged your memory?

18    A.  Yes, sir.

19    Q.  Did you have -- I would -- this is a couple minute

02:42:52    20    conversation.  I assume you're not out there taking notes or

21    anything?

22    A.  That's correct, Judge.

23    Q.  Yeah.  Okay.

24         Let me just check one second here to make sure there

02:43:04    25    wasn't something else I wanted to ask.


            MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 127 of 217 PageID #:3493
Thomas - redirect by Evans
127

1    (Pause.)

2        THE COURT:  I think that's it.  Mr. Goodfriend, do you

3    have any further questions based on my questions?

4        MR. GOODFRIEND:  No, Judge, we have no questions.

02:43:17    5        THE COURT:  Mr. Evans?  Yes, go ahead.

6                    REDIRECT EXAMINATION

7    BY MR. EVANS:

8    Q.  Mr. Thomas, you received several -- in preparation for

9    today's hearing you received several phone calls from Mr.

02:43:32    10   Logan's counsel?

11   A.  I received a phone call from Tara Thompson.

12   Q.  Yes.  And you declined to speak with defense counsel before

13   today's hearing?

14   A.  I did not speak with defense counsel or counsel for Mr.

02:43:44    15   Logan prior to the hearing, that's correct.

16   Q.  You didn't return any phone calls from defense counsel?

17   A.  I did not.

18        MR. EVANS:  No further questions.

19        THE COURT:  Anything else?

02:43:53    20        MR. GOODFRIEND:  No, Judge.

21                    EXAMINATION

22   BY THE COURT:

23   Q.  There is an obvious question here.  You know what it's

24   going to be.

02:43:58    25        Why not?

         MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 128 of 217 PageID #:3494
Thomas - redirect by Evans
128

1    A.  Judge, the reason was I did not feel comfortable talking to

2    Mr. Logan's attorneys.

3    Q.  Okay.  That leads to the next question.

4         Why didn't you feel comfortable?

02:44:15    5    A.  I didn't feel comfortable talking with them because I did

6    not feel that what was happening in terms of the allegation of

7    ineffectiveness, I did not think that that was fair because Mr.

8    Kelly and I tried hard to win this case for him.

9    Q.  I understand.  Is this the only time in your life you've

02:44:40    10   ever had a claim of ineffective assistance, to your knowledge?

11   A.  No, sir.  It's not the only time, but it's the only time I

12   testified in federal court.

13   Q.  Every time that happens, do you decline to talk to the

14   defendant's current attorney?

02:44:51    15   A.  Judge, I've never --

16   Q.  I have to say I'm a bit skeptical, so you're going to have

17   to convince me.

18   A.  I'm trying to answer the Court's question.

19         I've never testified in court, in federal court about

02:45:01    20   this issue before.  This has never happened to me before.

21   Q.  Sure.

22   A.  And so if you're going to say every time, in talking about

23   this time, this is the only time, so it's every time.

24   Q.  But that's not what you said.  You said you weren't

02:45:14    25   comfortable talking to Mr. Logan's attorneys because you

MICHAEL P. SNYDER, Official Court reporter

Thomas - redirect by Evans

129

1     thought that the accusation of ineffective assistance was

2     unfair.  So the other times when you've been accused of

3     ineffective assistance, you thought it was fair?

4     A.  No, Judge.  What I'm saying is the other times when I was

02:45:27    5     accused of ineffective assistance of counsel, I didn't have to

6     go to court and testify.

7     Q.  Okay, and that's the distinction?

8     A.  Yes, sir.

9     Q.  So why then were you comfortable talking to the lawyers for

02:45:41    10    Mr. Logan -- for your former client's adversary?

11    A.  Because my -- the attorneys to whom I was speaking were

12    taking the position that there was nothing wrong with what I

13    had done.

14    Q.  Okay.  I mean, you've described before you've tried at

02:46:10    15    least, even by the time you tried this case, it's probably way

16    more now, you tried 400 felony trials, a hundred juries, and

17    300 benches.  It's probably triple that number by now, I'm

18    guessing.  I mean -- and I was never an assistant Public

19    Defender, but I did, you know, do criminal defense work.  I

02:46:31    20    mean, you kind of know this comes with the territory, right?

21    A.  I do.

22    Q.  I guess I'd have to say I'm just kind of surprised that you

23    wouldn't have talked to your client's current lawyers.

24              Did you talk to the lawyers that were representing him

02:46:44    25    in the post-trial hearing and in the post-conviction hearing?

MICHAEL P. SNYDER, Official Court reporter

Miraglia -

1  A.  No, sir, I did not.

2  Q.  Did you talk to the prosecutors during those hearings?

3  A.  I don't remember.

4  Q.  In other words, in preparation for testifying.

02:46:54  5  A.  Like for the, my preparation for the 2001?

6  Q.  Yes, I guess you just testified at the one, right?

7  A.  Yeah.  I did not, I was not prepared for that.

8  Q.  You were just called cold?

9  A.  Right.

02:47:08  10  THE COURT:  Okay.  Anybody else have any further

11  questions?

12  MR. EVANS:  No, Your Honor.

13  THE COURT:  Thanks, Mr. Thomas.  You're excused.

14  (Witness excused.)

02:47:16  15  THE COURT:  Miss Dimond is on the way up.  We are

16  going to take like a ten-minute break, and then we'll pick up

17  after that.

18  Mr. Thomas can go.  We are going to take a ten-minute

19  break, and then we need to discuss the status of Mr. Miraglia.

02:47:30  20  (Recess.)

21  THE COURT:  I have a couple more questions to ask Mr.

22  Miraglia.  So can somebody get him in here, and then I'll let

23  him go.  I'm not completely 100 percent certain that this got

24  asked quite the way, so I want to make sure it gets covered.

02:54:57  25  JOHN MIRAGLIA, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 131 of 217 PageID #:3497
Miraglia - examination by the Court
131

1       THE COURT:  I'll just have you for a couple more

2   minutes, Mr. Miraglia, and I'll let you go.  I'm sorry you had

3   to hang around.

4       Have a seat.  You're a lawyer.  You understand you are

02:55:04   5   still under oath.

6       THE WITNESS:  Yes.

7                      EXAMINATION

8   BY THE COURT:

9   Q.  So when you were testifying earlier about the conversation

02:55:09   10   you had out in the hallway with the family members, you said at

11   some point, and I'm sure I didn't write it down verbatim, you

12   talked about the conversation you had with them, it was a

13   minute or two, and you said this was your only interaction with

14   them, right?

02:55:23   15   A.  Yes.

16   Q.  Do you remember ever going back out there with them along

17   with Mr. Thomas and talking to them again?

18   A.  I -- no, I don't remember offhand if I did that.  It's

19   possible, but I don't remember.

02:55:39   20   Q.  Okay.  Well, when you said it was your only interaction

21   earlier, only means only, right?

22   A.  Well, I was thinking more along the lines of me

23   interacting, me having a conversation, me talking with them.

24   Q.  So do you remember walking through the courtroom, guiding

02:55:54   25   Mr. Thomas immediately after that, taking him out there and

            MICHAEL P. SNYDER, Official Court reporter

1  talking to the same people and having, going through the same

2  conversation over again?

3  A.  I, I don't remember that.  I don't remember.

4  Q.  Thanks.

02:56:12  5          THE COURT:  Does anybody want to ask any questions

6  based on that?

7          MR. GOODFRIEND:  No, Judge.

8          MR. EVANS:  No, Your Honor.

9          THE COURT:  Thanks, you're excused.  You don't have to

02:56:19  10  wait around.

11          THE WITNESS:  Can I leave?

12          THE COURT:  Excused as in goodbye.

13      (Witness excused.)

14          THE COURT:  Next.

02:56:25  15          MR. EVANS:  We are going to call Earline, Your Honor.

16          THE COURT:  Ma'am, you're coming right up here.  You

17  can take your coat off if you want to, it's probably going to

18  get a little warm, or you can bring it with you.

19          Why don't you set that thing down.  Raise your right

02:57:36  20  hand.

21      EARLINE LOGAN-MOORE, PLAINTIFF'S WITNESS, SWORN

22          THE COURT:  Remind me of your name again.

23          MR. ALSTON:  Eric Alston.

24          THE COURT:  A-l-l-s-t-o-n?

02:58:02  25          MR. ALSTON:  One L.

        MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - direct by Alston

133

| | | |
|---|---|---|
| | 1 | THE COURT:  Okay.  Go ahead. |
| | 2 | DIRECT EXAMINATION |
| | 3 | BY MR. ALSTON: |
| | 4 | Q.  Could you please state your name for the Court. |
| 02:58:06 | 5 | A.  Earline Logan-Moore. |
| | 6 | THE COURT:  Logan-Moore, M-o-o-r-e? |
| | 7 | THE WITNESS:  Yes. |
| | 8 | THE COURT:  Earline is E-a-r-l-e-n-e? |
| | 9 | THE WITNESS:  E-a-r-l-i-n-e. |
| 02:58:23 | 10 | THE COURT:  Thanks. |
| | 11 | BY MR. ALSTON: |
| | 12 | Q.  Now, Miss Logan-Moore, how are you related to the |
| | 13 | petitioner? |
| | 14 | A.  He's my brother. |
| 02:58:29 | 15 | Q.  And how old are you? |
| | 16 | A.  37. |
| | 17 | Q.  So you've known Leonard all your life then? |
| | 18 | A.  Yes. |
| | 19 | Q.  Are you currently employed? |
| 02:58:50 | 20 | A.  Yes. |
| | 21 | Q.  Doing what? |
| | 22 | A.  I am a dispatcher at Transit Express. |
| | 23 | Q.  Is that a full-time position? |
| | 24 | A.  Yes. |
| 02:58:57 | 25 | Q.  Are you currently married? |

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - direct by Alston

134

1    A.  Yes.

2    Q.  And your husband, how long have you known him?

3    A.  19 years.

4    Q.  So you were dating him in 1997?

02:59:07    5    A.  Yes.

6    Q.  And in the spring of 1997, what were you doing for a

7    living?

8    A.  I was a waitress.

9    Q.  And in March of that year, did you take off work to take

02:59:18   10    Leonard to Milwaukee?

11    A.  Yes.

12    Q.  Do you recall what day in particular that was?

13    A.  It was March the 17th.  I don't remember exactly what --

14    Q.  How come you know it was that day in particular that you

02:59:31   15    took him?

16    A.  Because earlier I testified again and stated that day.

17    Q.  So subsequent testimony fixed that particular day?

18    A.  Yes.

19    Q.  But you still recall having to take off work and take him

02:59:45   20    to Milwaukee that day, correct?

21    A.  Yes.

22    Q.  Okay.  Now, there have been a number of court hearings

23    associated with the murder for which Leonard was convicted.  To

24    keep things clear for you and for the Court from now on, when I

02:59:58   25    say "Leonard's original trial," I'm reaching to the murder

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 135 of 217 PageID #:3501
Logan-Moore - direct by Alston
135

1   trial at which he was ultimately convicted.  I'm not referring

2   to his sentencing hearing or his post-conviction hearing.  Is

3   that clear?

4   A.  Yes.

03:00:08

5   Q.  Drawing your attention back Leonard's original trial, do

6   you recall being present in court for those proceedings?

7   A.  Some of them court days, yes.

8   Q.  Okay.  And do you recall a particular reason you came to

9   Leonard's original trial?

03:00:22

10  A.  Some days I had off work to come, and some days I didn't.

11  Q.  Okay.  And --

12          THE COURT:  So we are talking about proceedings, you

13  mean during the trial?

14          MR. ALSTON:  Yes.

03:00:32

15          THE COURT:  During the jury trial, in other words?

16          THE WITNESS:  Yes.

17          THE COURT:  You were there some days and not other

18  days?

19          THE WITNESS:  Yes.

03:00:37

20          THE COURT:  All right.

21  BY MR. ALSTON:

22  Q.  And did you, did you have contact with Leonard's trial

23  attorneys before his original trial?

24  A.  Yes.

03:00:44

25  Q.  And did they ever contact you to ask how to contact

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - direct by Alston

136

1  Princess and Chevelle Thomas?

2  A.  I guess they called me and told me to get in contact with

3  them, yes.

4  Q.  Okay.  And did you have the impression leading up to trial

5  at Leonard's original trial that you would be testifying?

6  A.  Yes.

7  Q.  Did one of Leonard's original trial attorneys give you that

8  impression?

9  A.  Yes.

10  Q.  But did you end up testifying at Leonard's original trial?

11  A.  No.

12  Q.  And did anyone tell you why you did not testify at his

13  trial?

14  A.  His lawyer told -- when I tried to talk to his lawyer, the

15  lawyer told me to wait, he was going back there to talk to

16  Leonard Logan, and never got back to me, and things was over

17  with.

18  Q.  But the particular conversation you're talking about, you

19  approached Leonard's attorneys, correct?

20  A.  Yes.

21  Q.  And this was at his original trial?

22  A.  Yes.

23  Q.  So prior to that, at no point did his lawyers talk to you

24  to give you, to let you know you would not be testifying?

25  A.  No.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 137 of 217 PageID #:3503
Logan-Moore - direct by Alston
137

1   Q.  And just going back to this conversation that you did have

2   with his attorneys at trial, it sounds like it was pretty

3   brief?

4   A.  Yes.

03:01:53   5   Q.  Do you remember where in the courthouse it was?  Was it in

6   the courtroom in particular?

7   A.  It was like in the courtroom like where they sitting there

8   right there, and he was coming in.  And I asked them come here,

9   and he's like wait a minute.  That was it.

03:02:08   10   Q.  So one of Leonard's trial attorneys was entering the

11   courtroom heading towards the defense's table, and you stopped

12   him on his way there and asked him a question?

13   A.  Yes.

14   Q.  What did you --

03:02:18   15         THE COURT:  Do less leading.

16         MR. ALSTON:  Okay.

17   BY MR. ALSTON:

18   Q.  So what was your conversation with Leonard's attorney

19   about?

03:02:28   20   A.  I asked him what was going on, am I going to testify.  He

21   like "Wait a minute.  I want to talk to Leonard, and I'll be

22   right with you."

23   Q.  And did his attorneys ever get back in touch with you?

24   A.  No.

03:02:41   25   Q.  Okay.  Do you recall which of Leonard's trial attorneys you

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - direct by Alston

138

1    talked to?

2    A.  I can't remember his name, but -- I can't remember his name

3    because he had several.

4    Q.  Okay.  And one of his trial attorneys was African-American

5    and another was Caucasian?

6    A.  Yes.

7    Q.  Do you recall whether it was the African-American or the

8    Caucasian?

9    A.  It was the Caucasian.

10   Q.  Okay.  And was this the only time you spoke to Leonard's

11   trial attorneys during his original trial?

12   A.  Yes.

13   Q.  Do you know a Latonya Payton?

14   A.  I know of her.

15   Q.  Do you recall her testifying at Leonard's original trial?

16   A.  I wasn't present that day.

17   Q.  So you weren't present all the days of Leonard's trial?

18   A.  Not all of them.

19   Q.  Okay.  As to the day that you were at Leonard's trial, do

20   you recall witnesses appearing and being asked questions by the

21   attorneys?

22   A.  Yes.  Only one person I was there when he had testified.

23            THE COURT:  When who testified?

24            THE WITNESS:  When a gentleman testified.

25            THE COURT:  Do you remember who it was?


           MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 139 of 217 PageID #:3505
Logan-Moore - direct by Alston
139

1      THE WITNESS:  I don't know his name.

2      THE COURT:  Okay.  Do you remember what he talked

3  about?

4      THE WITNESS:  He was on the stand, and he was saying

03:03:49   5  that he had told someone that Leonard wasn't the person, that

6  didn't shoot him.

7      THE COURT:  Okay.

8  BY MR. ALSTON:

9  Q.  So this person was a victim of the shooting that Leonard

03:04:03  10  was being tried for?

11  A.  Yes.

12  Q.  Were you also there when the jury returned a verdict?

13  A.  Yes.

14  Q.  Were you sitting with anyone at the original trial?

03:04:13  15  A.  I was sitting in the front with my grandmother.

16  Q.  And getting back to Miss Latonya Payton, were you ever

17  aware of any kind of domestic issue between Leonard and Latonya

18  Payton?

19  A.  No.

03:04:27  20  Q.  So before or during the trial, you never told either of his

21  attorneys about such an issue?

22  A.  No.

23  Q.  Similarly, either before or at the original trial, did you

24  ever have an opportunity to raise concerns about Princess and

03:04:42  25  Chevelle Thomas' willingness to testify?

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 140 of 217 PageID #:3506
Logan-Moore - direct by Alston
140

1   A.  No.

2   Q.  Why not?

3   A.  They were my aunties, and they was willing to do it.

4   Q.  Okay.  And at any point during the trial, do you remember

5   talking to the trial attorney's clerk, a younger law student?

6   A.  No.

7   Q.  So you never told the law clerk that Princess and Chevelle

8   Thomas might not want to testify?

9   A.  No.

10  Q.  Nor about any potential domestic issue with Latonya Payton?

11  A.  No.

12  Q.  And did you at any point at the original trial see Princess

13  and Chevelle Thomas in the courtroom?

14  A.  No.

15  Q.  Did you see them at any point outside the courtroom that

16  day?

17  A.  No.

18  Q.  And other than the times you approached Leonard's

19  attorneys, did you at any point talk to Leonard's attorneys or

20  law clerk at the original trial?

21  A.  No.

22          MR. ALSTON:  Your Honor, one moment, please?

23          THE COURT:  Yes.

24      (Pause.)

25  BY MR. ALSTON:


                MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 141 of 217 PageID #:3507
Logan-Moore - direct by Alston
141

1  Q.  So at any point when you were at the original trial, did

2  you talk to Princess and Chevelle Thomas?

3  A.  Yes.

4  Q.  When did this conversation occur?

03:06:07   5        THE COURT:  The question was during the trial?

6        MR. ALSTON:  During the original trial.

7        THE COURT:  Okay.

8  BY THE WITNESS:

9  A.  On the way back home.

03:06:16  10  BY MR. ALSTON:

11  Q.  On the way back home?  So it was after --

12  A.  Right, yes.

13  Q.  -- the verdict had been returned from the jury?

14  A.  Uh-huh.

03:06:21  15  Q.  So you saw them.  It wasn't in the courtroom that you saw

16  them, but it was --

17  A.  No.

18  Q.  Was it outside in the hallway?

19  A.  No.

03:06:26  20  Q.  So it was only on the way home to Milwaukee that you

21  finally talked to them?

22  A.  Yes.

23  Q.  But you knew, because they were there and taking you back

24  to Milwaukee, that they had been in court that day ready to

03:06:37  25  testify?

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

142

1    A.  Yes.

2           MR. ALSTON:  No further questions, Your Honor.

3           THE COURT:  Mr. Chimera.

4                       CROSS-EXAMINATION

03:06:52   5  BY MR. CHIMERA:

6    Q.  Good afternoon, ma'am.

7    A.  Hello.

8    Q.  Ma'am, I couldn't quite hear you in the beginning when you

9    were testifying.  Did you say that you spoke to Leonard Logan's

03:07:21  10  attorneys with regards to you testifying at trial?

11   A.  Yes.

12   Q.  And when was the first time you did that?

13   A.  During the trial.  I approached them the day I was there.

14   I approached them, and that's what he had told me, wait one

03:07:37  15  minute, he was going to talk to Leonard, and never came back to

16   see what I wanted.  And all I was trying to ask him was when I

17   was going to testify.

18   Q.  And that was during the trial?

19   A.  Yes.

03:07:51  20  Q.  Okay.  So my question is before the trial, had they talked

21   to you, Leonard's attorneys, about testifying?

22   A.  Yes.

23   Q.  Who talked to you?

24   A.  I don't really know his name.  It's the Caucasian guy.

03:08:09  25  Q.  Was it one of the attorneys that was actually in the

                MICHAEL P. SNYDER, Official Court reporter

1  courtroom?

2  A.  No, it was actually, it's the attorney because when Leonard

3  called me, I do, clicked over and do three-way calls, and he

4  told me to call his lawyer.

03:08:21  5  Q.  So Leonard asked you to call his lawyer?

6  A.  Yes.

7  Q.  And this was before trial?

8  A.  Yes.

9  Q.  Do you know -- now, you know Leonard had a couple other

03:08:31  10  attorneys before --

11  A.  I know all his attorneys, not all of them like that, but,

12  yes, I had to do three-way calls to call Leonard's attorney.

13  Q.  Do you know if it was the same attorneys that actually did

14  the trial in the case?

03:08:46  15  A.  Leonard had several --

16         THE COURT:  No, no.  What he's asking is if this

17  conversation that you were talking about where Mr. Logan called

18  you and you clicked through to the lawyer and talked about you

19  testifying, do you know if the lawyer you talked to was one of

03:08:59  20  the same two lawyers who was in the courtroom during the actual

21  jury trial?

22         That was your question, right?

23         MR. ALSTON:  Yes.

24  BY THE WITNESS:

03:09:05  25  A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 144 of 217 PageID #:3510
Logan-Moore - cross by Chimera
144

1  BY MR. ALSTON:

2  Q.  You said it was?

3  A.  Yes.

4  Q.  And then you said it was a Caucasian?

03:09:10    5  A.  Yes.

6  Q.  But it was on the phone, right?

7  A.  Yes.

8  Q.  So you couldn't see who you were talking to, right?

9  A.  Well, no.  I mean, at the time I wouldn't know the name,

03:09:23   10  yes.  I know who I was talking to.  He had to click over and

11  ask for him.

12  Q.  Okay.  So you were on the phone with your brother Leonard

13  Logan prior to trial, and he somehow patched you into another

14  attorney to talk to, fair to say?

03:09:42   15  A.  Yes.

16  Q.  Okay.  And did you know why he was patching you in to talk

17  to that attorney?

18  A.  No.

19  Q.  Do you know how long before the trial started that you had

03:09:56   20  that conversation with that attorney?

21  A.  No.

22  Q.  Did the attorney ever give you his name?

23  A.  Yes.

24  Q.  And what did he say his name was?

03:10:09   25  A.  Sir, that was a long time ago.  I really can't remember

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

145

|     |     |
| --- | --- |
| 1 | their name or the conversation. I had a conversation with one |
| 2 | about, okay? |
| 3 | Q. Okay. Was, did he say his name was Martin Kelly? |
| 4 | A. I can't remember. |
| 5 | Q. Okay. And I'm sorry. Did you say you don't remember the |
| 6 | substance of the conversation or you do remember it? |
| 7 | A. I say I don't. |
| 8 | Q. You don't? Okay. |
| 9 | So you know you talked to a lawyer on the phone, it |
| 10 | was prior to trial, but you don't remember what you talked |
| 11 | about? |
| 12 | A. No. |
| 13 | Q. No, you don't remember what you talked about? |
| 14 | A. No, I'm sorry, I do not. |
| 15 | Q. Now, I think you testified and you said there were times |
| 16 | during the trial that you were actually inside the courtroom? |
| 17 | A. Yes, sir. |
| 18 | Q. And your mom was there as well? |
| 19 | A. Yes. |
| 20 | Q. And your mom's name I believe is Ezzie, is that correct? |
| 21 | A. Yes. |
| 22 | Q. And your grandmother was there when you were there? |
| 23 | A. Yes. |
| 24 | Q. And what's your -- |
| 25 | A. Grandma came every day. Every time he had court, my |

03:10:23 (line 5)
03:10:35 (line 10)
03:10:44 (line 15)
03:11:04 (line 20)
03:11:11 (line 25)

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

1   grandma was there.

2   Q.  Okay.  Was there anybody else in the courtroom besides you

3   three during the times at least that you were in courtroom?

4         THE COURT:  You mean in terms of family members?

03:11:26   5   BY MR. ALSTON:

6   Q.  Yes, yes, family members.

7   A.  Cousins, aunties.  Yes, several family members were there

8   in court.

9   Q.  There were other families members there?

03:11:36   10   A.  Yes.

11   Q.  Do you recall generally how many people were with you?

12   A.  No, sir, I do not.

13   Q.  Would it be more than five total?

14   A.  Sir, I don't know.

03:11:48   15   Q.  But it was more than the three of you?

16   A.  Yes.

17   Q.  Is that as close as you can get to it?

18   A.  That's the most important thing, me, his mother, and his

19   grandmother.

03:11:58   20   Q.  And some other people, but you don't know the exact number,

21   right?

22   A.  Right.

23   Q.  Okay.  Now, when you were in the courtroom with the family,

24   do you recall, were you in the courtroom when the Court was

03:12:15   25   asking Leonard whether or not he was going to testify in the

Logan-Moore - cross by Chimera

1   case?  Were you in the courtroom that day?

2   A.  No, sir, I wasn't.

3   Q.  Were you ever, were you ever in the hallways with any of

4   the family members -- and by family members I mean your mom or

03:12:33   5   your grandmother and any other people in the courtroom -- were

6   you ever in the hallway when any of the attorneys for Leonard

7   came out and talked to the group?

8   A.  No.

9   Q.  Now, you said that you were not aware of any domestic

03:12:52   10   issues with Latonya Payton.  The defendant was dating a

11   Lasandresi Smith, isn't that correct?

12   A.  Yes.

13   Q.  And he had domestic issues with her, right?

14   A.  If that's what you want to call it, yes, I guess.

03:13:06   15   Q.  Now, Princess Thomas and Chevelle Thomas, they are your

16   aunties?

17   A.  Yes.

18   Q.  And they live in Milwaukee?

19   A.  Yes.

03:13:43   20   Q.  Now, at the time of this trial, did you also live in

21   Milwaukee?

22   A.  Yes.

23   Q.  Did you live with them?

24   A.  No.  We lived in the same building, different apartments.

03:13:53   25   Q.  Same building, different apartments?

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 148 of 217 PageID #:3514
Logan-Moore - cross by Chimera
148

1    A.  Yes.

2    Q.  When they came down to Chicago for the trial, did you come

3    with them?

4    A.  No.

03:14:03    5    Q.  Did you drive separately?

6    A.  Yes.

7    Q.  When they were here in Chicago for the trial, did Chevelle

8    and Princess stay with you and your mom or where did they stay,

9    do you know?

03:14:18    10   A.  No, sir, I do not.

11   Q.  Did they stay with your grandmother?

12   A.  No, sir, they didn't.

13   Q.  Do you know where they stayed?

14   A.  No.

03:14:27    15   Q.  Do you know how they would get back and forth to the

16   courthouse there at 2600 South California?

17   A.  No.  I guess his lawyer did it.  I don't know.

18   Q.  Well, were there ever any days that you went to the

19   courtroom that you drove with them to the courthouse?

03:14:47    20   A.  No.

21   Q.  But after the trial you did drive back to Milwaukee with

22   them together?

23   A.  Yes.

24   Q.  Now, I think you testified that -- first let me ask you

03:15:11    25   this.

                MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

149

1    Before you came here today, did you get to read

2  anything at all to refresh your memory as to what happened or

3  at least your involvement in this case?

4  A.  Yes.

03:15:22    5  Q.  What did you read?

6  A.  I read my little testimony that I gave.

7  Q.  And is it the testimony from February 8th, 2002?

8  A.  Well, can I see that, please?

9  Q.  Yes.

03:15:40    10    MR. CHIMERA:  Judge, may I get a copy of her?

11    THE COURT:  Yes.

12    MR. CHIMERA:  We don't have it marked.

13    THE COURT:  It's her testimony.  It's part of the

14  record anyway.  I don't think you need to mark it as an

03:16:11    15  exhibit.

16    MR. CHIMERA:  For the record, Judge, I'm handing to

17  the witness a copy of a transcript.  I have on the front page

18  the caption of the case, and it's dated February 8th, 2002, and

19  the Bates stamp is 713.

03:16:23    20    THE COURT:  Thanks very much.

21    MR. CHIMERA:  And then the actual page where the

22  testimony begins is 742.

23    THE COURT:  Thank you.

24  BY MR. CHIMERA:

03:16:31    25  Q.  Here you go.  Would you take a look at that, please.

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 150 of 217 PageID #:3516
Logan-Moore - cross by Chimera
150

| | | |
|---|---|---|
| | 1 | THE COURT: Rather than just have her read it, why |
| | 2 | don't you direct her attention. |
| | 3 | BY THE WITNESS: |
| | 4 | A. Yes, this is what I read. |
| 03:16:56 | 5 | BY MR. CHIMERA: |
| | 6 | Q. So my question is the document I've just handed to you, |
| | 7 | that's the document you read? |
| | 8 | A. Yes. |
| | 9 | Q. Okay. And you read that before coming to court today? |
| 03:17:04 | 10 | A. No, sir. |
| | 11 | Q. When did you read it? |
| | 12 | A. About a week or two ago. |
| | 13 | Q. All right. And would that have been with a meeting with |
| | 14 | the attorneys for Leonard Logan? |
| 03:17:15 | 15 | A. Yes. |
| | 16 | Q. Are they the same attorneys that are sitting here today? |
| | 17 | A. Yes. |
| | 18 | Q. And did you read or review anything else besides that |
| | 19 | transcript I just handed to you? |
| 03:17:25 | 20 | A. No. |
| | 21 | Q. All right. I'm going to ask you some questions about that |
| | 22 | in just a minute, but if you would just hold on to that, okay? |
| | 23 | A. Okay. |
| | 24 | Q. Now, at any time prior to the trial, your brother's trial |
| 03:17:57 | 25 | in November of 2000, did you talk to him at all about his case? |

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 151 of 217 PageID #:3517
Logan-Moore - cross by Chimera
151

A. Yes.

Q. Did you visit him in the jail?

A. Yes. Okay, I got your question. If your brother was in jail, wouldn't you visit him?

03:18:17    Q. I wouldn't have.

THE COURT: Nobody is criticizing you.

THE WITNESS: I know. I'm just asking the question.

THE COURT: I am going to tell you something I told somebody earlier. You're just here to answer questions, so

03:18:26    just do that.

THE WITNESS: Okay.

BY MR. CHIMERA:

Q. So when you visited your brother, how many times would you say you visited him prior to trial?

03:18:35    A. I'm not quite sure.

Q. When you would visit him, did you discuss the case?

A. No.

Q. Now, do you remember the name Anthony Thomas?

A. No.

03:18:55    Q. Do you recall an African-American attorney who was blind that represented your brother Leonard Logan?

A. Okay, yes.

Q. Did you ever tell him that you wanted to testify in your brother's defense?

03:19:13    A. No.

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

1   Q.  There was another male Caucasian who was an attorney with

2   him.  His name is Martin Kelly, and I think you said you don't

3   remember the name.  My question is did you ever tell the other

4   attorney that was with the African-American attorney that you

03:19:28   5   wanted to testify for your brother Leonard Logan?

6   A.  No.

7   Q.  That's no?

8   A.  No.

9   Q.  Now, do you remember when your brother was arrested for

03:19:44   10  this charge?

11  A.  Do I remember?  Yes.

12  Q.  Do you remember -- it was in 1997.  Do you remember the

13  approximate month?

14  A.  It was June.

03:19:59   15  Q.  Of '97?

16  A.  Yes.

17  Q.  And after he was arrested in June of '97, where were you

18  living?

19  A.  I stayed at 63rd Street.  The address was 121 West 63rd

03:20:18   20  Street.

21  Q.  So you were living in Chicago at the time?

22  A.  Yes.

23  Q.  But in 2000 -- well, strike that.

24      Okay.  So in June of '97 you were living in Chicago.

03:20:30   25  At the time that you found out your brother was arrested for

MICHAEL P. SNYDER, Official Court reporter

1  this murder, did you go to the police and tell them "My brother

2  couldn't have done it because I drove him to Milwaukee on March

3  17th"?

4  A.  No, I didn't.

03:20:43  5  Q.  Did you go to anybody else to tell them that, hey, he

6  couldn't have done it, he was in Milwaukee?  Did you do that?

7  A.  No, I didn't.

8  Q.  Now, Chevelle Thomas and Princess Thomas, from my

9  understanding, they would celebrate their mom's birthday during

03:21:16  10  March of every year, is that correct?

11  A.  Yes.

12  Q.  Do you know the exact date of their mom's birthday?

13  A.  Yes.

14  Q.  What day is that?

03:21:24  15  A.  It's March the 16th.

16  Q.  March 16th or 15th?

17  A.  March the 16th.

18  Q.  Okay.  Now, on March 16th of 1997, did you celebrate that

19  birthday party with Chevelle and Princess Thomas?

03:21:45  20  A.  No.

21  Q.  So you were not with them when they celebrated?

22  A.  No.

23  Q.  Now, I think your testimony was on March 17th you drove,

24  you had your brother driven up to Milwaukee, is that correct?

03:22:11  25  A.  On March 17th me and my husband drove Leonard Logan to

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

154

1      Milwaukee.

2      Q.  And that's March 17th of 1997?

3      A.  Yes.

4      Q.  Because he had court that day, right?

03:22:23    5      A.  Yes.

6      Q.  And you drove him up to Milwaukee?

7      A.  Yes.

8      Q.  Now, have you been in Milwaukee at any time prior to March

9      17, 1997, during the month of March or was that when you first

03:22:42   10      brought him up there?

11      A.  I was there on March the 5th.  That's my cousin's birthday.

12      Q.  I'm sorry, whose birthday?

13      A.  My cousin, Chevelle Thomas' son.  That's his birthday, and

14      we was there.

03:22:55   15      Q.  And he was there March 5th?

16      A.  Yes.

17      Q.  Do you know how long he was there in the beginning of

18      March?

19      A.  No, I really don't.

03:23:04   20      Q.  Do you know when he went back to Chicago?

21      A.  I said I was, not him.  I was.

22             THE COURT:  She was there.

23      BY MR. CHIMERA:

24      Q.  I'm sorry, ma'am.  You were where?

03:23:14   25             THE COURT:  I think the premise of the question was

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 155 of 217 PageID #:3521
Logan-Moore - cross by Chimera
155

1  were you -- she thought you said, actually I did too, whether

2  she was in Milwaukee earlier in the month.  You've now switched

3  to he.  That's the reason.

4       MR. CHIMERA:  I apologize, Judge.

03:23:25  5  BY MR. CHIMERA:

6  Q.  Let me just clarify.

7       So in the beginning, when you said March 5th, 1997,

8  you were in Milwaukee?

9  A.  Yes, you're asking me have I been to Milwaukee besides that

03:23:36  10  date.  That's what you asked me.

11  Q.  On March 5th of 1997, was your brother in Milwaukee?

12  A.  No.

13  Q.  By your brother, I mean Leonard Logan.

14  A.  No.

03:23:46  15  Q.  Was he there March 6th?

16  A.  No.

17  Q.  Was he there March 7th?

18  A.  No.

19  Q.  Was he there March 8th?

03:23:54  20  A.  No.  I wasn't there many days.

21  Q.  Okay.  Well, let me ask you this.  Beginning March 5th

22  through March 17th of 1997, do you know whether or not your

23  brother was in Milwaukee, Wisconsin?

24  A.  He was there March 17th.

03:24:10  25  Q.  17th?

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

1   A.  Yes.

2   Q.  That's the only date you're aware of?

3   A.  Yes.

4   Q.  Because you brought him up there with your fiance, correct?

03:24:18  5   A.  Yes.

6   Q.  And you were not at the party that they celebrated Chevelle

7 and Princess' mom's birthday, right?

8   A.  Right.

9   Q.  Now, you were not with your brother on March 18th, 1997,

03:25:15  10 correct?

11  A.  March 18th?

12  Q.  Yes.

13  A.  No, I wasn't.

14  Q.  And you were not with him March 19th, 1997, correct?

03:25:22  15  A.  No.  The only day I was with him was March 17th.

16  Q.  Would it be fair to say that's the only day you saw him in

17 March of 1997 was the day you drove him up?

18  A.  No, I wouldn't say that because he lived with me.

19  Q.  So there were times he would stay with you in March?

03:25:40  20  A.  Yes.

21  Q.  But March 17th you drove him up, right?

22  A.  Yes.

23  Q.  March 18th he was not with you, right?

24  A.  No.

03:25:47  25  Q.  And neither was he with you on March 19th?

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - cross by Chimera

1  A.  No.

2  Q.  I may have asked you this.  I apologize if I did, ma'am.

3       Did you say you were not in the courtroom the day that

4  Leonard Logan was asked by the Judge "Do you want to testify,"

03:26:28  5  and he said "No"?  Were you there?

6  A.  No, I wasn't.

7       MR. CHIMERA:  I'm almost done, Judge.  Thank you for

8  your patience.

9  BY MR. CHIMERA:

03:27:25  10  Q.  Did you have any conversations with Princess Thomas about

11  what she knew about the whereabouts of Leonard Logan during

12  March of 1997?

13  A.  No.

14  Q.  So Princess Thomas never told you where Leonard Logan was

03:27:46  15  during March of 1997, fair enough?

16  A.  No.

17  Q.  So that would include March 18th, right?

18  A.  You say that would include March 18th?

19  Q.  Yes.

03:28:00  20  A.  Sir, I drove Leonard Logan to Milwaukee on March 17th.

21  Chevelle Thomas was there at the house.  Princess Thomas was at

22  work.  And that's about it.  I didn't stay but a good two hours

23  and I left.

24  Q.  Okay.  And you didn't --

03:28:21  25       THE COURT:  Which one was there and which one was at

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - redirect by Alston

158

1    work?

2         THE WITNESS:  Chevelle Thomas was there.  Princess

3    Thomas was at work.

4    BY MR. CHIMERA:

03:28:28    5    Q.  And it was at their home that he stood?

6    A.  Yes.

7    Q.  What is your husband's name?

8    A.  Gary Moore.

9    Q.  Gary Moore?

03:28:55    10    A.  Yes.

11         MR. CHIMERA:  Judge, can I have just one second?

12         THE COURT:  Sure.

13      (Pause.)

14         MR. CHIMERA:  No further questions, Judge.

03:30:30    15         THE COURT:  Mr. Alston?

16         MR. ALSTON:  Just a few more, Your Honor.

17                    REDIRECT EXAMINATION

18    BY MR. ALSTON:

19    Q.  Now, Miss Logan, getting back to the time prior to

03:30:43    20    Leonard's original trial.  You answered a few questions

21    regarding the attorney you talked to on the phone, and you said

22    you couldn't see him, obviously, because you were on the phone,

23    correct?

24    A.  Right.

03:30:51    25    Q.  But you said that he was Caucasian.  Why do you say he was

                MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 159 of 217 PageID #:3525
Logan-Moore - redirect by Alston
159

1 Caucasian?

2 A.  Okay.  The first two lawyers was Caucasian.

3 Q.  Okay.

4           THE COURT:  She's saying the guy -- what he's saying

03:31:04  5 is the guy you talked to on the phone.  Do you think it's the

6 same guy you talked to in the courtroom?

7           THE WITNESS:  Yes.

8           THE COURT:  What made you think it was the same guy?

9           THE WITNESS:  Because he asked for that person's name.

03:31:14  10 Leonard asked for that person's name.

11           THE COURT:  You don't remember the name as you're

12 sitting here now?

13           THE WITNESS:  Right.

14           THE COURT:  Okay.

03:31:20  15 BY MR. ALSTON:

16 Q.  Okay.  And around the time of trial or at the original

17 trial, was it your understanding that Leonard Logan told his

18 attorneys that he was in Milwaukee at the time of the murder?

19 A.  Yes.

03:31:30  20 Q.  And did you do anything else on March 17th with Leonard

21 Logan besides driving him up to Milwaukee?

22 A.  Actually, we went to court earlier that day.

23 Q.  So you went to court with him earlier that day, and then

24 from there you went to Milwaukee?

03:31:44  25 A.  We came back to my house, and then we waited till my

          MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 160 of 217 PageID #:3526
Logan-Moore - redirect by Alston
160

1    husband got off, and we drove to Milwaukee.

2    Q.  Okay.  So you were at court with him, then went to your

3    home that you mentioned on 63rd Street, was it?

4    A.  Yes.

03:31:56    5    Q.  And then from there, once your husband, your now husband

6    got home, you went to Milwaukee from there?

7    A.  Yes.

8    Q.  Okay.  And, finally, were you at Leonard's original trial

9    for more than one day?

03:32:09    10    A.  Yes.

11    Q.  So you earlier testified that you recalled a victim of the

12    shooting testifying at court.  So that's one day that you are,

13    you're clear that you were there.  And you also testified that

14    you recall hearing the verdict in the trial come down, as well?

03:32:27    15    A.  Yes.

16    Q.  So that's -- are there any more days that you recall?

17    That's two days at least?

18    A.  I was there when the officer was on the stand, whatever his

19    name is.

03:32:43    20        THE COURT:  Do you remember what he was testifying

21    about?

22        THE WITNESS:  When him and Logan was transferring,

23    wrestling in the hallway with the gun.

24        THE COURT:  Okay.

03:32:54    25    BY MR. ALSTON:


        MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 161 of 217 PageID #:3527
Logan-Moore - recross by Chimera
161

1  Q.  And on the day the verdict was returned, you previously

2  testified that you drove back to Milwaukee with Princess and

3  Chevelle Thomas?

4  A.  Yes.

03:33:06  5  Q.  And just to clarify once more, there's no point prior to

6  that that you had seen Princess and Chevelle in the courtroom?

7  A.  No.

8       MR. ALSTON:  No further questions.

9       MS. THOMPSON:  One moment, Your Honor.

03:33:17  10     (Pause.)

11  BY MR. ALSTON:

12  Q.  Finally, do you happen to recall on March 17th, the day you

13  drove Leonard to Milwaukee, whether or not he had a cast on his

14  arm?

03:33:38  15  A.  Yes.  He had got shot.  Yes, he had a cast.

16  Q.  Okay.

17       MR. ALSTON:  No further questions, Your Honor.

18       THE COURT:  Mr. Chimera, do you have anything else?

19       MR. CHIMERA:  Just one point of clarification, Judge.

03:33:51  20     THE COURT:  Sure.

21            RECROSS-EXAMINATION

22  BY MR. CHIMERA:

23  Q.  Earline, so you drove Leonard Logan on March 17th of 1997

24  after court with your husband, your then-fiance, to Chevelle

03:34:12  25  and Princess Thomas' home, right?

MICHAEL P. SNYDER, Official Court reporter

1    A.  Yes.

2    Q.  In Milwaukee?

3    A.  Yes.

4    Q.  And prior to that, were you living in Chicago?

03:34:20  5    A.  Yes.

6    Q.  So you don't know whether or not Leonard Logan, your

7    brother, was in Milwaukee at any time in March prior to March

8    17, is that fair to say, or do you know whether he was there?

9    A.  No.

03:34:37  10    Q.  You do not know?

11        But you do remember you were there March 5th?

12    A.  I was there March 17th.  I was there March 5th, I was.

13    Q.  And was Leonard there then?

14    A.  No.

03:34:49  15    Q.  And you don't know whether or not Leonard had been in

16    Milwaukee prior to March 17th.

17        THE COURT:  When you talk -- it's not just beating a

18    dead horse at this point.  The horse is like it's down to

19    bones, and you're like breaking the bones apart.

03:35:02  20        MR. ALSTON:  Sounds good, Judge.

21        THE COURT:  And you've made the point.

22        MR. CHIMERA:  Thank you, Judge.

23        THE COURT:  Anything else?

24        MR. CHIMERA:  Nothing further.

03:35:07  25        THE COURT:  I have a few questions.

MICHAEL P. SNYDER, Official Court reporter

1                         EXAMINATION

2    BY THE COURT:

3    Q.  So I want to ask you first about conversations you had with

4    anybody that you thought was one of your brother's lawyers.  So

03:35:23    5    I've heard about two so far.  One was where your brother called

6    you on the phone from jail, and then you three-wayed in the

7    lawyer.  And then the other was when you tried to stop the

8    lawyer when he was coming into the courtroom.

9             Did you have any conversations with anybody you

03:35:36   10    understood to be his lawyers other than those two?

11    A.  In different times?

12    Q.  At any other time.  Let me be more specific.

13             So when you had the conversation on the phone where

14    your brother called you from the jail and you three-wayed in

03:35:52   15    the lawyer, I know you don't remember exactly what was said,

16    but do you remember what you talked about?  Did you talk about

17    this situation where you had taken him up to Milwaukee on the

18    17th of March?

19    A.  I think so.  I think --

03:36:07   20    Q.  So then my question is at any time between then and the

21    trial, did the lawyers talk to you again?

22    A.  No.

23    Q.  Okay.  And did you have any understanding from that

24    conversation that you had on the phone one way or another about

03:36:22   25    whether they were going to call you to testify.

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - examination by the Court

164

1  A.  Right.  By that conversation on the phone, I thought I was

2  going to testify.

3  Q.  You thought you were going to, but did they say "We are

4  going to call you," or did you just assume that?

03:36:34  5  A.  No.  He said I was going to testify, and then after it was

6  over with, he told me that I was, what you call that, not a

7  good witness.

8  Q.  Okay.  When you say "after it was over with," when?  After

9  the trial was over with?

03:36:44  10  A.  After everything was over with, he got --

11  Q.  Okay.  So you were in the courtroom off and on during the

12  trial?

13  A.  Uh-huh.

14  Q.  I don't know if you know this or not, but normally people

03:36:54  15  who are going to testify don't get to listen to testimony in

16  the courtroom.  So did anybody come to you at any point and

17  say, "Hey, you're not supposed to be here"?

18  A.  No.  At one part when I thought I was going to testify, I

19  was sitting across the room, I mean sitting in a room.

03:37:07  20  Q.  Okay.  Where was the room.

21  A.  It's in 26th and California.  I don't know what room.

22  Q.  Was it in the same area as the courtroom?

23  A.  I think so, yeah.

24  Q.  Why were you sitting in the room?

03:37:16  25  A.  Because I thought I was going to testify that day.

MICHAEL P. SNYDER, Official Court reporter

1   Q.  Okay.

2   A.  And I didn't never testify that day.

3   Q.  Was anybody else in the room too along with you?

4   A.  No.

03:37:24    5   Q.  Were your aunts in the room?

6   A.  They was in another room across the building.  I mean, I

7   say across the building because I don't know exactly where they

8   was.

9   Q.  Okay, all right.  So let's just stick with you again for a

03:37:36   10   second here.

11          So the day that you stopped the lawyer as I think you

12   said he was coming into the courtroom and asked when you were

13   going to testify, he said "I'll get back to you; I'm going to

14   go talk to Leonard," and he never got back to you, was that

03:37:48   15   while the jury trial was going on?  Was that one of the days of

16   the trial you were there or was that before the trial even

17   started?

18   A.  No, that was when the trial was going on.

19   Q.  It was already going on at that point?  All right.

03:38:09   20          Oh.  You were asked a question by Mr. Chimera, the

21   gentleman over here, about the person that Mr. Logan was

22   dating.  I think the name was Lasandresi Smith.  I may have

23   written it down wrong.  That's who you understood your brother

24   was dating around the time he got arrested or a different time?

03:38:30   25   I'm not sure when he was dating them.  That's what I'm trying

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - examination by the Court

1    to get at.

2    A.  My brother had several girlfriends, but that was his baby's

3    mother, Lasandresi Smith.

4    Q.  Okay.  And Mr. Chimera said that he had some sort of a

03:38:45    5    domestic issue with her, and you said something like "If that's

6    what you want to call it, yeah"?  So I want to know, when you

7    said that, what were you talking about?

8    A.  They had it with each other.  I mean, both of them argue

9    and throw things.  She'd throw things, like that.

03:39:01   10    Q.  She's throw things?

11    A.  Uh-huh.

12    Q.  Were you aware of any occasion where the police had come to

13    the house or Mr. Logan had gotten arrested or anything at all

14    like that?

03:39:11   15    A.  Yes, I do.

16    Q.  Okay.  Did any, did you ever discuss that with any of the

17    lawyers?

18    A.  No.

19    Q.  And when that event happened, was that during the period of

03:39:27   20    time that Mr. Logan was living with you or was he living

21    somewhere else?

22    A.  He probably was living somewhere else.

23    Q.  In the city or --

24    A.  In the city.

03:39:35   25    Q.  In Chicago, okay.

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - examination by the Court

167

1      How was it that you knew that the police had been

2  called or there had been something like that?

3  A.  Because I got a collect call from the jail.

4  Q.  From your brother?

5  A.  Yes.

6  Q.  And he told you he had been arrested for whatever reason?

7  A.  Uh-huh.

8  Q.  Do you know how long this was approximately before he was

9  arrested for the shooting?

10 A.  No, I don't.

11 Q.  More than a year, less than a year, no idea?

12 A.  No.

13 Q.  No idea?  Okay.

14      And in that case, whatever case that was, did you ever

15 go to court with him on that, that you remember?

16 A.  No.  I know I came to pick him up from there one time.

17 Q.  Okay.  But that was all in Chicago; that --

18 A.  Yes.

19 Q.  You don't think that came up with the lawyer when you had

20 that three-way phone conversation?

21 A.  No.  Most of the time I had my daughter, my daughter was

22 young, and I had to take care of her.  Most time I put the

23 phone down and go tend to my child.

24 Q.  Okay.  All right.

25      Does anyone want to ask follow-up questions based on

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 168 of 217 PageID #:3534
Logan-Moore - recross by Chimera
168

1    my questions?

2            Mr. Alston, do you want to ask any?

3            MR. ALSTON:  No.

4            THE COURT:  Yes, Mr. Chimera.  Go ahead.

03:40:44    5                    RECROSS-EXAMINATION

6    BY MR. CHIMERA:

7    Q.  Earline, regarding that domestic problem that your brother

8    had with Lasandresi, did your mom know about it?

9    A.  I wasn't living with my mother, so I don't know.

03:41:08   10    Q.  Do you know if your grandmother knew about it?

11    A.  No.

12    Q.  Was it possible your mom knew about it?

13    A.  No, sir.

14    Q.  It's not possible that she would know about it?

03:41:19   15    A.  I say I don't know.

16    Q.  That's fine.

17            Now, Judge Kennelly asked you about if you remembered

18    the substance of what you talked to the attorneys about prior

19    to trial when your brother patched you in with another attorney

03:41:35   20    on the phone.  Do you remember that, he was asking you those

21    questions?

22            And he asked you if the substance dealt with what you

23    talked about today about driving him up to Milwaukee, something

24    like that, and you said you believe it did?

03:41:47   25    A.  I didn't say I believe I did.  I said I did drove him up to

                    MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 169 of 217 PageID #:3535
Logan-Moore - recross by Chimera
169

1  Milwaukee March 17th.

2  Q.  Did you tell that to the attorneys on the phone?

3  A.  Yes.

4  Q.  Okay.

03:41:58  5      MR. CHIMERA:  Could you take a look at that transcript

6  in front of you, Judge.  It's page 744?

7      THE COURT:  744.

8      MR. CHIMERA:  Line 18.

9  BY MR. CHIMERA:

03:42:15  10  Q.  Do you have that there, ma'am?

11  A.  Yes.

12  Q.  Were you asked this question and did you give this answer

13  when you were under oath in that case:

14      "Question:  Did you ever talk to any Public Defenders

03:42:23  15  or any lawyers who represented Leonard regarding the fact that

16  you had taken him up to Milwaukee the day before the murder

17  supposedly happened?

18      "Answer:  No."

19      Were you asked that question and did you give that

03:42:36  20  answer on that date, February 8th of 2002 while you were under

21  oath?

22  A.  Okay.  I thought they were saying if I talked to him in a

23  room or something.

24  Q.  Okay, so, but did you give that answer?

03:42:53  25      THE COURT:  Is the transcript accurate, in other

MICHAEL P. SNYDER, Official Court reporter

```
              1    words?  In other words, does it actually say what you were
              2    asked when you testified that time?  I understand your
              3    explanation, but did you give that answer to the question when
              4    you were asked at the time of that testimony?
03:43:07      5         You know what?  I think I can take -- you'll stipulate
              6    that the transcript is accurate, right?
              7         MS. THOMPSON:  Yes.
              8         THE COURT:  Okay, fine.
              9         MR. CHIMERA:  No further questions.
03:43:16     10         THE COURT:  All right.  Any other questions, Mr.
             11    Alston?
             12         MR. ALSTON:  One more question.
             13         THE COURT:  Hang on one second.
             14                   REDIRECT EXAMINATION
03:43:23     15    BY MR. ALSTON:
             16    Q.  This is regarding the line in the transcript that was just
             17    identified.
             18         So when you answered this question "Did you ever talk
             19    to any Public Defenders or any lawyers who represented
03:43:33     20    Leonard," there's a number of questions preceding that that ask
             21    about that original trial in particular:
             22         "Were you present for that trial?  Where were you
             23    during the trial?
             24         "Where was I?  Yeah, part of the trial I was sitting
03:43:45     25    here, and part I was on the other side of the building."
```

MICHAEL P. SNYDER, Official Court reporter

Logan-Moore - redirect by Alston

171

1        The immediate next question is:

2        "Did you ever talk to any Public Defenders or any

3   lawyers who represented Leonard regarding your taking him to

4   Milwaukee?"

03:43:57   5        When you answered that question, were you under the

6   impression that that question was treating that trial, just the

7   original trial?

8   A.  Right, yes.

9        MR. ALSTON:  No further questions.

03:44:05  10                    EXAMINATION

11  BY THE COURT:

12  Q.  Do you have the transcript there in front of you?

13  A.  Yes.

14  Q.  There was something there I just noticed that I wanted to

03:44:12  15  ask you about.  Look at the one that says 744, a couple more

16  pages.

17        Do you see where it says there in line 1617, "Part of

18  the trial I was sitting in here, and part I was on the other

19  side of the building"?

03:44:23  20        What did you mean by "the other side of the building"?

21  A.  We, like I said, I thought I was on the other side of the

22  building during the trial.  I went in a room, that's what I

23  explained to you.  When I thought I was going to testify, they

24  had me in a different room.

03:44:38  25  Q.  Okay.  But was it, okay, I don't know how many times you've

        MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 172 of 217 PageID #:3538
Logan-Moore - redirect by Alston
172

1  been out to the courthouse.

2  A.  Not that often.

3  Q.  So you may remember when you go in, you go up some steps

4  and there's a sort of a one-floor area there where you go

03:44:52  5  through the metal detectors.  If you go into the court, you

6  turn to the right, you go around some corners, go up some

7  elevators, and you go to court.

8        There's a different building to the left.  It's an

9  office building.  There's a cafeteria over there like up on the

03:45:04  10  second floor I think.

11        So when you said you were on the other side of the

12  building, did you mean over in the courthouse side but just not

13  in the courtroom, or did you mean on the way other side of the

14  building where the cafeteria and the offices are?

03:45:19  15  A.  I don't know.

16  Q.  Don't know one way or another?

17  A.  Right.  I'm sorry, I don't.

18  Q.  So whenever it was that you weren't in the courtroom, were

19  you close to the courtroom?  Were you on the same floor as the

03:45:34  20  courtroom?

21  A.  Probably the same floor, probably different office.  I

22  don't know.

23  Q.  It sounds like you're not clear on the memory?

24  A.  Yes.

03:45:41  25  Q.  Okay, that's fair.

MICHAEL P. SNYDER, Official Court reporter

1    THE COURT:  Does anybody want to delve into this

2  further?  No?  I didn't think so.

3        Okay, thanks.  You're excused.

4      (Witness excused.)

03:45:52  5    THE COURT:  Okay, next witness.

6        MR. EVANS:  Your Honor, should Miss Logan remain in

7  the courthouse?

8        THE COURT:  No, she's good to go.

9        MR. EVANS:  We'll call Martin Kelly next, Your Honor.

03:46:03  10   THE COURT:  We are going to go till 4:30.  I'm

11  guessing we may not finish with him.

12       MS. THOMPSON:  I don't believe so.

13       THE COURT:  I don't know what his travel plans are.

14  He doesn't have flight out tonight, does he?

03:46:14  15   MR. GOODFRIEND:  I thought ahead, Judge, and his

16  flight is later tomorrow.  I think it's --

17       THE COURT:  Probably good anyway because they are

18  probably still getting sorted out out at O'Hare from all the

19  mess from yesterday, so good thinking.

03:46:26  20   All right.  Just come right around.  Raise your right

21  hand, please.

22       MARTIN KELLY, PLAINTIFF'S WITNESS, SWORN

23       THE COURT:  Have a seat.

24                DIRECT EXAMINATION

03:47:01  25  BY MS. THOMPSON:

Kelly - direct by Thompson

174

1  Q.  Good afternoon.

2  A.  Good afternoon.

3  Q.  Can you please identify yourself for the record.

4  A.  My name is Martin Kelly.

03:47:10  5  Q.  Mr. Kelly, can you hear me okay?

6  A.  I can.

7  Q.  Thank you.

8      Mr. Kelly, I'm Tara Thompson.  I'm one of the counsel

9  for Mr. Logan.

03:47:18  10      You and I have met once before, right?

11  A.  We have.

12  Q.  We, you and I talked when you gave testimony at the

13  post-conviction hearing back in 2009, right?

14  A.  That is correct.

03:47:28  15  Q.  And in preparation for that post-conviction hearing, you

16  declined to talk with me, right?

17  A.  That is correct.

18  Q.  Mr. Kelly, you're now retired?

19  A.  I am.

03:47:36  20  Q.  Do you have any paid employment currently?

21  A.  I do not.

22  Q.  And you currently live outside of the state of Illinois,

23  right?

24  A.  That is correct.

03:47:43  25  Q.  You formerly worked for the Cook County Public Defender's

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  office?

2  A.  Yes.

3  Q.  And I believe you were there from 1986 to 2007, right?

4  A.  1987 to 2007.

03:47:55  5  Q.  1987 was when you began?

6  A.  Correct.

7  Q.  And is it true that your entire legal career in Illinois

8  was as a Cook County Public Defender?

9  A.  Well, I -- no, it's not true.

03:48:09  10  Q.  What other legal jobs did you hold while you were an

11  attorney in Illinois?

12  A.  For a year after graduating law school until the time that

13  I became a Public Defender, I did some small private work

14  myself, closings, going to a traffic ticket or looking at

03:48:28  15  contracts, something of that nature.

16  Q.  But other than that, the rest of your career was as a

17  Public Defender?

18  A.  Correct.

19  Q.  And you were first chair for Leonard Logan's criminal trial

03:48:40  20  for murder, right?

21  A.  Correct.

22  Q.  And that murder trial was about the 11th or the 13th murder

23  trial in which you'd been involved?

24  A.  It was -- yes, correct.

03:48:51  25  Q.  Were you involved in other murder trials after Mr. Logan's?

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

176

1   A.  I was.

2   Q.  How many?

3   A.  Four or five, I would say.

4   Q.  Obviously I have some questions for you specifically about

5   Mr. Logan's case.

6   A.  I'm sorry?

7   Q.  I said I have some questions for you specifically about Mr.

8   Logan's case, obviously why we are here today.

9           You were assigned to Judge Simmons' courtroom at 26th

10  and California in November of 1999, is that right?

11  A.  Correct.

12  Q.  And you had been in his courtroom for about a year before

13  Mr. Logan's case went to trial?

14  A.  Correct.

15  Q.  Were you assigned to Mr. Logan's case at the time that you

16  came to Judge Simmons' courtroom?

17  A.  I was.

18  Q.  And when did Anthony Thomas comes on board as a second

19  chair for Mr. Logan's trial?

20  A.  Oh, it would have been a few months prior to his going to

21  trial.

22  Q.  Is there a time at which Mr. Thomas became actively

23  involved in preparing for trial?

24  A.  I would say probably within the few, the few weeks prior to

25  the actual trial date.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    Q.  So you were the lead attorney?

2    A.  I was.

3    Q.  And you made all the final decisions on issues in the case?

4    A.  I did.

03:50:06  5    Q.  Other than decisions which were Mr. Logan's alone to make?

6    A.  Correct.

7    Q.  So you spoke with key witnesses?

8    A.  I did.

9    Q.  And Mr. Thomas spoke to some police officers who were

03:50:15  10   involved prior to trial, isn't that right?

11   A.  I'm not sure.  I'm not sure.

12   Q.  Are there any witnesses you're aware of that Mr. Thomas

13   interviewed in preparation for trial that you did not talk to?

14   A.  No.

03:50:37  15   Q.  Did you meet with Latonya Payton prior to trial?

16   A.  No.

17   Q.  But you knew prior to trial that there was a possibility

18   that she was going to recant her grand jury testimony?

19   A.  Correct.

03:50:46  20   Q.  And that's because an investigator with your office had met

21   with her?

22   A.  That is not correct.

23   Q.  But you knew there was the possibility she might recant?

24   A.  Correct.

03:50:57  25   Q.  You also met with Charles Jenkins who was another key

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

178

1   witness, right?

2   A.  Correct.

3   Q.  And he was one of the most important witnesses who

4   testified, correct?

03:51:05   5   A.  Correct.

6   Q.  And you knew prior to trial that Mr. Jenkins was not going

7   to identify Leonard Logan as the shooter in this case?

8   A.  That is correct.

9   Q.  And you knew prior to trial that there were no scene

03:51:16   10   witnesses who were going to identify Mr. Logan as the shooter?

11   A.  That is not correct.

12         Do you mind if I ask you to repeat that question to

13   hear exactly what you said?

14   Q.  Sure.  My question was you knew prior to trial that there

03:51:33   15   were no witnesses at the scene who were going to identify Mr.

16   Logan as the shooter?

17   A.  No, that is not correct.

18   Q.  So prior to trial you thought there was a possibility that

19   someone might say that they had seen Mr. Logan fire the gun

03:51:46   20   that killed the victim in this case?

21   A.  Correct.

22   Q.  I mentioned just a minute ago that there are some decisions

23   in a criminal case that are a criminal defendant's alone to

24   make, right?

03:52:06   25   A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  Q.  And then there are other decisions that are ultimately the

2  trial attorney's to make?

3  A.  That is correct.

4  Q.  Although a good trial attorney consults with their client?

03:52:14  5  A.  Correct.

6  Q.  But ultimately they are decisions that the lawyer alone

7  makes, right?

8  A.  Correct.

9  Q.  So one decision that the client alone gets to make is

03:52:22  10  whether or not they testify?

11  A.  That is correct.

12  Q.  You give input to the client about that, but ultimately,

13  even if you don't want them to testify, they can do so if

14  that's their decision?

03:52:31  15  A.  That is correct.

16  Q.  But other than the client alone testifying, the attorney

17  decides what witnesses to call, right?

18  A.  Correct.

19  Q.  And the attorney decides what questions to ask witnesses?

03:52:40  20  A.  That is correct.

21  Q.  The attorney decides what arguments to make in opening

22  statements?

23  A.  That is correct.

24  Q.  The attorney decides what arguments to make in closing

03:52:53  25  statements?

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

180

1    A.  That is correct.

2    Q.  And the attorney decides other strategic issues in

3    connection with the case, right?

4    A.  That is correct.

03:52:59    5    Q.  Mr. Logan was not an easy client to deal with, was he?

6    A.  No, that is correct.

7    Q.  He didn't have confidence in you?

8    A.  I -- I'm not sure I can answer what he had in me or not.

9    Q.  Fairly or unfairly, he had some issues with you, right?

03:53:20    10    A.  Correct.

11    Q.  And he had gotten a supervisor in the Public Defender's

12    office involved in the case at one point, right?

13    A.  Correct.

14    Q.  He had spoken with the Public Defender supervisor about how

03:53:31    15    the case was proceeding?

16    A.  He had contact with the supervisor in the Public Defender's

17    office, correct.

18    Q.  There were points in this case before you got involved

19    where other attorneys represented Mr. Logan, is that right?

03:53:43    20    A.  That's correct.

21    Q.  And the case had actually been pending for about two years

22    before you got involved?

23    A.  Correct.

24    Q.  But you had adequate time to prepare for trial?

03:53:55    25    A.  I did.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

181

1  Q.  And you had time to do what you needed to do to get ready?

2  A.  I'm sorry.  I didn't hear you correctly.

3          THE COURT:  That's because she's talking so fast.

4          Slow it down.

5          MS. THOMPSON:  I'm sorry, Your Honor.

6  BY MS. THOMPSON:

7  Q.  You had time to do what you needed to do to prepare for

8  trial?

9  A.  I did.

10  Q.  You reviewed documents in this case?

11  A.  I did.

12  Q.  Is there any discovery you received from the State that you

13  did not review prior to trial?

14  A.  Not that I'm aware of.

15  Q.  So you feel you had an opportunity to see all of the

16  discovery that was provided by the State?

17  A.  I do, yes.

18  Q.  And you also met with Mr. Logan in preparation for trial?

19  A.  I did.

20  Q.  You met with him at least two times that were documented?

21  A.  At least two times, yes.

22  Q.  And you met with him many other times that were not

23  documented?

24  A.  Correct.

25  Q.  You met with him at Cook County Jail?

MICHAEL P. SNYDER, Official Court reporter

03:54:04

03:54:10

03:54:22

03:54:36

03:54:44

Kelly - direct by Thompson

1  A.  I did.

2  Q.  And from the time that he was arrested until the time that

3  he was convicted and went to IDOC, he was in pretrial detention

4  at the Cook County Jail, right?

03:54:55  5  A.  Correct.

6  Q.  So you knew where he was if you needed to speak to him?

7  A.  Correct.

8  Q.  When was your first meeting with Mr. Logan at the jail

9  prior to his trial?

03:55:07  10  A.  I'm sorry, I don't recall the date on that.

11  Q.  Was it months before the trial?

12  A.  It was several months before the trial, yes.

13  Q.  Was Mr. Thomas also there for that meeting?

14  A.  I believe he was, yes.

03:55:23  15  Q.  And at that meeting you went through the case with Mr.

16  Logan?

17  A.  Yes.

18  Q.  And you talked to him about strategy?

19  A.  Yes.

03:55:36  20  Q.  Did you talk him at that meeting about possible defenses?

21  A.  I don't -- I don't recall, not in depth, if we did.

22  Q.  Did you have any meetings with Mr. Logan at the jail where

23  you discussed possible defenses with him?

24  A.  I, I can't remember what we discussed at that first meeting

03:56:12  25  at the jail.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    Q.  Okay.  My follow-up question was did you have any

2    conversations with Mr. Logan at the jail where you discussed

3    possible defenses?

4    A.  As I said, I had the one meeting with him at the jail, and

03:56:31    5    I don't really recall the specifics of that conversation.

6    Q.  Are you saying that it's possible that at that first

7    meeting you did not talk about possible defenses with him?

8    A.  It's possible I did.  It's possible I did not speak to him

9    about possible defenses.

03:56:53    10    Q.  At that meeting, did you go through discovery with Mr.

11    Logan?

12    A.  I went through parts of discovery, not all of it.

13    Q.  Do you recall what parts of discovery you went through with

14    Mr. Logan?

03:57:06    15    A.  I would have gone through the pertinent parts.

16    Q.  And what were the pertinent parts?

17    A.  Well, they would have been what police reports were

18    generated, Latonya Payton's recantation, possible other

19    witnesses that could be called to testify.

03:57:36    20    Q.  Other than that meeting at the jail, did you have any other

21    meetings with Mr. Logan at the Cook County Jail prior to trial?

22    A.  No.

23    Q.  And then you had other meetings with him where you met with

24    him in the lockup area behind the courtroom at his status, at

03:57:57    25    his appearance?

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

184

1   A.  Correct.

2   Q.  And in those meetings in the lockup, he would not be the

3   only inmate that was in the lockup area behind the court,

4   right?

03:58:07   5   A.  Correct.

6   Q.  There were other inmates there whose cases were also up?

7   A.  Correct.

8   Q.  That's a loud area?

9   A.  At times, yes.

03:58:14   10   Q.  It's not a private area?

11   A.  It is not.

12   Q.  And it's your testimony today that you also had phone

13   conversations with Mr. Logan?

14   A.  Correct.  Well, I -- yes, correct.

03:58:30   15   Q.  Did you have any meetings at the jail with Mr. Logan on the

16   eve of trial?

17   A.  No.

18   Q.  You and Mr. Thomas also met some time before trial to talk

19   about the case and preparation?

03:58:45   20   A.  Yes.

21   Q.  And that meeting with Mr. Thomas was not, was not

22   immediately before trial, right?

23   A.  I'm sorry.  You're talking about a conversation between Mr.

24   Thomas and I?

03:59:03   25   Q.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    A.  Yeah.  We had actually several meetings of various lengths.

2    Q.  You had adequate time to meet with Mr. Thomas to prepare

3    the case?

4    A.  I did.

03:59:17    5    Q.  Now, an important thing to do in preparing for a criminal

6    trial is to understand your client's criminal history, right?

7    A.  That is correct.

8    Q.  So you can prepare for impeachment?

9    A.  Yes.

03:59:31    10    Q.  So that you can adequately advise your client about whether

11    or not they should take the stand?

12    A.  Correct.

13    Q.  And so you can assess their credibility, right?

14    A.  To assess my client's credibility?

03:59:45    15    Q.  That's right.

16    A.  Yes.

17    Q.  And one thing that you would do in assessing your client's

18    criminal history is to determine if officers in the case had

19    some kind of history with your client, right?

04:00:00    20    A.  That could be one of the ways.

21    Q.  To determine potentially if there's a reason your client

22    might become a suspect?

23    A.  That could be one of the ways, yes.

24    Q.  And so you did investigate Leonard Logan's criminal history

04:00:13    25    before trial, right?

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

186

04:00:23

04:00:35

04:01:06

04:01:26

1   A.  I looked, yes.

2   Q.  One of the things you got in discovery was a rap sheet for

3   Mr. Logan?

4   A.  Correct.

5   Q.  And there were some arrest reports that you got in

6   discovery that were Mr. Logan's arrest reports, right?

7   A.  I got arrest reports in discovery, yes.

8   Q.  You knew that Mr. Logan had some criminal history prior to

9   this trial, right?

10  A.  Correct.

11  Q.  You knew that he had some earlier drug cases that had been

12  resolved before the time of trial?

13  A.  That is correct.

14  Q.  And you knew that he had a disarming case?

15  A.  Yes.

16  Q.  That he had been accused of disarming a police officer?

17  A.  He had a pending disarming case, yes.

18  Q.  He had a disarming case that was pending at the time that

19  he was accused of doing the shooting for which he was

20  convicted, right?

21  A.  I believe it was Officer Evans, yes.

22  Q.  So at the time of Mr. Logan's trial -- let me actually ask

23  you a different question.

24       At the time of -- do you recall that the shooting for

25  which Mr. Logan was originally convicted occurred on March

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  18th, 1997?

2  A.  That was the date of the incident, yes, I believe so.

3  Q.  The only criminal case that he had pending on March 18th,

4  of 1997 was this disarming case, right?

04:01:41  5  A.  Yes, as far as I know.

6  Q.  He didn't have any drug cases pending on that date?

7  A.  No.

8  Q.  You knew that he had been arrested on that disarming case

9  on November 17th of 1996, right?

04:01:58  10  A.  I, I did not know the date of the arrest on the disarming

11  case.

12  Q.  But you knew that he was represented by a different

13  attorney on that case, right?

14  A.  That is correct.

04:02:09  15  Q.  And that attorney's name is Bruce Cowen?

16  A.  I believe -- yes, it is.

17  Q.  C-o-w-e-n, is that the right spelling?

18  A.  That is correct.

19  Q.  You had contact information for Mr. Cowen?

04:02:21  20  A.  Well, I didn't have actual contact information.  If I

21  needed to get hold of him, I knew how to track him down.

22  Q.  You didn't have his actual telephone number written down in

23  your file?

24  A.  I don't believe so.

04:02:33  25  Q.  And you knew that Mr. Logan had a court date in that

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

188

1    disarming case that had been on March 17th of 1997, right?

2    A.  That is correct.

3    Q.  And that was obviously significant because it was the day

4    before the shooting in this case, right?

04:03:00    5    A.  Correct.

6    Q.  So at the time you went to trial, you knew about that date?

7    A.  Correct.

8    Q.  And that's something you would have talked about with Mr.

9    Logan in preparation for trial?

04:03:12    10    A.  Correct.

11    Q.  And actually, when you reviewed the discovery in this case,

12    you went through and looked for documents in this case where

13    Officer Evans was involved, right?

14    A.  No, I didn't.

04:03:29    15    Q.  Are you aware of anyone in the Public Defender's office

16    making notations in the file about times where Officer Evans

17    was mentioned in the discovery of this case?

18    A.  I am not.

19    Q.  Would looking at documents from your file refresh your

04:03:45    20    memory about that?

21    A.  Probably -- yes.

22        MS. THOMPSON:  Your Honor, this document is not part

23    of the record, so do you want me to mark it as an exhibit?

24        THE COURT:  Yes, you should.

04:05:09    25        MS. THOMPSON:  Your Honor, I've shown Petitioner's

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

189

1   Exhibit 1 to the State, and I think just for the record it's a

2   three-page document that has some numbers up on the top

3   right-hand corner, and those numbers are 42, 43, and 44.

4          Can I approach the witness, Your Honor?

04:05:23   5          THE COURT:  That's fine.

6   BY MS. THOMPSON:

7   Q.  Mr. Kelly, I've shown you what is marked as Petitioner's

8   Exhibit 1.  I am going to ask you to specifically take a look

9   at page 2 and page 3 of that document, and once you've had a

04:05:42   10  chance to look at them, I have some questions.

11  A.  Okay.  Yes, I remember that.

12  Q.  So looking at page 2 of Petitioner's Exhibit 1, there is

13  some handwriting there at the top right-hand corner of page 2.

14  A.  That's correct.

04:06:13   15         MS. THOMPSON:  Actually, Your Honor, would Your Honor

16  like a copy?

17         THE COURT:  That would be nice, yes.

18         MS. THOMPSON:  (Tendering).

19         THE COURT:  Thanks.

04:06:20   20  BY MS. THOMPSON:

21  Q.  There is some handwriting at the top of page 2 there.  Do

22  you see where there's the word "Evans"?

23  A.  I do.

24  Q.  And it's circled?

04:06:32   25  A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    Q.  Do you recognize the handwriting of the word "Evans" there?

2    A.  No, I do not.

3    Q.  And looking further down, there's some underlining in the

4    second-to-the-last paragraph at the bottom of that page, right?

04:06:45    5    A.  Correct.

6    Q.  There's actually a box that's written, that's made there?

7    A.  Correct.

8    Q.  And that box is made around, in part around the name Evans?

9    A.  Correct.

04:06:54    10    Q.  And then do you see there at the bottom right-hand corner

11    that there's the name Bruce Cowen that's been written?

12    A.  I do.

13    Q.  And do you recognize the handwriting of the word "Bruce

14    Cowen" there?

04:07:03    15    A.  No, I do not.

16    Q.  Looking at page 3, there's some underlining on the last

17    page that in part is underlining a paragraph that begins "Off.

18    Evans," right?

19    A.  Yes.

04:07:17    20    Q.  Do you remember reading Petitioner's Exhibit 1 prior to

21    trial?

22    A.  I don't recall reading it, no.

23    Q.  And is it possible that you are the person who made all or

24    some of the markings on Petitioner's Exhibit 1?

04:07:48    25    A.  I don't believe I -- no, I don't believe I made those

MICHAEL P. SNYDER, Official Court reporter

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 191 of 217 PageID #:3557
Kelly - direct by Thompson
191

1    markings.

2    Q.  Is there anyone in the Public Defender's office besides you

3    who could have made those markings?

4    A.  Perhaps the attorney that had it before me, if that was in

04:08:02    5    the file.

6    Q.  Is there anyone in the Public Defender's office after you

7    who could have made those markings?

8    A.  I don't know.

9    Q.  To your knowledge --

04:08:11    10    THE COURT:  Could I just see you at sidebar, and bring

11    those documents that I gave you earlier, including the ones

12    that request the interview.  Yes.  Just the lawyers, if I

13    could, whoever is going to question the witness.

14    (Discussion at sidebar off the record.)

04:09:23    15    BY MS. THOMPSON:

16    Q.  Mr. Kelly is there anyone in the Public Defender's office

17    who handled this case after your participation in the trial

18    concluded?

19    A.  Handled the case as far as court or the file, handling the

04:09:38    20    case, no.

21    Q.  If the handwriting on Petitioner's Exhibit 1 was made by

22    George Tountas -- let me ask you this.

23    George Tountas was a member of the Public Defender's

24    office around this time, correct?

04:09:55    25    A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    Q.  And he represented Mr. Logan prior to you, right?

2    A.  Correct.

3    Q.  So if Mr. Tountas had made markings on Petitioner's Exhibit

4    1, those are markings that you would have seen at the time you

04:10:07    5    reviewed the file, right?

6    A.  If there had been markings on it, yes, I would have seen

7    them when I reviewed the file.

8    Q.  Is it your testimony before this Court today, Mr. Kelly,

9    that you learned about this March 17th, 1997 court date that

04:10:43    10    Mr. Logan had in the disarming case only shortly before trial?

11    A.  Correct.

12    Q.  And is it your testimony before the Court that prior to

13    this time shortly before trial when you first learned of this

14    disarming case, you say that Mr. Logan never discussed the

04:11:03    15    disarming case with you?

16    A.  That is correct.

17    Q.  That you only learned about it -- well, let me ask you

18    this.

19         Did Leonard, is it your testimony that Leonard Logan

04:11:13    20    never told you that he believed he was being framed by Officer

21    Evans in this case?

22    A.  I don't recall him saying that, no.

23    Q.  And is it your testimony he never told you that he had a

24    civil suit against Officer Evans?

04:11:24    25    A.  He mentioned he had a civil suit.  I don't recall the

Case: 1:12-cv-06170 Document #: 64 Filed: 04/09/14 Page 193 of 217 PageID #:3559
Kelly - direct by Thompson
193

1   specifics.

2   Q.  Did he tell you that Officer Evans had shot him?

3   A.  I don't recall the specifics of the civil suit.

4   Q.  He told you that in fact that he was in Milwaukee at the

5   time of the shooting because he was trying to avoid Officer

6   Evans, right?

7   A.  No, he did not.

8   Q.  And he told you to call Bruce Cowen because Bruce Cowen

9   could corroborate his testimony about that, right?

10  A.  No, he did not.

11  Q.  Your testimony is he never told that to you at any point?

12  A.  I don't recall him telling me anything about Mr. Cowen or

13  why he was in Milwaukee.

14  Q.  Now, you know, Mr. Kelly, that during the opening

15  statements in this case, there was a reference to alibi

16  evidence potentially being presented, right?

17  A.  Correct.

18  Q.  And you have no reason to doubt that the official

19  transcript that exists of those opening statements is

20  incorrect, right?

21  A.  The transcript is -- I'm sorry.  The transcript is correct

22  as related to those opening statements, yes.

23  Q.  So what's in the transcript is what was said in opening

24  statements?

25  A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  Q.  And the potential alibi evidence that's referenced in

2  opening statements, that's something that you and Mr. Thomas

3  discussed prior to trial, right?

4  A.  Correct.

04:12:51  5  Q.  And was it your intention that that reference referred to

6  the potential testimony from Princess Thomas and Chevelle

7  Thomas?

8  A.  Yes.

9  Q.  Was it your intention that it reference any other potential

04:13:02  10  alibi evidence that you might present?

11  A.  No.

12  Q.  That wasn't intended to be a reference that Mr. Logan

13  himself might testify?

14  A.  Oh, I'm sorry.  It could have been, yes.

04:13:15  15  Q.  But you, the way that that's worded in the opening

16  statements is to be somewhat generic, right?

17  A.  That was the intention, yes.

18  Q.  And that's because you didn't want to promise the jury that

19  they would hear from Mr. Logan if in fact he didn't end up

04:13:31  20  testifying, right?

21  A.  That was one of the reasons, yes.

22  Q.  Because in fact you had advised Mr. Logan numerous times

23  not to testify, right?

24  A.  I had told him that he should not testify.

04:13:41  25  Q.  And you knew that it was his ultimate decision whether or

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

195

1    not he take the stand, right?

2    A.  Correct.

3    Q.  And at the time of trial, he hadn't told you yet that he

4    didn't intend to testify, right?

04:13:55    5    A.  That is correct.

6    Q.  There was some possibility that he might insist on

7    testifying, right?

8    A.  That is correct.

9    Q.  But you didn't want to promise the jury that he might

04:14:02    10    testify because you weren't sure if he ultimately would, right?

11    A.  That was one of the reasons, yes.

12    Q.  Because your intention was to talk Mr. Logan out of taking

13    the stand on his own behalf?

14    A.  My intention was not to talk him out of it.  My intention

04:14:22    15    was to give him the best advice I could and let him make his

16    own mind up.

17    Q.  And that's what I meant.  Your intention was to advise him

18    and for him to take your advice on that point, right?

19    A.  That is correct.

04:14:32    20    Q.  So part of what you did for trial was to prepare a

21    potential alibi defense, correct?

22    A.  Correct.

23    Q.  And you were prepared to present such a defense if you

24    decided that you should, right?

04:14:44    25    A.  Correct.

            MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

196

1   Q.  So in doing so, you talked with Mr. Logan about his alibi?

2   A.  Yes.

3   Q.  Now, Mr. Logan told you that he had been in Milwaukee,

4   Wisconsin, at the time of the shooting in this case, right?

04:15:05   5   A.  Correct.

6   Q.  And when he told you that, you asked him who saw him in

7   Milwaukee?

8   A.  Yes.  That was the source of information, yes.

9   Q.  Well, you asked him who could help prove that he was in

04:15:24   10   Milwaukee, right?

11   A.  Right.

12   Q.  And you asked him who might have information that he was in

13   Milwaukee?

14   A.  Correct.

04:15:29   15   Q.  You asked him how he got to Milwaukee?

16   A.  No.

17   Q.  That's not a question you ever asked?

18   A.  No.

19   Q.  Is that information he offered to you?

04:15:37   20   A.  No.

21   Q.  So prior to trial, you never established with your client

22   how he got to Milwaukee?

23   A.  No.

24   Q.  And you asked Mr. Logan how long he stayed in Milwaukee?

04:15:48   25   A.  Yes.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

 1  Q.  And you asked him what he was doing while he was there?

 2  A.  No.

 3  Q.  Is that information he offered to you?

 4  A.  No.

04:15:59  5  Q.  So prior to trial you had never established what he was

 6  doing while in Milwaukee?

 7  A.  That is correct.

 8  Q.  Mr. Logan told you that he had been in Milwaukee for a few

 9  days in March and had come back to Chicago, right?

04:16:23  10  A.  He did not.

 11  Q.  Now, you've given testimony before where you've indicated

 12  that Mr. Logan told you that he was in Milwaukee for the entire

 13  month of March?

 14  A.  Correct.

04:16:37  15  Q.  Is that your testimony today, that that is what Mr. Logan

 16  told you?

 17  A.  My testimony today is Mr. Logan told me that he was up

 18  there April and all of March.

 19  Q.  So did you ask Mr. Logan if he had been in Chicago at all

04:16:56  20  during March, and he told you no?

 21  A.  No.

 22  Q.  So it's your position today that -- well let me ask you

 23  this.

 24        Did you ever inquire if Mr. Logan was in Chicago at

04:17:08  25  all during the month of March?

          MICHAEL P. SNYDER, Official Court reporter

1   A.  No.

2   Q.  So he told you he was in Milwaukee for some of April and

3   all of March, and you didn't ask him any questions about that?

4   A.  No.

04:17:19   5   Q.  So you learned that, as part of his alibi, that he had

6   stayed in Milwaukee with Princess Thomas and Chevelle Thomas?

7   A.  I did not learn that prior to trial.

8   Q.  Did you know prior to trial that Princess Thomas and

9   Chevelle Thomas had information about Mr. Logan's alibi?

04:17:49   10  A.  Yes.

11  Q.  And when did you learn that information?

12  A.  When I spoke to them.

13  Q.  How did you come to speak to them?

14  A.  I spoke to them on, via the telephone.

04:18:00   15  Q.  Well, why -- how did you learn that they might have

16  information?

17  A.  There were two ways.  I believe that Mr. Logan had told me

18  that they were alibi witness, and also I found their names in

19  the court file.  Additionally, I believe that this had been set

04:18:22   20  for trial prior to me picking it up, and their name was on the

21  answer, I believe.  Their name was all over the place.

22          THE COURT:  Do you mean the answer to discovery?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Yes.

04:18:35   25  BY MS. THOMPSON:


              MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    Q.  That was filed by prior counsel?

2    A.  I'm sorry?

3    Q.  It was an answer to discovery that had been filed by

4    counsel that came before you?

04:18:43   5    A.  I believe -- I believe that there was an answer filed by

6    Mr. Gaston with their name, with those names on it.  It would

7    have been a prior attorney of Mr. Logan's.

8    Q.  Did you speak on the telephone with Princess and Chevelle

9    separately?

04:19:08   10   A.  Yes, I did.

11   Q.  So you had one, you had one phone call with Princess and

12   one phone call with Chevelle?

13   A.  Correct.

14   Q.  Did you have more than one phone call with Princess?

04:19:18   15   A.  No.

16   Q.  And what about more than one phone call with Chevelle?

17   A.  No.

18   Q.  And you talked to them in the winter or the early spring of

19   2000, right?

04:19:28   20   A.  That is correct.

21   Q.  So that was several months before trial, right?

22   A.  Correct.

23   Q.  And after you talked with them, you were prepared to go

24   ahead with an alibi defense, right?

04:19:41   25   A.  No.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1    Q.  Is it your testimony here today that after talking with

2    them, you were not prepared to go ahead with an alibi defense?

3    A.  I was prepared to think about an alibi defense.  I was not

4    comfortable with the alibi defense.

04:20:00    5    Q.  Your plan at the beginning of trial was to present the

6    alibi witnesses at trial, right?

7    A.  Correct.

8    Q.  So you were prepared to go ahead with that defense, right?

9    A.  At that time, yes.

04:20:14    10    Q.  And the only potential alibi witnesses that you were

11    contemplating calling were either Princess Thomas or Chevelle

12    Thomas, right?

13    A.  Correct.

14    Q.  But you --

04:20:28    15    A.  And Mr. Logan, if possible.

16    Q.  If he chose to testify?

17    A.  If he chose to testify.

18    Q.  Which would not have been your advice?

19    A.  Correct.

04:20:35    20    Q.  But prior to trial even, you did not have confidence in

21    either Princess Thomas or Chevelle Thomas, right?

22    A.  That is correct.

23    Q.  Because prior to trial they were never able to give you an

24    exact date that Mr. Logan was in Milwaukee, right?

04:20:51    25    A.  That is correct.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

201

1  Q.  And you also have concerns about alibis generally, right?

2  A.  That is correct.

3  Q.  And about family alibis specifically, right?

4  A.  Correct.

04:21:00  5  Q.  Because people's family members might want to lie to help

6  them, right?  Or that might be what a jury would perceive?

7  A.  They could perceive that, yes.

8  Q.  They are not neutral witnesses, right?

9  A.  It could be defined as a nonneutral, yes.

04:21:22  10  Q.  Did you ever talk with Earline Logan prior to trial?

11  A.  No.

12  Q.  Did Mr. Logan prior to trial tell you that Earline Logan

13  had information about his alibi?

14  A.  No.

04:21:36  15  Q.  Did you talk to a Gary Moore prior to trial?

16  A.  No.

17  Q.  Did Mr. Logan tell you prior to trial that Gary Moore had

18  information about his alibi?

19  A.  No.

04:21:46  20  Q.  Did you have information from any other source that Earline

21  Logan or Gary Moore might have information about Mr. Logan's

22  alibi?

23  A.  No.

24  Q.  Now, at the time of trial, as you said, you thought that

04:22:00  25  Princess Thomas and Chevelle Thomas were shaky, right?

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

202

1   A.  Correct.

2   Q.  But you did bring them to trial anyway, right?

3   A.  Correct.

4   Q.  So you brought them to trial because, if it was absolutely

5   necessary to call them, then you were going to call them,

6   right?

7   A.  That's one of the reasons, yes.

8   Q.  And also you thought that you might be able to prepare them

9   more and see if they were more certain in their testimony?

10  A.  Well, that's -- yes.

11  Q.  But if the case was going well or if you for some reason

12  didn't need them, then you weren't necessarily going to call

13  them, right?

14  A.  If the case went very well, I did not want to call them.

15  Q.  Now, there was a day in the trial in which there were

16  several conversations with the Court and with Mr. Logan on the

17  record about the alibi witnesses potentially testifying.  Do

18  you recall that day?

19  A.  Yes, that would be the last day of trial, I believe, the

20  actual trial.

21  Q.  So there was a day when you picked the jury, correct?

22  A.  Yes.

23  Q.  And then the next day you had some opening statements and

24  some State witnesses testified, right?

25  A.  Correct.

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  Q.  And then there was another day where the State had some

2  witnesses and then rested, right?

3  A.  Correct.

4  Q.  And you called Charles Jenkins?

04:23:31  5  A.  Correct.

6  Q.  And that's the day where there was all the on-the-record

7  discussion about these witnesses, correct?

8  A.  Correct.

9  Q.  And that's the day that you brought them from Milwaukee to

04:23:41  10  court, right?

11  A.  No.  That was one of the days I brought them.

12  Q.  Is it your testimony that they were here, that they were in

13  court the day before?

14  A.  Yes.

04:23:49  15  Q.  And were they in court the day before that?

16  A.  Yes.

17  Q.  Your testimony is you brought them to court the day that

18  the jury was picked?

19  A.  Yes.  I believe that I had Mr. Harris bring them down every

04:24:08  20  day beginning at voir dire through the end of trial.

21  Q.  Did you talk with them the day of voir dire?

22  A.  No, I don't believe I did.

23  Q.  Did you see them in the building at all that day?

24  A.  I don't recall seeing them that day.

04:24:25  25  Q.  Did you talk with them at all on the next day of trial, the

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

204

| | | |
|---|---|---|
| | 1 | day that the trial, that the witnesses began? |
| | 2 | A. Yes. |
| | 3 | Q. Did you talk to them that day? |
| | 4 | A. I'm sorry? |
| 04:24:35 | 5 | Q. Did you talk to them that day? |
| | 6 | A. Yes, I did. |
| | 7 | Q. Did you interview them that day about their testimony? |
| | 8 | A. No. |
| | 9 | Q. Do you have any information the day of the voir dire that |
| 04:24:50 | 10 | Anthony Thomas spoke to them? |
| | 11 | A. No, I don't have any information about that. |
| | 12 | Q. All right. And then there was the day that you actually |
| | 13 | presented the defense for Mr. Logan, and you said they were |
| | 14 | brought that day as well? |
| 04:25:08 | 15 | A. They were brought that day, yes. |
| | 16 | Q. And that there was -- the investigator that worked on this |
| | 17 | case with you, his name was Whitney Harris, right? |
| | 18 | A. That is correct. |
| | 19 | Q. And he's the person that brought them from Milwaukee? |
| 04:25:19 | 20 | A. That is correct. |
| | 21 | Q. This was a jury trial, right? |
| | 22 | A. Yes. |
| | 23 | Q. So there were no witness rooms near the courtroom where |
| | 24 | this trial was held where those witnesses could sit, correct? |
| 04:25:34 | 25 | A. There weren't any actual witness rooms, no. |

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  Q.  And the witnesses would have been excluded from the

2  courtroom itself in this trial, right?

3  A.  That is correct.

4  Q.  So sometimes when witnesses are excluded, they might stand

04:25:50  5  outside in the hallway, correct?

6  A.  That's one of the places they might be, yes.

7  Q.  What are other places where witnesses might be when they

8  have been excluded from trial?

9  A.  Several places.  I can enumerate if you'd like.

04:26:02  10  Q.  Please do.

11  A.  It's possible that they could be seated in the jury room of

12  one of the vacant courtrooms that isn't being used or is down

13  for the day whose call is done.  It's possible they could be

14  sitting in the actual gallery part of the courtroom like here

04:26:22  15  awaiting.  It's possible that they could be brought over to our

16  office and placed in a conference room and wait until they are

17  called.  Our office building is right next door to the criminal

18  court building.

19  Q.  When Princess and Chevelle came for voir dire, do you know

04:26:43  20  where in the court complex they were during the day?

21  A.  I don't.

22  Q.  What about the first day of trial?

23  A.  I believe that they were back at our office in a conference

24  type room.

04:26:57  25  Q.  And what about the day that the State rested and the

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  defense put on testimony?  Where were they that day?

2  A.  It's my belief that they were as well -- I'm not sure where

3  they were that day, to be honest with you.

4  Q.  Did you see them anywhere in the court complex that day?

04:27:24  5  A.  That day again, the day the State rested and we put on

6  witnesses?

7  Q.  Yes.  I'm sorry that wasn't clear.  That's the day I'm

8  talking about.  My question was that day, did you see them

9  anywhere in the courthouse complex?

04:27:37  10  A.  Yes.

11  Q.  Where did you see them?

12  A.  I saw them outside the courtroom.

13  Q.  Did you see them anywhere else?

14  A.  Yes.

04:27:49  15  Q.  Where else did you see them?

16  A.  I saw them later on inside the courtroom.

17  Q.  Inside the courtroom?

18  A.  Yes, ma'am.

19  Q.  All right.  We'll talk about that in a minute.

04:28:05  20  A.  Okay.

21       THE COURT:  We are creeping up on 4:30, just so you

22  know.

23  BY MS. THOMPSON:

24  Q.  You agreed with Anthony Thomas to make some mention of the

04:28:21  25  alibi witnesses in the opening statements, right?

MICHAEL P. SNYDER, Official Court reporter

Kelly - direct by Thompson

1  A.  I did.

2  Q.  And so the ultimate statements that were made was a result

3  of both your input and Mr. Thomas' input, correct?

4  A.  Correct.

04:28:36  5  Q.  But at the time that you discussed those statements with

6  Mr. Thomas and at the time that those statements were

7  ultimately made, you weren't sure if the alibi witnesses were

8  going to be called, correct?

9  A.  The intention was that the alibi witnesses would be called

04:29:00  10  unless something occurred that would cause, it would make no

11  sense to call them.

12  Q.  Even though you had little confidence in them, your plan at

13  that time was to call them?

14  A.  Correct.

04:29:17  15  Q.  I want to go in -- obviously these witnesses ultimately

16  were not called at trial, right?

17  A.  I'm sorry?

18  Q.  I apologize for talking too fast.

19       Ultimately, these witnesses did not testify at trial,

04:29:30  20  right?

21  A.  That is correct.

22  Q.  All right, and I want to talk about some of the reasons for

23  that.

24       THE COURT:  This is probably a good place to break

04:29:36  25  because otherwise you're going to be in the middle of it.

MICHAEL P. SNYDER, Official Court reporter

Kelly -

1       So looking at my call for tomorrow, I think

2   realistically I should say 10:15 will be our start time.

3       I don't know if I have to sign any paperwork.  I'm

4   guessing I probably do.  Let me do that first while I'm

04:29:55   5   thinking about it.

6       I want to ask you one thing while I'm thinking about

7   it too.

8       Okay.  While I've got you here, this is a little mini

9   cassette that was in the Public Defender's file.

04:30:53   10       THE WITNESS:  Yes, sir.

11       THE COURT:  It looks like your writing.

12       THE WITNESS:  No, I don't believe it is, sir.

13       THE COURT:  Okay.  Nobody knows what it is, and quite

14   honestly it's because nobody has a mini cassette player

04:31:09   15   anymore.

16       THE WITNESS:  Can I propose a possibility?

17       THE COURT:  Yes.  I was going to ask you to do that.

18       THE WITNESS:  Would it be the 911 tape?

19       THE COURT:  Oh, in theory that could be what it is.

04:31:18   20   Okay.  I mean, do you think it's -- there's any conceivable

21   possibility that either one of the -- I know this is a --

22   you're going to think it's a ridiculous question.  I'm going to

23   ask it anyway.

24       THE WITNESS:  No, Judge.

04:31:32   25       THE COURT:  That any of the lawyers or the

MICHAEL P. SNYDER, Official Court reporter

1  investigators would have recorded an interview that they did

2  with Mr. Logan, their client.

3          THE WITNESS:  The lawyers from my office?

4          THE COURT:  Yes.

5          THE WITNESS:  No.

6          THE COURT:  That wouldn't have been sort of the norm.

7          THE WITNESS:  No, sir.

8          THE COURT:  We'll figure that out later.

9          So we need you back here at 10:15 tomorrow.

10         THE WITNESS:  Certainly.

11         THE COURT:  Thanks.  And you can step down.

12     (Witness temporarily excused.)

13         THE COURT:  Let's just talk about a couple of

14  logistical things.  I apologize for handing the wrong paperwork

15  from this file to the wrong people.  I just want to make sure I

16  have got a handle on it.

17         I've got back here now because it was given to me the

18  five cases which I think was stuff I said wasn't relevant.  The

19  thing about interviewing this other witness, same deal; the

20  draft order to look at the photographs, same deal; the

21  apparently draft motion to suppress.  I am going to hang onto

22  those.  I'll make copies so I can get it back to Ms. Dimond.

23         But then I've also got back -- I'm sorry -- the notes

24  that somebody took at the hearing on the post-conviction

25  petition also not relevant.

          MICHAEL P. SNYDER, Official Court reporter

04:32:58

1  Then I also got back these file request forms, the
2  note which at least on its face would appear to be from Mr.
3  Tountas about, quote unquote, your most difficult client, and
4  then the investigation request forms.  And who did I give them
5  to?  I'm sorry.  I was handing things to the wrong people.  Did
6  I give those to you mistakenly or to you in the first instance?

7  MS. THOMPSON:  I think you might have given them to
8  me, but I think we ultimately both saw them.

9  THE COURT:  All right.  And you're okay with that, I'm
04:33:09
10  assuming?

11  MS. THOMPSON:  I just don't want to be waiving
12  privileges, particularly with post-conviction counsel, but I
13  don't think those are particularly relevant necessarily.

14  THE COURT:  Well, I thought, actually, I think that
04:33:18
15  given some of the testimony that's come up, the memo, the
16  little note about difficult client I think is relevant, and I
17  think that if there ever was a privilege on that, or ever was a
18  work product protection on that, because it doesn't disclose
19  any privileged communications other than he doesn't understand
04:33:39
20  why the case hasn't been thrown out.  I think if there's work
21  product, it's overcome by the substantial need for it.

22  The two copies which are slightly different of the
23  investigation request to interview Ms. Payton, you know, there
24  was theoretically an embedded privileged communication in
04:34:06
25  there, but what it was is that Mr. Logan said Ms. Payton is

MICHAEL P. SNYDER, Official Court reporter

1  lying.  I mean, the notion that he told his lawyers that, I

2  don't think anybody is going to say that anybody has waived any

3  privilege, and, frankly, it's obvious that that's what Mr.

4  Logan thought.  I don't think it comes as a shock to anybody.

04:34:28  5      And then we've got to figure out -- if anybody knows

6  anybody that has a mini cassette player so they can listen to

7  this thing.

8      MS. THOMPSON:  I actually have one, Your Honor.

9      THE COURT:  That's sad.

04:34:37  10     MS. THOMPSON:  I can bring it to court tomorrow.

11     THE COURT:  Okay, bring it to court, and I'll borrow

12  it.

13     MS. THOMPSON:  I will.

14     MR. GOODFRIEND:  Judge, in terms of the tapes, I

04:34:44  15  believe there was a recantation made by Latonya Payton that was

16  audio recorded.

17     THE COURT:  I wonder if that's what the cassette is,

18  because it says Latonya Payton first ten minutes.  I assume

19  that means it's on the first ten minutes of the tape.  And if

04:34:57  20  you look at -- well, that's the one that's broken.  So, I mean,

21  in terms of what the hearing is about, I understand that

22  everything is intertwined in some way, but what's the -- why do

23  you need it for this hearing?

24     MR. CHIMERA:  Judge, we really don't care about that.

04:35:20  25  We've got a transcript I think anyway of that.

MICHAEL P. SNYDER, Official Court reporter

1      THE COURT:  Oh, you may have a transcript of this
2  interview?
3      MR. CHIMERA:  Yes, if that's the same.  There is only
4  one interview.
04:35:28  5      THE COURT:  It stands to reason that that's what it
6  would be, some investigator doing an interview with, carrying
7  around a cassette recorder.  Imagine that these days.
8      This other thing I don't know.  911 call is a
9  possibility, I guess.
04:35:41  10      MS. THOMPSON:  There was some reference by the Public
11  Defender's office that one of those might be some kind of
12  discovery that had been read for Mr. Thomas.  I don't know that
13  that will necessarily end up mattering at this trial, but that
14  may also be what those --
04:35:56  15      THE COURT:  Is that a possibility, Ms. Diamond?
16      MS. DIMOND:  No, Your Honor.  When we met on Friday
17  afternoon, I spoke with counsel for both sides on Friday
18  afternoon, went through some documents in my office, I
19  speculated that it might be because I knew that Mr. Thomas was
04:36:08  20  blind.
21      THE COURT:  People read stuff to him.
22      MS. DIMOND:  I have since talked to him about that,
23  and he said that would not have been the case.
24      THE COURT:  Okay, so that possibility is out the
04:36:18  25  window.

MICHAEL P. SNYDER, Official Court reporter

1    So I still haven't made up my mind on this question of
2 post hearing briefs.  I do have a question about that, though.
3 I suspect I know the answer.  I am gathering nobody has ordered
4 the transcript because Mr. Snyder has been here by himself all
5 day.  If somebody had ordered it on short notice, there would
6 have been people kind of shuffling in and out.

7    MR. GOODFRIEND:  We didn't order it.

8    THE COURT:  Okay.  Anybody planning to?  I'm just
9 asking.

10    MS. THOMPSON:  It depends.  Obviously, if there's a
11 longer schedule for post-trial briefing, we would order it.

12    THE COURT:  Well, but, see, whether there's a longer
13 schedule for post-trial briefing might depend whether you order
14 it, if you follow what I'm saying.

15    MS. THOMPSON:  Our position is we'll do what the Court
16 feels would be the most useful.

17    THE COURT:  So you're making me make the tough
18 decision.

19    MS. THOMPSON:  But we intend to order the transcript
20 at some point.

21    THE COURT:  If you're going to order it, you might as
22 well order it anyway.

23    MR. GOODFRIEND:  We would prefer to do post-trial
24 briefs.

25    THE COURT:  Yes.  Okay.  Well, part of the problem

MICHAEL P. SNYDER, Official Court reporter

1  with that, I'll just speak candidly here.  And Mr. Goodfriend

2  and Mr. Chimera are familiar with this.

3      The problem with post-trial briefs is that -- they are

4  familiar with this from another case they had in front of me.

04:37:24  5  The problem with post-trial briefs is that for me, everything

6  gets put aside.  And when something gets put aside, you then

7  have to rake it back in front of you, and it's not always easy

8  to do.  And they know how long I had another case under

9  advisement, an extraordinarily long and in fact unconscionably

04:37:39  10  long time I had another case under advisement where we went

11  through that.  That was a really complicated case from a bunch

12  of standpoints.  There was good reason to do it in that case.

13  That's part of my reluctance to do that.  And I know you all

14  would prefer to do that, but that's part of my reluctance.

04:37:55  15      This is all still relatively fresh in my mind

16  including the transcript of the trial, and I guess I have this

17  sort of visceral disinclination to do that because I think

18  what's going to happen is I'll just end up back ordering the

19  thing, and it's just not good.  But I'll think about it

04:38:10  20  overnight and talk about it tomorrow.

21      MS. THOMPSON:  Well, Your Honor --

22      THE COURT:  So who else do we have on the batting

23  order here?

24      MR. GOODFRIEND:  Well, with Mr. Kelly concluded, we

04:38:21  25  don't have any of our own witnesses.


MICHAEL P. SNYDER, Official Court reporter

1      THE COURT:  Okay.

2      MS. THOMPSON:  We still intend to call both Princess

3  and Chevelle Thomas and Mr. Logan.

4      THE COURT:  So we ought to be able to get this all

04:38:32  5  done tomorrow.  Sound right?

6      MR. CHIMERA:  Yes.

7      MS. THOMPSON:  Your Honor, to be clear, I am

8  absolutely not advocating for post-trial briefs.  I'll do

9  whatever the Court wants, but we are prepared to do closings

04:38:42  10  tomorrow, and I agree with the Court.

11      THE COURT:  If we do closing arguments, you know,

12  depending upon how long this will go, I'd probably say come

13  back on Wednesday just to give people a little bit more time to

14  kind of ponder it if we went that route.

04:38:54  15      MR. GOODFRIEND:  Next Wednesday?

16      THE COURT:  I mean Thursday.  I'm off.  Today is

17  Tuesday.  In other words, I'd tell you to come back on Thursday

18  to do that.  But I'll think about it overnight.

19      MR. BECKER:  May I throw another consideration in for

04:39:08  20  you, Your Honor?

21      THE COURT:  Yes.

22      MR. BECKER:  I think the briefing in our answer was

23  based on the court decisions and the court record we had, and I

24  think the testimony of the attorneys has brought out some other

04:39:21  25  factual issues that in my view make a slightly larger universe

MICHAEL P. SNYDER, Official Court reporter

1    of precedence relevant to the ultimate question.

2           So I would like to keep it concise, but I would like

3    the opportunity to cite not just Hampton.

4           THE COURT:  I am trying to get my head around that.  A

5    slightly larger universe.  You know, the universe is all

6    encompassing, so there can't be a larger universe, just in

7    theory.  But I understand what you're saying.  I'm just having

8    fun with you a little bit here.

9           Can you give me just a little hint?

10          MR. BECKER:  Sure.  One of the cases was cited in our

11   answer but not discussed at great length.  That's Barrow

12   against Uchtmen, which talks about the relevance of the level

13   of generality at which the opening statement is pitched.

14   There's another one called Atkins against Zenk from the Seventh

15   Circuit in 2012.

16          THE COURT:  So these are all cases about lawyers

17   allegedly promising, not delivering on a promise made in

18   opening statement?

19          MR. BECKER:  That's correct.

20          THE COURT:  Okay.

21          MR. BECKER:  So they are relevant to --

22          THE COURT:  But you can talk about those orally too.

23          MR. BECKER:  That's true.

24          THE COURT:  You'll end up doing that upstairs anyway.

25          MR. CHIMERA:  We can bring copies if Your Honor told

MICHAEL P. SNYDER, Official Court reporter

1   us.

2            THE COURT:  I understand.  I'll think about all that,

3   we'll talk about it tomorrow.

4            So what I'm hoping to do tomorrow is I'll have copies

04:40:39   5   from Ms. -- I will have copies.  I don't know whether I should

6   keep the originals or copies.  I guess I'm sort of inclined to

7   say I should keep copies, because I think there's some value in

8   having the file intact for whatever reason.  So I'll make

9   copies of these things, I'll keep the copies, I will give the

04:40:53  10   originals back, and then we'll figure out at some point what to

11   do with these recordings.  So just make sure you bring your

12   little thing tomorrow.

13            MS. THOMPSON:  I will.

14            THE COURT:  Okay.  Anything else anybody can think of

04:41:04  15   you want to talk about before he would stop for today?  Okay,

16   great.  See you tomorrow.

17            MR. CHIMERA:  Thanks.

18            MR. BECKER:  Thank you.

19        (Proceedings concluded.)

20                   C E R T I F I C A T E
            I, Michael P. Snyder, do hereby certify that the
21   foregoing is a complete, true, and accurate transcript of the
     proceedings had in the above-entitled case before the Honorable
22   MATTHEW F. KENNELLY, one of the judges of said Court, at
     Chicago, Illinois, on February 18, 2014.

23

                              /s/ Michael P. Snyder
24                            Official Court Reporter
                              United States District Court

25


            MICHAEL P. SNYDER, Official Court reporter