**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America ex rel.** | ) | |
| **LEONARD LOGAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12 C 6170** |
| | ) | |
| **TARRY WILLIAMS,[1] Warden,** | ) | |
| **Dixon Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

After a jury trial in the Circuit Court of Cook County held in 2000, Leonard Logan was convicted of first-degree murder and was sentenced to a forty-five-year prison term. Logan filed a post-trial motion, alleging ineffective assistance of counsel because, among other alleged errors, his trial counsel failed to present the testimony of alibi witnesses. After a hearing in which his trial counsel, Martin Kelly and Anthony Thomas, testified, as did their then-law clerk John Miraglia, Logan, and Logan's sister Earlene Logan, the state trial court denied the motion. Logan's conviction and sentence were upheld on appeal.

---

[1] Tarry Williams is the warden of the correctional facility in which Logan was last incarcerated. The Court has therefore substituted Williams as the respondent pursuant to Federal Rule of Appellate Procedure 43(c)(2). Because Logan has since been released, it is not clear if Williams is currently the correct respondent. If the parties believe the Court has erred in this regard, they should promptly file an appropriate motion.

In 2005, Logan filed a post-conviction petition in state court, alleging (among other things) ineffective assistance of counsel.  The state trial court ordered a new trial based on the admission of polygraph evidence without any written limiting instruction, though the court initially also noted that trial counsel's failure to call the alibi witnesses "factored into [its] decision."  Dkt. No. 39-13 at B-5.  The appellate court reversed and remanded, holding that an evidentiary hearing was required.  The state trial court subsequently held a hearing on Logan's ineffective assistance claims with respect to admission of the polygraph evidence without any written limiting instructions and failure to call the alibi witnesses.  After the hearing, the court denied Logan's post-conviction petition.  The trial court did not resolve any of the conflicting testimony regarding purported trial developments that, according to Kelly, caused him to change his strategy with respect to the alibi witnesses.  Rather, the court reasoned that trial counsel's decision was reasonable primarily because there was not "an alibi in this particular case that would have been worth pursuing."  Dkt. No. 39-17 at 6–10.  The court concluded that "[t]he fact [that] it was mentioned at one point in the opening statement, and the decision made not to use[] it[,] is not ineffective assistance of counsel."  *Id.* at 10.

The trial court's ruling was upheld on appeal.  The appellate court made a finding on a key point that the trial court had not addressed:  it *expressly* relied on Kelly's testimony that "after the State rested, he learned from his law clerk that the alibi witnesses did not wish to testify, and that one of the alibi witnesses expressed concern that the State might ask her about 'a domestic violence issue.'"  *People v. Logan*, 2011 IL App (1st) 093582, ¶ 56, 954 N.E.2d 743, 759.  These were both points that were hotly contested during the post-conviction evidentiary hearing—and as noted, the trial

court judge had made no finding on these points.

Logan then filed a federal habeas corpus petition under 28 U.S.C § 2254, again asserting ineffective assistance of counsel among other claims.  After the parties briefed Logan's claims, the Court denied all of them except one of his ineffective assistance claims.  In that claim, Logan contends that his trial counsel rendered ineffective assistance by promising alibi witnesses during opening statement and then failing to call them during the trial.  The Court held that the last reasoned state court decision addressing this claim, the decision of the Illinois appellate court, was "based on an 'unreasonable determination of the facts in light of the evidence presented.'"  *United States ex rel. Logan v. Chandler*, 999 F. Supp. 2d 1047, 1085 (N.D. Ill. 2013) (quoting 28 U.S.C § 2254(d)(2)).  The Court accordingly ordered an evidentiary hearing on that claim.

The evidentiary hearing before this Court took place in February 2014, and post-hearing briefing concluded in April 2014.  In December 2014, the Court granted Logan's motion for leave to file an amended habeas corpus petition to add new claims.  Proceedings were subsequently stayed, at Logan's request, while he pursued a successive post-conviction petition in state court on the newly asserted claims.  In March 2020, the Court granted Logan's motion to voluntarily dismiss his unexhausted claims and lifted the stay.  The Court apologizes for its inordinate delay since that date.

This decision constitutes the Court's findings of fact and conclusions of law.  For the reasons stated below, the Court grants Logan's petition for a writ of habeas corpus.

## Facts

At the evidentiary hearing before this Court, both Logan and Kelly testified.

There were five other witnesses: second chair defense attorney Anthony Thomas, then-law clerk and now practicing attorney John Miraglia, Logan's sister Earline Logan-Moore, and Logan's aunts Princess and Chevelle Thomas. The Court finds the facts as follows, having made judgments regarding the credibility of the witnesses and the weight to be given to their testimony.

## A. Preparation of the alibi defense

Logan was represented by several attorneys before Kelly became his attorney in 1999. Kelly was lead counsel, and Thomas joined as second chair a few months before trial. By all accounts, Logan's relationship with Kelly and Thomas was contentious. Thomas and Kelly described Logan as "a difficult client" who was "hostile" and "discourteous." Feb. 18 Tr. at 99–100; Feb. 19 Tr. at 249. Kelly stated that Logan "was always accusing [him] of not preparing the case correctly, not talking to witnesses, not seeing witnesses," and so on. Feb. 19 Tr. at 290. Logan testified that he was frustrated by Kelly's trial preparation and the lack of communication he received from Kelly. Logan acknowledged that he had complained to public defender supervisors about Kelly and requested Kelly's removal from his case.

Several months before trial, Kelly learned of the alibi witnesses, Princess and Chevelle Thomas, through Logan and an answer to discovery filed by Logan's prior counsel. Kelly testified that he had one phone call each with Princess and Chevelle in the winter or spring of 2000. Princess and Chevelle testified that they recall speaking with Logan's attorney on the phone before trial about Logan's alibi. Both testified that they told the attorney who called them that Logan came to visit them in Milwaukee around their mother's birthday, which is March 15, but they could not remember the

4

exact dates they told the lawyer. Kelly testified that after speaking with the witnesses on the phone he "was not comfortable with the alibi defense." Feb. 18 Tr. at 200. Kelly testified that neither Princess nor Chevelle was able to give him an exact date that Logan was in Milwaukee. He also stated that he had concerns with alibis from family members in general.

## B. Opening statements

Despite Kelly's hesitations, Thomas promised in his opening statement at Logan's jury trial that the jury would hear evidence of an alibi, stating that "[t]he evidence will show that on the date that the murder took place, Leonard Logan was not in Chicago. He was in Milwaukee, Wisconsin." Dkt. No. 39-3 at 136. Kelly agreed that defense counsel intended this promise to refer to the anticipated testimony of Princess and Chevelle Thomas, though "[i]t could have been" a reference to Logan's anticipated testimony. Feb. 18 Tr. at 194. Thomas testified that he "told the jury" about the alibi because the defense "might call the witnesses to testify to that," which he later clarified were Princess and Chevelle. *Id.* at 62–67. Kelly and Thomas testified that they discussed together whether to include the alibi in opening statement, but Kelly testified that it was ultimately his decision to do so.

Kelly's testimony was contradictory with respect to his intent to introduce the alibi evidence at trial as of the time of opening statements. Although at some points Kelly testified that his "plan" was to call the alibi witnesses, he also testified that "[i]f the case went very well, [he] did not want to call them." *Id.* at 202, 207. Kelly testified that he had prepared to call as a witness a victim of the shooting, Charles Jenkins, who he expected would testify that Logan was not the shooter. Kelly also testified that he had

in advance of trial prosecution witness Latonya Payton's recantation of her grand jury testimony, in which she had identified Logan as the shooter. At the time Kelly decided to include the alibi in Thomas's opening statement, he testified that he was "at least 50/50" on whether he would actually call the alibi witnesses. Feb. 19 Tr. at 294. But when pressed for clarification by the Court, Kelly testified that if the case came in as he expected—with Jenkins stating Logan was not the shooter and Payton sticking to her recantation—there was "zero" chance that he would use the alibi. *Id.* at 295. The Court finds based on the credible evidence that at the time Thomas promised evidence of an alibi in opening statements, Kelly was reasonably certain that in fact he would not introduce the alibi witnesses' testimony at trial.

This finding is supported by Kelly and Thomas's own testimony regarding their decision to include the alibi in opening statement. Kelly and Thomas stated that they had two reasons for promising the alibi evidence despite not expecting to call the alibi witnesses. The first reason was their claimed "[e]xasperation" with Logan. *Id.* at 226. Thomas described a conversation he had with Kelly about including the alibi defense in opening statement as follows:

> In the conversation we talked about how we did not think this alibi was a strong alibi at all, and Mr. Logan wanted us to put this alibi in. We did not really believe in it because we thought it was very tenuous. His being there around that time was not strong, in our position. But Mr. Logan was such a difficult client that what we said we would do, we said that we would go and talk to Mr. Logan and explain to him that we would say in opening statement about the alibi, but we did not want to be too specific about it because we didn't really have specific information and because we were thinking there's a possibility we may not call those witnesses, depending on how the evidence comes out.

Feb. 18 Tr. at 103. According to Kelly, he had a conversation with Logan the morning

before jury selection[2] during which Logan "was insisting upon an alibi defense when it was [Kelly's] determination that [he] thought it was a very poor defense given the conversation that [he] had had with the potential alibi witnesses." Feb. 19 Tr. at 225. Kelly testified that when he told Logan that counsel would mention the alibi in the opening statement, it "seemed to calm him down." *Id.* at 270. Logan disputes that this conversation happened. But even if it did, Kelly acknowledged that Logan never told him to bring up the alibi in opening statements. Kelly stated that he thought that "if the case came in as strong as [he] thought it was going to come in," they could mention the alibi in opening statement "but downplay[] it" and then "explain it away in closing statement." *Id.*

Further, Kelly testified that lawyers decide what to include in opening statement, not the client. When the Court asked how that fit with Kelly's reasoning in Logan's case, Kelly conceded that it was "hard to reconcile it." *Id.* at 292. Kelly acknowledged that "[c]ertainly, the best option would have been not to mention the alibi and just to go with the generic opening statement," but that he included the alibi because he was "very concerned with Mr. Logan going off," i.e., having an "outburst" or an "incident." *Id.* But Kelly conceded that nothing like that had ever happened on any prior court date.[3]

Kelly and Thomas testified that their second reason for including the alibi defense in opening statement was that if they ultimately decided to call the alibi witnesses, they thought it would be better for the jury to have heard the alibi

---

[2] Kelly could not remember whether the conversation occurred before voir dire or before opening statements, but he stated that "it probably would have happened before voir dire." Feb. 19 Tr. at 225.

[3] Indeed, both Kelly and Miraglia testified that even when Logan would get angry with Kelly, Logan had never yelled at Kelly.

defense in opening statement.  *See* Feb. 18 Tr. at 103–104 ("[I]f we needed to put on an alibi, we thought it would be easier to explain witnesses that the jury had heard about rather than not telling them anything about it . . . ."); Feb. 19 Tr. at 222.

## C.     Reasons for not presenting the alibi defense at trial

During trial, Logan did not testify, and Kelly did not call Princess or Chevelle to testify regarding Logan's alibi.  As with the opening statement, Kelly and Thomas discussed together the decision not to call the alibi witnesses, but it was ultimately Kelly's decision.  At the evidentiary hearing, Kelly and Thomas testified that their reasons for not calling the alibi witnesses were the following:  1) the case went so well that the alibi was not necessary, 2) alibis are inherently weak and can cause the jury to improperly place the burden of proof on the defendant, 3) the alibi would have conflicted with Payton's recantation at trial that still placed Logan at her house in the early morning of the day after the shooting, and 4) the alibi witnesses told Kelly during trial that they did not want to testify.  During Thomas's testimony at the evidentiary hearing, he also explained that he was worried about the accuracy of the alibi witnesses' recollection. Kelly testified that another reason he did not present the alibi witnesses was to avoid opening the door for the prosecution to present evidence regarding the circumstances of Logan's arrest.[4]

But most of these reasons for not calling the alibi witnesses existed before opening statements.  Kelly and Thomas knew before trial the weaknesses of the alibi

---

[4] Thomas had previously testified to this same reason in the prior post-conviction proceedings, but at the evidentiary hearing he testified that he did not remember this reason.

because they both testified that Kelly called the alibi witnesses several months before trial. Logan and Kelly dispute whether Logan lied about being in court on March 17, 1997, but even Kelly's own testimony is that he learned this fact before trial. Similarly, Kelly and Thomas testified that they held their general beliefs about the weaknesses of alibis before trial. Lastly, although Kelly and Thomas could not have known exactly how well the case would go for the defense, as noted above, Kelly testified that he *did* know before trial that Jenkins would testify that Logan was not the shooter and that Payton would recant. Kelly testified that he "felt that she would stick with her recantation," though he "was worried she wouldn't." Feb. 19 Tr. at 228.

Therefore, of the reasons Kelly and Thomas offered at the evidentiary hearing, only Kelly's purported meeting with the alibi witnesses, the conflict with Payton's recantation, and the potential for rebuttal information regarding Logan's arrest relate to developments claimed to have taken place during the trial. Thus, only these reasons can be potential viable explanations for not following through on the promise of alibi evidence made in Thomas's opening statement. The Court assesses each in turn.

### 1. Alibi witnesses' reluctance to testify

The trial transcript reflects that after the testimony of the defense's last witness, Kelly requested a sidebar that was held in the trial judge's chambers. Kelly informed the judge that the defense intended to rest its case at that point. The judge asked Logan to confirm whether he wished to testify. Logan requested more time to discuss this with his attorneys. The judge gave Logan "a few moments with your attorney in this room in private next to my chambers" to decide whether to testify and whether to call the alibi witnesses. Dkt. No. 39-7 at 531. The record reflects that there was a "brief pause," and

9

then the trial judge asked counsel whether they had discussed with Logan prior to that day about him testifying and his alibi witnesses. *Id.* at 532. At this point, Thomas interrupted, stating that they "have just received additional information that some of [Logan's] family members have advised us to tell him that he should not call his alibi witnesses." *Id.* at 534. When the trial judge asked which family members said this, Thomas stated that it was Logan's mother and grandmother.

At the evidentiary hearing, Kelly, Thomas, Miraglia, and Logan each described these events reflected in the trial transcript slightly differently with respect to where and when the discussions took place. Putting aside these minor details, the central dispute involves who, if anyone, spoke with the alibi witnesses and whether the witnesses actually expressed a desire not to testify.

Kelly testified that while he, Thomas, Miraglia, and Logan were in the room adjacent to the judge's chambers, Thomas asked Miraglia to inform the alibi witnesses that they would not be needed to testify. Kelly testified that when Miraglia returned, Kelly overheard him tell Thomas that the alibi witnesses did not want to testify. Kelly contradicted himself on this point, though, as he also testified at an earlier point in the hearing—and in prior hearings—that Miraglia told him *directly* that the alibi witnesses did not want to testify and that he (Kelly) should speak with them. *See* Feb. 19 Tr. at 276.

In any event, after Kelly recalled Miraglia saying that the witnesses did not want to testify, he believed Thomas then left with Miraglia, though he could not say this "with any certainty." *Id.* at 306. Kelly testified that he left the room next, to talk to the alibi witnesses, Princess and Chevelle, in the hallway outside the courtroom. Kelly stated

10

that there were a couple other people gathered with Princess and Chevelle, who he believed were family members.  It was during this conversation, Kelly stated, that the alibi witnesses told him they did not want to testify because they worried that a domestic issue involving Logan and Payton would come out.  He could not recall whether it was Princess or Chevelle that said this or who mentioned Payton.  Kelly testified that he did not inquire further and returned to the room to talk more with Logan.

In contrast, Thomas and Miraglia both testified that Thomas asked Miraglia to inform Logan's family members that the lawyers' position was that Logan should not testify or call his alibi witnesses.  Thomas explained that he wanted Miraglia to talk to Logan's family because in his experience, clients were more likely to go along with his advice if their family members agreed.  Miraglia testified that he spoke with Logan's mother, who was with several other women, for one to two minutes during which he conveyed the lawyers' view, and they told him to tell Logan to listen to his lawyers. Miraglia believed that this conversation took place either in the courtroom gallery or the hallway outside of the courtroom and that the people he spoke with were the same people he had observed watching the trial.  Miraglia then returned and relayed to Thomas what the family had told him.  When shown the trial transcript, Miraglia stated that the trial judge and Logan may have been in the room when he communicated the family's message to Thomas.  Miraglia testified that this was the only conversation he had with Logan's family during the trial.  To put a fine point on it, Miraglia's testimony was not that he learned that the witnesses did not want to testify, but rather that he told Logan's family the lawyers' view that the witnesses should not testify, and they agreed. That, in the Court's view, is a significant difference, not a mere nuance.

The Court finds Miraglia's testimony credible and finds Kelly's contrary testimony to lack credibility. First, Kelly's testimony regarding the events is not reasonable, partly because it lacks a logical or reasonable progression. It is implausible that Miraglia would tell either Kelly or Thomas that the alibi witnesses did not want to testify if, as Kelly testified, what actually happened was that Thomas asked Miraglia to tell the alibi witnesses that they were not needed to testify. When the Court pointed out this inconsistency, Kelly was unable to explain and then admitted that he was "not certain" why Miraglia left the room or whether Thomas left the room. *Id.* at 304–06.

Second, Miraglia's testimony on this issue is consistent with the other witnesses' hearing testimony and the trial transcript, whereas Kelly's testimony is utterly unsupported and uncorroborated. Kelly testified that he understood Miraglia and Thomas to be speaking with the alibi witnesses in the hallway in front of the courtroom. This is contradicted by Thomas and Miraglia, who each testified that they spoke with Logan's mother and grandmother in a small group and did not understand the alibi witnesses to even be included. As noted above, Miraglia testified that he believed the small group he addressed had been in the courtroom listening to the trial, which suggests that they were not the alibi witnesses—as those witnesses would have been excluded. And although Thomas had previously testified that Miraglia spoke with the alibi witnesses, during the evidentiary hearing Thomas stated that he "misspoke" and had intended to refer to the family members. Feb. 18 Tr. at 109–10.

Moreover, the alibi witnesses, Princess and Chevelle, each testified—credibly in the Court's view—that they did not speak with any attorneys that day. Both testified that they were waiting in a room all day to testify and did not see the courtroom or Logan's

12

mother until the end of the day. Chevelle testified that she thought the person who brought her to the waiting room at the courthouse was an attorney, but her description of that person did not fit Kelly, Thomas, or Miraglia. And, in any event, Chevelle testified during the hearing, credibly, that she did not tell that person that she did not want to testify at the trial. In addition, both Princess and Chevelle credibly testified that they were not aware of any domestic violence issue between Logan and Payton and that they never told anybody that they did not want to testify. And Kelly's testimony that he was not curious for any details after hearing for the first time that his witnesses, who he had brought to the courthouse to testify, did not actually want to testify due to a domestic violence issue involving the prosecution's central witness is quite difficult to believe.

Lastly, the trial transcript is more consistent with Miraglia's testimony than Kelly's version of events. The trial transcript reflects that counsel received information from Logan's family members, not his alibi witnesses. Although the alibi witnesses were Logan's aunts, Thomas specifically told the trial court that Logan's "mother and his grandmother have advised that he not call his alibi witnesses to testify." Dkt. No. 39-7 at 534. This statement is more consistent with Miraglia's testimony that Logan's mother and grandmother told him that Logan should follow his lawyer's advice not to call the alibi witnesses than Kelly's testimony that the alibi witnesses were unwilling to testify.

Thomas was the only other witness to testify that Kelly talked to the alibi witnesses during this time, and, as noted above, not even his testimony lines up with Kelly's. Thomas testified that Kelly told him that he (Kelly) left to tell the alibi witnesses that they were not going to be called, *not* that Kelly left in response to Miraglia's

purported statement that the alibi witnesses did not want to testify. Thomas also testified that he learned that the alibi witnesses did not want to testify from a conversation with Kelly that took place *before* Thomas said he went out in the hallway to talk to the family members.

In short, at the evidentiary hearing, Thomas and Kelly both pointed to each other as having initially obtained information that the alibi witnesses did not want to testify. Unlike in prior proceedings, at this hearing Kelly testified for the first time that he merely "overheard" Miraglia, upon returning to the room, tell *Thomas* that the witnesses did not want to testify and that he did not know why Miraglia even left the room in the first place. Feb. 19 Tr. at 235. Thomas, in contrast, testified for the first time that Kelly told him that the alibi witnesses did not want to testify earlier in the day and that he and Miraglia only spoke to Logan's family members, not the witnesses. Thomas and Kelly's changing stories to shift responsibility to the other further reduces their credibility.

In sum, the Court finds that the alibi witnesses did not tell Kelly—or anyone else—during Logan's trial that they did not wish to testify due to a domestic violence issue or for any other reason. This therefore cannot serve as a viable reason for Kelly's decision not to call the alibi witnesses.

The Court also notes that the trial transcript reflects that Kelly informed the judge that he "d[id] not anticipate calling the alibi witnesses" *before* the point at which he claimed he spoke with the alibi witnesses. Dkt. No. 39-7 at 514. When pressed by this Court during the evidentiary hearing, Kelly confirmed that he had already made his decision not to call the alibi witnesses when he made the statement to that effect to the trial judge. Thus, according to Kelly's own testimony, even if the meeting with the

14

witnesses had happened, it was *after* he had already made, and communicated to the trial judge, his decision to not call the alibi witnesses.

### 2.    Conflict with Payton's recantation

Thomas and Kelly also testified that they did not call the alibi witnesses because they were concerned that the alibi could not be reconciled with Payton's recantation, which still placed Logan in her apartment hours after the crime happened.  Neither Kelly nor Thomas had ever raised this rationale in the extensive prior proceedings.  Kelly explained that he recalled this concern only now, during the hearing before this Court, because it was "the first time that [he'd] ever read the complete trial transcript" and that "when [he] read it . . . [he] thought, yeah, you know, that's another issue . . . that should have been raised and [he] didn't."  Feb. 19 Tr. at 312–13.

The natural inference from this statement is that Kelly did not actually consider this rationale during trial.  Rather, it was only after reading the transcript in preparation for the evidentiary hearing that Kelly determined this could have been, in retrospect, a plausible reason not to call the alibi witnesses.  Indeed, when the Court directly asked if Kelly thought about it at the time, he hedged that he "thought *a bit* about it at the time." *Id.* at 313 (emphasis added).  When the Court pressed why Kelly had not raised the issue earlier, Kelly replied only that he "forgot." *Id.*  This strains credulity past the breaking point.  Kelly was, in the Court's view, making it up as he went along.  The Court concludes that any potential conflict with Payton's recantation was not a reason Kelly decided not to call the alibi witnesses.  This conclusion is supported by Kelly's own testimony that he was never comfortable with the alibi evidence and included it in the opening statement primarily to appease Logan.

15

### 3. Evidence of Logan's arrest

Finally, Kelly only briefly mentioned during his testimony at the evidentiary hearing a concern he had raised in prior proceedings that introducing the alibi testimony could allow evidence of the circumstances of Logan's arrest to be introduced by the prosecution in rebuttal. At the evidentiary hearing, Kelly acknowledged that "it probably would not have come in" and instead articulated only a general fear of "doors being opened." *Id.* at 241. Kelly testified that he "wanted to get the case shut down as quickly as possible" and not give "the State the ability to bring rebuttal witnesses in." *Id.* at 239. Kelly agreed, however, that the prosecution actually did introduce rebuttal testimony at Logan's trial. The Court likewise considers this claim by Kelly to have been made up.

## Discussion

In his motion, Logan contends that Kelly provided ineffective assistance of counsel in violation of the Sixth Amendment. He argues that Kelly rendered ineffective assistance by promising alibi witnesses during opening statement and then failing to call them during the trial.

A defendant claiming ineffective assistance of counsel in a criminal case must show that counsel's representation was deficient in that it fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

## A. Deficient performance

Failing to fulfill a promise made in opening statement "may be justified when 'unexpected developments warrant changes in previously announced trial strategies.'" *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003) (alterations

16

accepted) (quoting *Ouber v. Guarino*, 293 F.3d 19, 29 (1st Cir.2002)).  The Seventh Circuit has held, however, that "when the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable."  *Id.*; *see also Myers v. Neal*, 975 F.3d 611, 621 (7th Cir. 2020) ("[C]ounsel's false promises are indefensible—a clear instance of deficient performance.").  Thus, whether defense counsel's failure to fulfill a promise in opening statement is objectively unreasonable turns on whether counsel's decision not to call the alibi witnesses was the result of unexpected developments at trial.

This was not the case, for the reasons the Court has discussed.  The credible evidence showed that Kelly decided before Thomas gave his opening statement that the alibi witnesses should not testify.  As in *Hampton*, "to the extent that [Kelly] had legitimate reasons to conclude that [the alibi witnesses] should not testify, it was unreasonable for him to" promise the jury an alibi.  *Hampton*, 347 F.3d at 258.  The reasons Kelly offered that might possibly have served as a basis to change his mind about the alibi after opening statement were not credible.  Indeed, even though Kelly offered numerous reasons for purportedly changing his strategy, the state addressed only one in its briefing—the supposed mid-trial meeting where the alibi witnesses said they did not want to testify.  As discussed above, the Court finds that this claimed meeting did not happen.

Rather than continue to press the theory that defense counsel had strategic reasons for breaking their promise to the jury to present an alibi, the state primarily argues that the broken promise cannot rise to the level of ineffective assistance under Seventh Circuit law.

17

First, relying on *Schlager v. Washington*, 113 F.3d 763 (7th Cir. 1997), the state contends that "counsel rendered reasonable performance by using closing argument to cure any error made in opening statements." Post-hr'g Resp. Br. at 17. But in *Schlager*, there was no "error" to cure. Trial counsel promised that certain witnesses would testify in openings, but evidence admitted during trial set up a different defense than trial counsel had planned that did not require the witnesses' testimony. *See Schlager*, 113 F.3d at 769. The Seventh Circuit noted that counsel's decision to not call the witnesses "was more than sensible" considering the changed circumstances and that counsel was able to explain that decision during his closing argument. *Id.*

In contrast, in *Hampton*, the Seventh Circuit held that there were no changed circumstances affecting the promised testimony. The state contends that in *Hampton*, the problem was not merely the broken promises, but rather that counsel reneged on his promises "without explaining to the jury why he did so." Post-hr'g Resp. Br. at 17 (quoting *Hampton*, 347 F.3d at 257). But this misses the point—without changed circumstances, it is unclear what reasonable explanation counsel could have offered. Indeed, this Court noted in *Hampton* that defense counsel "did not explain to the jury why his promise that Hampton would testify went unfulfilled, other than to assert that Hampton was not required to prove his innocence." *Hampton v. Leibach*, 290 F. Supp. 2d 905, 911 (N.D. Ill. 2001) (Kennelly, J.), *aff'd sub nom. Hampton*, 347 F.3d 219.

Similarly, in Logan's case, trial counsel did not explain during closing argument why the defense did not present the alibi witnesses, other than saying that the prosecution had the burden "to prove its case to you beyond a reasonable doubt." Dkt. No. 39-8 at 588. Indeed, counsel's "explanation" in closing argument exacerbated,

rather than cured, the error. Thomas stated that the alibi witnesses "were present in court" and "were prepared to testif[y]." *Id.* at 587. But, Thomas went on, "[c]onferring with our client, we made the decision not to call those witnesses. . . . The issue is has the State been able to prove its case to you beyond a reasonable doubt, and we did not want you to get concerned about what someone else would say or whether you should believe them." *Id.* at 587–88. The natural inference from this explanation is that counsel did not call the alibi witnesses because their credibility was doubtful. Thus, even assuming closing arguments hypothetically may cure a broken promise made in opening statements, Thomas's closing argument did not do so in this case. *See Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) (holding that, despite counsel's attempted explanation in closing argument, counsel's broken promise to present testimony from doctors was "much worse than if he had not mentioned the doctors initially"). The Court further discusses below the likely prejudicial effect of defense counsel's closing argument.

Second, the state contends that "a competent reasonable-doubt defense can trump a problematic alibi reference in opening statements." Post-hr'g Resp. Br. at 21–22 (citing *Atkins v. Zenk*, 667 F.3d 939 (7th Cir. 2012)). But although courts "are obliged to consider [counsel]'s performance as a whole," "the possibility that [counsel] was competent in other aspects of his lawyering by no means rules out the possibility that" a particular failure "amounted to constitutional ineffectiveness." *Hampton*, 347 F.3d at 248 n.14; *see also Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994) ("The fact that Moore's cross examination was effective does not necessarily indicate that a reasonable lawyer, viewing the trial *ex ante*, would have regarded an interview of the

eyewitnesses as unnecessary.").  Similarly, in this case, the fact that counsel was able to describe a plausible reasonable-doubt defense does not mean that it was not objectively unreasonable for counsel to promise in opening statement an alibi defense that they knew prior to trial they did not intend to present.

*Atkins*, cited by the state, is not to the contrary.  It did not cite *Hampton* or discuss any case law related to counsel's failure to fulfill promises made in opening statements.  Rather, the Seventh Circuit in that case addressed circumstances where trial counsel had prepared an alibi defense, but the day before trial, the defendant told his counsel that he committed the crime.  *Atkins*, 667 F.3d at 942.  Trial counsel then advised the defendant that "the 'best' strategy" would be to instead argue that he lacked intent, but "when [the defendant] chose instead to exercise his right not to testify, [counsel] felt that this door closed."  *Id.* at 945.  Counsel therefore chose to "falsely state[] to the jury that" the defendant was elsewhere when the crime occurred and then "rest[] after the State presented its case-in-chief."  *Id.* at 942.  The Seventh Circuit held that this was not deficient performance, despite noting that "the portions of [counsel]'s opening statement about [the alibi] may have been inappropriate and misguided."  *Id.* at 945.  The court reasoned that counsel's "strategy options were exceedingly limited," and that counsel "did what he could" when "dealt a tough hand by a difficult client."  *Id.* at 945–46.

Logan's counsel's strategy options were not similarly limited in this case.  Logan did not sabotage his defense.  Logan's counsel had ample time to prepare a defense and decide whether to pursue an alibi defense.  Indeed, Kelly was reasonably certain at the time of opening statements that the defense actually would not offer an alibi, yet

counsel promised one in opening anyway, supposedly to appease Logan. *Atkins* is therefore inapposite. The Seventh Circuit has subsequently reaffirmed the general rule that "counsel's false promises are indefensible—a clear instance of deficient performance." *Myers*, 975 F.3d at 621.

Next, the state contends that in *Barrow v. Uchtman*, 398 F.3d 597 (7th Cir. 2005), the Seventh Circuit narrowed *Hampton* to cases where counsel promises that the defendant will testify. Although the Seventh Circuit emphasized in *Barrow* the fact that in *Hampton*, "trial counsel had specifically promised the jury that the defendant would testify himself," *Barrow* does not suggest that only breaking that specific promise can be considered deficient performance. *Id.* at 606 (emphasis omitted). Indeed, the Seventh Circuit has held after *Barrow* that counsel's promise to present evidence that someone other than the defendant committed the crime when counsel "had to know he could not follow through on that promise at trial" was "a clear instance of deficient performance." *Myers*, 975 F.3d at 621. Rather than limit *Hampton*, *Barrow* primarily emphasizes the lack of prejudice arising from counsel's broken promise given that the defendant's recorded oral confession was in evidence at trial. *Barrow*, 398 F.3d at 607. As discussed below, the prejudice analysis in *Barrow* is inapplicable to this case.

Lastly, the state contends that the promise in Thomas's opening statement was reasonable because trial counsel did not know if Logan would testify at trial and "referring to the alibi during opening statements . . . increased the odds of acquittal if petitioner were to insist on testifying." Post-hr'g Resp. Br. at 28. This contention lacks merit. First, it is clear from both Kelly and Thomas's testimony that the promise of an alibi in opening statement referred to the testimony of Princess and Chevelle Thomas,

not Logan.  Second, and more importantly, the state's argument runs contrary to *Hampton*.  *See Hampton*, 347 F.3d at 258 ("Nothing was to be gained from making that promise, only to renege upon it later without explanation.").  The Seventh Circuit in *Hampton* expressly observed that "[m]aking such promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy" and "[i]n no sense does it serve the defendant's interests."  *Id.* at 259.

## B.    Prejudice

"Errors are prejudicial when there is a 'reasonable probability' that the trial would have come out differently without them."  *Myers*, 975 F.3d at 623 (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Cook v. Foster*, 948 F.3d 896, 909 (7th Cir. 2020) (quoting *Strickland*, 466 U.S. at 694).  "[T]he likelihood of a different result must be substantial, not just conceivable."  *Thurston v. Vanihel*, 39 F.4th 921, 929 (7th Cir. 2022) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).  "In deciding whether there is a reasonable probability that the errors changed the outcome of the trial, the court must consider all of the evidence."  *Cook*, 948 F.3d at 909.

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  *Strickland*, 466 U.S. at 696.  The state does not contest that Logan's case was close.  The prosecution's key witness, Payton, had recanted her testimony that she witnessed Logan commit the crime, though detectives testified that she had changed her story several times during the investigation.  The only physical evidence was Logan's

fingerprints found in Payton's apartment and on a CD in the car used in the crime. A victim testified that Logan was not the shooter, though the prosecution raised some questions regarding this witness's bias. In sum, the prosecution's case against Logan was not terribly strong. *See Blackmon v. Williams*, 823 F.3d 1088, 1107 (7th Cir. 2016) (noting "the weakness of the State's case" that included "the complete lack of any motive, the dearth of physical evidence, and the heavy reliance on the eyewitness identifications").

In these circumstances, "it is substantially likely that [Logan] could have raised at least a reasonable doubt and had a different outcome at trial if counsel had provided adequate representation." *Blackmon*, 823 F.3d at 1107 (internal quotation marks omitted); *see also Ouber*, 293 F.3d at 33 ("In a borderline case, even a relatively small error is likely to tilt the decisional scales. The error here—failing to present the promised testimony of an important witness—was not small, but monumental.") (citation omitted); *Plummer v. Jackson*, 491 F. App'x 671, 679–80 (6th Cir. 2012) ("[T]he evidence of Plummer's guilt was not overwhelming on its own, and several facts . . . could have been reasonably interpreted in Plummer's favor had his counsel not promised Plummer's testimony as the keystone of a self-defense theory, and instead argued from the outset that Plummer had not committed the act at all.").

"[L]ittle is more damaging than to fail to produce important evidence that had been promised in an opening." *Hampton*, 347 F.3d at 257 (alteration in original) (quoting *Anderson*, 858 F.2d at 17); *see also Myers*, 975 F.3d at 621 ("Making false promises about evidence in an opening statement is a surefire way for defense counsel to harm his credibility with the jury."). Courts have consistently recognized the likely

prejudice resulting from breaking a promise to introduce critical evidence. *See Hampton*, 347 F.3d at 260 ("Those broken promises themselves supplied the jury with reason to believe that there was no evidence contradicting the State's case, and thus to doubt the validity of Hampton's defense."); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir. 1990) ("When counsel failed to produce the witnesses to support this version, the jury likely concluded that counsel could not live up [to] the claims made in the opening."); *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993) ("The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel.").

Prejudice arises because the promise "creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility." *Hampton*, 347 F.3d at 259; *see also Saesee v. McDonald*, 725 F.3d 1045, 1049 (9th Cir. 2013) ("The juror will naturally speculate why the witness backed out, and whether the absence of that witness leaves a gaping hole in the defense theory. Having waited vigilantly for the promised testimony, counting on it to verify the defense theory, the juror may resolve his confusion through negative inferences.").

Though not necessary to the Court's conclusion, the trial transcript reflects that the jury was invited to draw precisely this prejudicial inference. As noted above, Thomas told the jury in his closing argument that even though the alibi witnesses "were present in court" and "were prepared to testify," counsel did not call those witnesses

24

because "we did not want you to get concerned about what someone else would say or whether you should believe them." Dkt. No. 39-8 at 587–88. This signaled by clear implication that the alibi witnesses were of suspect credibility. Moreover, Thomas said that counsel made that decision by "[c]onferring with our client," *id.* at 587, which specifically attributed the witnesses' failure to testify to Logan himself, further increasing the probability that the broken promise prejudiced the jury's view of Logan. In rebuttal, the prosecutor took advantage of this, ridiculing Thomas's purported explanation as "unbelievable," stating "[b]ut he tells you, 'Oh, it was my strategy. I chose not to call them.' I wonder why? Let's see, Latonya Payton puts him at the house, even with her testimony here, like an hour or so after the murder happens, I wonder why?" *Id.* at 635– 36. The prosecutor told the jury to "do your own math on that one." *Id.* at 636.

In short, given the weakness of the prosecution's case against Logan, there is a reasonable probability that the trial would have come out differently absent trial counsel's broken promise.

The state contends that the broken promise is not prejudicial because the broken promise in *Hampton* "was not so prejudicial that it would support relief in and of itself." *Hampton*, 347 F.3d at 260. [5] But the prejudice inquiry is case-specific, "consider[ing] the totality of the evidence before the judge or jury." *Blackmon*, 823 F.3d at 1105 (internal quotation marks omitted). The broken promise in this case was more prejudicial than the one in *Hampton*, for two reasons. First, the prosecution's case for

---

[5] In Logan's brief, he also argues that trial counsel was ineffective for failing to properly investigate the alibi evidence and failing to call the alibi witnesses. The state contends that these claims are procedurally defaulted. Because the Court grants relief based on Logan's broken promise claim, the Court need not resolve this dispute.

Logan's guilt was weaker than in *Hampton*. In *Hampton*, "the linchpin of the State's case" were three eyewitnesses who identified the defendant and stuck with this at trial, though trial counsel was able to "emphasize the vulnerabilities in the identification testimony." *Hampton*, 347 F.3d at 249–50. At Logan's trial, by contrast, the prosecution's case heavily relied on only one eyewitness, Payton, who recanted at trial her prior testimony identifying Logan as the perpetrator. Second, the prejudicial effect on the jury is far greater in this case because the prosecution emphasized the broken promise in its closing argument. In *Hampton*, there is no indication that the prosecution pointed out the broken promise at trial.

The state's citation to *Ruhl v. Hardy*, 743 F.3d 1083, 1097 (7th Cir. 2014), is similarly unavailing. In that case, the Seventh Circuit held that "an unfulfilled suggestion during opening statement that evidence will be coming on a collateral issue is not enough to undermine confidence in the result." *Id*. But the state does not contend—nor could it plausibly—that an alibi defense could possibly be a collateral issue.

The state next contends that there is no prejudice in this case because of "the legal presumption that jurors follow their instructions." Post-hr'g Resp. Br. at 25. The trial court judge did not provide a specific instruction to address counsel's failure to fulfill the promise made in opening statement. Instead, the judge gave the standard instruction that opening and closing statements are not evidence and that "any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Dkt. No. 34 at 641. And when the prosecutor asked the jury the rhetorical question of why trial counsel decided not to call the alibi witnesses, *the court overruled defense counsel's objection*, and the prosecutor was permitted to

conclude with the final remark to the jurors to "do your own math on that one." Dkt. No. 39-8 at 636. Given this argument, the fact that the prosecutor also told the jury that they "cannot consider whether [defense counsel] did or didn't have witnesses," *id.*, does not negate or even deflect the prejudice arising from defense counsel's broken promise.

The state does not cite to any case holding that the general presumption that juries will follow standard instructions can overcome the prejudicial effect of a broken promise. Indeed, it can be fairly assumed that similar instructions are given in most cases, and courts still regularly hold broken promises prejudicial. *See Ouber*, 293 F.3d at 35 ("The fact that the jury was advised not to draw a negative inference from the petitioner's failure to testify is likewise irrelevant; the attorney's mistake was not in invoking the petitioner's right to remain silent, but in the totality of the opening and the failure to follow through.") (internal quotation marks omitted); *Plummer*, 491 F. App'x at 679 ("Plummer's counsel's unfulfilled promises . . . likely had a prejudicial effect on the jury's view of Plummer, his case, and his lawyer, despite instructions from the court not to consider it in reaching their verdict.").

Lastly, the state again contends that "*Barrow* draws a bright line between *Hampton* and other broken-promise scenarios," such that prejudice only occurs where trial counsel expressly promises the defendant's own testimony because that scenario is "uniquely dramatic." Post-hr'g Resp. Br. at 26. The Court has already explained that *Barrow* does not establish any such bar to broken promise claims. Although the Seventh Circuit held that the broken promise in *Barrow* was not prejudicial, the "the primary evidence against Barrow was his own oral confession, . . . in which Barrow confessed to the crime and described in his own words how he committed it." *Barrow*,

398 F.3d at 607. The Seventh Circuit held that "given the abundance of evidence against him, Barrow cannot show that he suffered prejudice from his attorney's unfulfilled promises to present evidence." *Id.* at 608. As detailed above, there was nothing close to an abundance of evidence against Logan. Thus, *Barrow* is inapposite.

## C.   The Court's prior § 2254(d)(2) determination

The state asks the Court to "revisit its § 2254(d)(2) determination" because it contends that in the post-conviction proceedings, the state trial court implicitly credited Kelly's testimony that he learned from the alibi witnesses that they were reluctant to testify during trial. Post-hr'g Resp. Br. at 33. When ordering the evidentiary hearing, the Court held "that the appellate court determined that Kelly learned new evidence during trial that warranted abandoning the promised alibi defense in a way that was contrary to the clear and convincing weight of the evidence that was presented" and thus the appellate court's conclusion was "based on an 'unreasonable determination of the facts in light of the evidence presented.'" *Logan*, 999 F. Supp. 2d at 1085 (quoting 28 U.S.C. § 2254(d)(2)).

The Court reaffirms this ruling. As the Court explained in its previous decision, the trial court "did not rely upon, and in fact made no mention of, Kelly's testimony about the domestic violence issue . . . or the purported desire of the alibi witnesses not to testify." *Id.* at 1084. Instead, the trial court overruled Logan's claim because it found that trial counsel's decision "was one of trial strategy" based on several factors, including the weaknesses of the prosecution's case, the tendency of alibis to confuse the jury as to the burden of proof, Logan's initial purported lie to Kelly that he was in Milwaukee for all of March, and the "lack of certainty" from the alibi witnesses. Dkt. No.

13-2 at 6–10.  The Court acknowledges that the trial judge credited Kelly's testimony as to *these* points, but they "involve matters that Kelly knew *before* trial (and thus before opening statement) and thus could not, without more, have been reason to change his mind."  *Logan*, 999 F. Supp. 2d at 1083.

The state contends that under two Supreme Court cases regarding implicit credibility findings, "the trial judge is presumed to have implicitly credited Kelly's testimony about the alibi-witness meeting — unless federal law would have allowed the judge to deny the claim on other grounds."  Post-hr'g Resp. Br. at 33 (citing *LaValle v. Delle Rose*, 410 U.S. 690, 694 (1973) (per curiam); *Marshall v. Lonberger*, 459 U.S. 422, 433–34 (1983)).  "When competing testimony is presented on a single issue decided in the government's favor, a federal habeas court can imply a credibility finding in favor of the government from the state court's decision," but a credibility finding is *not* implied where multiple issues were contested at the trial court.  *Taylor v. Grounds*, 721 F.3d 809, 822 n.3 (7th Cir. 2013).  The trial judge did expressly overrule Logan's claim based on issues other than the existence of the alibi-witness meeting.  In short, this is not a case where the Court is "mistak[ing] silence for legal error."  *Id.* (citing *LaVallee*, 410 U.S. at 694).  There is therefore no reason to assume that the trial court implicitly credited Kelly's testimony regarding the alibi-witness meeting.  Indeed, the Court noted in its earlier decision that the fact that the trial court "made no reference at all" to certain portions of Kelly's testimony "suggests that the circuit judge either did not credit Kelly's testimony on these points or, at least, did not consider the points significant."  *Logan*, 999 F. Supp. 2d at 1072.

**Conclusion**

The Clerk is directed to substitute Tarry Williams as the respondent in this case. For the reasons stated above, the Court grants the petitioner's section 2254 motion [dkt. no. 76]. The exact nature of the relief to be provided given Logan's post-filing completion of his sentence is not readily apparent. The Court assumes that the remedy is to vacate the conviction but to allow the state to prosecute Logan anew. But input is required before entry of final judgment. The parties are directed to confer on this point promptly and are to file a joint status report stating their respective positions on the form of relief by no later than July 10, 2023. A telephonic status hearing is set for July 12, 2023 at 9:20 a.m., using call-in number 888-684-8852, access code 746-1053.

MATTHEW F. KENNELLY
United States District Judge

Date: June , 2023

30